## No. 2014-1114

_____

# United States Court of Appeals
# for the Federal Circuit

_____

BARD PERIPHERAL VASCULAR, INC. AND DAVID GOLDFARB, M.D.,
*Plaintiffs-Appellees*,
and

C.R. BARD, INC.
*Counterclaim Defendant-Appellee*
*v.*

W.L. GORE & ASSOCIATES, INC.,
*Defendant-Appellant*
and

JASON DANIELS,
*Defendant*.

_____

**Appeal From The United States District Court For The District of Arizona
In Case No. 03-CV-00597, Judge Mary H. Murguia**

_____

**BRIEF OF APPELLANT W.L. GORE & ASSOCIATES, INC.**

_____

| JAMES PORADEK | JARED B. BRIANT | MICHAEL E. FLOREY |
|---|---|---|
| FAEGRE BAKER DANIELS LLP | LESLIE B. PRILL | DEANNA REICHEL |
| 90 South Seventh Street | FAEGRE BAKER DANIELS LLP | FISH & RICHARDSON P.C. |
| Minneapolis, MN 55402 | 1700 Lincoln Street | 60 South Sixth Street |
| (612) 766-7000 | Denver, CO 80203 | Minneapolis, MN 55402 |
| | (303) 607-3500 | (612) 337-2505 |

*Attorneys for Defendant-Appellant W.L. Gore & Associates, Inc.*

December 10, 2013

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant W.L. Gore & Associates, Inc. hereby certifies the following:

1. The full name of the party represented by me is: W.L. Gore & Associates, Inc.

2. The name of the real party in interest represented by me is: N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court and in previous appeals to this Court or are expected to appear in this Court are:

**FAEGRE BAKER DANIELS LLP**
James Poradek
Kevin Wagner
Jared Briant
Leslie Prill

**FISH & RICHARDSON P.C.**
Michael Florey
Deanna Reichel
Frank Porcelli
John Dragseth
David Pfeffer
Juanita Brooks
Roger Denning

**FARR & TARANTO**
Richard Taranto

**GRIMWOOD LAW FIRM PLC**
Newton Grimwood
Helen Grimwood

**OSBORN MALEDON PA**
William Maledon
Brett Dunkelman

**LOCKE LORD BISSELL & LIDDELL LLP**
David Pfeffer
Harry Marcus
James Gould
Matthew Blackburn
Steven Purdy
Joseph Farco
Arnold Rady

December 10, 2013
Date

/s/ James Poradek
James Poradek

i

# TABLE OF CONTENTS

<u>SECTION</u>                                                                                           <u>PAGE</u>

STATEMENT OF RELATED CASES ................................................................ viii

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................... 2

STATEMENT OF THE CASE ............................................................................ 2

STATEMENT OF FACTS .................................................................................. 6

      A.    The 1980 Agreement Granted Bard All Substantial Rights in the
           '135 Patent, Including the Exclusive Right to Practice, Enforce,
           and Sublicense the '135 Patent .......................................................... 7

      B.    There Is No Writing Constituting a Present Assignment or
           Transfer of Bard's Rights in the '135 Patent to IMPRA/BPV ............ 12

      C.    After the Purported 1996 Transfer to IMPRA/BPV, Bard
           Consistently Represented to Federal Courts That It Was the
           Real Party in Interest and Held the Rights in the '135 Patent ............ 13

           1.    A 1984 Settlement Agreement Between Gore and Bard
                  Gave Gore an Option to Sublicense the '135 Patent at 5% ...... 13

           2.    Between 1997 and 2002, Bard Tried to Void Gore's
                  Option to the '135 Patent and Repeatedly Represented
                  That Bard, Not IMPRA/BPV, Held the Rights to the '135
                  Patent ...................................................................................... 15

           3.    Bard Repeatedly Represented to This Court in *Cooper I*
                  and *Cooper II* That It Was the Licensee and Real Party in
                  Interest for the '135 Patent ...................................................... 16

SUMMARY OF THE ARGUMENT ................................................................. 18

ARGUMENT ..................................................................................................... 20

I.      STANDARD OF REVIEW ......................................................................... 20

II.     THE COURT HAS A CONSTITUTIONAL OBLIGATION TO
        REVIEW STANDING DE NOVO EVEN AT THIS LATE STAGE
        OF THE LITIGATION ..................................................................21

III.    THE DISTRICT COURT LACKED SUBJECT MATTER
        JURISDICTION BECAUSE NEITHER NAMED PLAINTIFF HAD
        CONSTITUTIONAL STANDING .............................................23

        A.   Goldfarb Lacks Constitutional Standing Because He Conveyed
             All Substantial Rights in the '135 Patent to Bard ...............23

        B.   IMPRA/BPV Lacks Constitutional Standing Because Bard
             Never Assigned Its Rights in a Written Instrument ............37

IV.     THE CASE MUST BE DISMISSED AND THE JUDGMENT
        BELOW VACATED FOR LACK OF SUBJECT MATTER
        JURISDICTION ...........................................................................44

V.      GORE'S CONDITIONAL APPEAL ............................................45

        A.   Factual Record Relating to Gore's Joint Inventorship Defense..........45

        B.   Gore's Defense That Its Employee Peter Cooper Was a Co-
             Inventor Was Objectively Reasonable .................................48

             1.   The Law of Joint Inventorship...............................48

             2.   Gore Presented Credible Evidence That Cooper Was a
                  Co-Inventor ..........................................................49

        C.   Judge Newman's Dissenting Opinions Are Persuasive Evidence
             That Gore Relied on a Reasonable Defense to Bard's
             Infringement Charge............................................................54

        D.   The District Court Failed to Apply the Objective
             Reasonableness Test............................................................56

        E.   The Court Should Remand the Case to the District Court for a
             New Trial or in the Alternative for a Decision on Gore's
             Motion for New Trial ..........................................................59

CONCLUSION ..................................................................... 60

iii

# TABLE OF AUTHORITIES

PAGE(S)

**FEDERAL CASES**

*Abbott Point of Care Inc. v. Epocal, Inc.*,
   666 F.3d 1299 (Fed. Cir. 2012) ..............................................................20, 21, 32

*Abraxis Bioscience, Inc. v. Navinta LLC*,
   625 F.3d 1359 (Fed. Cir. 2010) ...................................................................40, 44

*Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*,
   604 F.3d 1354 (Fed. Cir. 2010) ......................................................24, 27, 34, 35

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
   434 F.3d 1336 (Fed. Cir. 2006) ..............................................................25, 36, 37

*Asymmetrx, Inc. v. Biocare Med., LLC*,
   582 F.3d 1314 (Fed. Cir. 2009) .........................................................................25

*Asyst Technologies, Inc.v Empak, Inc.*,
   No. C98-20451, 2006 WL 3302476 (N.D. Cal. Nov. 14, 2006) ........................56

*Baltimore & Ohio R.R. v. United States*,
   279 U.S. 781 (1929) ..........................................................................................44

*Bard Peripheral Vascular, Inc. v. W. L. Gore & Assoc., Inc.*,
   670 F.3d 1171 (Fed. Cir. 2012) ("*Bard I*") ............................   x, 5, 53, 54

*Bard Peripheral Vascular, Inc. v. W. L. Gore & Assoc., Inc.*,
   682 F.3d 1003 (Fed. Cir. 2012) ("*Bard II*") ……………………...x, 5, 49, 50, 55

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) ..........................................................................48

*Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*,
   824 F.2d 765 (9th Cir. 1987) .............................................................................44

*Diamond Rubber Co. v. Consolidated Rubber Tire Co.*,
   220 U.S. 428 (1911) ....................................................................................49, 58

*Durel Corp. v. Osram Sylvania Inc.*,
   256 F.3d 1298 (Fed. Cir. 2001) .........................................................................22

*Enzo APA & Son, Inc. v. Geapag A.G.*,
　　134 F.3d 1090 (Fed. Cir. 1998) ..................................................................passim

*Ethicon, Inc. v. U.S. Surgical Corp.*,
　　135 F.3d 1456 (Fed. Cir. 1998) ..........................................................................48

*Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*,
　　357 F.3d 1266 (Fed. Cir. 2004) ..........................................................................22

*Fina Oil & Chem. Co. v. Ewen*,
　　123 F.3d 1466 (Fed. Cir. 1997) ....................................................................48, 49

*FW/PBS v. City of Dallas*,
　　493 U.S. 215 (1990) ............................................................................................22

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
　　687 F.3d 1300 (Fed. Cir. 2012) ..........................................................................58

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
　　248 F.3d 1333 (Fed. Cir. 2001) ..........................................................................36

*Int'l Gamco, Inc. v. Multimedia Games, Inc.*,
　　504 F.3d 1273 (Fed. Cir. 2007) ..........................................................................27

*Mars, Inc. v. Coin Acceptors, Inc.*,
　　527 F.3d 1359 (Fed. Cir. 2008) ..........................................................7, 20, 41, 42

*McNeilab, Inc. v. Scandipharm, Inc.*,
　　No. 94-1508, 1996 WL 431352 (Fed. Cir. July 31, 1996) ...........................31, 37

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
　　244 F.3d 1365 (Fed. Cir. 2001) ..............................................................22, 39, 40

*Nat'l Org. of Women, Inc. v. Scheidler*,
　　510 U.S. 249 (1994) ............................................................................................22

*Newman v. Quigg*,
　　877 F.2d 1575 (Fed. Cir. 1989) ..............................................................49, 50, 52

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
　　320 F.3d 1354 (Fed. Cir. 2003) ..........................................................................22

*Paper Converting Machine Co. v. Magna-Graphics Corp.*,
   785 F.2d 1013 (Fed. Cir. 1986) .......................................................55, 56

*Penske Logistics, Inc. v. KLLM, Inc.*,
   285 F. Supp. 2d 468 (D.N.J. 2003) .......................................................34

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*,
   12 F. Supp. 2d 69 (D. Mass. 1998) .......................................................53

*Peter B. Cooper v. David Goldfarb*,
   240 F.3d 1378 (Fed. Cir. 2001) ("*Cooper II*") ............................passim

*Peter B. Cooper v. David Goldfarb*,
   154 F.3d 1321 (Fed. Cir. 1998) ("*Cooper I*") ............................passim

*Prima Tek II, L.L.C. v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000) .......................................................13, 31

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ("PRE") .......................................................50

*Sicom Sys. Ltd. v. Agilent Tech., Inc.*,
   427 F.3d 971 (Fed. Cir. 2005) .......................................................20

*Speedplay, Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000) ............................................passim

*State Contracting & Eng. Corp. v. Condotte America, Inc.*,
   346 F.3d 1057 (Fed. Cir. 2003) .......................................................56

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .......................................................21, 23

*United States v. Hays*,
   515 U.S. 737 (1995) .......................................................2, 19, 21

*United States v. Morgan*,
   307 U.S. 183 (1939) .......................................................44

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
   944 F.2d 870 (Fed. Cir. 1991) ............................................passim

*Waterman v. Mackenzie*,
138 U.S. 252 (1891) ........................................................................24

STATE CASES

*Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer*,
755 A.2d 637 (N.J. Super. Ct. App. Div. 2000) ..................................32

*Matter of Fairfield Gen. Corp.*,
383 A.2d 98 (N.J. 1978) ....................................................................34

FEDERAL STATUTES

28 U.S.C. § 1295(a)(1) ...........................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1338(a) ...............................................................................1

28 U.S.C. § 2201(a) ...............................................................................1

28 U.S.C. § 2202 ....................................................................................1

35 U.S.C. § 116 ....................................................................................48

35 U.S.C. § 261 ..............................................................................passim

vii

## STATEMENT OF RELATED CASES

There are four previous appeals to this Court from the district court proceedings from which this appeal arises, Case No. 03-CV-00597 (D. Ariz.). In No. 2009-1345, Defendant-Appellant W.L. Gore & Associates, Inc. ("Gore") appealed the district court's March 31, 2009 denial of certain post-trial motions. In No. 2009-1359, Plaintiffs-Appellees Bard Peripheral Vascular, Inc. ("BPV") and David Goldfarb, MD ("Goldfarb") and Counterclaim Defendant-Appellee C.R. Bard, Inc. ("Bard") (collectively "Appellees") cross-appealed the district court's March 31, 2009 order. Before briefing on the merits, a panel of this Court (Mayer, Clevenger, and Rader) granted Appellees' motion to dismiss Gore's appeal. 346 Fed. Appx. 580 (Fed. Cir. Aug. 17, 2009). Appellees then filed an unopposed motion to dismiss their cross-appeal, which the Court granted in an order signed by the Clerk. 346 Fed. Appx. 592 (Fed. Cir. Sept. 11, 2009).

In No. 2010-1510, Gore appealed the amended final judgment of the district court, entered on August 24, 2010, and in No. 2010-1542, Appellees cross-appealed. Appellees later filed a motion to voluntarily dismiss the cross-appeal, which the Court granted in an order signed by the Clerk. 405 Fed. Appx. 501 (Fed. Cir. Dec. 28, 2010). In No. 2010-1510, on February 10, 2012, a panel of this Court (Newman, Gajarsa, and Linn) affirmed the judgment of the district court, with Judge Newman dissenting. 670 F.3d 1171 (Fed. Cir. 2012) ("*Bard I*"). Gore filed

viii

a combined petition for panel rehearing and rehearing *en banc*. The *en banc* Court granted Gore's petition for the limited purpose of authorizing the panel to revise the portion of its opinion addressing willfulness, vacated the panel opinion in part, and returned the appeal to the panel to issue a revised opinion. 476 Fed. Appx. 747 (Fed. Cir. June 14, 2012) (en banc). On June 14, 2012, with Judge Newman concurring-in-part and dissenting-in-part, the panel issued an opinion vacating two sections of its original opinion, section E (relating to willfulness) and the portion of section F relating to the panel's discussion of willfulness, and remanded the issue of willfulness to the district court. 682 F.3d 1003 (Fed. Cir. 2012) ("*Bard II*").

As indicated in BPV and Goldfarb's brief in No. 2010-1510, the two previous appeals to this Court arising out of the interference concerning the patent-in-suit, U.S. Patent No. 6,436,135 ("'135 patent"), also relate to this case: *Peter B. Cooper v. David Goldfarb,* No. 97-1302, 154 F.3d 1321 (Fed. Cir. Sept. 1, 1998) (Clevenger, Skelton, and Schall) ("*Cooper I*"), and *Peter B. Cooper v. David Goldfarb,* No. 00-1046, 240 F.3d 1378 (Fed. Cir. Mar. 2, 2001) (Clevenger, Rader, and Schall) ("*Cooper II*"). As related to this appeal, in Goldfarb's appeal briefs in both *Cooper I* and *Cooper II*, counsel for Goldfarb and Bard listed Bard in the Certificate of Interest as the real party in interest, because, as counsel stated, Bard was "the licensee of the application." (A2511; A3902; A4110.)

As indicated in Appellee's brief in No. 2010-1510, the '135 patent was asserted in *Bard Peripheral Vascular, Inc. v. Atrium Medical Corp. and Endologix, Inc.*, No. 2:10-cv-01694-DGC (D. Ariz.). That suit was filed on August 10, 2010, and it was dismissed on November 15, 2011.

There are two additional lawsuits that relate to the '135 patent. As part of a March 1984 settlement agreement resolving *W.L. Gore & Associates, Inc. and Gore Enterprise Holdings, Inc. v. C.R. Bard, Inc.*, No. 84-cv-00720 (D.N.J.), Bard granted Gore an option to license the then-pending '135 patent. Then, on January 31, 1997, Bard filed a declaratory judgment action against Gore in the District of New Jersey, No. 97-cv-00517, seeking to have the option it granted Gore rescinded. On August 14, 2000, the district court in that case rejected Bard's request, and on December 6, 2001, the Third Circuit affirmed. *C.R. Bard, Inc. v. W.L. Gore & Associates, Inc.*, Civil Action No. 97-517 (D.N.J. Aug. 14, 2000), *aff'd* No. 00-2728, 281 F.3d 219 (3rd Cir. Dec. 6, 2001) (unpublished), *cert denied*, 535 U.S. 1055 (May 13, 2002).

Finally, in November 2012, Gore petitioned for *ex parte* reexamination of the patent-in-suit at the United States Patent and Trademark Office ("PTO"), Control No. 90/012,716. On January 23, 2013, the PTO granted Gore's reexamination request, and a reexamination certificate confirming the validity of the challenged claims issued on July 26, 2013.

x

# STATEMENT OF JURISDICTION

Plaintiffs IMPRA/BPV[1] and Goldfarb alleged district court jurisdiction under 28 U.S.C. §§ 1331, 1338(a), 2201(a), and 2202. (A221, ¶3.) Because Goldfarb transferred all substantial rights in the '135 patent to Bard in 1980 and Bard never validly transferred its interest in the '135 patent to IMPRA/BPV, neither IMPRA/BPV nor Goldfarb had standing to bring suit against Gore for patent infringement in the District of Arizona, and the district court lacked subject matter jurisdiction over this case. The district court, nevertheless, heard this case and entered orders in the remanded proceedings on October 16, 2013 and October 30, 2013 ordering that Gore is not entitled to reconsideration of JMOL on the issue of willful infringement, denying Gore's motion for a new trial, and granting IMPRA/BPV and Goldfarb's motion for leave to execute the district court's August 24, 2010 Amended Clerk's Judgment. Gore timely filed its Notice of Appeal on November 18, 2013, and this Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

---

[1] BPV is a subsidiary of C.R. Bard, Inc. ("Bard"), and it was named IMPRA, Inc. ("IMPRA") until 2003, when it underwent a name change and became BPV. (A277.) At the time the complaint in this action was filed, March 28, 2003, this entity was still named IMPRA. (A220.) Accordingly, Gore generally refers to this entity as "IMPRA/BPV."

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether Goldfarb transferred all substantial rights in the '135 patent to Bard in a 1980 license agreement.

2.      Whether IMPRA/BPV did not obtain Bard's rights in the '135 patent prior to the filing of the complaint in 2003 because no written assignment exists as required for a valid transfer under 35 U.S.C. § 261.

3.      Whether Goldfarb and IMPRA/BPV lacked constitutional standing because at the time they filed suit they did not hold substantial rights in the '135 patent, thereby necessitating vacatur of the judgment and a remand of this case for dismissal for lack of standing.

4.      Whether the district court erred in declining to grant judgment as a matter of law of no willful infringement to Gore and in declining to decide Gore's motion for a new trial.

## STATEMENT OF THE CASE

The primary issue raised in this appeal is constitutional standing. A fundamental principle under Article III of the Constitution is that the issue of standing is never waived and federal courts have "an independent obligation" to examine standing at all stages of the litigation. *United States v. Hays*, 515 U.S. 737, 742 (1995). A robust jurisdictional review is essential in this case because the plaintiffs who obtained the enormous money judgment below—IMPRA/BPV and

2

Goldfarb—did not have constitutional standing to file suit. In 1980, Goldfarb conveyed in writing all substantial rights in the '135 patent to Bard. This means that Goldfarb did not have standing to bring this action. Likewise, while IMPRA/BPV contends that it obtained Bard's interest in the '135 patent in 1996, it never produced a written assignment of the '135 patent as required under 35 U.S.C. § 261. This means that IMPRA/BPV did not have standing to bring this action. In fact, Bard itself repeatedly told federal courts in the years following the purported transfer of its rights to IMPRA/BPV in 1996 that ***Bard*** (not IMPRA/BPV) continued to own the rights to the '135 patent. During the appeal in *Cooper I* and *Cooper II* from 1997 to 2000, for example, Bard consistently represented to this Court that Bard was "the real party in interest" to the interference proceedings, and that Bard was "the licensee of the application." (A2511; A3902; A4110.) Bard made similar representations that it owned the '135 patent in a lawsuit it filed in the District of New Jersey in January 1997. Thus, Bard itself agreed for years with the standing analysis in this brief that IMPRA/BPV did not obtain the right to assert the '135 patent in 1996.

Here is the procedural history of this case: On March 28, 2003, Goldfarb and IMPRA/BPV sued Gore in the District of Arizona for infringement of the '135 patent based on Gore's expanded polytetrafluoroethylene ("ePTFE") vascular graft products. (A221.) In the complaint, IMPRA/BPV alleged that it was the exclusive

3

licensee of the '135 patent and that it sold vascular graft products covered by the '135 patent. (*Id.* at ¶5.) On April 18, 2003, Gore answered and brought counterclaims against IMPRA/BPV and Goldfarb for declaratory judgments of noninfringement, invalidity, and unenforceability of the '135 patent. (A229-59.) Gore also added Bard as a counterclaim defendant. (*Id.* at A243-45.) Bard, however, answered the counterclaims on May 12, 2003 and specifically stated that "Bard denies that it has asserted in this litigation that Gore infringes the '135 patent." (A274, ¶96.) Moreover, in four separate interrogatory responses, Bard specifically denied that it contended Gore infringed the '135 patent: "Counterdefendant Bard is not a plaintiff in this action and has not alleged that Gore infringes the '135 patent." (A637, at No. 1; A648, at No. 1; *see also* A628-29, at No. 2; A688, at No. 6.) Thus, Bard was not a party to the infringement-related claims or counterclaims in this case. For this reason, Bard was not a party to the infringement judgment. (A73-74, ¶1.)

A jury trial was held between November 2, 2007 and December 11, 2007. (A177; A187.) During the trial, on November 16, 2007, Gore filed a Motion for Judgment as a Matter of Law Regarding Plaintiffs' Lack of Standing. (A284.) The jury reached a verdict on December 11, 2007, finding, *inter alia*, that Gore had infringed and willfully infringed the asserted claims and that the asserted claims

4

were not invalid. (A84-102.) In post-trial rulings on July 29, 2008, the district court denied Gore's motion on standing. (A48.)

On August 12, 2008, Gore again raised the standing defect in this case by filing a Motion Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) to Dismiss Plaintiff's Complaint for Lack of Standing or in the Alternative Under Fed. R. Civ. P. 50(b) for Judgment as a Matter of Law. (A473.) The district court denied Gore's motion on March 31, 2009 (A71), and it entered an amended final judgment August 24, 2010 naming Goldfarb and IMPRA/BPV as the parties to the infringement judgment (A73-74, ¶1).

Gore timely appealed the August 24, 2010 amended final judgment, and on February 10, 2012, this Court affirmed the judgment of the district court with Judge Newman dissenting. *Bard I*, 670 F.3d 1171 (Fed. Cir. 2012). After the *en banc* Court granted Gore's petition for rehearing, on June 14, 2012, the panel issued an opinion vacating section E (relating to willfulness) and the portion of section F relating to the panel's discussion of willfulness of the February 10, 2012 opinion and remanded the issue of willfulness to the district court. *Bard II*, 682 F.3d 1003 (Fed. Cir. 2012).

In the remanded proceedings, the district court reaffirmed the willfulness

finding, denied Gore's motion for a new trial, and granted the plaintiffs' motion for

partial execution of the judgment.  (A20; A23; A24-27.)

## STATEMENT OF FACTS

The plaintiffs' argument that they had standing to bring suit in the District of

Arizona under the '135 patent in 2003 rested on two principle assertions:  (1) in

1980, Goldfarb purportedly transferred *fewer* than all substantial rights in the '135

patent to Bard through a written agreement ("1980 Agreement") (A291-314)[2]; and

(2) in 1996, Bard purportedly transferred its rights in the '135 patent to

IMPRA/BPV through an implied-in-fact transfer.  (A724-25; A727-28; A733-38.)

It is essential to the plaintiffs' standing argument that the 1980 Agreement be

viewed as a transfer of fewer than all substantial rights.  This is why:  If, when

properly viewed, the 1980 Agreement did transfer all substantial rights, then

Goldfarb did not retain any rights permitting him to be a party to this litigation.

Moreover, because Goldfarb and IMPRA/BPV have not produced a written

instrument of the 1996 transfer (and do not appear to contend that one has ever

---

[2] The 1980 Agreement specifically makes the transfer of rights from Goldfarb to "USCI Surgical Products Division, C. R. Bard, Inc. ('USCI')."  (A291.)  For the purposes of clarity in this brief, Gore refers to Bard, not USCI, as the receiving entity of the rights transferred by the 1980 Agreement.  Bard apparently sold its USCI division to another company after September 1996.  (A41.)

existed), there would be no effective transfer of Bard's rights in the '135 patent to

IMPRA/BPV,[3] and IMPRA/BPV would have no standing to participate in this suit.

Two sources confirm that the 1980 Agreement transferred all substantial

rights to Bard and that Bard did not transfer its interest in the '135 patent to

IMPRA/BPV.  First, the Agreement itself demonstrates that Goldfarb transferred

all substantial rights in the '135 patent to Bard in 1980.  Second, after the

purported (but undocumented) 1996 transfer between Bard and IMPRA/BPV, Bard

made repeated representations in the District of New Jersey and to this Court that

Bard (not IMPRA/BPV) was the real party in interest with respect to the '135

patent and retained the exclusive rights in the '135 patent.

**A.    The 1980 Agreement Granted Bard All Substantial Rights in the '135
       Patent, Including the Exclusive Right to Practice, Enforce, and
       Sublicense the '135 Patent.**

The 1980 Agreement is central to the standing issue in this case.  The 1980

Agreement was executed by Goldfarb and Bard on September 23, 1980.  It granted

Bard all substantial rights in Goldfarb's prosthetic vascular graft technology,

---

[3] Bard argued below that a purported 1997 amendment to the 1980 Agreement constitutes a written instrument transferring Bard's rights in the '135 patent to IMPRA/BPV.  (A45-46; A61; A731.)  But as Gore explains below, the 1997 amendment was only an after-the-fact confirmation of a transfer that had purportedly already happened in 1996 and cannot satisfy the written instrument requirement of 35 U.S.C. § 261.  (A317.)  *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1371-72 (Fed. Cir. 2008).

including U.S. Patent Application Serial No. 517,415, entitled "Prosthetic Vascular Graft," the application which eventually issued as the asserted '135 patent.

The 1980 Agreement represents that Goldfarb "is the inventor of certain inventions relating to vascular prostheses made from polytetrafluoroethylene ('PTFE') that has been expanded," and that Goldfarb "wishes to have such inventions commercialized and has offered to grant USCI exclusive, worldwide licenses under any patents that issue based on such inventions as now exist or as he may make or own, except heart valves derived from cooperative research with Shiley Scientific, Inc. (HEART VALVES)." (A291.) Thus, the 1980 Agreement was not limited only to the application leading to the '135 patent, but covered a broader range of inventions, improvements, and potential patents.

Specifically, under Section 1.1, the subject matter relating to the 1980 Agreement is defined as "prostheses for replacing, repairing or bypassing blood vessels of the human body except HEART VALVES ("VASCULAR PROSTHESES")." (A292, ¶1.1.) With respect to this subject matter, Goldfarb represented:

> [H]e is the owner of the entire, right, title and interest in and to the inventions that are disclosed and claimed in the patent applications listed in Exhibit A, which is a part of this Agreement, and to those inventions that are identified in Exhibit A but that are not the subject of a patent application listed therein ("INVENTIONS"). DR. GOLDFARB contemplates performing additional research such that after the EFFECTIVE DATE he may make or own inventions that are

8

betterments to or improvements upon PTFE GRAFTS ("IMPROVEMENTS").

(*Id.* at ¶1.2.)  Notably, the application resulting in the '135 patent is listed first in Exhibit A, and thus is expressly made a "part of this Agreement."  (*Id.* at ¶1.3; A310.)

Under Section 1.3, the 1980 Agreement is directed to "PATENTS," which are defined as patents issuing from the specifically defined "INVENTIONS" and "IMPROVEMENTS" that were included within the scope of the agreement.  (*Id.* at ¶1.3.)  In other words, "INVENTIONS" and "IMPROVEMENTS"  are subject matter on which applications for patents can be filed, and the "PATENTS" included within the scope of the agreement are those patents which issue from the defined "INVENTIONS" and "IMPROVEMENTS."

There is one explicit exclusion of Goldfarb inventions from the subject matter in the 1980 Agreement.  The 1980 Agreement references "cooperative research" that Goldfarb may do with a company called Shiley Scientific, Inc., and it excludes inventions relating to "heart valves derived from cooperative research with Shiley Scientific, Inc. (HEART VALVES)" from the agreement.  (A291; *see also* A292, ¶1.2.)  It also excludes improvements relating to the defined term "HEART VALVES" from the agreement:  "DR. GOLDFARB shall disclose to USCI all IMPROVEMENTS except HEART VALVES promptly after he invents or owns same and shall take all such steps as USCI reasonably requests in respect

9

to assisting USCI to obtain PATENTS based thereon." (A297, ¶3.1; *see also* A291; A292, ¶¶1.1-1.2.) Thus, the patents covered by the Agreement include the defined "PATENTS" relating to "VASCULAR PROSTHESES," including the '135 patent, and exclude any patents relating to Goldfarb's work with Shiley Scientific involving heart valves.

Under Section 1.4, the grant provided by the 1980 Agreement is directed to "PATENTS" (of which the '135 patent is one) but not "HEART VALVES," and the agreement conveys to Bard "worldwide, exclusive licenses, with the right to sublicense, to make, use and sell products covered by PATENTS except HEART VALVES." (A292, ¶1.4.) The inclusion of the defined term "HEART VALVES" in Section 1.4 of the Agreement makes clear that any patents or applications stemming from Goldfarb's cooperative work with Shiley Scientific are not included within the grant in Section 1.4. This understanding is further made clear in the relevant "whereas" clause of the Agreement, which provides: "DR. GOLDFARB wishes to have such inventions commercialized and has offered to grant USCI exclusive, worldwide licenses under ***any patents that issue based on such inventions*** as now exist or as he may make or own, ***except heart valves derived from cooperative research with Shiley Scientific, Inc.*** (HEART VALVES)." (A291 (emphasis added); *see also* A304-05, ¶5.4.)

10

In addition to the "worldwide, exclusive license[], with the right to sublicense, to make, use and sell products covered by" the '135 patent (A292, ¶1.4), Bard enjoyed "sole discretion to file, control, defend and settle" all claims and actions relating to the granted "PATENTS" (A303-04, ¶5.3). Bard could, but was not required to, request that Goldfarb assist in litigation filed by Bard seeking to enforce a patent or assist in an action brought by a third party seeking to declare a patent invalid. (*Id.*)

Bard's ability to sublicense to any third party of its choosing was effectively unfettered. In the event that Bard granted a sublicense to a third party, Bard was presumptively required to pay Goldfarb a royalty of 5% of the net selling price of the products that were sublicensed. (*Id.*) However, if Bard made a "good faith, but unsuccessful, effort to grant a sublicense at a royalty rate in excess of 5%, but is successful in granting the sublicense at a rate of 5% or less, then [Bard] shall pay to DR. GOLDFARB a royalty of one-half of the rate agreed to by [Bard] and the third party." (*Id.*) The agreement does not provide any lower limit on the sublicense rate at which Bard can license a third party.

Finally, the 1980 Agreement "and the performance, rights and obligations of the Parties thereunder" is governed by New Jersey law. (A307, ¶6.5.)

11

**B.    There Is No Writing Constituting a Present Assignment or Transfer of Bard's Rights in the '135 Patent to IMPRA/BPV.**

Bard purchased IMPRA in 1996 and changed its name to "Bard Peripheral Vascular" in 2003 after the lawsuit was filed.  (A277.)  As a result of the 1996 purchase, IMPRA/BPV became an independent, wholly owned subsidiary of Bard. Bard has repeatedly emphasized that Bard and IMPRA/BPV are separate corporate entities.  (*See, e.g.*, A524, ¶16; A537, ¶13.)

To support standing in this case, IMPRA/BPV alleged that there was a transfer of the 1980 Agreement from Bard to IMPRA/BPV in connection with the 1996 purchase of IMPRA by Bard.  (A736-38.)  However, the plaintiffs have not produced any writings constituting a present assignment or transfer of Bard's rights in the '135 patent to IMPRA/BPV.  In fact, the plaintiffs and Bard admitted below in response to requests for admission that they had "not located a separate document assigning Bard's License Agreement with Dr. Goldfarb to IMPRA." (A615, No. 245; A619, No. 95; A622-23, No. 2.)

For evidence of the purported 1996 transfer, the plaintiffs point to a February 21, 1997 amendment agreement executed by Goldfarb and IMPRA/BPV ("1997 Amendment") (A317-21).  But the plain language of 1997 Amendment demonstrates that it is not a present assignment.  Rather, it merely identifies a transfer that the parties contend already happened:  "[O]n September 16, 1996, BARD acquired IMPRA and thereafter assigned and transferred the License

12

Agreement to IMPRA along with responsibility for management of BARD's vascular graft business." (A317.)[4]

## C. After the Purported 1996 Transfer to IMPRA/BPV, Bard Consistently Represented to Federal Courts that it was the Real Party in Interest and Held the Rights in the '135 Patent.

For years after the purported 1996 transfer of the '135 patent to IMPRA/BPV, Bard represented to federal courts—including this one—that it continued to hold the rights in the '135 patent. To give context for Bard's representations, it is necessary to provide a brief description of patent litigation between Gore and Bard in 1984 involving a Gore patent, U.S. Patent No. 4,187,390 ("'390 patent").

### 1. A 1984 Settlement Agreement Between Gore and Bard Gave Gore an Option to Sublicense the '135 Patent at 5%.

In February 1984, Gore sued Bard in the District of New Jersey for infringement of five claims of Gore's '390 patent, which has an effective filing date of May 21, 1970 and is directed to ePTFE. In about March 1984, Bard settled, and, as a condition of the settlement, Bard gave Gore an option to sublicense the patent application which ultimately issued as the '135 patent at a 5%

---

[4] In 2007, long after this case was filed, Goldfarb executed an "Assignment of Patent Rights Agreement" that conveyed his remaining rights in the '135 patent to IMPRA/BPV. (*See* A352.) However, this 2007 agreement has no effect on the standing analysis because Goldfarb had already conveyed all substantial rights in the patent to Bard in the 1980 Agreement. *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1382 (Fed. Cir. 2000) ("[A]n owner or licensee of a patent cannot convey that which it does not possess.").

royalty rate. (A544-45, ¶3.) In the 1984 settlement agreement, Bard stated that it would "take all steps necessary and possible . . . to continue to have the right" to be able to sublicense Gore in the future. (*Id.*) The parties also agreed that Bard could terminate the option "in its sole discretion" if all five claims of the '390 patent asserted against Bard were held invalid by a final judgment from which no appeal was taken or could be taken. (A546, ¶6.)

Later in 1984, Gore sued IMPRA (which at that time had not yet been acquired by Bard) in the District of Arizona for infringing four claims of Gore's '390 patent. (A537, ¶13.) In 1990, the trial court found that the asserted claims were invalid, but the parties settled the case on appeal and agreed to seek a vacatur of the invalidity judgment below. (A537-38, ¶15.) Upon a motion of the parties, the Arizona district court vacated the invalidity judgment in 1993. (A539, ¶¶16-17.)

Then, in 1994, Bard gave Gore notice that it intended to terminate Gore's 5% option to the '135 patent based on the vacated invalidity judgment in the IMPRA litigation. On January 31, 1997, Bard filed a declaratory judgment action in the District of New Jersey to terminate the option. (A534-41.) Significantly, this suit was filed *after* Bard's 1996 acquisition of IMPRA and *after* the purported transfer of Bard's rights in '135 patent to IMPRA.

14

2. **Between 1997 and 2002, Bard Tried to Void Gore's Option to the '135 Patent and Repeatedly Represented that Bard, Not IMPRA/BPV, Held the Rights to the '135 Patent.**

In its January 1997 complaint filed in the District of New Jersey, Bard stated that "Bard granted Gore an option ['the Gore Option'] to obtain, in the future, a license to any patent issued or thereafter issuing to Bard as a result of a then-pending patent application *owned by Bard* ('the Goldfarb application')." (A536, ¶10 (emphasis added).) Bard then characterized the pending interference relating to the '135 patent (the interference at issue in this Court's opinions in *Cooper I* and *Cooper II*) as a proceeding that was taking place between "*Bard* and Gore." (*Id.* at ¶11 (emphasis added).) Nowhere in Bard's complaint did it suggest that IMPRA/BPV held rights in the '135 patent or that just prior to initiating suit it had transferred its interest in the '135 patent to IMPRA/BPV.[5]

To the contrary, Bard continued to represent throughout the New Jersey litigation that *Bard* owned the rights to the '135 patent. In April 1997, Bard Vice President and General Counsel Richard A. Flink submitted a declaration to the New Jersey court in which he emphasized that the '135 patent application had "tremendous economic value to Bard." (A524, ¶14.) Flink also stated that, "[i]n

---

[5] Bard's failure to mention IMPRA/BPV's now-purported interest in the '135 patent did not stem from a view in 1997 that IMPRA was merely a subsidiary of Bard. Bard emphasized that IMPRA was a separate corporate entity in its complaint and in a declaration from Bard's general counsel. (A537, ¶13; A524, ¶16.)

15

December 1996, after more than thirteen years of battle, Bard prevailed against Gore in the Patent Office interference proceeding concerning the Goldfarb application, and anticipates that a patent (the 'Goldfarb patent') ***will soon issue to Bard***." (*Id.* (emphasis added).) In November 1998, Flink verified an interrogatory response in which Bard stated that "it has valid rights in the Goldfarb application." (A601, No. 14; A607.) Finally, in April 1999, Flink testified as the corporate representative of Bard during a Rule 30(b)(6) deposition that "***I have no knowledge of an assignment from Bard to IMPRA***, so if my knowledge is correct, then Bard is still the licensee." (A611, 79:3-7 (emphasis added).) All these statements occurred after Bard's now-purported transfer of its rights in the '135 patent to IMPRA/BPV in 1996.

> **3.    Bard Repeatedly Represented to this Court in *Cooper I* and *Cooper II* that It Was the Licensee and Real Party in Interest for the '135 Patent.**

At the same time that Bard represented to the District of New Jersey that it had a proprietary interest in the '135 patent, Bard made similar representations to this Court. During the appeal in *Cooper I* and *Cooper II* arising from the interference proceedings relating to the '135 patent application, Bard repeatedly stated in certificates of interest in Goldfarb's appellate briefs that Bard (not IMPRA) was "the real party in interest" to the interference, and that Bard (not IMPRA) was "the licensee of the application." (A2511; A3902; A4110.) These

briefs were filed on September 11, 1997, February 13, 1998, and March 14, 2000—each after Bard's purported transfer of its interest in the '135 patent to IMPRA/BPV in 1996.

***

The following timeline summarizes the basic background events in this case:



And this timeline summarizes the specific points in *Cooper I*, *Cooper II*, and the New Jersey litigation in which Bard made express representations about possession of patent rights in the '135 patent that contradict its representations in this case:



## SUMMARY OF THE ARGUMENT

The federal district court in Arizona lacked subject matter jurisdiction over this case, which ended in one of the largest damages judgments ever awarded in a patent case. As a matter of law, plaintiff Goldfarb lacked constitutional standing to assert the '135 patent because he granted all substantial rights in the patent to Bard through an agreement executed between the parties in 1980. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir.

1991).  Also as a matter of law, plaintiff IMPRA/BPV lacked standing to assert the

'135 patent because there is no evidence that Bard assigned its rights in the patent

to IMPRA/BPV in a written instrument as required by § 261 of the patent statute.

*Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000).

A fundamental principle under Article III of the Constitution is that the issue

of standing is never waived and federal courts have "an independent obligation" to

examine standing at all stages of the litigation.  *Hays*, 515 U.S. at 742.  Here, a *de*

*novo* review of the plaintiffs' standing is essential because, in denying Gore's

standing motions below, the district court ignored the plaintiffs' standing defects

and reached conclusions that were contrary to established Federal Circuit standing

law.

The plaintiffs were fully aware of these standing problems when they filed

suit in 2003.  The plaintiffs' standing position in this case hinges on their

contention that Bard assigned its rights to the '135 patent to IMPRA/BPV in 1996.

However, the plaintiffs have admitted that they cannot locate a written document

for this purported assignment.  Bard also made a series of statements to federal

courts in other cases (including to this Court in *Cooper I* and *Cooper II*) beginning

shortly after this purported 1996 assignment in which Bard represented that it (not

IMPRA/BPV) held the proprietary rights to the '135 patent.  Indeed, the general

counsel of Bard testified in 1999 that "I have no knowledge of an assignment from

Bard to IMPRA, so if my knowledge is correct, then Bard is still the licensee."

(A611, 79:3-7.)

Bard's prior statements directly contradict the plaintiffs' standing position in this case. They reveal that the plaintiffs and Bard are now engaged in exactly the "revisionist history" that has caused this Court to rigorously enforce the written instrument requirement of § 261 in the context of virtual assignments. *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). Under basic patent standing law, the plaintiffs cannot meet their burden of establishing that they had standing to assert the '135 patent when they filed their complaint. The district court's judgment below should be vacated and the case dismissed for lack of subject matter jurisdiction.

## ARGUMENT

## I.    STANDARD OF REVIEW.

On appeal, this Court reviews the question of standing *de novo* and "without deference" to the district court below. *Abbott Point of Care Inc. v. Epocal, Inc.*, 666 F.3d 1299, 1302 (Fed. Cir. 2012); *Mars*, 527 F.3d at 1367. "The party bringing the action bears the burden of establishing that it has standing." *Sicom Sys. Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). The plaintiffs have the burden on appeal to "show necessary ownership rights to support standing to sue." *Abbott Point*, 666 F.3d at 1302.

The determination of whether a licensor has transferred "all substantial rights" is a question of law that the Court considers *de novo*. *Mars*, 527 F.3d at 1359-60. Under the New Jersey law that governs the 1980 Agreement, contract interpretation is reviewed "without deference." *Abbott Point*, 666 F.3d at 1302 (applying New Jersey law).

## II. THE COURT HAS A CONSTITUTIONAL OBLIGATION TO REVIEW STANDING DE NOVO EVEN AT THIS LATE STAGE OF THE LITIGATION.

Gore acknowledges that it is raising the issue of constitutional standing with this Court at a late stage. Yet a fundamental principle under Article III of the Constitution is that federal courts have "an independent obligation" to examine standing at all stages of the litigation, even when it is raised for the first time on appeal. *Hays*, 515 U.S. at 742. The Supreme Court is unequivocal that "[t]he federal courts are under an independent obligation to examine their own jurisdiction" even when the issue is not raised until the very end of the litigation, and even when it is not raised by the parties at all: "The question of standing is not subject to waiver . . . . [W]e are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us." *Id.* at 742 (citations omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a

cause under review even though the parties are prepared to concede it." (citations and quotations omitted).)  The Supreme Court itself has considered standing arguments raised for the first time at the Supreme Court.  *See, e.g.*, *FW/PBS v. City of Dallas*, 493 U.S. 215, 230 (1990) (standing raised *sua sponte* on appeal to the Supreme Court); *Nat'l Org. of Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994) (standing raised by defendant for the first time on appeal).

Likewise, this Court has repeatedly emphasized the importance of independently examining jurisdiction in patent cases:  "It is well-established that any party, and even the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation, including on appeal."  *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003); *Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004).  Accordingly, this Court has not hesitated to evaluate jurisdiction on its own even when the question was not raised by the parties below.  *See, e.g.*, *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1373 (Fed. Cir. 2001) ("[N]o party here raised the issue of standing in this case, even on appeal. We addressed this question only to satisfy our own jurisdictional obligation."); *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1301 n.1 (Fed. Cir. 2001) ("We nevertheless have addressed [*sua sponte*] the question whether Durel possesses all substantial rights

22

under the patent such that it has standing to sue without joining 3M because that question is jurisdictional.").

Finally, this Court has made it clear that "[w]hen standing is challenged on appeal after a final judgment on the merits, the appellate court determines standing based on an examination of the whole record." *Pandrol*, 320 F.3d at 1367; *see also Steel*, 523 U.S. at 95 ("[I]f the record discloses that the lower court was without jurisdiction this court will notice the defect[.]").

## III. THE DISTRICT COURT LACKED SUBJECT MATTER JURISDICTION BECAUSE NEITHER NAMED PLAINTIFF HAD CONSTITUTIONAL STANDING.

In examining the record below as a whole, the Court will see two fatal standing problems for the named plaintiffs. First, as a matter of law, Goldfarb granted all substantial rights in the '135 patent to Bard in 1980 through a virtual assignment, thereby divesting Goldfarb of standing to assert the patent. Second, as a matter of law, Bard never assigned its interest in the '135 patent to IMPRA/BPV in the written instrument required by the patent law, which means that IMPRA/BPV lacked standing to assert the patent when it filed its infringement complaint. The only entity with standing to assert the '135 patent, Bard, was not a plaintiff in the infringement case below.

### A. Goldfarb Lacks Constitutional Standing Because He Conveyed All Substantial Rights in the '135 Patent to Bard.

Goldfarb lacks constitutional standing because he conveyed all substantial

rights in the '135 patent to Bard under the 1980 Agreement between the parties, thereby making Bard the "virtual assignee" of the '135 patent. *Enzo*, 134 F.3d at 1093 (holding that licensee is the "virtual assignee" when "all substantial rights under the patent have been transferred in the form of an exclusive license"). This de facto assignment transferred ownership of the '135 patent from Goldfarb to Bard and divested Goldfarb of constitutional standing to sue on the '135 patent. *See Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1359-60 (Fed. Cir. 2010) (explaining that when a licensor conveys all substantial rights in a patent, "the licensee may sue but the licensor may not").

"To determine whether a provision in an agreement constitutes an assignment or a license, one must ascertain the intention of the parties and examine the substance of what was granted." *Vaupel*, 944 F.2d at 874-75. It is well-settled that the determination as to "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Id.* at 875 (quoting *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891)).

When carefully examined, it is clear the 1980 Agreement conveyed to Bard all substantial rights in the '135 Patent. Under Section 1.4 of the 1980 Agreement, Goldfarb granted to Bard "***worldwide, exclusive licenses, with the right to sublicense***, to make, use, and sell products covered by the PATENTS except

HEART VALVES." (A292 (emphasis added).) "PATENTS" are defined in

Section 1.2 as any "Letters Patent issued by any country of the world based on

INVENTIONS and IMPROVEMENTS." "INVENTIONS" are defined in Section

1.3 as (among other things) "the patent applications listed in Exhibit A." The first

patent application listed in Exhibit A is U.S. Patent Application No. 517,415, the

application that ultimately issued as the '135 patent. Thus, the 1980 Agreement

granted an exclusive license, with the right to sublicense, in the '135 patent. In

addition, the 1980 Agreement granted the right to sue for infringement of the '135

patent in Section 5.3. (A303-04, ¶5.3.)

Under the 1980 Agreement, therefore, Bard received: "(1) the exclusive

right to make, use, and sell products covered by the ['135] patent; (2) the right to

sue for infringement of the patent; and (3) a virtually unrestricted authority to

sublicense its rights under the agreement. ***Those provisions themselves strongly***

***favor a finding of an assignment***, not a license." *Aspex Eyewear, Inc. v. Miracle*

*Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (emphasis added); *see also*

*Vaupel*, 944 F.2d at 875; *Asymmetrx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314,

1319 (Fed. Cir. 2009).

Nonetheless, the district court adopted arguments of the plaintiffs made

below and identified several reasons why it believed the 1980 Agreement did not

convey all substantial rights in the '135 patent to Bard. Respectfully, the district court was incorrect as a matter of law on each point.

*1. "HEART VALVE" exclusion.* The district court incorrectly concluded that the exclusion of inventions related to "HEART VALVES" from the 1980 Agreement created a substantial retained right for Goldfarb in the '135 patent. (A57-58.) The district court reached this conclusion based on the unremarkable fact that the 1980 Agreement granted exclusive rights in Goldfarb's patents related to vascular prostheses (including the application that became the '135 patent) but excluded from the Agreement a different category of Goldfarb's inventions related to "heart valves derived from [his] cooperative research with Shiley Scientific, Inc."—which the Agreement defines as "HEART VALVES." In reaching its conclusion, the district court confused this exclusion relating to the scope of the patents conveyed in the 1980 Agreement based on a defined "subject matter" with a "field of use" restriction in the licensed patents themselves. (A57 ("Licenses with 'subject matter' exclusions are 'field of use' licenses and cannot confer 'all substantial rights.'").)

However, an "all substantial rights" analysis does not depend on whether the master license agreement has some restriction on the overall types or categories of patents conveyed. Any license agreement that does not license every single patent owned by the licensor includes some limitation on the scope of the patents coming

26

within the agreement.  Instead, the "all substantial rights" analysis depends on

whether the license agreement imposes a specific limitation on the scope of rights

granted for the ***particular patent*** at issue in the case.  *See Alfred E. Mann*, 604 F.3d

at 1358-60 (standing hinges on the transfer of "all substantial rights in the patents-

in-suit"); *Speedplay*, 211 F.3d at 1250 (standing hinges on whether licensor

"granted all substantial rights under the patent**"**); *Vaupel*, 944 F.2d at 876 (standing

found because the "contractual documents constituted a transfer of all substantial

rights under the patent").  Thus, it is only if the 1980 Agreement somehow

"divide[d] the scope of [Bard's] patent right" in the '135 patent itself that a "field

of use" restriction would exist that affects the standing analysis.  *Int'l Gamco, Inc.*

*v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278 (Fed. Cir. 2007).

    The 1980 Agreement created no such "field of use" restriction in the '135

patent.  An examination of the 1980 Agreement shows that exclusion of "HEART

VALVES" from the scope of the Agreement has nothing to do with the exclusive

license granted to Bard in the '135 patent.  The first page of the Agreement states

that "Dr. Goldfarb . . . is the inventor of certain inventions relating to vascular

prostheses made from polytetrafluoroethylene ('PTFE') that has been expanded."

(A291.)  It then states that "Dr. Goldfarb . . . has offered to grant [Bard] exclusive,

worldwide licenses under any patents that issue based on such inventions as now

exist or as he may make or own, ***except heart valves derived from cooperative***

27

*research with Shiley Scientific, Inc.* (HEART VALVES)." (*Id.* (emphasis

added).) The Agreement then expressly differentiates between two categories of

present or future Goldfarb inventions: (1) inventions like the '135 patent related to

"vascular prosthesis" made from PTFE, which Goldfarb *is licensing to Bard* in the

1980 Agreement, and (2) inventions related to "heart valves derived from research

with Shiley Scientific," which Goldfarb *is **not** licensing to Bard* in the 1980

Agreement. (A291.)

Section 1.1 of the Agreement then reiterates that the "Subject Matter" of the

Agreement relates to "prosthesis for replacing, repairing or bypassing blood

vessels of the human body" and not to "HEART VALVES" (*i.e.*, "heart valves

derived from cooperative research with Shiley Scientific, Inc."). (A292.) Indeed,

Section 1.1 specifically excludes "HEART VALVES" from the definition of

"VASCULAR PROSTHESES" that is the "subject matter" of the Agreement:

> 1.1 <u>Subject Matter</u>. This Agreement relates to prostheses for
> replacing, repairing or bypassing blood vessels of the human body
> except HEART VALVES ("VASCULAR PROSTHESES").

(*Id.*)

Section 3.1 further underscores the fact that "HEART VALVES" is a

different category of inventions outside the scope of the 1980 Agreement and thus

irrelevant to the patents licensed in the 1980 Agreement. Section 3.1 states that

"Dr. Goldfarb *shall disclose* to [Bard] all IMPROVEMENTS ***except HEART***

28

*VALVES* promptly after he invents or owns same." (A297.) "HEART VALVES" cannot be a part of the patents conveyed by the Agreement if Goldfarb does not even have to disclose patents related to "HEART VALVES" to Bard.

In sharp contrast to its exclusion of "HEART VALVES," the 1980 Agreement explicitly *includes* the patent application that became the '135 patent. Exhibit A of the Agreement identifies the existing patent applications that are the subject of the exclusive license grant. The application for the '135 patent is the very first application listed:

Goldfarb, David                              517,415
PROSTHETIC VASCULAR GRAFT       10/24/74

(A310.) There is no suggestion in Exhibit A that the '135 patent application is subject to a restriction on its use. In fact, Exhibit A goes on to list the foreign counterparts of the '135 patent application without limitation. (A310-12.)

Likewise, Section 1.2 leaves no doubt that the '135 patent application listed in Exhibit A is exclusively licensed in its entirety. Section 1.2 states that the "patent applications listed in Exhibit A" are "a part of this Agreement" and are one of the "INVENTIONS" exclusively licensed to Bard in the "Grant" provision of Section 1.4. (A292.) There is no suggestion in Section 1.2 that the '135 patent is subject to a restriction on its use.

Finally, in reading the 1980 Agreement as a whole, the fact that the '135 patent application is specifically identified as "part of this Agreement" and listed

29

as one of the licensed "INVENTIONS" means that this application cannot involve the inventions related to "HEART VALVES," which are completely excluded from the Agreement. If the '135 patent application had been an invention related to the excluded "HEART VALVES," the Agreement would not have listed the '135 patent application in Exhibit A, and it would not have identified that application as being "part of this Agreement" and one of the licensed "INVENTIONS."

In short, "HEART VALVES" are irrelevant to the scope of Bard's exclusive rights in the '135 patent. By its plain language and basic structure, the 1980 Agreement granted an undivided exclusive license in the '135 patent—a patent which is not and cannot be directed to the "HEART VALVES" defined by the agreement. The district court was thus mistaken in concluding that Bard's exclusive license to the '135 patent was limited by a "field of use" restriction.

**2. *Reversionary right to prosecute patent applications.*** The district court concluded that Goldfarb retained a substantial right in the '135 patent because he had a reversionary right to prosecute patent applications if Bard decided to abandon an application. (A58.) This Court has repeatedly held, however, that "a licensor does not retain a substantial right in a patent merely by reserving a reversion in the patent." *Speedplay*, 211 F.3d at 1252; *see also Vaupel*, 944 F.2d at 874 (no substantial retained right where termination provision triggered by

30

bankruptcy); *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1378-79 (Fed. Cir. 2000) (no substantial retained right where agreement provided for one-year renewals); *McNeilab, Inc. v. Scandipharm, Inc.*, No. 94-1508, 1996 WL 431352, at *3 (Fed. Cir. July 31, 1996) (unpublished) ("The right of the patentee to terminate the license in the event of the licensee's failure of performance does not negate the substantiality of the exclusive transfer of all rights to make, use, and sell the licensed product.").

   ***3.  Right to sue.***  The district court also incorrectly concluded that the 1980 Agreement did not grant Bard the exclusive right to sue for infringement of the '135 patent.  (A58.)  However, Section 5.3 expressly grants to Bard the sole right to file actions and claims against third parties for infringement of the licensed patents, including the '135 patent.  The key language is highlighted below:

> ***Enforcement and Licensing of PATENTS***.  Subject to the following, ***USCI shall have the right in its sole discretion to file, control***, defend and settle, by granting a sublicense or otherwise, ***all actions and claims against third parties for infringement of any PATENTS*** brought against DR. GOLDFARB or USCI seeking to declare PATENT invalid.  ***At USCI's request, DR. GOLDFARB shall render to USCI such assistance*** as is reasonably necessary ***to USCI's prosecution*** or defense ***of such actions and claims***.
>
> ***
>
> ***In the event that such action or claim by USCI is successful and USCI recovers damages or royalties based on past infringement***, USCI and DR. GOLDFARB shall share said damages and royalties according to the proportion of ***USCI's LITIGATION COSTS*** that were borne by each Party."

(A303-04, ¶5.3 (emphasis added).)  To be sure, the first sentence of Section 5.3

becomes awkward at the end when it sets out, without grammatical separation,

Bard's right to "*file* . . . all actions and claims against third parties for infringement

of any PATENTS" and Bard's right to "*defend* . . . all actions and claims . . .

brought against DR. GOLDFARB or USCI seeking to declare a PATENT invalid."

But this one point of awkward draftsmanship does not negate the fact that under

Section 5.3 Bard has an unfettered right to file and control litigation against

infringers of the '135 patent.

    As this Court recently stated when applying New Jersey contract law to

interpret an agreement relevant to a standing issue in *Abbott Point*, the Agreement

"must be read as a whole, without artificial emphasis on one section, with

consequent disregard for others."  666 F.3 at 1303 (quoting *Borough of Princeton*

*v. Bd. of Chosen Freeholders of Cnty. of Mercer*, 755 A.2d 637, 645 (N.J. Super.

Ct. App. Div. 2000)); *see also Speedplay*, 211 F.3d at 1250-51 ("[W]e agree with

Speedplay that despite the patent number erroneously set forth in the CLA, the

explicitly defined Licensed Patents must be construed to mean the '778 and related

foreign patents.").

    Here, the only reasonable reading of Section 5.3 is that Bard received the

exclusive right to sue for infringement of the '135 patent.  The very title of Section

5.3 is "*Enforcement and Licensing of PATENTS.*"  The use of the term

"enforcement" shows the parties intended Section 5.3 to govern offensive assertion of the patents against infringers. The first sentence grants Bard sole discretion to "*file*, control, defend and settle" all "actions and *claims*" for "*infringement*" of the patents. (Emphasis added.) "Filing" a "claim" for "infringement" is the essence of the right to sue, and the 1980 Agreement gives Bard that right. Goldfarb's role is defined in the very next sentence. He agrees that "[a]t USCI's request DR. GOLDFARB shall render to USCI such assistance as is reasonably necessary to USCI's *prosecution or defense* of such action and claims." (Emphasis added.) The reference to Goldfarb assisting with prosecution or defense shows the parties intended that Bard—not Goldfarb— would have the controlling role in either affirmatively bringing suit or in defending against invalidity claims. If, as plaintiffs contend, Goldfarb had retained the right to file and control suits against infringers, the Agreement would have provided that Bard, not Goldfarb, assist in such litigation. The only reasonable reading of the assistance language is that *Bard* was granted the exclusive right to file and control patent litigation. Moreover, the language in Section 5.3 relating to sharing of damages shows a clear intent that Bard would have the right to file infringement suits. The Agreement provides that "[i]n the event that *such action or claim by USCI is successful* and *USCI recovers damages or royalties based on past infringement*, USCI and Dr. Goldfarb shall share said damages and royalties according to the proportion of

***USCI's LITIGATION COSTS*** that were borne by each party." (Emphasis added.) The reference to "such action or claim" in which Bard might "recover[] damages or royalties based on past infringement" refers back to the "all actions and claims" recited in the first sentence of Section 5.3. This sentence further confirms the parties' intent that such action or claim for infringement would be brought "by USCI."

Despite the clear intent of the Agreement, the district court ruled below that Bard's right to sue "is limited to third party challenges to validity and does not grant C.R. Bard the exclusive right to sue for all infringement." (A58.) The district court's interpretation thus improperly reads out most of the language discussed above and violates established contract law that courts should not interpret an agreement in a manner which renders portions superfluous or meaningless. *See Penske Logistics, Inc. v. KLLM, Inc.*, 285 F. Supp. 2d 468, 474 (D.N.J. 2003) ("[A] contract should not be given an interpretation which renders a term or terms superfluous or meaningless"); *Matter of Fairfield Gen. Corp.*, 383 A.2d 98, 106 (N.J. 1978) ("[A]ll parts of the writing and every word of it will, if possible, be given effect."). If Bard only had control over defending against validity challenges, the Agreement would not discuss Bard's right to "file" "all actions and claims" "for infringement by third parties." The Agreement would not emphasize Bard's "enforcement" and "prosecution" of patent actions and claims.

34

The Agreement would not contemplate that Goldfarb would assist Bard in such

enforcement of patent actions and claims. And the Agreement would not lay out

what happens if "such action or claim by USCI is successful" such that Bard

"recovers damages or royalties based on past infringement" by a third party. Each

of these provisions is rendered meaningless under the district court's interpretation,

which means that its interpretation cannot be correct.

In short, Section 5.3 conveyed to Bard the exclusive right to sue for

infringement of the '135 patent. This strongly supports the grant of all substantial

rights to Bard. *See Alfred E. Mann*, 604 F.3d at 1361 (explaining that the right to

sue is "***the most important factor*** in determining whether an exclusive license

transfers sufficient rights to render the licensee the owner of the patent"); *Vaupel*,

944 F.2d at 875 (stating that the right to sue is "particularly dispositive").

***4. Right to participate in lawsuit.*** The district court incorrectly suggested

that the 1980 Agreement required "Dr. Goldfarb's participation in any lawsuit,

which is contrary to an assignment." (A58-59.) Again, however, the district court

failed to consider the express language of Section 5.3, which gives Bard the "***sole***

***discretion to*** file, ***control***, defend, and settle" all infringement actions. Section 5.3

also makes clear that Goldfarb will participate in the litigation only at Bard's

"request" and only to "render to [Bard] such assistance as is reasonably necessary

to [Bard's] prosecution or defense of such action and claims." Thus, under Section

5.3, Bard has complete control over whether and how much Goldfarb participates in any lawsuit.[6]

Further, while the district court seemed to find it significant that the 1980 Agreement provides for potential sharing of recovered damages with Goldfarb (A58), this Court has repeatedly rejected the argument that the licensor's right to receive a portion of damages constitutes a substantial retained right. *See Vaupel*, 944 F.2d at 875 (the right to receive infringement damages is "merely a means of compensation under the agreement"); *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1344 n.11 (Fed. Cir. 2001) (same).

   **5.  *Right to assign.***  Finally, the district court incorrectly relied on the assignment limitation in Section 6.4 of the 1980 Agreement to conclude that it did not convey all substantial rights.  (A59.)  However, the district court failed to consider that Section 1.1 of the 1980 Agreement expressly grants Bard "worldwide, exclusive license[], ***with the right to sublicense***" the '135 patent. Moreover, Section 5.3 emphasizes that Bard has the right in its "sole discretion" to grant sublicenses to third parties, with no lower limit on the potential sublicense royalty rate.  Thus, the Agreement gives Bard the virtually unlimited rights to sublicense the '135 patent to third parties, thereby limiting the significance of the

---

[6] Moreover, even if Goldfarb had retained some independent right to participate in litigation (and he did not), this Court has held that the "right to participate in lawsuits . . . is insignificant" where, as here, the licensor "does not have a right to make decisions on litigation strategy." *Aspex*, 434 F.3d at 1342.

assignment limitation in Section 6.4. As this Court has held, "given its virtually unfettered right to sublicense, [Bard's] limited ability to assign its rights to unaffiliated third parties is not controlling." *Aspex*, 434 F.3d at 1342. Moreover, this Court has explained that a partial limitation on patent assignment such as the one in the 1980 Agreement is "not a retention by [the licensor] of a substantial right under the patent, but a safeguard of the bargained-for consideration." *McNeilab*, 1996 WL 431352, at *4; *see also Vaupel*, 944 F.2d at 875 ("The sublicensing veto was a minor derogation from the grant of rights.").

\*\*\*

In sum, when the 1980 Agreement is correctly analyzed *de novo* in light of this Court's standing precedent, there can only be one conclusion: Goldfarb conveyed "all substantial rights" to the '135 patent to Bard in the 1980 Agreement. As a result, Goldfarb lacked constitutional standing to be a plaintiff at the time that the complaint was filed against Gore.

###   B.    IMPRA/BPV Lacks Constitutional Standing Because Bard Never Assigned Its Rights in a Written Instrument.

IMPRA/BPV lacked constitutional standing to bring this lawsuit because Bard never assigned its proprietary rights in the '135 patent to IMPRA/BPV in a written instrument. First, as discussed above, Bard held all substantial rights in the '135 patent under the 1980 Agreement at the time of the alleged transfer in 1996, thereby giving it the status of a virtual assignee. Second, Bard failed to transfer its

virtual assignment to the '135 patent to IMPRA/BPV through a written instrument as required by 35 U.S.C. § 261.

Thus, there was a fatal break in the chain of title between Bard and IMPRA/BPV:



Under § 261, a written instrument is required to effect a valid transfer of a patent assignment, including a "virtual assignment" that transfers all substantial rights. As this Court emphasized in *Enzo*, "if the license is to be considered a virtual assignment to assert standing, it must be in writing . . . [and] must, logically, resemble an assignment in both form and substance." 134 F.3d at 1093. This written instrument requirement is critical in preventing parties from engaging

in "revisionist history" regarding patent title when trying to establish standing in patent litigation. *Id.* Thus, a party attempting to prove standing based on a virtual assignment of all substantial rights in the patent "must produce a written instrument documenting the transfer of proprietary rights." *Speedplay*, 211 F.3d at 1250; *Mentor H/S, Inc. v. Med. Device Alliance*, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001) (same).

IMPRA/BPV cannot produce the required written instrument. Here, the plaintiffs contend that the transfer of the 1980 Agreement from Bard to IMPRA/BPV occurred in 1996. The plaintiffs stated in their standing briefing below that "Bard transferred the original 1980 exclusive license to IMPRA *in 1996*." (A357 (emphasis added).) Likewise, Goldfarb, IMPRA/BPV, and Bard each stated during discovery that "Bard assigned its license rights from Dr. Goldfarb . . . to IMPRA after it acquired IMPRA *in 1996*." (A618, No. 94 (emphasis added); A622, No. 1 (emphasis added); *see* A615, No. 244.) The district court itself found that there was a "*1996 transfer* to IMPRA/BPV of the 1980 license." (A50 (emphasis added).)

Critically, however, there is no written instrument conveying Bard's rights in the '135 patent to IMPRA/BPV in 1996. During the litigation below, IMPRA/BPV and Bard both admitted that they had "not located a separate document assigning Bard's License Agreement with Goldfarb to IMPRA." (A615,

No. 245; A622-23, No. 2.)  Likewise, Goldfarb admitted that he "does not have the

document evidencing the assignment to IMPRA of Bard's License Agreement with

Dr. Goldfarb."  (A619, No. 95.)  The district court itself found that a "written

assignment" of the purported 1996 transfer of rights from Bard to IMPRA/BPV

was "not in evidence, nor did plaintiffs produce such a document during

discovery."  (A40.)

The absence of a written instrument is dispositive of the standing issue with

respect to IMPRA/BPV.  *Speedplay*, 211 F.3d at 1250; *Mentor*, 240 F.3d at 1017.

As this Court held in *Abraxis*:  "Common corporate structure does not overcome

the requirement that *even between a parent and a subsidiary, an appropriate*

*written assignment is necessary to transfer legal title from one to the other*.

Without the transfer of legal title of the patents, [IMPRA/BPV] had no standing to

bring this infringement action."  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d

1359, 1366 (Fed. Cir. 2010) (emphasis added).

Moreover, the 1997 Amendment relied upon by the plaintiffs below cannot

satisfy the written assignment requirement because it did not purport to transfer

Bard's interest in the '135 patent to IMPRA/BPV.  Contrary to *Enzo*, the 1997

Amendment does not "resemble an assignment in both form and substance."  134

F.3d at 1093.  Instead, the 1997 Amendment is an agreement between

IMPRA/BPV and Goldfarb that assumes (wrongly) that a valid assignment to

IMPRA/BPV had already taken place in 1996:  "[O]n September 16, 1996, BARD

acquired IMPRA and thereafter *assigned and transferred* the License Agreement

to IMPRA."  (A317 (emphasis added).)  The plaintiffs themselves conceded below

that the 1997 Amendment did not assign Bard's proprietary rights but instead was

"*written confirmation . . . acknowledging the prior transfer* of the 1980 license

from [Bard] to IMPRA."  (A351 (emphasis added).)  The plaintiffs also stated that

"Bard *transferred* the original 1980 exclusive license to IMPRA *in 1996*" and then

the parties "*reaffirmed that transfer in writing* in their 1997 amendment."  (A357

(emphasis added).)  Likewise, the district court found that the 1997 Amendment

"*confirmed the transfer of the license* to Impra" in 1996.  (A41 (emphasis

added).)

    This Court's decision in *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359

(Fed. Cir. 2008), controls the analysis.  In *Mars*, the plaintiff Mars claimed that it

had standing to assert one of the patents-in-suit based on the assignment of the

patent from a subsidiary in an earlier purchase agreement between the parties.  *Id.*

at 1370-72.  However, the "purchase agreement was not made part of the record,"

and Mars was forced to rely on a later-executed "Confirmation Agreement" that

"acknowledge[d] that Mars owns and retains the right to sue" with respect to the

patent-in-suit.  *Id.* at 1364, 1371 & n.2.  The *Mars* court concluded that the

Confirmation Agreement only "describe[d] an acknowledgement—i.e., a

recognition—of rights that the contracting parties believed had already been transferred" and therefore "did not purport to be a transfer itself." *Id.* at 1371. Based on this analysis, the *Mars* court concluded that "the Confirmation Agreement did not transfer title and that Mars lacks standing" to assert the patent-in-suit. *Id.* at 1372.

*Mars* applies with full force to this case. Here, as in *Mars*, the plaintiffs admit and the district court found that there is no written document "made part of the record" showing the purported assignment of Bard's patent rights to IMPRA/BPV in 1996. As in *Mars*, IMPRA/BPV attempts to rely on an after-the-fact agreement (the 1997 Amendment) that acknowledges "rights that the contracting parties believed had already been transferred" but that "did not purport to be a transfer itself." The 1997 Amendment expressly states that the 1980 Agreement had already been "assigned and transferred" from Bard to IMPRA/BPV, and the plaintiffs and the court stated below that the 1997 Amendment was merely a "confirmation" of that defective alleged prior transfer. Thus, as in *Mars*, the 1997 Amendment "did not transfer title and [IMPRA/BPV] lacks standing."

Finally, the conclusion that Bard did not validly transfer its rights in the '135 patent to IMPRA/BPV in 1996 is directly supported by Bard's own contemporaneous statements about its ownership of the '135 patent rights. While

42

the plaintiffs and Bard now contend that Bard made an undocumented assignment of the 1980 Agreement to IMPRA/BPV in 1996, Bard consistently represented to federal courts from 1997 to 2000 that it (not IMPRA/BPV) possessed the rights to the '135 patent. Indeed, the General Counsel and Secretary of Bard, Richard Flink, testified under oath in 1999 that "I have no knowledge of an assignment from Bard to IMPRA, so if my knowledge is correct, then Bard is still the licensee." (A611, 79:3-7.)

The contradictory and undocumented standing argument now being made by the plaintiffs and Bard is exactly the kind of "revisionist history" that the written instrument requirement is intended to prevent. *Enzo*, 134 F.3d at 1093. When it was necessary to Bard's lawsuit in New Jersey to say that it owned the '135 patent application so that it could try to terminate Gore's 5% option, Bard said it was the owner of the '135 patent. When it was necessary in the *Cooper I* and *Cooper II* appeals for Bard to disclose the real party in interest on the Goldfarb side of the interference, Bard said it was the licensee of the '135 patent. And when it was necessary to Bard's litigation strategy in Arizona to say ***the exact opposite***—so that it could seek maximum infringement damages against Gore—Bard said it had assigned its rights in the '135 patent to IMPRA/BPV.

As this Court explained in *Enzo*, the written instrument requirement is essential in evaluating patent standing claims because without it "[p]arties would

43

be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261 by claiming to be patentee by virtue of a verbal licensing arrangement." 134 F.3d at 1093. Consistent with *Enzo*, application of the written assignment requirement of § 261 will prevent the plaintiffs from revising the standing history of the '135 patent. Because it is undisputed that there is no written instrument transferring Bard's interest in the '135 patent, IMPRA/BPV lacked standing to sue in this case.

## IV. THE CASE MUST BE DISMISSED AND THE JUDGMENT BELOW VACATED FOR LACK OF SUBJECT MATTER JURISDICTION.

If the Court agrees with Gore's standing analysis, then Goldfarb and IMPRA/BPV lacked constitutional standing when they filed their complaint, and their infringement complaint must be dismissed. *See Abraxis*, 625 F.3d at 1364 ("A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit . . . . [T]he jurisdictional defect cannot be cured after the inception of the lawsuit."). In that event, Gore asks that the Court further require the plaintiffs to return the money collected pursuant to the vacated judgment. As the Supreme Court has made clear, "[t]he right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established." *Baltimore & Ohio R.R. v. United States*, 279 U.S. 781, 786 (1929); *see also, e.g.*, *United States v. Morgan*, 307 U.S. 183, 197 (1939); *Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*, 824 F.2d 765, 767 (9th Cir. 1987).

44

## V.    GORE'S CONDITIONAL APPEAL

In the event that the Court does not vacate the judgment based on lack of

standing, then, as set forth below, Gore appeals from the district court's remand

ruling refusing to grant judgment as a matter of law of no willful infringement.

Gore also appeals from the district court's summary denial of its conditional

motion for a new trial, and from the district court's premature grant of the

plaintiffs' motion to execute.

### A.    Factual Record Relating to Gore's Joint Inventorship Defense.

Gore employee Peter Cooper and Appellee Goldfarb engaged in a lengthy

interference proceeding to resolve their competing claims of priority of

inventorship of the '135 patent.  *See Cooper I* and *Cooper II*.  Although Cooper

proved an earlier date of conception, this Court awarded priority to Goldfarb

because it determined that only Goldfarb had reduced the invention to practice,

despite his later conception date:  "Cooper had conceived the invention, including

the fibril length limitation, before Goldfarb reduced the invention to practice."

*Cooper II* at 1385 (citing *Cooper I*, 154 F.3d at 1326).

In reviewing the factual record during the interference proceeding, this Court

documented the substantial involvement of Cooper in the inventive process leading

up to the '135 patent:

> Cooper testified that he reviewed the slides under a microscope on
> April 22, 1973, and then photographed the slides, measured the fibril

45

lengths shown, and recorded his conclusions in his laboratory notebook. The first page of Cooper's notebook contains a photomicrograph of a harvested graft along with a notation indicating that the graft was submitted by Dr. Kelly. The page also contains a sticker with a 100 micron scale indicated. The following is written above the photomicrograph:

> I want to maximize the amount and rate of tissue ingrowth into Gore-Tex vascular prosthetics. Two qualities are necessary. 1. Uniform "poker chip" structure and 2. a minimal "skin" at both the O.D. and I.D. surfaces.

> Tissue has invaded Gore-Tex where the nodes are approx. 10-30 microns thick and with most separations between nodes at about 50-100 microns. Photo # 1. Other structures having approximately 5-10 micron node dimensions and spaces from about 5-30 micron do not appear to allow ingrowth-Photo # 2.

The page is signed "Peter B. Cooper/May 1, 1973" and "Read & Understood By" "John Giovale/June 5, 1973." John Giovale, a Gore manufacturing engineer, confirmed that *Cooper had shown him the photographs and discussed with him the need for sufficient internodal separation in order to allow tissue ingrowth*.

*Cooper I*, 154 F.3d at 1325 (emphasis added).

\* \* \*

Cooper provided the tubes to various researchers, who evaluated their suitability for vascular grafts. During the course of his work, Cooper *discovered* that material from ePTFE tubes *with fibril lengths within the scope of the interference* count was suitable for use in vascular grafts. The Board found that Cooper had conceived the invention as of June 5, 1973.

*Cooper II*, 240 F.3d at 1382 (emphasis added).

\* \* \*

[I]n the letter to Goldfarb accompanying the Lot 459-04133-9 material, Cooper described the material as "represent[ing] the latest attempt to achieve satisfactory patency rates in small artery prosthetics," indicating *that he expected the material to be suitable as*

46

*a vascular graft*. Finally, as the Board found, "Cooper certainly intended that Goldfarb use the [material] for vascular grafts, and to that extent Goldfarb's experiments could be said to have been performed at Cooper's request." *Cooper II*, slip op. at 14. Applying the *Genentech* test to these facts, we hold that Goldfarb's recognition that the 2-73 RF graft from the Lot 459-04133-9 material was suitable for use as a vascular implant *inures to Cooper's benefit*.

*Cooper II*, 240 F.3d at 1384-85 (emphasis added).

* * *

Dr. Sharp's letter reported the results of his studies in dogs of four distinct groups of ePTFE material that had been provided to him by Cooper. The letter identified one of the groups as being the most promising for use as a vascular graft, and suggested that further studies include the measurement of the porosity of the ePTFE material. As discussed above, Cooper's April 19 letter to Goldfarb described the Lot 459-04133-9 material as *"represent[ing] the latest attempt to achieve satisfactory patency rates in small artery prosthetics*."

*Cooper II*, 240 F.3d at 1385 (emphasis added).

So while Gore (just barely) failed to establish priority of invention during the interference proceeding, Gore succeeded in creating a robust record establishing the substantial work done by Peter Cooper towards achieving the claimed invention.[7]

---

[7] The complete record relating to inventorship is set forth in this Court's decisions in *Cooper I* and *Cooper II*, and in Gore's blue and gray briefs (A4670-97; A4723-35) filed in connection with the appeal in *Bard I*.

**B.** **Gore's Defense That Its Employee Peter Cooper Was a Co-Inventor Was Objectively Reasonable.**

**1.** **The Law of Joint Inventorship.**

Congress amended the Patent Act in 1984 to promote recognition of joint inventorship in patents. The amended statute provides in pertinent part:

> When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

35 U.S.C. § 116.

Section 116 clearly rejects the notion that any particular kind of contribution is a *sine qua non* of joint inventorship. Prior Federal Circuit decisions reject that notion as well, noting that Section 116 "sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor," *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997), that "no bright-line standard will suffice in every case," *id.*, that "the qualitative contribution of each collaborator is the key," *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229 (Fed. Cir. 1994), and that "each [co-inventor] needs to perform only a part of the task which produces the invention," *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).

48

Consistent with these principles, this Court has developed guidelines for the joint inventorship inquiry. The Court has recognized that *experimental* contributions can be sufficient for joint inventorship. *Fina Oil*, 123 F.3d at 1473. Indeed, the Supreme Court has long held that experimental contributions suffice to confer the status of inventor, and that an exact understanding (let alone communication) of *why* an experiment worked is unnecessary:

> A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention . . . ."

*Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 435-36 (1911); *see also Newman v. Quigg*, 877 F.2d 1575, 1581 (Fed. Cir. 1989) ("[I]t is not a requirement of patentability that an inventor correctly set forth, or even know, how or why the invention works.") (citing *Diamond Rubber*, 220 U.S. at 435-36).

### 2. Gore Presented Credible Evidence That Cooper Was a Co-Inventor.

Viewed against this legal backdrop, Gore's co-inventorship claim in this case was objectively reasonable. In remanding the issue of willfulness to the district court, this Court stated that the Supreme Court's precedent on "sham litigation" was "instructive" as to the issue of objective reasonableness. *Bard II*,

682 F.3d at 1007. Citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("PRE"), the *Bard II* court observed that sham litigation arises when a claim is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* (quoting *PRE*, 508 U.S. at 60). On the other hand, "'[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome,' it is not objectively baseless." *Id.*

At a high level, it is worth considering that the plaintiffs' lawsuit on its face appears anomalous: The plaintiffs sued Gore to stop Gore from using a material Gore indisputably invented (Gore-Tex®) for an application that Gore employees indisputably conceived (artificial blood vessels).[8] At trial, Goldfarb testified that he had no idea that one could potentially use Gore-Tex® as an artificial blood vessel:

> Q. Dr. Goldfarb, do you agree that the idea of trying out ePTFE tubes as an artificial vascular prosthesis was something that was first suggested to you by two Gore employees, Peter Cooper and Richard Mendenhall?
>
> A. Yes.
>
> Q. Before the Gore employees told you about trying ePTFE as a vascular prosthesis, you didn't know anything about that material, correct?
>
> A. That's correct.

[8] Bard had a marked advantage in its jury presentation on the co-inventorship issue because Goldfarb testified live, while Cooper was deceased at the time of trial.

50

Q. And the first suggestion from Gore came in about February 1973 I think you said; is that right?

A. That's correct.

(A1970-71.)

Goldfarb further agreed that he had no ability to make the claimed graft himself, and that he needed Gore's assistance to do so:

Q. Would it be fair to say, Dr. Goldfarb, that in the late 1973 to '74 period, you had no knowledge of how to make or fabricate ePTFE vascular grafts that would meet any of the claims of the patent?

A. I can't say I had no knowledge. But I would agree that I certainly did not have expertise in the process of manufacturing the graft.

Q. And realistically, you didn't know how to make a graft that would meet your specifications, correct?

A. That's correct, yes.

Q. Do you think you would have been able to make the invention described in your patent application without the participation and cooperation of Gore employees?

A. No.

Q. And all the tubing that you used in your work before you filed your patent application was tubing that was given to you by Gore without charging you anything, correct?

A. That's correct.

(A1979.)

Finally, Goldfarb admitted that what he viewed as his invention amounted to identifying or "characterizing" a pre-existing feature inherent in a graft conceived, produced and supplied to him by Gore employee Cooper:

51

Q. What contribution do you consider you made over the Matsumoto -
- over what is described in the Matsumoto article, Exhibit 13?

A. The recognition of internodal distance as a primary determinant for
patency of the grafts characterizing the specifications.

Q. You mean characterizing the ranges?

A. The ranges, yes.

(A2177.)

Cooper actually furnished Goldfarb with the embodiment of the invention

that Goldfarb later "characterized."  While Cooper may not have known precisely

why his graft worked, the law does not require that he have such knowledge to be a

joint inventor.  *Newman*, 877 F.2d at 1581.

Cooper did not blindly send Goldfarb samples of Gore-Tex® material

without any knowledge of how their structure might relate to arterial grafts.  As

this Court found in *Cooper I* and *Cooper II*, Cooper was actively attempting to

create successful Gore-Tex® grafts *based on* his knowledge of their structure:

> "Cooper **discovered** that material from ePTFE tubes with ***fibril
> lengths within the scope of the interference count*** was suitable for
> use in vascular grafts."

*Cooper II*, 240 F.3d at 1382.

* * *

> "Cooper had **conceived** the invention by the time Goldfarb evaluated
> the 2-73 RF graft."

*Cooper I*, 154 F.3d at 1326.

* * *

52

> "In addition, in the letter to Goldfarb accompanying the Lot 459-04133-9 material, Cooper **described** the material as 'represent[ing] the latest attempt to achieve satisfactory patency rates in small artery prosthetics,' indicating that **he expected the material to be suitable** as a vascular graft."

*Cooper II*, 240 F.3d at 1384-85.

* * *

> "Goldfarb's recognition that the 2-73 RF graft from the Lot 459-04133-9 material was suitable for use as a vascular implant **inures to Cooper's benefit**."

*Id.*

(All emphases added.)

The record is clear that Gore had created and was successfully testing the precise type of grafts claimed by Goldfarb before he ever came on the scene. As Judge Newman noted in her dissent:

> Figure 3 of the *Surgery* article is a photomicrograph "of an expanded polytetrafluoroethylene prosthesis removed ten months after operation. The neointima is very well developed and firmly adherent to the inner surface"; properties that the jury (and the PTO) was told were discovered by Dr. Goldfarb. Figure 4 is a "microscopic picture of an expanded polytetrafluoroethylene prosthesis removed 4.5 months after operation. Fibroplasis is well formed through pores"; these are all properties that the jury and the PTO were told were discovered by Dr. Goldfarb.

*Bard I*, 670 F.3d at 1194-95; *see also PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 12 F. Supp. 2d 69, 83-84 (D. Mass. 1998) ("[T]he discoverers of the latent qualities in the packing material developed and manufactured by another cannot claim sole inventorship within the meaning of the patent laws.").

Gore's joint inventorship defense was in no way a "sham." It was based on Gore's substantial contributions to the conception and creation of the very product the plaintiffs accused of infringement—a vascular graft made from Gore-Tex®.

### C. Judge Newman's Dissenting Opinions Are Persuasive Evidence That Gore Relied on a Reasonable Defense to Bard's Infringement Charge.

This Court affirmed the district court's liability judgment in favor of Bard in a split decision. Judge Gajarsa wrote the majority opinion, joined by Judge Linn. Judge Newman filed a strong dissenting opinion. Quoting extensively from the trial record, Judge Newman concluded that the evidence clearly showed that at a bare minimum, Gore employee Peter Cooper was a co-inventor of the '135 patent. *Bard I*, 670 F.3d 1193 (Newman, J., dissenting). Judge Newman also noted the glaring inconsistency between Goldfarb's sworn statements at the Patent Office, and the invention story that Bard presented at trial: "Dr. Goldfarb had told the PTO that it was 'well known in 1972 and before' that for tissue ingrowth in a vascular graft, the internodal distance must be 'at least the size of a fibroblast or red blood cell,' . . . [y]et at the infringement trial the jury was told that it was Goldfarb who discovered that Gore–Tex ePTFE had these properties and performance." *Id.* at 1196.

There is simply no doubt that Judge Newman found at least some of Gore's defenses to be reasonable and meritorious. Her stated opinion was that "*[a]s a*

54

*matter of law*, Dr. Goldfarb cannot deprive Gore of the invention Gore possessed and that was known to Gore and published by others before Goldfarb entered the scene." *Id*. at 1199 (emphasis added); *see also Bard II*, 682 F.3d at 1009 (Newman, J., dissenting in part) ("When these aspects are considered, it is apparent that willful infringement is not supportable.").

In light of Judge Newman's dissents, there should be no question that Gore's defenses were objectively reasonable. The fact that a sitting judge of the Federal Circuit has already found Gore's defenses to be reasonable should end the inquiry. If Gore's defense of this case was so reckless as to amount to "sham litigation," one would expect a unanimous affirmance on appeal.

Indeed, courts have recognized that when a federal judge has agreed with a party's claim or defense—whether through a dissent on appeal or through a district court ruling later reversed on appeal—the claim or defense cannot be baseless. For example, in *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 785 F.2d 1013 (Fed. Cir. 1986), the Federal Circuit considered whether a question of infringement was close or not. In light of a dissenting opinion by Judge Nies, the court reasoned as follows:

> We do not, of course, deny that the question is close. We could not do so in view of the able dissent that our colleague, Judge Nies, filed on the former appeal.

*Id.* at 1016.  Another example is *State Contracting & Eng. Corp. v. Condotte America, Inc.*, 346 F.3d 1057 (Fed. Cir. 2003), where the Federal Circuit ruled that defendants could not be willful infringers because the district court had previously ruled they were licensed to practice the invention, even though that ruling was later reversed on appeal.  *Id.* at 1064.  Similarly, in *Asyst Technologies, Inc.v Empak, Inc.*, No. C98-20451, 2006 WL 3302476, at *3 (N.D. Cal. Nov. 14, 2006), the court found no willful infringement because the court, though reversed on appeal, had previously ruled that defendant's product did not infringe.

Under any meaningful definition of "objective," Gore's defense cannot be objectively unreasonable where a sitting member of this Court has found it to be reasonable.

### D.    The District Court Failed to Apply the Objective Reasonableness Test.

On remand, the district court declined to grant Gore JMOL of no willful infringement.  (A20.)  While purporting to apply the "objective reasonableness" standard announced by this Court, the district court instead viewed the remand issue through the traditional JMOL lens, focusing on the evidence favorable to the prevailing party.  The district court's opinion dwells on evidence that may have swayed the jury, but has no legal relevance to the issue of joint inventorship:

- Disgruntled ex-Gore employees (Mendenhall and Detton) testified that they did not believe Cooper was a co-inventor, and that he had been a "hindrance to the project."

- *After* Cooper had filed a patent application claiming the invention, he entered Goldfarb's laboratory and took some research slides.

- None of the other physicians to whom Cooper sent Gore-Tex® tubes made successful grafts.

(A10-11; A8; A9.)

The district court also gave determinative weight to the fact that Cooper failed in the interference proceedings to establish priority as a sole inventor. The district court's opinion quotes and cites at length to the portions of *Cooper I* and *Cooper II* where this Court rejected Cooper's claim to priority of invention. (A2; A9-11; A19.) But Gore's defense in **this case** was not that Cooper was the first, sole inventor. Gore's defense was co-inventorship. As set forth above in Section V.A, this Court's decisions in *Cooper I* and *Cooper II* contain extensive findings that support a claim of **co-inventorship** by Gore. The district court ignored these findings, and improperly focused on adverse findings relating to issues (sole inventorship and inurement) that have no bearing on Gore's defense here.

In the same vein, the district court attributed improper significance to the question of whether or not Cooper appreciated the precise length of fibrils within the Gore-Tex® structure ultimately claimed in the '135 patent. (A9-11.) But this Court found that "Cooper discovered that material from ePTFE tubes with fibril lengths within the scope of the interference count was suitable for use in vascular grafts." *Cooper II*, 240 F.3d at 1381. The law imposes no requirement that a co-

57

inventor understand precisely why the invention works. *Diamond Rubber*, 220 U.S. at 435-436.

> The district court concluded its discussion of inventorship by holding:

> It was not reasonable for Defendant to expect that it could succeed on its defense that Cooper was a joint inventor with Dr. Goldfarb. ***Substantial evidence*** indicated a contrary finding.

(A11 (emphasis added).) But substantial evidence is not the test. Following *Bard II*, this Court further expanded on the "objective reasonableness" test in *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300 (Fed. Cir. 2012). In *Highmark*, this Court explained the role of the Judge in assessing the objective prong:

> [T]he objective reasonableness determination does not require fact finding. The question is simply whether the record established in the proceeding supports a reasonable argument as to the facts and law.

*Id.* at 1310 n.1.

Here, the district court re-weighed the facts, focusing on the "substantial evidence" it believed supported the jury's verdict. (A6-10; A19-20.) The record as a whole, though—including the facts established by this Court in *Cooper I* and *Cooper II*—compels a conclusion that Gore's co-inventorship defense was objectively reasonable.

**E.    The Court Should Remand the Case to the District Court for a New Trial or in the Alternative for a Decision on Gore's Motion for New Trial.**

Gore moved for a new trial in the event that the district court held on remand that Gore's defenses were objectively reasonable, thereby precluding any claim of willful infringement by plaintiffs.  (A924.)  The district court declined to rule on Gore's motion, finding it moot in light of the district court's refusal to grant JMOL of no willful infringement.  If this Court determines that Gore is entitled to JMOL of no willful infringement, the Court should remand the case so that the district court can either conduct a new trial or  consider and rule on Gore's motion for a new trial on liability and damages.  Gore's motion set forth in detail the prejudice to Gore stemming from the district court's submission of the willfulness issue to the jury *in toto*.  (A925-36.)  If this Court grants JMOL of no willful infringement to Gore, it should remand the case so that Gore can receive a new trial, free of the influence of plaintiffs' willfulness charge.  In the alternative, the Court should remand the case so the district court can fully consider and rule on Gore's motion that it receive a new trial and/or recalculate the post-verdict royalty ruling in light of the willfulness ruling.  The Court should also reverse and vacate the district court's order permitting the plaintiffs to partially execute the judgment.  This Court should order the plaintiffs to return the money it collected into the escrow fund, pending the district court's resolution of these issues.

## CONCLUSION

The judgment of the district court should be vacated and the case remanded with instructions for the district court to dismiss for lack of standing. The Court should also order the plaintiffs to return to Gore all money they collected from the judgment.

If the Court does not vacate the judgment for lack of standing, the Court should reverse the district court's willfulness finding and remand to the district court either (1) with instructions to conduct a new trial; or (2) for consideration of Gore's motion for a new trial in the first instance; and/or (3) with instructions to recalculate the post-verdict royalty in light of the ruling of no willfulness. In any of these events, the Court should order the plaintiffs to return the money they collected into the escrow fund, pending the outcome of these issues.

Dated:  December 10, 2013　　　　Respectfully Submitted,

By: */s/ James Poradek*

JAMES PORADEK
FAEGRE BAKER DANIELS LLP
90 South Seventh Street, Suite 2200
Minneapolis, Minnesota 55402
(612) 766-7000

JARED B. BRIANT
LESLIE B. PRILL
FAEGRE BAKER DANIELS LLP
1700 Lincoln Street, Suite 3200
Denver, Colorado 80203
(303) 607-3500

MICHAEL E. FLOREY
DEANNA REICHEL
FISH & RICHARDSON P.C.
60 South Sixth Street
Minneapolis, Minnesota 55402
(612) 337-2505

*Attorneys for Defendant/Counterclaimant-Appellant W.L. Gore & Associates, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 10, 2013, a true and correct copy of the

foregoing document was filed through the Court's ECF system.  I further certify

that I will file the six copies of the foregoing with the Clerk of Court by Overnight

Mail Delivery to:

## <u>BY OVERNIGHT MAIL</u>

Mr. Daniel E. O'Toole                          CLERK OF COURT
Clerk of Court
United States Court of Appeals for the
Federal Circuit
717 Madison Place, NW
Washington, D.C. 20439


December 10, 2013                              */s/ James Poradek*

CASE PARTICIPANTS ONLY

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B).  The relevant portions of the brief, including all

footnotes, contain 13,946 words, as determined by Microsoft Word® 2010.

<u>December 10, 2013</u>                       */s/ James Poradek*

Date                                        James Poradek

# ADDENDUM

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., | No. CV 03-0597-PHX-MHM |
| Plaintiffs, | **ORDER** |
| v. | |
| W. L. Gore & Associates, Inc., | |
| Defendant. | |

Before the Court is Defendant's Brief on Remand Regarding Objective Reasonableness of Defenses. (Doc. 1111 ("Def.'s Br.")). Plaintiffs have filed responsive briefing and Defendant has filed reply briefing. (Doc. 1115, Pls.' Br. in Resp. to Def.'s Br. Regarding Reconsid. of JMOL of No Willful Infringement ("Pls.' Resp. Br."); Doc. 1120, Def.'s Reply Br. on Remand Regarding Objective Reasonableness of Defenses ("Def.'s Reply Br.")). Counsel for the parties presented oral argument on June 12, 2013. (Doc. 1132).

## I. BACKGROUND

This patent infringement case was tried before a jury in 2007. The patent at issue (U.S. Patent No. 6,436,135 ("'135 patent" or "Goldfarb patent")) concerns a medical device described as a prosthetic vascular graft (artificial vascular prosthesis) made from expanded polytetrafluoroethylene ("ePTFE") with a specific microstructure. In late 1969, Defendant developed a process for making PTFE very strong and very porous and from which resulted

expanded PTFE, or ePTFE. (Doc. 786 at 1737-41). In early 1971, Defendant provided samples of ePTFE to various surgeons in furtherance of the idea that it might be used to develop a vascular product. (*Id.*). The grafts "are used to bypass or replace blood vessels to assure adequate and balanced blood flow to particular parts of the body." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1175 (Fed. Cir. 2012) ("*Bard I*"). Between 1983 and 2001, an Interference proceeding was ongoing in the United States Patent Office ("PTO") regarding a determination of the inventor of the vascular grafts. (Doc. 790 at 2756). Defendant advanced the position that its employee Peter Cooper[1] was the prior inventor as opposed to Plaintiff David Goldfarb, M.D. *See Cooper v. Goldfarb*, 154 F.3d 1321 (Fed. Cir. 1998) ("*Cooper I*").[2] The Patent Office issued the patent to Dr. Goldfarb in 2002 as the prior inventor. *See Cooper v. Goldfarb*, 240 F.3d 1378 (Fed.Cir. 2001) ("*Cooper II*"). Plaintiffs filed this patent infringement suit against Defendant in March 2003. (Doc. 1, Compl.).

During trial, Defendant presented evidence on several defenses to the patent's validity, including anticipation, obviousness, written description, and improper inventorship, and on the issue of willful infringement. The Court submitted the issue of willfulness to the jury based on prevailing legal authority at the time. The jury returned a unanimous verdict in Plaintiffs' favor, finding that Defendant had infringed the patent, the patent was not invalid, and Defendant's infringement was willful. (Doc. 771, Jury Verdict). The jury awarded Plaintiffs lost profits and a reasonable royalty on Defendant's pre-verdict infringing activity. (*Id.*). Following the jury's verdict, Defendant's motions for judgment as a matter of law ("JMOL") on a number of issues, including its defenses and on the issue of willful

---

[1] Cooper served for a period of time as Plant Manager at Defendant's Flagstaff, Arizona facility. (Doc. 786 at 1753).

[2] Cooper filed his patent application on April 2, 1974. *Cooper I*, 154 F.3d at 1325. Dr. Goldfarb filed his patent application on October 24, 1974. *Id.* at 1326.

- 2 -

1  infringement, were denied. (Doc. 833, Order; Doc. 834, Order; Doc. 938, Order; Doc. 940,

2  Order).

3      Plaintiffs moved for enhanced damages, attorneys' fees, and a permanent injunction.

4  The Court awarded enhanced damages and attorneys' fees but declined to enjoin Defendant

5  in light of the public health considerations concerning the medical devices at issue. (Doc.

6  941,Order; Doc. 942, Order; Doc. 951, Order; Doc. 1057, Redacted Order). The Court found

7  that a compulsory license would compensate Plaintiffs for Defendant's infringement. (Doc.

8  1057, Redacted Order). The Court also ruled that an increase of the reasonable royalty rate

9  set by the jury was appropriate. (Doc. 1057, Redacted Order). On August 24, 2010, the

10  Court entered an Amended Judgment on all adjudicated issues. (Doc. 1047, Am. Judgment).

11  Defendant appealed.

12      On February 10, 2012, the Federal Circuit affirmed the Court's Amended Judgment.

13  *Bard I*, 670 F.3d at 1193. The Federal Circuit affirmed this Court's rulings denying

14  Defendant's motions for JMOL regarding Defendant's defenses of joint inventorship,

15  anticipation, obviousness, and written description, and on the issue of willful infringement.

16  *Id.* at 1179-92. It also affirmed the jury's verdict finding Defendant's infringement willful

17  and this Court's awards of enhanced damages, attorneys' fees, and ongoing royalty. *Id.* at

18  1189-93.

19      Defendant petitioned for rehearing. The Federal Circuit "denie[d] en banc review, but

20  grant[ed] rehearing en banc for the limited purpose of authorizing the panel to revise the

21  portion of its opinion addressing willfulness," and "return[ed] [the] appeal to the merits

22  panel." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 476 F. App'x 747

23  (Fed. Cir. June 14, 2012).

24      The panel issued its decision in *Bard Peripheral Vascular, Inc. v. W.L. Gore &*

25  *Assocs., Inc.*, 682 F.3d 1003 (Fed. Cir. 2012) ("*Bard II*"), *cert. denied*, 133 S.Ct. 932 (2013),

26  "reaffirm[ing] its opinion issued on February 10, 2012, except for section E and that portion

27  of section F relating to Section 284 and 285 of Title 35 of the United States Code allowing

28                               - 3 -

1  for enhanced damages and attorneys' fees," which were vacated as related to willfulness.

2  *Bard II*, 682 F.3d at 1005. In its analysis, the Federal Circuit endorsed the two-prong

3  subjective and objective standard of *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed.

4  Cir. 2007) (en banc), but "clarified the legal standard for *Seagate's* objective willfulness

5  prong" by holding that "the objective determination of recklessness, even though predicated

6  on underlying mixed questions of law and fact, is best decided by the judge as a question of

7  law subject to *de novo* review." *Bard II*, 682 F.3d at 1006-08. The Federal Circuit

8  "remand[ed] the issue of willfulness so that the trial court may reconsider its denial of JMOL

9  of no willful infringement in view of this holding." *Id.* at 1005. The appellate court's

10  remand included the following instructions:

11  > On remand, therefore, the court should determine, "based on the record
12  > ultimately made in the infringement proceedings," whether a "reasonable
   > litigant could realistically expect" those defenses to succeed. . . . If, in view of
   > the facts, the asserted defenses were not reasonable, only then can the jury's
13  > subjective willfulness finding be reviewed for substantial evidence."

14  *Id.* at 1008 (citations omitted). The Federal Circuit further instructed that, "[i]f the court

15  grants the JMOL, it should then reconsider its decisions on enhanced damages and attorneys'

16  fees." *Id.* at 1005.

17  **II.  DISCUSSION**

18  **A.  Standard of Review**

19  This Court's review of Defendant's defenses is "'based on the record ultimately made

20  in the infringement proceedings'" and involves a determination of "whether a 'reasonable

21  litigant could realistically expect' those defenses to succeed." *Bard II*, 682 F.3d at 1008

22  (citation omitted). In *Highmark, Inc. v. Allcare Health Management Systems, Inc.*, 687 F.3d

23  1300 (Fed. Cir. 2012), *cert. granted*, 81 U.S.L.W. 3562 (U.S. Oct. 1, 2013) (No. 12-1163),

24  the Federal Circuit stated that the objective prong "requires a retrospective assessment of the

25  merits of the entire litigation determined 'based on the record ultimately made in the

26  infringement proceedings.'" *Highmark*, 687 F.3d at 1310. Stated another way, "[t]he

27  objective prong is a single backwards-looking inquiry into the reasonableness of the claims

28

- 4 -

in light of the full record." *Id.* at 1310-11. The *Highmark* court noted *Bard II's* explanation that "the objective reasonableness test was based on the objective prong of the standard for sham litigation," as explained in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 60-61 (1993). *Id.* at 1309-10 n.1. As the *Highmark* court explained, "the objective reasonableness determination does not require fact finding. The question is simply whether the record established in the proceeding supports a reasonable argument as to the facts and law." *Id.*

"Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Or. Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). *See Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011) (applying the law of the regional circuit in reviewing denial of a JMOL motion).

**B.   Analysis**

The Court previously denied Defendant's Motion for JMOL Regarding Plaintiffs' Claim of Willful Infringement and Renewed Motion for JMOL Regarding Willful Infringement. (Doc. 833, Order at 3-4; Doc. 940, Order at 21-23).   The Court now reconsiders those rulings as instructed on remand upon consideration of the parties' present briefing and based on the record made in the infringement proceedings.

Defendant contends that a review of the record demonstrates that it had a reasonable expectation of success on each of its defenses. However, for purposes of remand, Defendant has focused on two of its defenses, joint inventorship based on Cooper as joint inventor, and anticipation based on the Matsumoto reference. (Def.'s Br. at 10).

Joint inventorship is a question of law "based on underlying facts." *Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009). "[A]nticipation is a question of fact." *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010).   "When the objective prong [of willfulness] turns on fact questions, as related, for example, to anticipation, or on legal questions dependent on the

- 5 -

1   underlying facts, . . . the judge remains the final arbiter of whether the defense was

2   reasonable, even when the underlying fact question is sent to a jury." *Bard II*, 682 F.3d at

3   1007.

4          At the outset, the Court considers Defendant's argument that its defenses were

5   objectively reasonable because Plaintiffs did not move for summary judgment on the patent-

6   related defenses prior to trial. (Def.'s Br. at 4-5). Defendant also contends that Plaintiffs'

7   JMOL motions were denied, allowing the defenses to be considered by the jury, and that the

8   dissenting opinions in *Bard I* and *Bard II* show that its defenses were reasonable. (Def.'s Br.

9   at 5-10). The Court has considered these arguments but finds that they are not dispositive

10  or necessarily persuasive regarding its determination of whether Defendant's defenses were

11  objectively reasonable. The "threshold determination of objective recklessness . . . entails an

12  objective assessment of potential defenses based on the risk presented by the patent." *Bard*

13  *II*, 682 F.3d at 1006. The Court must base its decision on the "record ultimately made in the

14  infringement proceedings."[3]

15          **1.    Joint Inventorship**

16          Pursuant to 35 U.S.C. § 116,

17          When an invention is made by two or more persons jointly, they shall apply
            for patent jointly and each make the required oath, except as otherwise
18          provided in this title. Inventors may apply for a patent jointly even though (1)
            they did not physically work together or at the same time, (2) each did not
19          make the same type or amount of contribution, or (3) each did not make a
            contribution to the subject matter of every claim of the patent.
20
21          To succeed on a joint inventorship defense, a defendant must prove by clear and

22  convincing evidence that a person "(1) [contributed] in some significant manner to the

23  conception or reduction to practice of the invention, (2) [made] a contribution to the claimed

24  _____

25          [3] Some courts have held that "summary judgment rulings do not automatically prove
    that an objectively reasonable defense has been raised." *Carnegie Mellon Univ. v. Marvell*
26  *Tech. Grp., Ltd.*, No. 09-290, 2012 WL 5417552, at *2 (W.D. Pa. Nov. 2, 2012) (citing
    *Monsanto Co. v. E.I. DuPont de Nemours & Co.*, No. 4:09-cv-686-ERW, 2012 WL 2979080,
27  at *2 (E.D. Mo. July 20, 2012)).

28                                          - 6 -

1  invention that is not insignificant in quality, when that contribution is measured against the

2  dimension of the full invention, and (3) [did] more than merely explain to the real inventors

3  well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d

4  1344, 1351 (Fed. Cir. 1998). "Conception is the formation, in the mind of the inventor, of

5  a definite and permanent idea of the complete and operative invention, as it is thereafter to

6  be applied in practice." *Cooper I*, 154 F.3d at 1327. An actual reduction to practice requires

7  the inventor to prove that: "(1) he constructed an embodiment or performed a process that

8  met all the limitations of the [claim]; and (2) he determined that the invention would work

9  for its intended purpose." *Id.* Joint inventorship requires "collaboration or concerted effort"

10 such as "when the inventors have some open line of communication during or in temporal

11 proximity to their inventive efforts." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359

12 (Fed. Cir. 2004).

13     In asserting that its defense that Cooper was a joint inventor was reasonable,

14 Defendant emphasizes that it invented the material used in the patented device, and that Dr.

15 Goldfarb testified that in February 1973, two of Defendant's employees, Richard Mendenhall

16 and Peter Cooper, told him about trying ePTFE tubes as an artificial vascular prosthesis.

17 (Def.'s Br. at 12-14, referring to Doc. 782 at 677-78). Defendant cites Dr. Goldfarb's

18 testimony that Defendant's employees provided the tubing he used in his work and that he

19 had no expertise in the process of manufacturing the graft, stopping short of saying that in

20 late 1973 to 1974 he had no knowledge of how to make or fabricate ePTFE vascular grafts.

21 (*Id.*, referring to Doc. 782 at 686). Defendant argues that its joint inventorship defense was

22 based on Cooper's furnishing to Dr. Goldfarb the embodiment of the invention before

23 Goldfarb conceived the invention using that embodiment. (Def.'s Reply Br. at 8).

24     Plaintiffs argue that Defendant's defense based on Cooper as joint inventor was

25 unreasonable. Plaintiffs contend that, based on the evidence, Defendant merely suggested

26 that ePTFE was potentially useful as a vascular graft and then provided ePTFE tubes to

27 numerous other physicians, but none repeatedly made a successful graft. (Pls.' Resp. Br. at

28                                                                    - 7 -

13, referring to Doc. 1115, Ex. 6, PX1271.1-8 [shipping log showing tubes shipped to other doctors]; Ex. 3, PX116.15239 [Dr. Cohn report - grafts "bled like stink"]; PX116.17671 [Dr. Eiseman report that grafts "clotted in two attempts"]; PX116.17722 [Dr. Kelly report that grafts "completely thrombosed"]; & PX116.13101 [Dr. Eiseman report that "we are doing something wrong in the use of Goretex tubes"]). Plaintiffs cite evidence showing that in February 1973, Cooper sent to Dr. Goldfarb a box of undifferentiated ePTFE tubes "in a variety of sizes" for Goldfarb to use on his "animal artery prosthetic experiments, . . . to help you [Goldfarb] with your project." (Pls.' Resp. Br. at 14, referring to Doc. 1115, Ex. 3, PX116.13350). In April 1973, Cooper sent to Dr. Goldfarb "up-to-date-research reports" and ePTFE tubes that had the walls "penetrated . . . with many . . . 50-100 micron holes." (Pls.' Resp. Br. at 14, referring to Doc. 1115, Ex. 3, PX116.13351). These "research reports" reflected the state-of-the-art and erroneously focused on macroscopic properties. (Pls.' Resp. Br. at 14, referring to Doc. 791 at 3066 & Doc. 1115, Ex. 3, PX116.16082 & PX116.16194). Plaintiffs cite Dr. Goldfarb's testimony that "puncturing" the walls of the tubes with a sewing needle "destroy[ed] the true PTFE structure" and that he cut away the punctured portions of the tubes. (Pls.' Resp. Br. at 14, referring to Doc. 780 at 376 & Doc. 1115, Ex. 3, PX116.10211).

Plaintiffs also cite Cooper's testimony indicating that after he filed the patent application, he entered Dr. Goldfarb's laboratory and took Dr. Goldfarb's research slides, stating "we were trying to get the good research results that Dr. Goldfarb had obtained" in order to see if "there was something to be learned through the microscope that could help us decide if production of variables in the grafts were important." (Pls.' Resp. Br. at 15, referring to Doc. 1115, Ex. 3, PX116.15124). Plaintiffs contend that Cooper's action in taking Dr. Goldfarb's research slides shows that "Cooper still did not understand the invention." (Pls.' Resp. Br. at 15). Plaintiffs also argue that the evidence showed that in 1979, the patent examiner investigated Dr. Goldfarb's application to determine who among

- 8 -

Goldfarb, Cooper, Dan Detton,[4] and others was the proper inventor, concluding that the inventor was Dr. Goldfarb. (Pls.' Resp. Br. at 16, referring to Doc. 1115, Ex. 2, PX115.593-94 & PX115.603).

The Court has considered the parties' arguments and references to the evidence. Based on the record of the proceedings, Dr. Goldfarb was the first to discover that internodal distance was the key factor, and who further identified the requisite internodal distance necessary to make a successful vascular graft and reduce it to practice. *Cooper II*, 240 F.3d at 1380 (citing *Cooper I*, 154 F.3d at 1326-27). As found by the Federal Circuit in the *Cooper* decisions, "Cooper was focusing on the porosity of the material . . . not its fibril length." *Cooper II*, 240 F.3d at 1385 (citing *Cooper I*, 154 F.3d at 1324). The Federal Circuit noted Cooper's statements admitting his minimal contact with Dr. Goldfarb:

> Indeed, Cooper admits that, even after he conceived the importance of fibril length, he did not convey that information to Goldfarb. He also admits that he did not ask Goldfarb to use grafts with fibril lengths required by the interference count, or to determine the fibril lengths of successful grafts. While Cooper was not required to communicate his conception to Goldfarb, *Cooper I*, 154 F.3d at 1332, 47 USPQ2d at 1905, his failure to convey any information or requests regarding fibril length prevents Goldfarb's determination of the fibril lengths of the material from inuring to his benefit.

*Cooper II*, 240 F.3d at 1385. After a lengthy Interference, the Patent Office found, as affirmed by the Federal Circuit, that Dr. Goldfarb had rightful priority to the invention, that his reduction to practice did not inure to Cooper's benefit, and that "[t]his is not a case where a party conceives the invention, and then sends out the apparatus or compound in question to another for testing to confirm that the apparatus or compound will function to achieve the result intended by the conceiver." (Doc. 1115, Ex. 3, PX116.8381); *see Cooper II*, 240 F.3d at 1384-86.

The record shows that Defendant developed ePTFE and proposed using it to develop a vascular product. Defendant's Chairman Robert W. Gore testified that in late 1970 or early

---

[4] Detton was employed by Defendant from February 1973 until the Spring of 1974 and worked in the medical products area. (Doc. 787 at 1844).

1971, his father met Dr. Ben Eiseman at a medical conference and they came up with the idea that ePTFE might make a vascular product. (Doc. 786 at 1736, 1740-41). Cooper was put in charge of overseeing the vascular graft project. (Doc. 786 at 1742). As noted by the Federal Circuit, when Cooper sent the tubes to Dr. Goldfarb, he was not aware of the importance of fibril length. *Cooper II*, 240 F.3d at 1381. No one from Defendant, including Cooper, instructed Dr. Goldfarb on how to set up his experiments, what grafts to use, or what range of variables would produce a successful graft. (Doc. 1115, Ex. 3, PX116.9768-70). Dr. Goldfarb testified during trial that Cooper had very little to do with the projects except as a communicator to some of the laboratories, and had very little contact with Goldfarb. (Doc. 781 at 408-09). Dr. Goldfarb requested additional grafts from Defendant with certain identified specifications regarding internodal distance. (Doc. 781 at 398-400). Dr. Goldfarb confirmed that shortly after he filed his patent application in October 1974, a representative from Defendant matching Cooper's description entered his laboratory without permission and took his slides and that Cooper later admitted to this act. (Doc. 781 at 424-25).

Defendant's employee Mendenhall testified in a previous proceeding that there was "no discussion of substance" from Cooper and that it was Dr. Goldfarb who explained "the characteristics that were ideal for the synthetic artery." (Doc. 1115, Ex. 3, PX116.771-72, 777-78). Mendenhall testified that naming Cooper as inventor was "probably the most unethical thing [he had] ever seen done in [his] life. It is just not true." (Doc. 1115, Ex. 3, PX116.2103). Detton, Defendant's former employee whose credibility was thoroughly examined before the jury, testified in a previous deposition that Cooper was "a hindrance to the project" and "had certainly never been an inventor at the project." (Doc. 787 at 1942). Detton testified in another previous deposition that Cooper "didn't make any grafts" and did not "extrude any tubing that was used to make grafts." (Doc. 787 at 1938-39).

Portions of Cooper's September 2004 video deposition were admitted into evidence at trial. Cooper testified that he had developed a range of fibril lengths that would be suitable for a vascular prosthetic but he was not sure of the date. (Doc. 786 at 1757, 1760). He

- 10 -

1  claimed that he was aware of the five micron limit but he could not recall who taught it to

2  him and thought it might have been something he had read. (*Id.* at 1757-58). Cooper did not

3  recall telling anyone about the lower limit. (*Id.* at 1759). Cooper testified that "due to my

4  work, these tubes were created and put into David Goldfarb's hands. So I believe that that

5  was a contribution that I made, yes." (*Id.* at 1760).

6       It was not reasonable for Defendant to expect that it could succeed on its defense that

7  Cooper was a joint inventor with Dr. Goldfarb. Substantial evidence indicated a contrary

8  finding. Relevant to the Court's reasonableness assessment of the joint inventorship defense

9  is whether Defendant, as an objective litigant, had a realistic argument as to the facts and the

10  law that Cooper made a contribution to the invention that was not insignificant in quality

11  when measured against the full invention and that he engaged in collaboration or concerted

12  effort with Dr. Goldfarb. *Pannu*, 155 F.3d at 1351; *Eli Lilly & Co.*, 376 F.3d at 1359. The

13  PTO and the Federal Circuit found that Dr. Goldfarb's work did not inure to Cooper or to

14  Defendant's credit. Cooper's action of providing the ePTFE tubes to Dr. Goldfarb was

15  insignificant as the evidence shows that he punctured the tubes, he erroneously focused on

16  porosity, and that, after applying for the patent, he took Dr. Goldfarb's research slides to help

17  him understand an invention that he apparently did not comprehend. Cooper did not control

18  or direct Dr. Goldfarb's experiments and Cooper admitted that he did not convey the

19  importance of fibril length to Dr. Goldfarb. Indeed, Defendant's steps in pursuing the joint

20  inventorship defense can be deemed reckless. The PTO considered and rejected Defendant's

21  contention that Cooper was the prior inventor, there was essentially no evidence that Cooper

22  collaborated in any meaningful way with Dr. Goldfarb, and Defendant's own employees

23  denied that Cooper contributed to the invention. Defendant could not have realistically

24  expected to succeed on its joint inventorship defense. Therefore, Defendant's request for

25  relief based on joint inventorship is denied.

26      **2.**    **Anticipation**

27

28                               - 11 -

The defense of anticipation requires the alleged infringer to prove that a single prior art reference "describe[d] every element of the claimed invention, either expressly or inherently," and that it enabled "a person of ordinary skill in the art [to] practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

Defendant argues that Plaintiffs' witnesses, inventor Dr. Goldfarb and expert Dr. Anderson,[5] agreed that the Matsumoto prior art reference showed a picture of an ePTFE vascular graft possessing all of the claimed characteristics of the asserted '135 patent claims. (Def.'s Br. at 16).[6] Defendant supports this argument with a chart outlining excerpts of the testimony of Drs. Goldfarb and Anderson relevant to claim 20:

> Q.  Do you agree that Matsumoto describes an artificial vascular prosthesis comprising expanded porous polytetrafluoroethylene?
>
> A.  Dr. Goldfarb:  Yes.

(Doc. 788 at 2107).

> Q.  Now, let's see if we can streamline this a little bit.  Let's put up claim 20, which talked about Matsumoto. Now, let's talk at the top part here, right above the "which permits tissue ingrowth," you agree that Matsumoto discloses and describes using the words of claim 20 an artificial vascular prosthesis comprising expanded porous polytetrafluoroethylene having a microstructure of nodes interconnected by fibrils, correct?
>
> A.  Dr. Anderson:  Correct.
>
> Q.  Yes?
>
> A.  Dr. Anderson:  Yes.

(Doc. 791 at 3084).

---

[5] James M. Anderson, Ph.D., M.D., is a Professor of Pathology, Polymer Science, and Biomedical Engineering at Case Western University in Cleveland, Ohio. (Doc. 783 at 1013, 1016).

[6] Dr. Goldfarb testified that the third Matsumoto article referred to the Surgery publication in the United States. (Doc. 782 at 653, 660-61, 712). This article was published in October 1973. (Doc. 788 at 2181; *see* Doc. 1115, Ex. 7, DX3009).

- 12 -

Q.     You agree with me, though, that the photograph that Matsumoto shows is of a microstructure consisting of nodes interconnected by fibrils, looking at Figure 1?

A.     Dr. Goldfarb: That's the way it appears, yes.

Q.     And Matsumoto shows that his prosthesis permitted tissue ingrowth; isn't that right?

A.     Dr. Goldfarb: Yes.

(Doc. 788 at 2108).

Q.     I'm going to show you again the better photocopy of the Matsumoto article open to Figure 4. From that photograph, particularly the presence of nuclei, does that clarify the fact that Matsumoto is describing that there was cellular ingrowth in the pores?

A.     Dr. Goldfarb: In this picture, it does look like that, yes.

Q.     And that's the same sort of cellular ingrowth that you observed in the 1973, 1974 work; is that right?

A.     Dr. Goldfarb: It has the same appearance.

(Doc. 788 at 2104).

Q.     And you agree that these words in Matsumoto of a well developed fibroplasia or fibroplastic proliferation in the porous layer - - through the pores may support claim 20 permits tissue ingrowth as construed by the Court, correct?

A.     Dr. Anderson: Correct.

(Doc. 791 at 3089).

Q.     Dr. Goldfarb, I'm going to hand you Gore's Deposition Exhibit 15 and I'm going to ask you . . . to look at the photograph which is figure 11[.]

A.     Dr. Goldfarb: Yes.

Q.     Would you please compare that with Figure 4 that appears in the English language Matsumoto publication, Gore Exhibit 13, and confirm for me that, apart from the size of the photograph, we're looking at the same photograph. And I can make it easier for you by giving you better copies.

A.     Dr. Goldfarb: It appears the same.

Q.     Okay. Now, in paragraph 13 of the declaration of Dr. Schoen, which has been marked a Gore Deposition Exhibit 14, Dr. Schoen states his determination that the ePTFE graft described in Figure 11 of the Matsumoto Japanese article - - which we've marked here as . . . Exhibit

- 13 -

**A000013**

15 - - had an internodal distance on the order of 50 microns. Do you have any reason to agree or disagree with that determination by Dr. Schoen which was filed on your behalf?

A.    Dr. Goldfarb: I would say that's a reasonable approximation.

Q.    Is it your position that the Matsumoto 1973 article, Exhibit 13, described an ePTFE tube as a vascular prosthesis having values of internodal distance and wall thicknesses within the range you described in your patent application?

A.    Dr. Goldfarb: I don't believe - - and correct me if I'm understanding it wrong - - that he described it in this article. But the picture that he shows could possibly be interpreted as being within the range. But there's no calibration here in the Matsumoto article. So it would be hard for me to come to a definite conclusion about that.

Q.    But you're willing to accept Dr. Schoen's conclusion as being reasonable for one skilled in the art; is that correct?

A.    Dr. Goldfarb: His method of extrapolation is logical.

(Doc. 788 at 2105-07).

Q.    And if we believe Dr. Schoen's declaration filed in your behalf, the average distance between nodes is not less than six microns and is small enough to prevent transmural blood flow; isn't that correct?

A.    Dr. Goldfarb: It appears that way.

(Doc. 788 at 2108).

        In contending that Defendant's anticipation defense was not reasonable, Plaintiffs argue that the Matsumoto reference said nothing about internodal distance and that Defendant before the PTO had previously argued against the Matsumoto reference being considered as prior art. (Pls.' Resp. Br. at 18-19, referring to Doc. 1115, Ex. 4, PX117.158 & Ex. 3, PX116.3828). Plaintiffs refer to evidence indicating that scientists failed to replicate Matsumoto's results. (Pls.' Resp. Br. at 19, referring to Doc. 1115, Ex. 8 [DX3205 at 40931], Ex. 3 [PX116.13192], Ex. 5 [PX1216.129:16-17], Ex. 4 [PX117.155], & Doc. 787 at 1960 (testimony of Defendant's employee Detton)). Plaintiffs argue that Matsumoto was before the PTO as prior art to Dr. Goldfarb's application in 1976, in 1984-1986, and in 2001, and each time the PTO rejected any contention that Matsumoto invalidated Goldfarb's claims. (Pls.' Resp. Br. at 19-20, citing *Bard I*, 670 F.3d at 1185 ("Matsumoto was already

- 14 -

1    before the PTO during prosecution of the '135 patent, and the PTO did not find that

2    Matsumoto anticipated . . . ")).

3           Based on the Court's review of the record, Jock Wheeler, M.D., a vascular surgeon

4    and Defendant's expert, acknowledged in his testimony that the PTO considered the

5    Matsumoto prior art reference before issuing the patent. (Doc. 788 at 2120, 2246).[7]  Dr.

6    Wheeler agreed that the Matsumoto article never used the term "fibril length" but used

7    "porosity" instead, which did not refer to "internodal distance." (*Id.* at 2246-47). Dr.

8    Wheeler also acknowledged that the PTO had determined that "pore size" bore no

9    relationship to fibril length, but said he did not agree with that conclusion. (*Id.* at 2247).

10   Defendant's employee Detton testified at trial that "you couldn't figure anything" from the

11   Matsumoto article "because the article itself did not define anything." (Doc. 787 at 1960).

12   Detton further testified that there were "real problems" even with the third Matsumoto article

13   and "that wouldn't have been enough for me to even do much with . . . so we had no idea."

14   (*Id.*). Detton testified that Matsumoto had received industrial tubing but that they "knew

15   nothing about what Matsumoto received except that it was Gore-Tex." (*Id.*).

16          Regarding the testimony cited by Defendant, Dr. Goldfarb also testified that the

17   Matsumoto reference had been considered by the PTO which concluded it had no effect on

18   the issuance of the patent. (Doc. 781 at 500, 502; Doc. 782 at 693, 699). Dr. Goldfarb

19   testified that the Matsumoto reference "could possibly be interpreted as being within the

20   range," but there was "no calibration here in the Matsumoto article." (Doc. 788 at 2106).

21   Dr. Anderson testified that "there's not enough information" in Matsumoto to "identify the

22   parameters that a doctor should use to create a working vascular graft with ePTFE" because

23   Matsumoto did not disclose "[t]he characteristics of the graft material" and did not discuss

24   internodal distance at all. (Doc. 791 at 3063-64). Dr. Anderson further testified that

25

26   ——————————

27          [7] Dr. Wheeler also had served as Dean and Provost of the Eastern Virginia Medical
     School. (Doc. 788 at 2120-21).

28                                          - 15 -

1   Matsumoto did not recognize a connection between internodal distance and tissue ingrowth

2   and did not show a connection in the dimensions. (*Id.* at 3089).

3       Other evidence shows that in October 1973, Defendant's employee noted that

4   Matsumoto "claims 100% success on femoral arteries in dogs: but we do not know what

5   tubes we used. So we start again." (Doc. 1115, Ex. 8, DX3205 at 40931; Doc. 787 at 1958-

6   61). In 1973 and 1975, doctors stated they had not been able to replicate Matsumoto's

7   results. (Doc. 1115, Ex. 3 [PX116.13174 & PX116.13192] & Ex. 4, PX117b.155). In 1975,

8   Defendant's employee Mendenhall testified regarding the Matsumoto article that "nobody

9   knew what was sent over" and "[n]obody was very able to reproduce that." (Doc. 1115, Ex.

10  5, PX1216.129). Finally, Defendant, before the PTO, argued against the Matsumoto

11  reference. (Doc. 1115, Ex. 3, PX 116.3826-29). For example, Defendant argued in briefing

12  before the PTO that "[o]ne is left to speculate as to whether this small portion of the

13  Matsumoto graft is representative of the fibril length throughout the entire graft and whether

14  other portions of the graft had tissue ingrowth." (Doc. 1115, Ex. 3, PX116.3828).

15      Substantial evidence supports the finding that the anticipation defense was

16  unreasonable. In order for the defense to have been reasonable, there must have been

17  credible evidence on which Defendant could successfully show that Matsumoto was a prior

18  art reference that described every element of the claimed invention, either expressly or

19  inherently, and enabled a person of ordinary skill in the art to practice the invention without

20  undue experimentation. *Advanced Display*, 212 F.3d at 1282. Here, in contrast, scientists

21  and physicians at the time could not replicate Matsumoto's claimed results. Defendant's own

22  employees could not figure anything out from the Matsumoto article even though Defendant

23  manufactured the tubing. Defendant's expert Dr. Wheeler agreed that the Matsumoto article

24  never used the term "fibril length." Defendant, before the PTO, even argued that Matsumoto

25  did not anticipate. The Matsumoto reference was considered by the PTO and consistently

26  rejected. Against all of these concerns, Defendant could not have "realistically expected"

27

28

- 16 -

1   its anticipation defense to succeed based on Matsumoto. Thus, Defendant's request for relief

2   on this basis is also denied.

3   ### 3.   Other Defenses

4   Other evidence in the infringement proceedings supports the conclusion that

5   Defendant's other defenses also were unreasonable. Defendant relied on a November 2002

6   opinion letter from counsel that the patent was invalid to show Defendant's good faith in

7   continuing to manufacture and sell its vascular graft products. (Doc. 791 at 3003-09, 3021-

8   37). Counsel's opinion letter was based in part on Matsumoto as enabling prior art; however,

9   the Matsumoto article was considered and rejected by the PTO. The Matsumoto article is

10  cited on the face of the patent. (Doc. 729 at 7; Doc. 781 at 498-500, 502-503; Doc. 782 at

11  654-55, 693; Doc. 788 at 2264; Doc. 791 at 3031-32; PX1). Counsel's opinion letter on

12  which Defendant relied ignored Defendant's arguments in the Interference proceedings that

13  Matsumoto was not enabling and that Defendant could not determine the structure that was

14  disclosed. (Doc. 729 at 8; Doc. 787 at 1957-61). Notably, the opinion letter stated that Dr.

15  Goldfarb and Cooper were joint inventors even though Defendant argued in the Interference

16  that Cooper was the sole inventor and made no claim that Cooper was a joint inventor. (Doc.

17  791 at 3032-33, 3055).

18  Next, Defendant contended at trial that Dr. Volder was a sole or joint inventor. (Doc.

19  790 at 2594-2630; Doc. 793 at 3566-75, 3582, 3587, 3595-96). However, Defendant's

20  opinion letter claimed that only Cooper was a co-inventor. (Doc. 791 at 3032-33). The PTO

21  made no determination regarding Dr. Volder as inventor as the issue was between Dr.

22  Goldfarb and Cooper. (Doc. 791 at 2900, 2918-19). In July 1976, Dr. Volder submitted an

23  affidavit to the PTO that supported Dr. Goldfarb's patent application. (Doc. 782 at 694-98).

24  Dr. Volder stated under oath in the affidavit that "he is of the unqualified opinion that the

25  prosthetic vascular structure conceived and developed by [Dr. Goldfarb] . . . was by no

26  means obvious to those actively conducting research on expanded PTFE vascular structures

27  during 1972 and 1973." (Doc. 782 at 694, 697-98). Dr. Volder never made a claim to the

28

- 17 -

1    PTO that he was an inventor or co-inventor. (Doc. 790 at 2646; Doc. 791 at 2903). The trial

2    testimony indicated that Drs. Goldfarb and Volder were "independent surgical research

3    investigators." (Doc. 781 at 408-09, 415; Doc. 788 at 2265-66). Dr. Volder's article is listed

4    on the front page of the patent. (Doc. 781 at 499).[8] Its significance was considered and

5    rejected by the PTO. (Doc. 781 at 502). After the Volder article, Defendant was still

6    searching for a solution and a structure. (Doc. 788 at 2264-66). Dr. Volder did not testify at

7    trial.

8         Defendant additionally presented weak arguments at best based on written description

9    and best mode. (Doc. 756; Doc. 758; Doc. 788 at 2197, 2205-16, 2261-63). The key critical

10   element was fibril length or internodal distance. (Doc. 791 at 3067). Complete transmural

11   tissue ingrowth and formation of a neointima were not essential to the Goldfarb invention.

12   (Doc. 314 at ¶ 46; Doc. 559 at 18; Doc. 782 at 668; Doc. 786 at 1622). Dr. Goldfarb testified

13   that no specific density was required and "that wall thickness was important, but not

14   essential." (Doc. 781 at 401, 514).

15        Defendant's reliance on counsel's opinion letter, its defense that Dr. Volder was a sole

16   or joint inventor, and its written description and best mode arguments all lacked a sufficiently

17   reasonable persuasive basis. Defendant argued that Cooper was the sole inventor before the

18   PTO but then claimed he was a co-inventor. Defendant claimed that Dr. Volder was a sole

19   or joint inventor, but Dr. Volder provided an affidavit to the PTO that supported Dr. Goldfarb

20   and he never claimed the invention before the PTO as either inventor or co-inventor. These

21   unreasonable, unrealistic arguments and Defendant's weak references to written description

22   and best mode all are rejected by this Court just as they were by the jury. The record of the

23   infringement proceedings does not permit a reasonable conclusion contrary to that reached

24   by the jury. *Ostad*, 327 F.3d at 881.

25   _____

26        [8] The Volder article was published in April and November 1973. (Doc. 781 at 499;
     Doc. 788 at 2181-82; Doc. 782 at 695). Defendant asserted obviousness in light of the
27   Volder article. (Doc. 771 at 17; Doc. 872 at 6-10).

28                                              - 18 -

### III.    CONCLUSION

There is no dispute that Defendant had notice of the Goldfarb patent.  Defendant was familiar with the patent's subject matter and pre-trial litigation history because it litigated the inventorship issue in an eighteen-year Interference in which the PTO and the Federal Circuit ultimately determined that Dr. Goldfarb was the prior inventor.  Defendant relied on counsel's opinion letter even though it was based in part on prior art that had been considered and rejected by the PTO and  ignored arguments that Defendant had made before the PTO.  The extensive litigation history of this case shows that Defendant relied on the same references, that is, the Matsumoto and Volder articles, to support its invalidity defense that the PTO previously had considered and found were not invalidating.  Defendant argued before the PTO that Cooper was the sole inventor but then later changed its position by claiming at trial that Cooper was a joint inventor or that Volder was either a sole inventor or joint inventor.  Defendant's arguments asserted prior to the issuance of the '135 patent and Defendant's contradictory arguments asserted after the patent issued, and its diluted defenses, convince this Court that Defendant did not have a reasonable basis for believing in the noninfringement of the patent.

Plaintiffs contend that the facts underlying the jury's verdict of willfulness are binding on the Court with respect to its determination of whether Defendant's defenses were objectively reasonable.  (Pls.' Resp. Br. at 11).  Defendant, in contrast, argues that "the objective reasonableness determination does not require fact finding" and that "there is no direct role for the jury to play in that determination."  (Def.'s Reply Br. at 5).  Defendant's argument appears inconsistent with *Bard II's* recognition that, depending on the defense that has been asserted, the court may "allow the jury to determine the underlying facts relevant to the defense in the first instance."  *Bard II*, 682 F.3d at 1008.  Under either standard, it is clear to this Court, just as it was to the jury, that Defendant, as a "reasonable litigant," could not have "realistically expected" its defenses to succeed.  *Id.*  Defendant's incautious and

- 19 -

1  arguably reckless defenses were not objectively reasonable.  It is unnecessary for the Court
2  to reconsider its rulings on enhanced damages and attorneys' fees.
3          **Accordingly,**
4          **IT IS ORDERED** upon reconsideration pursuant to remand of this matter, Defendant
5  is not entitled to JMOL on the issue of willful infringement.
6          Dated this 16th day of October, 2013

Mary H. Murguia
United States Circuit Judge
designated as United States District Judge

- 20 -

A000020

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., | No. CV 03-0597-PHX-MHM |
| Plaintiffs, | **ORDER** |
| v. | |
| W. L. Gore & Associates, Inc., | |
| Defendant. | |

     Before the Court are Defendant's Request for Judicial Notice of Decision on Request for Reexamination of United States Patent No. 6,436,135 ("'135 patent") ("Def.'s Req.") (Doc. 1122); Defendant's Motion for a New Trial or in the Alternative to Amend the Judgment and Memorandum in Support ("Def.'s Mem.") (Doc. 1113); and Plaintiffs' Motion for Leave to Execute on the Judgment ("Pls.' Mot.") (Doc. 1109). Counsel for the parties presented oral argument on June 12, 2013.

## I.  Defendant's Request for Judicial Notice

    Defendant asks the Court to take judicial notice of the "Decision On Request For Reexamination" issued by the Central Reexamination Unit ("CRU") of the United States Patent and Trademark Office on January 23, 2013, submitted as Exhibit A to Defendant's Request. (Def.'s Req. at 2, Ex. A). The CRU granted an ex parte reexamination of claims 20-27 of the '135 patent based on the Matsumoto reference. (Doc. 1122, Ex. A). However,

on July 11, 2013, Plaintiffs filed a Notice of Supplemental Authority that on July 10, 2013, the U.S. Patent and Trademark Office terminated the reexamination. (Doc. 1138, Bard's Notice of Supplemental Authority - Notice of Termination of Reexamination). Defendant's Request for Judicial Notice is denied as moot.

## II.    Defendant's Motion for a New Trial

Defendant has moved for a new trial based on the assumption that the Court has granted judgment as a matter of law in its favor and against Plaintiffs based on the issue of willful infringement. (Def.'s Mem. at 1). Defendant alternatively moves for an amendment to the Amended Clerk's Judgment based on the premise that the Court has found that Defendant did not willfully infringe the '135 patent. (*Id.* at 24). Defendant seeks a ruling lowering the ongoing royalty rates assessed against it as found by the Court.

The Court has issued an Order finding against Defendant on the issue of willful infringement and in favor of Plaintiffs. Defendant's motion for new trial or, in the alternative, for an amendment to the judgment, is denied.

## III.    Plaintiffs' Motion for Leave to Execute on the Judgment

Plaintiffs move for leave to execute on the August 24, 2010 Amended Clerk's Judgment to the extent it is final and non-appealable following the Federal Circuit's decisions in *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,* 670 F.3d 1171 (Fed. Cir. 2012) (*"Bard I"*), and *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,* 682 F.3d 1003 (Fed. Cir. 2012) ("*Bard II*"). (Pls.' Mot.). Plaintiffs contend that the final and non-appealable portions of the Amended Judgment are appropriate for execution, equitable considerations favor execution on those portions of the Amended Judgment, and Plaintiffs are entitled to post-judgment interest on the final and non-appealable portions of the Amended Judgment other than the quarterly payments. (Doc. 1110, Mem. in Support of Pls.' Mot. for Leave to Execute on J.). Defendant responds in opposition that the Court stayed enforcement of the Amended Judgment with respect to money judgments and ordered the escrow of Defendant's royalty payments until entry of a final and non-appealable

- 2 -

1    judgment. (Doc. 1116, Def.'s Opp'n to Pls.' Mot. for Leave to Execute on J. ("Def.'s

2    Opp'n") at 2). Defendant argues that execution on the judgment is not appropriate because

3    a final and non-appealable judgment has not been entered.

4            The Court has considered the parties' arguments.  The Court also has considered

5    Defendant's supplemental authority which it does not find persuasive. (Doc. 1136).  The

6    Court of Appeals for the Federal Circuit affirmed the judgment that the '135 patent is valid.

7    The Federal Circuit remanded the issue of willfulness so that this Court could reconsider its

8    denial of JMOL.  The Court has now ruled that Defendant is not entitled to JMOL on the

9    issue of willful infringement.  The Court's reconsideration of its rulings on enhanced

10   damages and attorneys' fees is not necessary.  The Court finds no compelling reason to

11   further stay execution of the Amended Clerk's Judgment regarding the portions that are final

12   and non-appealable based on *Bard I* and *Bard II*.

13           Accordingly,

14           **IT IS ORDERED** that Defendant's Request for Judicial Notice of Decision on

15   Request for Reexamination of United States Patent No. 6,436,135 (Doc. 1122) is **denied as**

16   **moot.**

17           **IT IS FURTHER ORDERED** that Defendant's Motion for a New Trial or in the

18   Alternative to Amend the Judgment (Doc. 1113) is **denied.**

19           **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to Execute on the

20   Judgment (Doc. 1109) is **granted regarding the final and non-appealable issues.** Any stay

21   previously issued by the Court concerning the final and non-appealable issues in the

22   Amended Clerk's Judgment is lifted.  Plaintiffs shall submit a proposed Order.

23           Dated this 16th day of October, 2013

24

25

26           Mary H. Murguia
             United States Circuit Judge
27           designated as United States District Judge

28                                        - 3 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Bard Peripheral Vascular, Inc. and David
Goldfarb, M.D.,

    Plaintiffs,

    v.

W. L. Gore & Associates, Inc.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. CV 03-0597-PHX MHM

**ORDER GRANTING PLAINTIFFS'
MOTION FOR LEAVE TO
EXECUTE ON JUDGMENT**

    Pursuant to the Court's Order filed October 17, 2013 (D.I. 1145), it is **HEREBY ORDERED** that:

    1.    Plaintiffs are entitled to execute immediately on the Amended Clerk's Judgment filed August 24, 2010 (D.I. 1047) as follows:

    a.    Lost profits damages in the amount of $102,081,578.82 and reasonable royalty damages in the amount of $83,508,292.20, for a total of $185,589,871.02, to which Plaintiffs are entitled for the time period ending June 30, 2007, are due pursuant to the Amended Clerk's Judgment dated August 24, 2010, and are immediately payable to Plaintiffs;

    b.    Taxable costs in the amount of $165,554.54 are due pursuant to the Amended Clerk's Judgment dated August 24, 2010, and are immediately payable to Plaintiffs;

    c.    Prejudgment interest on the damages specified above in paragraph 1.a., in the amount of $18,558,987.10, are due pursuant to the Amended Clerk's Judgment

1   dated August 24, 2010, and are immediately payable to Plaintiffs; and

2           d.     Supplemental lost profits damages in the amount of $44,556,381.24

3   and supplemental reasonable royalty damages in the amount of $64,440,740.00, for a total

4   of $108,997,121.24, to which Plaintiffs are entitled for the time period beginning July 1,

5   2007 and ending March 31, 2009, are due pursuant to the Amended Clerk's Judgment

6   dated August 24, 2010, and are immediately payable to Plaintiffs.

7        2.     Plaintiffs are entitled to post-judgment interest pursuant to 28 U.S.C. § 1961

8   on the amounts specified above, calculated daily at a rate of 0.25%, compounded

9   annually, for the period beginning August 24, 2010 and ending on the date of payment

10  ($2,505,570.23 as of October 31, 2013).

11       3.     Subject to paragraph 6.a below, all royalty payments held in the CRIS, as

12  well as all interest accumulated on those accounts, are immediately due and payable to

13  Bard.  As of October 25, 2013, the principal of the compulsory royalty payments total

14  $541,607,871.75 (D.I. 1046, 1062, 1065, 1066, 1069, 1071, 1073, 1075, 1077, 1096,

15  1123, 1129, and 1139).  Gore's October 31, 2013 compulsory royalty payment shall be

16  deposited with the CRIS and thereafter be immediately due and payable to Bard.  Only

17  Gore's deposit of $195,000,000 deposited as Registry Case No. DAZX203CV000597001,

18  and an additional $13,000,000 as explained in paragraph 6.a, will remain in the CRIS.

19       4.     All future royalty payments beginning after October 31, 2013, shall be made

20  by Gore directly to Bard in accordance with the terms in the Amended Clerk's Judgment

21  filed August 24, 2010 (D.I. 1047).

22       5.     Any stay previously issued by the Court concerning the enforcement of the

23  money judgments listed above in paragraphs 1-4 is hereby lifted effective immediately.

24       6.     In accordance with the foregoing, Bard shall collect the amounts payable

25  above on November 1, 2013, in the manner set forth below:

26          a.     All amounts in the Court's registry system, except $195,000,000

27  deposited as Registry Case No. DAZX203CV000597001 and $13,000,000 from Registry

28  Case No. DAZX203CV000597014, should be released by the Clerk to Bard on November

1    1, 2013. The Clerk will retain all remaining amounts in the CRIS, in satisfaction of Gore's

2    obligations under paragraph 10 below.

3            b.      On November 1, 2013, Fidelity and Deposit Company of Maryland

4    and Zurich American Insurance Company shall pay (or cause to be paid) to Bard the full

5    face amount of $115,000,000 of supersedeas bond No. CGB 8936325. Gore is liable for

6    the payment of this $115,000,000 to Bard until payment is actually made to Bard by

7    Fidelity and Deposit Company of Maryland and Zurich American Insurance Company.

8            c.      On November 1, 2013 Liberty Mutual Insurance Company shall pay

9    (or cause to be paid) to Bard the amount of $213,817,104.13 from supersedeas bond No.

10    019025260. Gore is liable for the payment of this $213,817,104.13 to Bard until payment

11    is actually made to Bard by Liberty Mutual Insurance Company.

12            Payment of these amounts to Bard shall satisfy all Plaintiffs' interests in the

13    money judgments listed above in paragraphs 1-3 of this order.

14        7.      Upon Fidelity and Deposit Company of Maryland and Zurich American

15    Insurance Company's payment to Bard as set forth in 6.b above, it is ordered that the bond

16    posted by Fidelity and Deposit Company of Maryland and Zurich American Insurance

17    Company shall be cancelled, be of no further effect, and Fidelity and Deposit Company of

18    Maryland and Zurich American Insurance Company shall be fully and finally released

19    from any and all liability under the bond. Once this Order is issued by the Court and the

20    payment has been remitted by Fidelity and Deposit Company of Maryland and Zurich

21    American Insurance Company, Plaintiffs shall have no right to make any further claim

22    under the bond.

23        8.      Upon Liberty Mutual Insurance Company's payment to Bard as set forth in

24    6.c above, it is ordered that the bond posted by Liberty Mutual Insurance Company shall

25    be cancelled, be of no further effect, and Liberty Mutual Insurance Company shall be fully

26    and finally released from any and all liability under the bond. Once this Order is issued

27    by the Court and the payment has been remitted by Liberty Mutual, Plaintiffs shall have

28    no right to make any further claim under the bond.

9.    The only portions of the Amended Clerk's Judgment filed August 24, 2010 (D.I. 1047) that remain subject to any stay previously issued by the Court are:

a.    Enhanced damages in the amount of $185,589,871.02.

b.    Attorneys' fees and nontaxable costs in the amount of $19,000,000.00.

c.    Prejudgment interest on the fees and costs specified above in paragraph 9.b., in the amount of $1,900,000.00.

d.    The total amount of the money judgment that remains subject to a stay is therefore $206,489,871.02, subject to post-judgment interest.

10.   As a condition of maintaining a stay of execution on those parts of the money judgment described in paragraph 9, Gore is required to maintain a bond sufficient to satisfy the amounts reflected in paragraph 9 and post-judgment interest thereon.

11.   Following receipt of the funds listed in paragraphs 1-3 of this order, Plaintiffs shall file with the Court a partial accord and satisfaction of judgment for the portions of the Amended Clerk's Judgment reflected in paragraphs 1-3 above, which will not extend to the amounts in paragraphs 4 and 9 above.

**IT IS SO ORDERED.**

Dated this 30th day of October, 2013.


Mary H. Murguia
United States Circuit Judge
designated as United States District Judge



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc.; David Goldfarb, M.D., | No. CV 03-0597–PHX-MHM |
| Plaintiffs, | **ORDER** |
| vs. | |
| W.L. Gore & Associates, Inc., | |
| Defendant. | |
| | |
| W.L. Gore & Associates, Inc., | |
| Counterclaimant, | |
| vs. | |
| Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., | |
| Counterdefendants. | |

Presently, Gore has ten outstanding Motions for Judgment as a Matter of Law ("JMOL"). Gore's ten motions include the following: (1) Gore's Motion for JMOL Regarding Plaintiffs' Claim of Willful Infringement; (2) Gore's Motion for JMOL Regarding Invalidity of the '135 Patent for Failure to Disclose Best Mode; (3) Gore's Motion for JMOL that Claims 20-27 are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112, ¶ 1; (4) Gore's Motion for JMOL Regarding Plaintiffs' Failure to Prove that

1  Gore's Accused Products Meet the Typicality Element of Claims 20-27; (5) Gore's Motion

2  for JMOL that Claims 20-27 are Invalid under 35 U.S.C. § 102(B) for Lack of Novelty in

3  View of the 1973 Matsumoto Surgery Article; (6) Gore's Motion for JMOL Regarding

4  Plaintiffs' Claim that Propaten Infringes the '135 Patent; (7) Gore's Motion for JMOL

5  Regarding Invalidity for Anticipation by Dr. Norton's December 1971 Use in "Mrs. B"; (8)

6  Gore's Motion for JMOL Regarding Invalidity for Improper Inventorship Because Cooper

7  and Goldfarb are Joint Inventors; (9) Gore's Motion for JMOL Regarding Plaintiffs' Lack

8  of Standing; and (10) Gore's Motion for JMOL that Claim 20 is Obvious in Light of the

9  Volder Publication. This Order addresses the first nine of Gore's JMOL Motions. The Court

10 will issue a separate Order addressing Gore's tenth Motion for JMOL relating to

11 obviousness.

12                                **LEGAL STANDARD**

13     Rule 50, Fed.R.Civ.P., states in relevant part as follows:

14     If a party has been fully heard on an issue during a jury trial and the court finds
       that a reasonable jury would not have a legally sufficient evidentiary basis to
15     find for the party on that issue, the court may:

16         (A) resolve the issue against the party; and
           (B) grant a motion for judgment as a matter of law against the party on
17     a claim or defense that, under the controlling law, can be maintained or
       defeated only with a favorable finding on that issue.
18

19     "Judgment as a matter of law is proper if the evidence, construed in the light most

20 favorable to the non-moving party, allows only one reasonable conclusion . . . ." Acosta v.

21 City and County of San Francisco, 83 F.3d 1143, 1145 (9th Cir. 1996); see also Pavao v.

22 Pagay, 307 F.3d 915, 918 (9th Cir. 2002) (a motion for judgment as a matter of law should

23 be granted only "if the evidence . . . permits only one conclusion, and that conclusion is

24 contrary to the jury's verdict."). "If reasonable minds could differ as to the import of the

25 evidence, however, a verdict should not be directed." Anderson v. Liberty Lobby, Inc., 477

26 U.S. 242, 250-51 (1986). In other words, to grant JMOL, there most be "no scenario by

27 which a jury could have concluded" in the nonmoving party's favor. City Solutions, Inc. v.

28                                      - 2 -

1  Clear Channel Commc'ns, 365 F.3d 835, 841 (9th Cir. 2004) (reversing grant of motion for

2  JMOL).

3  **DISCUSSION**

4  **I.    GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' CLAIM OF**
5  **WILLFUL INFRINGEMENT**

6         Gore has moved for JMOL regarding Plaintiffs' claim of willful infringement,

7  claiming Plaintiffs did not proffer sufficient evidence to meet their burden of proving willful

8  infringement by clear and convincing evidence.

9         "[T]o establish willful infringement, a patentee must show by clear and convincing

10  evidence that the infringer acted despite an objectively high likelihood that its actions

11  constituted infringement of a valid patent." In re Seagate Tech., LLC, 497 F.3d 1360, 1368

12  (Fed. Cir. 2007). Stated another way, "proof of willfulness . . . requires at least a showing

13  of objective recklessness." Id. If this objective standard is satisfied, then the plaintiffs must

14  establish the existence of a separate, subjective element – the risk that the defendant's

15  conduct was objectively reckless "was either known or so obvious that it should have been

16  known to the accused infringer." Id.

17         A party seeking to establish that patent claims are invalid must overcome statutory

18  presumption of validity set forth in 35 U.S.C. § 282 by clear and convincing evidence.

19  Nystrom v. TREX co., Inc., 424 F.3d 1136, 1149 (Fed. Cir. 2005). This presumption of

20  validity "exists at every stage of the litigation," Cannon Computer Sys., Inc. v. Nu-Kote Int'l,

21  Inc., 134 F.3d 1985, 1088 (Fed. Cir. 1998), and "is never annihilated, destroyed or even

22  weakened regardless of what facts are of record." ACS Hosp. Sys., Inc. v. Montefiore Hosp.,

23  732 F.2d 1472, 1574-75 (Fed. Cir. 1984).

24         Where the matter alleged to be invalidating was expressly considered by the PTO, the

25  party challenging validity has the "added burden . . . of overcoming the deference that is due

26  to a qualified government agency presumed to have properly done its job, which includes one

27  or more examiners who are assumed to have some expertise in interpreting the references and

28  - 3 -

1  to be familiar with their work with the level of skill in the art and whose duty it is to issue

2  only valid patents." <u>Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.</u>, 725 F.2d 1350, 1359

3  (Fed. Cir. 1984).

4       The trial record in this case provides sufficient evidence for the jury to have found

5  willful infringement by clear and convincing evidence. Such evidence includes the extensive

6  litigation history before the PTO – all of which has found Dr. Goldfarb to be the rightful

7  inventor and patent holder – and that Gore relied on the same references (the Soyer, Volder,

8  and Matsumoto articles) to support its invalidity defense that the PTO previously found not

9  to invalidate Dr. Goldfarb's invention. The Court finds sufficient evidence upon which a

10  reasonable jury could have found willful infringement. Accordingly, Gore's Motion for

11  JMOL Regarding Plaintiffs' Claim of Willful Infringement is denied.

12  **II.**    **GORE'S MOTION FOR JMOL REGARDING INVALIDITY OF THE '135**

13         **PATENT FOR FAILURE TO DISCLOSE BEST MODE**

14       Gore alleges that the '135 patent is invalid for violating the best mode requirement of

15  35 U.S.C. § 112. A best mode analysis involves two steps. "First, the factfinder must

16  determine whether, at the time of filing the application, the inventor possessed a best mode

17  for practicing the invention." <u>Eli Lilly & Co. v. Barr Labs., Inc.</u>, 251 F.3d 955, 963 (Fed.

18  Cir. 2001). "Second, if the inventor possessed a best mode, the fact finder must determine

19  whether the written description disclosed the best mode such that one reasonably skilled in

20  the art could practice it." <u>Id.</u> "The first prong involves a subjective inquiry, focusing on the

21  inventor's state of mind at the time of filing," whereas "the second prong involves an

22  objective inquiry, focusing on the scope of the claimed invention and the level of skill in the

23  art." <u>Id.</u> Both steps must be proven by clear and convincing evidence for each asserted

24  claim. <u>Liquid Dynamics Corp. v. Vaughan Co. Inc.</u>, 449 F.3d 1209, 1223 (Fed. Cir. 2006).

25       "There is no requirement in 35 U.S.C. § 112 that an applicant point out which of his

26  embodiments he considers his best mode; that the disclosure includes the best mode

27  contemplated by the applicant is enough to satisfy the statute." <u>Randomex, Inc. v. Scopus</u>

28                - 4 -

1    Corp., 849 F.2d 585, 589 (Fed. Cir. 1988) (internal citations omitted). Thus, contrary to

2    Gore's assertion, the best mode requirement is satisfied when an inventor discloses a range

3    that includes his best mode. See e.g., Ernsthausen v. Nakayama, 1 U.S.P.Q. 1539, 1549 (Bd.

4    Pat. App. & Inter. 1985) ("There is no concealment of best mode here since one of ordinary

5    skill in the art could readily determine the best operating mode . . . by producing and testing

6    display samples . . . within the rage of thicknesses disclosed by [the patent applicant]").

7        This Motion bears a striking resemblance to the arguments Gore set forth in its

8    February 2004 Motion for Partial Summary Judgment (Doc. 68 at 5-13). The Court denied

9    that Motion. Now, three years later, following the trial of this matter, Gore asserts the

10    argument again.

11        In support of its position, Gore cites a number of statements Dr. Goldfarb made in a

12    number of different scholarly publications. However, Gore has not presented sufficient

13    evidence to meet its high burden that the papers were prepared prior to the filing of the

14    Goldfarb application. Nor has Gore provided sufficient evidence to demonstrate that Dr.

15    Goldfarb actually had a "best mode" for carrying out the invention at the time the '135 patent

16    application was filed, let alone sufficient evidence to establish a violation of the best mode

17    requirement. Gore has failed to establish that a reasonable jury would not have a legally

18    sufficient evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's

19    Motion for JMOL regarding invalidity of the '135 patent for failure to disclose best mode is

20    denied.

21 **III.**   **GORE'S MOTION FOR JMOL THAT CLAIMS 20-27 ARE INVALID FOR**
       **FAILURE TO SATISFY THE WRITTEN DESCRIPTION REQUIREMENT**

22        **OF 35 U.S.C. § 112, ¶ 1**

23

24        Gore asserts that Claims 20-27 of the '135 patent are invalid for violating the written

25    description requirement of 35 U.S.C. § 112. The written description requirement of 35

26    U.S.C. § 112 requires that the patent applicant "recount his invention in such detail that his

27    future claims can be determined to be encompassed within his original creation." Vas-Cath

28                  - 5 -

1   Inc. v. Mahurkar, 935 F.2d 1555, 1561 (Fed. Cir. 1991). "The adequacy of the written (*i.e.*,

2   the disclosure) is measured from the face of the application . . . ." New Railhead Mfg. L.L.C.

3   v. Vermeer Mfg. Co., 298 F.3d 1290, 1295 (Fed. Cir. 2002). In determining whether the

4   written description requirement has been satisfied, the "application considered as a whole

5   must convey to one of ordinary skill in the art, either explicitly or inherently, that [the

6   inventor] invented the subject matter claimed . . . ." Reiffin v. Microsoft Corp., 214 F.3d

7   1342, 1346-45 (Fed. Cir. 2000). "Although [the] applicant does not have to describe exactly

8   the subject matter claimed, the description must clearly allow persons of ordinary skill in the

9   art to recognize that [the inventor] invented what is claimed." In re Gosteli, 872 F.2d 1008,

10   1012 (Fed. Cir. 1989).

11        Gore specifically asserts that claims 20-27 of the '135 patent are invalid for lack of

12   written description because they "encompass grafts having any wall thickness" and thus are

13   not limited to a wall thickness of 0.2 and 0.8 mm, which Gore alleges is "critical" to Dr.

14   Goldfarb's invention. Gore's argument appears to ignore the fact that these same issues were

15   rejected by the Patent Office.

16        Gore also asserts that claims 20-27 are invalid for failure to satisfy the written

17   description requirements because the claims do not require "through the wall [*i.e.*,

18   transmural] cellular ingrowth" resulting in a neointima. However, this Court has previously

19   considered and rejected this argument after Gore asserted it during claim construction. The

20   Court is not persuaded by the latest assertion of this argument.

21        In view of the substantial evidence demonstrating that wall thickness is not an

22   essential element of Dr. Goldfarb's invention, and because Gore has not established that one

23   of ordinary skill would understand that the '135 patent required complete transmural

24   ingrowth, Gore has not met its burden. Gore has not demonstrated that no reasonable jury

25   could find that the asserted claims of the '135 patent comply with the written description

26   requirement. Accordingly, Gore's motion for JMOL is denied.

27

28                  - 6 -

**IV.    GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' FAILURE TO PROVE THAT GORE'S ACCUSED PRODUCTS MEET THE TYPICALITY ELEMENT OF CLAIMS 20-27**

Gore contends that it is entitled to JMOL on infringement because Plaintiffs purportedly have failed to demonstrate that the accused products satisfy the "average distance between nodes" requirement in each of the asserted claims. Gore's motion for JMOL is based on the assertion that the claim limitation of an "average distance between nodes" is required to be applied "to all of the ePTFE portions of the prosthetic device." This is contrary to the Court's express construction of the asserted claims as requiring ePTFE including but not limited to the microstructure recited in the claims.

The evidence established during trial establishes that a reasonable jury could find that each of Gore's accused products "includes" an ePTFE component that satisfies each of the claim limitations. For example, Gore's employee/expert witness on the accused stent-grafts, Dr. Vonesh, testified that each of the accused Gore stent-grafts includes an ePTFE component having an average internodal distance within the claimed range. On the other hand, the only evidence Gore offered to rebut infringement of the "average distance between nodes" limitation at trial (and as evidence to support its JMOL now) is the testimony and measurements of Gore's expert Dr. McMillian. However, Dr. McMillin offered no testimony to contradict that the ePTFE base graft included in each of the accused products has a "typical" distance between nodes that fits within the claims.

Gore has failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's Motion for JMOL as to Plaintiffs' failure to prove that Gore's accused products meet the typicality elements of claims 20-27 is denied.

/////

/////

- 7 -

A000034

1    **V.    GORE'S MOTION FOR JMOL THAT CLAIMS 20-27 ARE INVALID UNDER**
2    **35 U.S.C. § 102(B) FOR LACK OF NOVELTY IN VIEW OF THE 1973**
     **MATSUMOTO SURGERY ARTICLE**
3
           Gore seeks JMOL regarding claims 20-27 of the '135 patent, claiming they lack
4
     novelty in view of the 1973 Matsumoto Surgery article.
5
           If a single item of prior art discloses every element of a patent claim, that claim is
6
     "anticipated" and, hence, invalid under 35 U.S.C. § 102 for lack of novelty. Karsten Mfg.
7
     Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1383 (Fed. Cir. 2001). The prior art reference
8
     must also "be sufficient to enable those skilled in the art or science to understand the nature
9
     and operation of the invention, and carry it into practice use." In re Omeprazole Patent Lit.,
10
     483 F.3d 1364, 1379-80 (Fed. Cir. 2007) (internal citations omitted). Where the allegedly
11
     anticipatory prior art was expressly considered by the PTO, as is true here, the party
12
     challenging validity faces the "added burden . . . of overcoming the deference that is due to
13
     a qualified government agency presumed to have properly done its job." Am. Hoist, 725
14
     F.2d at 1359.
15
           The evidence establishes that the 1973 Matsumoto article was not enabling, as neither
16
     Gore nor any of the other doctors with whom Gore was working, could determine the
17
     structure disclosed in the Matsumoto article or replicate Matsumoto's results. In fact, at trial,
18
     Gore's fact witness, Mr. Detton, stated that "you couldn't figure anything" from the
19
     Matsumoto article "because the article itself did not define anything." Trial Tr., 11/27/08 at
20
     1959:17 - 161:3 (Detton).
21
           Gore has failed to establish that a reasonable jury would not have a legally sufficient
22
     evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's Motion for
23
     JMOL regarding lack of novelty in view of the 1973 Matsumoto Surgery article is denied.
24
25
26   /////
     /////
27
28                                         - 8 -

1  **VI.   GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' CLAIM THAT**
2      **PROPATEN INFRINGES THE '135 PATENT**

3      Gore argues for JMOL with respect to its Propaten Vascular Grafts.  Gore bases its
4  Motion on the assertion that Plaintiffs' chief infringement expert witnesses, Dr. Anderson
5  and Mr. Calcote, did not mention Propaten during their testimony and that Dr. Becker's
6  testimony regarding Propaten was based on Gore's 510(k) notification.  Thus, Gore contends
7  that Plaintiffs presented no proof of infringement regarding Gore's Propaten graft.

8      Though it is true that Dr. Becker testified about Gore's 510(k) notification, she also
9  testified that Gore told the FDA that Propaten Vascular Grafts had the same physical
10 structure and tissue ingrowth characteristics as the predicate Gore-Tex Vascular Graft
11 (K830806), Gore-Tex Stretch Vascular Graft (K903931) and FEP Ringed Gore-Tex Stretch
12 Vascular Graft with Removable Rings (K933943) already on the market.  Dr. Becker's
13 testimony is further confirmed by the evidence demonstrating (1) that the Propaten Vascular
14 Grafts have an "average fibril length" that is within the claimed ranges of the '135 patent
15 (see, e.g., PX1397.30; PX480.31; PX493.19); and (2) that the tissue ingrowth in the Propaten
16 Vascular Grafts is the same as that observed in the underlying Gore-Tex Stretch Vascular
17 Graft (see, e.g., PX1397.41).

18     In addition, there is sufficient factual evidence to support a finding that Gore's
19 Propaten Vascular Grafts consists of an underlying Gore-Tex Stretch Vascular Graft (a
20 product whose structure was discussed at length during the trial) with an added layer of
21 bonded heparin molecules (see, e.g., PX1397.13).  There is also evidence to show that the
22 addition of heparin molecules has no effect on the underlying microstructure of the ePTFE
23 graft (see, e.g., PX305.7).  One cannot avoid infringement merely by adding elements if each
24 element recited in the claims is found in the accused device.  Amstar Corp. v. Envirotech
25 Corp., 730 F.2d 1476, 1482 (Fed. Cir. 1984).

26
27
28                                        - 9 -

1    Gore has not established that a reasonable jury could not have found for Plaintiffs as

2  to their claim that Gore's Propaten Vascular Grafts infringe the '135 patent. Accordingly,

3  Gore's Motion for JMOL on this issue is denied.

4  **VII.    GORE'S   MOTION   FOR   JMOL   REGARDING   INVALIDITY   FOR**
   **ANTICIPATION BY DR. NORTON'S DECEMBER 1971 USE IN "MRS. B"**
5

6    Gore asserts that it is entitled to JMOL that claims 20-25 and 27 of the '135 patent are

7  invalid for anticipation due to the implantation of a Gore-Tex vascular graft in a human

8  patient, "Mrs. B" in December 1971.  Gore bases its Motion on slides allegedly obtained

9  from Dr. Lawrence Norton, that Gore argues show the graft after explantation.

10    To show invalidity by anticipation, "[e]very element of the claimed invention must

11  be literally present, arranged as in the claim.  The identical invention must be shown in as

12  complete detail as is contained in the patent claim." Richardson v. Suzuki Motor Co., Ltd.,

13  868 F.2d 1226, 1236 (Fed. Cir. 1989).  Furthermore, when the anticipatory prior art being

14  relied on is a "public use," such as here, the party asserting invalidity must prove both (1) a

15  public use, and (2) that the "invention" in the public was "ready for patenting." Invitrogen

16  Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1379 (Fed. Cir. 2005).  The "ready for

17  patenting" requirement "can be satisfied in at least two ways: by proof of reduction to

18  practice before the critical date; or by proof that prior to the critical date the inventor had

19  prepared drawings or other descriptions of the invention that were sufficiently specific to

20  enable a person skilled in the art to practice the invention." Pfaff v. Wells, 525 U.S. 55,

21  67-68 (1998). Again, where the allegedly anticipatory prior art was expressly considered by

22  the PTO, as is true here, the party challenging validity faces the "added burden . . . of

23  overcoming the deference that is due to a qualified government agency presumed to have

24  properly done its job." Am. Hoist, 725 F.2d at 1359.

25    Gore has not provided sufficient evidence to show that the Norton slides were actually

26  implanted in Mrs. B.  In fact, the evidence demonstrates significant questions about the origin

27  of slides C196X and C196Y, including Dr. Norton's testimony during the interference, Mr.

28                              - 10 -

1  Lawrence Green's testimony, and considerable evidence that suggests that the slides may

2  actually have been from animal testing. Gore has not overcome this evidence and, instead,

3  seems to assume that the slides represent the graft implanted in Mrs. B.

4      Nor has Gore met its burden to show that Dr. Norton's work was anticipatory. In its

5  Motion, Gore has not established, nor even discussed, the "ready for patenting" requirement

6  to prove anticipation. In contrast, the evidence shows that Dr. Norton lacked appreciation

7  of the critical elements of (i) fibril length and (ii) "a microstructure that permits tissue

8  ingrowth," as claimed in the '135 patent. Thus, Dr. Norton's work was not "ready for

9  patenting" and cannot constitute anticipatory prior use as a matter of law. Pfaff, 525 U.S. at

10  66.

11      Finally, a reasonable jury could find that Dr. Norton's work was experimental and,

12  thus, not a public use. See TP Labs., Inc. v. Professional Positioners, Inc., 724 F.2d 965, 970

13  (Fed. Cir. 1984) (holding that "if a use is experimental, even though not secret, 'public use'

14  is negated"). Dr. Norton testified that he "wasn't a hundred percent sure that [the graft]

15  would work" for Mrs. B but contemplated trying the Gore-Tex tube in Mrs. B based on his

16  "experience in the laboratory" using the same material "as replacement for veins in animals."

17  Trial Tr., 11/27/07, at 2074:20-2075:13. Plus, the Soyer et al., "A New Venous Prosthesis"

18  article in Surgery in 1972, which discusses Dr. Norton's work and his implantation of an

19  ePTFE graft in Mrs. B, describes the implantation in Mrs. B as having been conducted on an

20  "experimental basis." DX3334.

21      The Court does not find that a reasonable jury would not have a legally sufficient

22  evidentiary basis to find in favor of the Plaintiffs on this issue. Accordingly, Gore's Motion

23  for JMOL is denied.

24

25  /////

26  /////

27

28                                    - 11 -

1
2
3

## VIII. GORE'S MOTION FOR JMOL REGARDING INVALIDITY FOR IMPROPER INVENTORSHIP BECAUSE COOPER AND GOLDFARB ARE JOINT INVENTORS

4
5
6
7
8
9
10

Gore argues that it is entitled to JMOL for improper inventorship contending that Peter Cooper and Dr. Goldfarb were co-inventors. Gore previously argued to the PTO and the Federal Circuit that Dr. Goldfarb's work should "inure" to Peter Cooper's credit. However, both the PTO and the Federal Circuit found that Dr. Goldfarb's work did not inure to Mr. Cooper or Gore's credit. Further, the Federal Circuit found that Mr. Cooper: (1) had not conceived of the invention at the time he sent ePTFE tubes to Dr. Goldfarb, and (2) never communicated a conception or any information regarding fibril lengths to Dr. Goldfarb.

11
12
13
14
15
16
17
18
19

To establish its claim of joint inventorship, Gore must prove by clear and convincing evidence that Mr. Cooper "contribute[d] in some significant manner to the conception or reduction to practice of the invention." Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998). "Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is applied in practice." Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998). Joint inventorship can only arise when "collaboration or concerted effort occurs, that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1359 (Fed. Cir. 2004).

20
21
22
23
24
25
26

Thus, the test for joint inventorship requires more of a showing of concerted effort between co-inventors than is required to meet the test for inurement. However, despite this standard, Gore failed to present sufficient evidence to show that a reasonable jury could not have found the patent valid notwithstanding Gore's claims of improper inventorship. Gore has not established that a reasonable jury could have found that Mr. Cooper was not a co-inventor of the '135 patent. Accordingly, Gore's Motion for JMOL on this issue is denied.

27
28

- 12 -

A000039

## IX. GORE'S JMOL MOTION REGARDING PLAINTIFFS' LACK OF STANDING

Gore's JMOL Motion Regarding Standing alleges that the Plaintiffs, Dr. David Goldfarb, and Bard Peripheral Vascular, Inc., ("BPV"), lack standing to sue for infringement of the '135 Patent. Gore contends that there is a document in evidence from 1980 in which Dr. Goldfarb granted an exclusive license of the '135 patent application to USCI Surgical Products Division, C.R. Bard, Inc. ("USCI"), a division of C.R. Bard. There also is a 1997 amendment that refers to a written assignment and transfer of the 1980 exclusive license from USCI or C.R. Bard to Impra, which later became BPV. However, the written assignment referred to in the 1997 amendment is not in evidence, nor did Plaintiffs produce such a document during discovery. Gore asserts that without such a written instrument in evidence transferring the 1980 exclusive license from USCI/C.R. Bard to Impra/BPV, the transfer is invalid and Plaintiffs lack standing in this lawsuit.

### A. BACKGROUND

The evidence demonstrates that on October 24, 1974, Dr. Goldfarb filed a patent application involving the subject matter of the '135 patent. The '135 patent issued in Dr. Goldfarb's name on August 20, 2002. At the time this suit was filed, Dr. Goldfarb was the owner of the '135 patent.

On September 23, 1980, Dr. Goldfarb and USCI entered into a written license agreement pursuant to which Dr. Goldfarb granted USCI a "worldwide, exclusive license[], with the right to sublicense, to make, use, and sell products covered by [the Goldfarb Application]." PX4; Trial. Tr., 11/7/07, at 462:10-463:4 (Goldfarb). The 1980 license did not transfer all of Dr. Goldfarb's rights to USCI. For example, Dr. Goldfarb retained the right to share in any damages recovered from enforcement or licensing of the Goldfarb patent. PX4 § 5.3. Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did not prosecute its rights. Id. at §§ 3.1-3.2. In addition, the exclusive license excluded a category of products ("heart valves") from its "subject matter." Id. at 1.1.

- 13 -

1    In September 1996, C.R. Bard acquired Impra.  Trial Tr., 11/16/07, at 1635:20-22
2  (McDermott).  At that time, USCI was no longer involved in the vascular graft business and
3  it subsequently was sold.  Id. at 1644:9-19 (McDermott).  Following C.R. Bard's purchase
4  of Impra, C.R. Bard's existing non-ePTFE vascular graft business (the Bard Vascular
5  Systems Division) was merged into Impra.  Id. at 1635:23-1636:9, 1639:24-1640:17
6  (McDermott).

7    Impra was the sole C.R. Bard division making and selling ePTFE grafts and, because
8  of this, C.R. Bard transferred responsibility for the 1980 license to Impra.  Id. at 1644:9-19
9  (McDermott.)  Dr. Goldfarb, C.R. Bard, and Impra confirmed the transfer of the license to
10  Impra in the written February 2, 1997 "Agreement Amending License Agreement."  PX191.
11  Pursuant to the 1997 amendment, Impra assumed all of USCI's rights and obligations under
12  the 1980 license agreement including the payment of all royalties to Dr. Goldfarb.  Trial Tr.,
13  11/16/07, at 1644:20-1645:7 (McDermott).  In addition, the 1997 amendment also added new
14  terms to the agreement including replacing "[a]ll references" to Bard's division (USCI) in
15  the 1980 License with Impra/BPV, removing the subject matter exclusion regarding heart
16  valves, and changing the assignment clause to expressly provide Impra the right to "assign
17  . . . to any affiliate or division of C.R. Bard, Inc. . . . ."  PX191.

18    The '135 patent issued on August 20, 2002.  Dr. Goldfarb, as the patentee, and BPV
19  ("Impra" at that time), filed suit as co-plaintiffs in 2003.  On January 30, 2007, BPV (Impra's
20  successor) and Dr. Goldfarb entered into an Assignment of Patent Rights Agreement.
21  Pursuant to this agreement, BPV acquired "all rights, title and interest in and to the [Goldfarb
22  patent]" including the right to "sue and collect damages for violations of the [Goldfarb
23  patent]," regardless of whether the violations occurred prior to or after the execution date of
24  this Agreement."  PX1476.

25  **B.    DISCUSSION**

26    Gore contends that Dr. Goldfarb lacked standing to bring the instant lawsuit because,
27  Gore asserts, Dr. Goldfarb assigned the right to enforce the '135 patent to C.R. Bard as part

28                                              - 14 -

1   of the exclusive license given to C.R. Bard. Gore argues that Dr. Goldfarb retained only

2   naked title to the '135 patent, and "cannot maintain suit in his own name." Thus, Gore

3   asserts, Dr. Goldfarb acting without C.R. Bard, who Gore contends remained the exclusive

4   licensee at the time of filing suit, lacked standing to sue. However, the 1980 license did not

5   transfer all of Dr. Goldfarb's rights to the '135 patent. For example, Dr. Goldfarb retained

6   the right to share in any damages recovered from enforcement or licensing of the Goldfarb

7   patent. PX4 § 5.3. Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did

8   not prosecute its rights. Id. at §§ 3.1-3.2. In addition, the exclusive license excluded a

9   category of products (heart valves) from its subject matter. Id. at 1.1. Moreover, as

10  discussed below, C.R. Bard transferred its exclusive license to Impra/BPV. Therefore, Dr.

11  Goldfarb, in conjunction with Impra/BPV, had standing to enforce the patent.

12       The Patent Act provides that a patentee has a remedy for patent infringement by civil

13  action. 35 U.S.C. § 281. "This has been interpreted to require that a suit for infringement

14  must ordinarily be brought by a party holding legal title to the patent." Enzo APA & Son,

15  Inc. v. Geapag A.G., 134 F.3d 1091, 1093 (Fed. Cir. 1998). Yet, in Rite-Hite Corp. v. Kelly

16  Co., Inc., 56 F.3d 1538, 1552 (Fed. Cir.1995), the Federal Circuit held as follows:

17       Under certain circumstances, a licensee may possess sufficient interest in the
         patent to have standing to sue as a co-plaintiff with the patentee. Such a
18       licensee is usually an 'exclusive licensee.' To be an exclusive licensee for
         standing purposes, a party must have received, not only the right to practice the
19       invention in a given territory, but also the patentee's express or implied
         promise that others shall be excluded from practicing the invention within that
20       territory as well. If the party has not received an express or implied promise
         of exclusivity under the patent, i.e., the right to exclude others from making,
21       using, or selling the patented invention, the party has a 'bare license,' and has
         received only the patentee's promise that party will not be sued for
22       infringement.

23

24       An exclusive license need not be in writing. A license may be written, oral, or

25  implied-in-fact. Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003)

26  (stating as follows:

27

28                                          - 15 -

Only assignments need be in writing under 35 U.S.C. § 261. Licenses may be oral. Waymark allegedly had an oral license from [a member of the partnership]. It is true that only in extremely limited circumstances can the holder of an oral transfer of patent rights sue for infringement in its own name. However, the partnership claimed a written assignment of the patent. *Under such circumstances, the partnership had standing to bring the action, and it was permissible to join Waymark as a plaintiff under the alleged oral exclusive license.*

(emphasis added) (citations omitted)).

Here, as in Waymark, the alleged 1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact transfer of the license to Impra/BPV thereby conferring standing to sue in conjunction with Dr. Goldfarb. This implied-in-fact transfer was done in conjunction with Bard's acquisition of Impra/BPV, whereby Impra/BPV assumed all rights and responsibilities for the license including the right to sue to enforce the patent, provided it joined Dr. Goldfarb, the patent title holder at the time. In further support of an implied-in-fact transfer of the exclusive agreement is the testimony of then-president of Impra, John McDermott, that pursuant to the transfer, Impra assumed the obligation to pay Dr. Goldfarb royalties as his licensee. Trial Tr., 11/16/07, at 1644:20-1645:10 (McDermott).

Gore argues that any oral or implied-in-fact license to BPV is, at most, a non-exclusive license that does not confer standing. Gore theorizes that C.R. Bard had a written exclusive license that amounted to a transfer of title because of the limited rights that Dr. Goldfarb retained. Therefore, Gore contends, any transfer of C.R. Bard's rights would be an assignment of title, which requires a writing.

Contrary to Gore's argument, Dr. Goldfarb retained substantial rights in the 1980 agreement including, *inter alia*, the right to share in any patent damages or license fees. Thus, the 1980 agreement granted an exclusive license, not title, to USCI/C.R. Bard. C.R. Bard was free to orally transfer its exclusive license to BPV, thereby conveying standing to enforce the patent with Dr. Goldfarb. See Waymark, 334 F.3d at 1364 (an oral licensee could properly join patent suit by partnering with holder of written assignment of patent);

- 16 -

A000043

1   Kalman v. The Berlyn Corp, 914 F.2d 1473, 1482 (Fed. Cir. 1991) (a licensee had standing

2   to sue along with the patentee because the parties had stipulated to the existence of a license);

3   Weinar v. Rollform, Inc., 744 F.2d 797, 807 (Fed. Cir. 1984) (an oral exclusive distribution

4   agreement was sufficient to create standing to sue for patent infringement).

5       In its Motion, Gore relies on Enzo APA & Son v. Geapag A.G., 134 F.3d at 1093, to

6   assert that "[a]n oral assignment of the exclusive license is ineffective." (Gore Mot. at 2.)

7   Enzo, however, addressed the more narrow question of whether an oral exclusive licensee

8   had standing to enforce a patent in its own name where it failed to join the patentee and

9   subsequently received a *nunc pro tunc* assignment. Id. at 1092. The Federal Circuit rejected

10  this claim and, reiterating well-established precedent, held that an exclusive licensee may

11  only file suit in its own name where it is the actual or "virtual assignee" of the patent, which

12  requires written evidence of such an assignment. Id. at 1093. The instant case is

13  distinguishable from Enzo for a number of reasons. Here, Dr. Goldfarb, the patent holder,

14  is a party to the lawsuit. In addition, Dr. Goldfarb retained substantial rights to his patent

15  application. Finally, by at least 1997, there is a writing transferring the exclusive license

16  from C.R. Bard to BPV.

17      Plaintiffs claim that the 1997 amendment, which is in evidence, not only confirms the

18  earlier agreement but serves as a new agreement because it added additional terms. Gore,

19  on the other hand, asserts that the 1997 amendment is insufficient to create standing because

20  (1) it was not executed by C.R. Bard or USCI (the 1980 exclusive licensee) and (2) because

21  it did not assign the 1980 exclusive license, but merely conformed the alleged 1996

22  assignment for which there is nothing in the record to support.

23      Gore's argument that the 1997 amendment was not executed by C.R. Bard focuses on

24  Mr. McDermott's testimony in which he acknowledged that he had signed the 1997

25  agreement "on behalf of" Impra/BPV. However, Mr. McDermott also testified that he signed

26  on behalf of C.R. Bard with its express consent.

27

28                                      - 17 -

A000044

1     Q.     Now, did you get approval from your management at C.R. Bard, the
2              owners of Impra, to enter into this agreement [PX191] on their behalf?

3     A.     Yes, yeah.

4     Trial Tr., 11/16/2007, at 1647:2-5 (McDermott). [1]

5          In support of Gore's second argument that the 1997 assignment merely confirmed the

6     alleged 1996 assignment, Gore filed a Notice of New Authority Relating to Plaintiffs' Lack

7     of Standing (Doc. 825). In Gore's Notice, Gore asserts that the recent Federal Circuit

8     decision in Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359 (Fed. Cir. 2008), "reaffirms

9     Gore's position that the Amendment to the license does not give BPV standing to sue"

10    because in Mars the Federal Circuit held that a later amendment to a license "confirming"

11    an alleged prior transfer is merely a "confirmation" and does not serve to transfer the license.

12    Plaintiffs filed an "Objection to Gore's . . . [Allegedly] New Authority Related to Plaintiffs'

13    Lack of Standing" (Doc. 827). Gore filed a Response to Plaintiffs' Objection to Gore's

14    Notice (Doc. 829) and Plaintiffs filed a Reply (Doc. 832).

15         In Mars, Mars owned the patent-in-suit when the complaint was filed in 1990 and

16    undisputedly had standing. Mars, 527 F.3d at 1363. Mars entered into an agreement

17    transferring "its entire interest in the Covered Intellectual Property that relates to the business

18    of the parties" to a wholly-owned subsidiary, Mars Electronics Inc., ("MEI"), in a 1996

19    agreement. Id. The Federal Circuit ruled that the 1996 agreement operated to transfer title

20    in the patent-in-suit from Mars to MEI such that "Mars lacked standing as of 1996." Id. at

21    1370. In 2006, Mars entered into a purchase agreement with its subsidiary in which Mars

22    purported to reacquire title to the patent-in-suit to correct the jurisdiction defect created in

23

---

24        [1] The Court recognizes that Mr. McDermott testified on direct examination that he
had express consent from C.R. Bard to enter into the 1997 agreement and then later on cross-
25    examination stated that he signed the agreement as the president of Impra. See Trial Tr.,
26    11/16/2007, at 1647:2-5, 1690:19-20 (McDermott). However, the Court does not find that
Mr. McDermott's statement that he signed the agreement as the President of Impra negates
27    his statement that he had C.R. Bard's consent to enter into the agreement.

28

- 18 -

A000045

1  1996. Id. The purchase agreement was not made part of the record. Id. at 1364. Instead,

2  Mars relied on a later dated "Confirmation Agreement" to establish the transfer of title. Id.

3  The Confirmation Agreement stated as follows:

> Mars and the Buyer [MEI] do hereby acknowledge that Mars owns and retains
> the right to sue for past infringement of the Litigation Patents. To the extent
> that MEI may have or claim any rights in or to any past infringement of the
> Litigation Patents or any recovery therefor, upon the terms and subject to the
> conditions of the Purchase Agreement, MEI hereby does irrevocably assign all
> such rights to Mars.

Id. at 1371. The Federal Circuit found this language insufficient to transfer title back to Mars

and correct the jurisdictional defect. Id. at 1369. It held that the first sentence of the above

paragraph was not "a transfer itself." Id. at 1371. It also determined that although the second

sentence did constitute a transfer, the language was insufficient to confer standing because

it was "an assignment of the right to sue for past infringement, not an assignment of title."

Id. at 1371-72. ("We see no provision in the Confirmation Agreement that transfers title to

the [patent-in-suit] back to Mars.").

Mars is distinguishable from the instant case. Here, the 1997 written Agreement

Amending License Agreement was not merely "confirmatory" as Gore contends. Rather, the

1997 Agreement created a new license agreement between Dr. Goldfarb and Impra/BPV.

The terms of the 1980 License that were amended by the 1997 Agreement include the

following:

- Replacing "[a]ll references" to Bard's division (USCI) in the 1980 License
  with Impra/BPV;

- Removing the subject matter exclusion regarding heart valves;

- Changing the assignment clause to expressly provide Impra the right to "assign
  . . . to any affiliate or division of C.R. Bard, Inc. . . . ."

Thus, unlike Mars where the Confirmation Agreement merely "acknowledged" that Mars

owned the patents, here, the 1997 Agreement expressly transferred in writing the rights from

- 19 -

1  C.R. Bard to Impra/BPV and actually enhanced those rights by granting additional rights to

2  Impra/BPV that Dr. Goldfarb had previously retained.  Moreover, also distinguishable from

3  <u>Mars</u>, here, the owner of the patent title – Dr. Goldfarb – was a plaintiff at the

4  commencement of the lawsuit and has remained a plaintiff throughout the entire litigation.

5       Gore has not established that Plaintiffs lack standing.  Accordingly, Gore's Motion

6  for JMOL Regarding Plaintiffs' Lack of Standing is denied.

7                  **CONCLUSION**

8       For the foregoing reasons,

9       IT IS ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs' Claim of

10  Willful Infringement (Doc. 651).

11       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity

12  of the '135 Patent for Failure to Disclose Best Mode (Doc. 731).

13       IT IS FURTHER ORDERED denying Gore's Motion for JMOL that Claims 20-27

14  are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112,

15  ¶ 1 (Doc. 732).

16       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs'

17  Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27

18  (Doc. 734).

19       IT IS FURTHER ORDERED denying Gore's Motion for JMOL that Claims 20-27

20  are Invalid under 35 U.S.C. § 102(B) for Lack of Novelty in View of the 1973 Matsumoto

21  <u>Surgery</u> Article (Doc. 736).

22       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs'

23  Claim that Propaten Infringes the '135 Patent (Doc. 737).

24       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity

25  for Anticipation by Dr. Norton's December 1971 Use in "Mrs. B" (Doc. 740).

26       IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity

27  for Improper Inventorship Because Cooper and Goldfarb are Joint Inventors (Doc. 741).

28                 - 20 -

1        IT IS FURTHER ORDERED denying Gore Motion for JMOL Regarding Plaintiffs'

2   Lack of Standing (Doc. 652).

3        DATED this 29th day of July, 2008.

4

5

6                              Mary H. Murgula

7                      United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A000048

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Bard Peripheral Vascular, Inc., and David )
Goldfarb, M.D., )
                     )
            Plaintiff, )
                     )
vs. )
                     )
W.L. Gore & Associates, Inc., )
            Defendant. )
_____ )

No. CV-03-0597-PHX-MHM

**ORDER**

Currently pending before the Court are Defendant's Motion Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3) to Dismiss Plaintiffs' Complaint for Lack of Standing or in the Alternative Renewed Motion for Judgment as a Matter of Law (Dkt.#849.), Motion for New Trial or Remittitur for Excessive Damages (Dkt.#840.), Motion for Judgment as a Matter of Law Regarding Invalidity Because Cooper and Goldfarb are Joint Inventors (Dkt.#841.), Renewed Motion for Judgment as a Matter of Law Regarding Willful Infringement (Dkt.#842.), Renewed Motion for Judgment as a Matter of Law Regarding Invalidity of the '135 Patent' for Failure to Disclose Best Mode (Dkt.#843.), Renewed Motion for Judgment as a Matter of Law that Claims 20-27are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112, ¶1 (Dkt.#844.), Renewed Motion for Judgment as a Matter of Law that Claims 20-27 are Invalid Under 35 U.S.C. § 102(B) for Lack of Novelty in View of the 1973 Matsumoto *Surgery* Article (Dkt.#845.), Renewed Motion for Judgment as a

Matter of Law Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27 (Dkt.#846.), Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent.' (Dkt.#847.) After reviewing the pleadings and holding oral argument on Defendant's remittitur motion, the Court issues the following Order.

## I. STANDING

In the instant Motion, Gore reiterates arguments it set forth in its previous standing briefing. See Doc. 652. Although standing may be challenged at any time, the Federal Rules do not grant the right to assert the same standing arguments repeatedly.

> It makes sense that, at some point, even jurisdictional rulings achieve a reasonable level of finality. Surely a court that has decided that it has jurisdiction is not duty-bound to entertain thereafter a series of repetitive motions to dismiss for lack of jurisdiction. Jurisdictional reconsiderations can be as wasteful as any other kind.

Ferreira v. Borja, 93 F.3d 671, 674 (9th Cir. 1996). Gore's latest standing motion ignores the factual findings the Court has previously made based on the record evidence. For example:

- Gore again argues that Dr. Goldfarb lacked standing because the 1980 License transferred "all substantial rights" in the Goldfarb application to C.R. Bard. (Gore's Motion at 8-11). Yet the Court expressly found that Dr. Goldfarb did not transfer all substantial rights to C.R. Bard under the 1980 License. See Order, July 29, 2008, at 16 ("Dr. Goldfarb retains substantial rights in the 1980 agreement. . . ."); and 17 ("Dr. Goldfarb retained substantial rights to his patent application.").

- Gore again argues that there was no implied-in-fact license of the 1980 License in conjunction with Bard's acquisition of Impra/BPV. Id. at 11-13. Yet the Court expressly found, consistent with the Federal Circuit's holding in Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003), that the record evidence established that the "1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact license … ." Order, July 29, 2008, at 16.

A000050

• Gore again argues that the 1997 Amendment did not transfer the exclusive license to Impra/BPV because Mr. McDermott's signature was allegedly insufficient to bind C.R. Bard. Doc. No. 849 at 14-16. Yet the Court expressly found that Mr. McDermott entered into the agreement on behalf of C.R. Bard and thus no additional signature was required. Order, July 29, 2008, at 18.

In addition, the Court also found that "by at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV." Id. at 17, 19. Thus, BPV had constitutional standing to sue with Dr. Goldfarb, the then patent holder. Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed. Cir. 2003) ("Under such circumstances, the partnership had standing to bring the action, and it was permissible to join Waymark as a plaintiff under the alleged oral exclusive license."). Gore's argument that all assignments of exclusive licenses are required to be in writing is both wrong as a matter of law and irrelevant in light of the Court's express factual findings. Nevertheless, the Court will again entertain Gore's arguments regarding Plaintiffs' standing.

Interestingly, Gore bases its current Motion on documents and deposition testimony that, although being listed in the Pre-Trial Order, are not in evidence and were not presented during trial. Gore offers no explanation for not introducing such information into the evidentiary record. However, the record is now closed and Gore points to no authority permitting a party to base a Rule 12(h)(3) motion on evidence a party failed to submit following a full evidentiary hearing.[1] Indeed, consideration of evidence outside the record

---

[1] Essentially, it appears that Gore is asking the Court to reopen the record. But Gore has failed to make any proffer in support of such reopening and the case law does not support Gore's belated attempt to do so. See, e.g., Locklin v. Switzer Bros., Inc., 299 F.2d 160, 169 (9th Cir. 1961) ("The time for testing of proof is the time of trial. Our judicial system does not contemplate that the rights of litigants shall be held in abeyance for months or years in order that hindsight may provide a more accurate appraisal of evidence."); Romeo v. Sherry, 308 F. Supp. 2d 128, 140 (E.D.N.Y. 2004) (refusing to consider new evidence contained in post-trial briefing where "[t]he lack of diligence by [movant's] counsel in pursuing this evidence and bringing it to the court's attention in a timely fashion was the result of his own actions (or inaction)."); see also Fed. R. Evid. 403 (relevant evidence may be excluded on

A000051

is improper under Fed.R.Civ.P. 50(b) because such motions challenge the sufficiency of the evidence based on the record "as it existed when the trial was closed." Elbert v. Howmedica Inc., 143 F.3d 1208, 1209 (9th Cir. 1998). Further, where there has been a full evidentiary hearing on the merits, as there has been here, the Court must "evaluate standing from all materials of record." Pandrol USA,LP v. Airboss Ry. Prods., 320 F.3d 1354, 1367 (Fed. Cir. 2003) (citation omitted).

Moreover, even if supplementation of the record were permissible under Rule 12(h)(3), Gore's reliance on inadmissible testimony[2] is not because "any evidence submitted outside the pleadings [must] be 'competent.'" Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986) (rejecting "conclusory and hearsay statements contained in the affidavits submitted by defendants"); accord Sapp v. FDIC, 876 F. Supp. 249, 251 (D. Kan. 1995) ("[A]ffidavits in support of or opposing motions to dismiss for lack of jurisdiction must comply with the requirements of Fed. R. Civ. P. 56(e) … [and must] set forth such facts as would be admissible into evidence[.]"). Gore's improper and inadmissible evidentiary supplementation, therefore, cannot support its Motion.

Nor can Gore's effort to manufacture alleged legal error salvage its Motion. Gore disingenuously argues that the Court applied the wrong standard of proof when it denied Gore's last standing motion by mischaracterizing the import of a single line at the end of the Court's Order – a line that does not purport to set forth the applicable legal standard. Gore's Motion at 1. Gore has cherry-picked one line at the end of the Court's Order and misrepresents that it reflects a misallocation of the burden of proof. However, a review of the entirety of the Court's judgment (instead of a single line out of context) establishes that the Court correctly reviewed and credited the standing evidence adduced by Plaintiffs, and

grounds of "unfair prejudice" and "undue delay").

[2] For example, Gore cites the deposition testimony of Mr. Krueger, a witness within the Court's subpoena power, who did not testify during trial.

- 4 -

1  concluded that Gore failed to adduce sufficient credible evidence to rebut Plaintiffs'

2  showing.[3]

3  ### A.  Background

4     The Court reiterates the relevant background, which was similarly provided in its pre-

5  judgment JMOL Order addressing standing.  On or about October 24, 1974, Dr. Goldfarb

6  filed a patent application involving the subject matter of the '135 patent.  The '135 patent

7  issued in Dr. Goldfarb's name on August 20, 2002.  At the time this suit was filed, Dr.

8  Goldfarb was the owner of the '135 patent.

9     On or about September 23, 1980, Dr. Goldfarb and USCI entered into a written license

10  agreement pursuant to which Dr. Goldfarb granted USCI a "worldwide, exclusive license[],

11  with the right to sublicense, to make, use, and sell products covered by [the Goldfarb

12  Application]."  PX4; Trial. Tr., 11/7/07, at 462:10-463:4 (Goldfarb).  The 1980 license did

13  not transfer all of Dr. Goldfarb's rights to USCI.  For example, Dr. Goldfarb retained the

14  right to share in any damages recovered from enforcement or licensing of the '135 patent.

15  PX4 § 5.3.  Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did not

16  prosecute its rights.  Id. at §§ 3.1-3.2.  In addition, the exclusive license excluded a category

17  of products ("heart valves") from its "subject matter."  Id. at 1.1.

18     In September 1996, C.R. Bard acquired Impra.  Trial Tr., 11/16/07, at 1635:20-22

19  (McDermott).  At that time, USCI was no longer involved in the vascular graft business and

20  it subsequently was sold.  Id. at 1644:9-19 (McDermott).  Responsibility for C.R. Bard's

21  vascular graft business had passed to Bard Vascular Systems Division, which manufactured

22  non-ePTFE grafts, and that business was merged into Impra.  Id. at 1635:23-1636:9, 1639:24-

23  1640:17 (McDermott).

24  / / /

25

26

27     [3]  Courts "review judgments, not the rhetoric in opinions."  Lindemann

28  Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., 730 F.2d 1452, 1458 (Fed. Cir. 1984).

A000053

1    Though a wholly-owned subsidiary, Impra was a separate corporate entity from C.R.

2  Bard. Id. at 1680:17-1681:6 (McDermott).  Thus, as Mr. McDermott testified, because Impra

3  was the sole C.R. Bard entity manufacturing ePTFE grafts, all rights and obligations under

4  the 1980 License were transferred to it.   Id. at 1644:2-1645:10 (McDermott); see also

5  11/07/07 Tr. at 489:6-490:18 (Goldfarb).  This testimony was confirmed by the extensive

6  evidence of the parties' subsequent conduct, including the following:  (i) the payment to, and

7  acceptance by Dr. Goldfarb, of all royalty payments from Impra, (Trial Tr., 11/16/07, at

8  1644:20-1645:10, 1647:14-23 (McDermott); PX564 (showing Impra royalty payments).); (ii)

9  the entry into the written amendment of the 1980 License by Dr. Goldfarb, C.R. Bard and

10  Impra in 1997 making Impra the exclusive licensee, (PX191); (iii) Impra's granting of a

11  sublicense to Endomed as the holder of "certain license rights under United States Patent No.

12  6,436,135, including the right to grant sublicenses," (PX785 at 785.1), and (iv) Dr.

13  Goldfarb's 2007 assignment of the '135 patent to BPV (Impra's successor) confirming that

14  Dr. Goldfarb had "granted [BPV] an exclusive, worldwide license under the Patent." PX1475

15  at 1475.2.  The 1997 Amendment (PX191) is particularly significant.  Not only did this

16  agreement confirm the understanding of all three contracting parties – Dr. Goldfarb, C.R.

17  Bard and Impra – that C.R. Bard had "assigned and transferred the License Agreement to

18  Impra along with responsibility for management of Bard's vascular graft business," (id. at

19  191.1), but it also amended and substantially altered the terms of the 1980 License by

20  replacing USCI with Impra as the exclusive licensee, (id. at § 3), removing the subject matter

21  exclusion of heart valves under the license, (id. at §§ 5 and 6), and granting Impra the ability

22  to freely assign the license to any affiliate or division of C.R. Bard (id. at § 14).  Thus, as the

23  Court found, the 1997 Amendment enlarged and enhanced the rights granted to Impra by

24  transferring several of Dr. Goldfarb's previously retained rights.  Doc. No. 833 at 19-20; see

25  also DX3181 (referring to "a new agreement").  The preamble to the 1997 Amendment

26  expressly states that it is made "by and among" Dr. Goldfarb, C.R. Bard, and Impra. PX191

27  at 191.1.  As the Court has already found, Mr. McDermott's unrebutted testimony established

28  that he signed the agreement both as President of Impra and on behalf of C.R. Bard with its

A000054

1  full knowledge and consent. Trial Tr., 11/16/07, at 1647:2-5 (McDermott). The authority of

2  Mr. McDermott to enter into this agreement on behalf of C.R. Bard was confirmed by the

3  decade-long course of conduct during which C.R. Bard has never repudiated the agreement.

4  The Court explicitly found that these facts established standing. Doc. No. 833 at 13-20.

5       In support of its Motion, Gore presents document and deposition testimony from the

6  previous New Jersey litigation between C.R. Bard and Gore. Not a single one of the

7  documents attached to Gore's Motion were presented or admitted at trial or are "materials

8  of record." Pandrol USA, L.P. v. Airboss Ry. Products, Inc., 320 F.3d 1354, 1367 (Fed. Cir.

9  2003). Gore presents no justification for its failure to timely present this alleged evidence,

10  and cites no authority establishing that it is legally permissible for the Court to consider such

11  non-evidence at this late stage. Indeed, Gore does not even explain why it waited until its

12  most recent standing motion to cite to this non-record evidence.

13  **B.    Legal Standard**

14       Standing is a judicially created doctrine that is an essential part of the

15  case-or-controversy requirement of Article III. Pritikin v. Dept. of Energy, 254 F.3d 791,

16  796 (9th Cir. 2001). "To satisfy the Article III case or controversy requirement, a litigant

17  must have suffered some actual injury that can be redressed by a favorable judicial decision."

18  Iron Arrow Honor Soc. v. Heckler, 464 U.S. 67, 70 (1984). "In essence the question of

19  standing is whether the litigant is entitled to have the court decide the merits of the dispute

20  or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).

21       The doctrine of standing "requires careful judicial examination of a complaint's

22  allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the

23  particular claims asserted." Allen v. Wright, 468 U.S. 737, 752 (1984). The court is

24  powerless to create its own jurisdiction by embellishing otherwise deficient allegations of

25  standing. Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990).

26  / / /

27

28

A000055

## C. Discussion

The Plaintiffs have met their burden of establishing standing. Standing in a patent infringement case is derived from the Patent Act: "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). The Federal Circuit recognizes three categories of potential plaintiffs in patent cases: "[1] those that can sue in their own name alone; [2] those that can sue as long as the patent owner is joined in the suit; and [3] those that cannot even participate as a party to an infringement suit." Morrow v. Microsoft Corp., 499 F.3d 1332, 1339 (Fed. Cir. 2007). The first two categories of plaintiffs have constitutional standing to sue for patent infringement. Id. After considering the evidentiary record here, the Court previously determined that Dr. Goldfarb was "the owner of the patent title" and that Bard Peripheral Vascular ("BPV") was the exclusive licensee when the suit was filed. Order, July 29, 2008, at 19-20. Based on these two findings, the Court determined that Plaintiffs had standing. Id. at 20.

### 1. Transfer of Rights

Gore argues that Dr. Goldfarb's complaint must be dismissed because Goldfarb granted all substantial rights to C.R. Bard and C.R. Bard is not a plaintiff." Gore's Motion at 8. In an attempt to support this claim, Gore ascribes legal error to the Court's July 29 Order asserting that the Court "used the wrong legal test" in finding that Dr. Goldfarb did not transfer "all rights," as opposed to "all substantial rights," to C.R. Bard. Gore's Motion at 8 (citing Order at 15), see also id. at 1, 9. Gore mischaracterizes the Court's holding and ignores the Court's express finding, which stated that: "[c]ontrary to Gore's argument, Dr. Goldfarb retained substantial rights in the 1980 agreement including, *inter alia*, the right to share in any patent damages or license fees. Thus, the 1980 agreement granted an exclusive license, not title, to USCI/C.R. Bard." Order, July 29, 2008, at 16; see also id. at 17 ("In addition, Dr. Goldfarb retained substantial rights to his patent application."). However, Gore's mischaracterization of, and refusal to acknowledge, the Court's factual findings is not

- 8 -

A000056

well taken.  The Court's July 29 Order makes plain that the Court applied the correct legal test: "To determine whether an agreement conveys all substantial rights in the patent, '[the court] must ascertain the intention of the parties and examine the substance of what was granted by the agreement.'"  Fieldturf, Inc. v. Sw. Rec. Indus., 357 F.3d 1266, 1269 (Fed. Cir. 2004). "In making such a determination, it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee." Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1342 (Fed. Cir. 2001).  This is precisely the analysis conducted by the Court in finding that Dr. Goldfarb retained "substantial rights" under the 1980 License. July 29,2008 Order at 15-16.

Gore nonetheless challenges the Court' factual findings claiming that "[a]s a matter of law, none of these retained rights are substantial rights and do not affect the conclusion that C.R. Bard received substantially all the rights."  Gore's Motion at 9.  However, Gore appears to be rearguing its point based on the same legal authority it previously relied on, which the Court previously considered and disregarded.  See Gore's Response to Plaintiffs' Objection to Gore's Notice [re:] Standing, Doc. 829, at 5 (citing Vaupel Texilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874-75 (Fed. Cir. 1991).

The instant case is distinguishable from Vaupel for a number of reasons.  First, unlike the agreement in Vaupel (which had no subject matter limitation), the 1980 License expressly excluded a category of products ("heart valves") from its "subject matter."  See Order, July 29, 2008, at 15 (citing PX4 at § 1.1). Licenses with "subject matter" exclusions are "field of use" licenses and cannot confer "all substantial rights."  See, e.g., Int'l Gamco, Inc. v. Multimedia Games, Inc., 504 F.3d 1273, 1278 (Fed. Cir. 2007) ("exclusive field of use licensee does not have standing to sue in its own name" because license "divide[s] the scope of a patent right by its subject matter").  At a minimum, this exclusion is strong evidence that

/ / /

A000057

Dr. Goldfarb and C.R. Bard intended the 1980 agreement to be a license not an assignment.[4] Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed. Cir. 1995) (license was exclusive where patentee reserved "a limited right to make, use and sell products embodying the patented inventions").

Second, Dr. Goldfarb retained an ownership interest in any patent that C.R. Bard elected to abandon, with "any patent so obtained [] not [] subject this LICENSE," (PX4 at § 3.2), and received royalties irrespective of the prosecution or maintenance of any patents (Id. § 2.2). Dr. Goldfarb's reversionary interest was, thus, materially different from the termination provision in Vaupel, which applied only in instances of bankruptcy or cessation of manufacture. See Order, July 29, 2008, at 15 (citing PX4 at §§ 3.1-3.2).

Third, the right to sue granted under the 1980 License is different from the right to sue in Vaupel and is limited to the right to "file, control, defend and settle, by granting a sublicense or otherwise, all actions and claims against third parties for infringement of any PATENTS brought against Dr. GOLDFARB or USCI seeking to declare a PATENT invalid." PX4 at § 5.3. By its terms, therefore, this right is limited to third party challenges to validity and does not grant C.R. Bard the exclusive right to sue for all infringement as Gore contends. Sicom Sys. Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 979 (Fed. Cir. 2005) (no virtual assignment where licensee was granted exclusive right to sue for "commercial" infringement only.) In addition, Dr. Goldfarb's right to share in any litigation damages was contingent on him bearing a portion of the litigation costs. PX4 at § 5.3. The 1980 License

---

[4] Gore's argument declaring that the exclusion of heart valves was "not a substantial right under the patent" is baseless. The 1980 License defines "VASCULAR PROSTHESES" as "prostheses for replacing, repairing or bypassing blood vessels of the human body except HEART VALVES." PX4 AT § 1.1. Thus, as of the time of the 1980 License, the parties clearly understood heart valves to be within the scope of the licensed patents (otherwise they would not have needed to expressly exclude them), and clearly thought that this right was substantial enough to expressly carve it out of their license. In addition, Gore's claim that heart valves fall outside of the Court's claim construction is unsubstantiated and lacks evidentiary foundation. The issue of whether ePTFE heart valves constitute a vascular prosthesis has yet to be decided and was not put before the Court.

thus contemplated Dr. Goldfarb's participation in any lawsuit, which is contrary to an assignment. See e.g., Abbott Labs., 47 F.3d at 1132 (no virtual assignment where "the parties appear to have contemplated that [patentee] could participate in a suit" filed by licensee).

Fourth, the 1980 License was not assignable by C.R. Bard except in limited circumstances to "any successor to or purchaser of all or substantially all of its VASCULAR PROSTHESIS business." PX4 at § 6.4. This precludes any assignment because "limits on the assignment of rights are a factor weighing in favor of finding a transfer of fewer than all substantial rights." Intellectual Prop. Dev., 248 F.3d at 1345; see also Abbott Labs., 47 F.3d at 1132 (finding "the right to prevent Abbott from assigning its rights under the license to any party other than a successor in business" a substantial retained right).

In sum, Plaintiffs presented substantial evidence – confirmed by the issuance of the patent to Dr. Goldfarb and the January 2007 Assignment of Patent Rights (PX1475) – demonstrating that the parties intended that the 1980 License to be a transfer of less than "all substantial rights."

## 2. Implied-In-Fact License

Because the Court determined, based on the evidence, that the 1980 License is not a virtual assignment, it found that, as in Waymark, the "1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact transfer of the license to Impra/BPV thereby conferring standing to sue in conjunction with Dr. Goldfarb." Order, July 29, 2008, at 16. Gore raises a new argument asserting that the terms of the 1980 License require an express written assignment. Gore's Motion at 12. However, Gore's argument is wrong. First, New Jersey law (which governs the 1980 License) expressly permits the oral assignment of contracts. See, e.g., Paxson v. Comm'r, 144 F.2d 772, 775 (3d Cir. 1944) ("New Jersey follows the Restatement view that contracts may be assigned orally."). Second, there is no requirement in the 1980 License for a written assignment, because the only restriction on assignment is that the transferee be a "successor or purchaser of all or substantially all of [C.R. Bard's] VASCULAR PROSTHESIS business." PX4 at § 6.4. Mr. McDermott's

unrebutted trial testimony established that Impra/BPV was the successor to that vascular prosthesis business, (Trial Tr., 11/16/07, at 1636:2-9 (McDermott) and 1639:24-1640:17 (McDermott), as confirmed by the 1997 Amendment, (PX191 at 191.1.), and Impra/BPV's assumption of all rights and obligations under the 1980 License for over a decade. Trial Tr., 11/16/07, at 1644:20-1645:10 (McDermott), 1647:14-23 (McDermott); PX564. The evidence adduced at trial, thus, strongly supports the Court's finding that there was "at least" an implied-in-fact assignment of the 1980 License. See, e.g., Weiner v. Rollform, Inc., 744 F.2d 797 (Fed. Cir. 1984) (finding standing based on oral exclusive distribution agreement as fact-finder "was at liberty to believe the testimony that an oral contract existed"). Moreover, even if the 1980 License required a written assignment, it is well-settled under New Jersey law that the terms of a contract (including a requirement for written consent to any transfer) may be waived by the parties. Goldstein v. Barclay Amusement Corp., 123 N.J.L. 166, 169 (N.J. 1939). Such waiver may be "by a written instrument, a course of dealing, or even passive conduct, *i.e.*, taking no action to invalidate the assignment *vis-à-vis* the assignee." Garden State, L.P. v. First Fidelity Bank, N.A., 305 N.J. Super. 510, 523, 702 A.2d 1315 (1997). Plaintiffs presented substantial evidence demonstrating that Dr. Goldfarb – the only party who could have objected – consented to the assignment of the 1980 License, including: Dr. Goldfarb's agreement to amend the 1980 License to make Impra the exclusive licensee; Impra/BPV's assumption of all rights and obligations under the 1980 License, including the payment of royalties to Dr. Goldfarb; and Dr. Goldfarb's 2007 assignment of the '135 patent to BPV expressly acknowledging that "Dr. Goldfarb granted [BPV] an exclusive, worldwide license under the Patent." See Trial Tr., 11/07/08, at 489-90 (Goldfarb); Trial Tr., 11/16/08, at 1646-47 (McDermott); Trial Tr., 11/16/08, at 1644-45 (McDermott); PX191; PX564; PX1475 at 1475.2.

Thus, the only evidence presented is that all relevant parties – Dr. Goldfarb, Impra/BPV, and C.R. Bard – treated BPV as the exclusive licensee, which is sufficient to establish standing. See, e.g., Kalman v. Berlyn Corp., 914 F.2d 1473, 1482 (Fed. Cir. 1990) (granting standing to *de facto* licensee as the "real party in interest"). Moreover, to the extent

- 12 -

that Gore is correct that a written transfer of the license is required, the Court found that "by at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV." Order, July 29, 2008, at 17, 19.

### 3.     Transferring a License by Way of a Writing

Gore asserts that all transfers of exclusive licenses are required to be in writing. Gore's Motion, Doc. 849, at 12 ("[U]nder 35 U.S.C. § 261, a transfer of an existing exclusive written license is required to be in writing").  As the Court has previously ruled, Gore's argument is wrong as a matter of law.  However, if a written transfer of C.R. Bard's exclusive license were somehow required, the evidence underlying the Court's findings shows that there is such a writing, the 1997 Agreement Amending License Agreement. Order, July 29, 2008 at 17 (finding that the record supports finding that "by at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV").

Gore now argues that the Court's finding cannot stand because "[a]ny assignment of C.R. Bard's license to BPV, under 35 U.S.C. § 261 and the case law, had to be in writing signed by C.R. Bard as the assignor."  Gore's Motion at 2.  Again, Gore misstates the law and the facts.

Section 261, to the extent it applies, only states that patents "shall be assignable in law by an instrument in writing," and imposes no limitations as to the form or content of such writing.  See generally Morrow, 499 F.3d at 1337 n.3 ("The type of written instrument [under 35 U.S.C. § 261] (e.g., license or assignment agreement, dissolution agreement, or merger agreement) and the factual context in which the instrument is created is irrelevant.")  The lack of C.R. Bard's signature on the 1997 Amendment is thus irrelevant under 35 U.S.C. § 261.

/ / /

A000061

## 4. Prudential Standing

The record evidence that Plaintiffs introduced at trial further confirms that a C.R. Bard's signature was not required. For example, the preamble to PX191 expressly states that the 1997 Agreement is "made … by and among David Goldfarb, M.D., … C.R. Bard, Inc., and IMPRA, Inc." Another example is that the evidence showed that although the 1997 Amendment was drafted by C.R. Bard, and identified C.R. Bard as a party, the only signature block C.R. Bard included for itself was through Mr. McDermott in his capacity as president of C.R. Bard's wholly-owned subsidiary Impra. PX191 at 191.1 and .3; Trial Tr., 11/16/07, at 1646:4-7 (McDermott). A third example is that Mr. McDermott confirmed C.R. Bard's intent to be bound by the Agreement, testifying that he signed it on C.R. Bard's behalf and with Bard's express authorization.[5] Trial Tr., 11/16/07, at 1647:2-5 (McDermott). This evidence overwhelmingly establishes Mr. McDermott's authority to enter into the 1997 Amendment for C.R. Bard. Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 569 (N.J. Super. Ct. App. Div. 2007) ("When one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent.") In addition, C.R. Bard's failure to repudiate Mr. McDermott's actions during the decade-long assumption of all rights and obligations under the 1980 License by Impra/BPV confirms Mr. McDermott's authority, and constitutes a ratification of the 1997 Amendment. Thermo Contractor Corp. v. Bank of N.J., 69 N.J. 352 (1976) ("Ratification may be express or implied, and intent may be inferred from the failure to repudiate an unauthorized act, … or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act."). The admitted evidence thus proves that the 1997 Amendment was a written assignment.

The record evidence indisputably established that BPV was an exclusive licensee, therefore, BPV unquestionably has constitutional standing. Intellectual Prop. Dev., 248 F.3d

---

[5] The Court has already found that this testimony is not negated by Mr. McDermott's testimony on cross-examination that he signed the 1997 Amendment as President of Impra. Order, July 29, 2008, at 18 n.1.

A000062

at 1346 (exclusive licensees are "constitutionally injured by another entity that makes, uses or sells the invention.") All that is required for prudential standing, therefore, is for the "patentee" to be joined. Id. at 1348. Because both Dr. Goldfarb and C.R. Bard are parties, and have participated throughout its duration, there are no prudential standing concerns.[6] Evident Corp. v. Church & Dwight Co., 399 F.3d 1310, 1314 (Fed. Cir. 2005) ("[R]egardless of whether [the patent owner] was brought into the suit by the accused or the licensee, there is no standing problem.").

## II.    MOTION FOR NEW TRIAL OR REMITTITUR

Pursuant to Fed. R. Civ. P. 59 Defendant requests that the Court grant a new trial, or in the alternative, a remittitur, based on claim that the jury awarded Plaintiffs excessive "reasonable royalty" damages.

### A.    Legal Standard

The decision of whether to grant a new trial rests with the sound discretion of the trial court. See Allied Chem. Corp. v. Daifon, Inc., 449 U.S. 33, 36 (1980). Traditionally, trial courts grant new trial motions "only if the verdict is contrary to the clear weight of the evidence, is based upon false or pernicious evidence or to prevent a miscarriage of justice." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007). In the context of damages, a new trial is generally granted when the trial court finds that the damages awarded by the jury are "grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork." See Monsanto Co. V. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004). When an award of damages justifies a new trial, the trial court may, within its discretion, "grant defendant's motion for a new trial or deny the motion conditional upon the

---

[6] If it appeared to the Court that standing was an issue here and that to have standing C.R. Bard is a necessary plaintiff, the Court would grant Plaintiffs leave to amend the Complaint under Fed.R.Civ.P. 15 and 21. Intellectual Prop. Dev., 248 F.3d at 1348 n.5 ("[E]ven appellate-level amendments to correct jurisdictional defects may be appropriate to allow an exclusive license to join the patent owner." (citing Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1019 (Fed. Cir. 2001)). However, the Court finds standing exists with the current Plaintiffs and does not find amendment necessary.

- 15 -

1   prevailing party accepting a remittitur." <u>Fenner v. Dependable Trucking Co.</u>, 716 F.2d 598,

2   603 (9th Cir. 1983). If the prevailing party accepts remittitur, judgment must be entered in

3   the lesser amount. <u>Fenner v. Dependable Trucking Co.</u>, 716 F.2d 598, 603 (9th Cir. 1983).

4   This allows the party to avoid the delay and expense of a new trial when the jury's verdict

5   is excessive in relation to the evidence found in the record. <u>Unisplay S.A. v. Am. Elect. Sign</u>

6   <u>Co.</u>, 69 F.3d 512, 519 (Fed. Cir. 1995).

7        **B.**    **Analysis**

8        Defendant makes two central arguments in its motion for a new trial/remittitur.

9   Defendant first claims that the verdict returned by the jury was "grossly excessive" and

10   cannot stand. Next, Defendant argues that the jury's verdict of a 10% reasonable royalty was

11   not supported by the evidence and was contradictory. Because of the alleged excessiveness

12   and inconsistent nature of the verdict, Defendant asks the Court to either grant a new trial or

13   reduce Plaintiffs' reasonable royalty damages award to $41.8 Million.

14        With respect to whether the jury's verdict was grossly excessive, the Court notes that

15   this argument was not substantively or adequately addressed by Defendants in their briefing.

16   In any event, the Court is unmoved by Defendants's bare bones assertion that the jury's

17   determination of damages could in any sense be considered grossly excessive or monstrous.

18   Although neither party specifically argued for a 10% reasonable royalty, that does not render

19   the jury's verdict erroneous for "the factual determination of a reasonable royalty . . . need

20   not be supported, and indeed, frequently is not supported by the specific figures advanced

21   by either party." <u>Smithkline Diagnostics, Inc. v. Helena Labs. Corp.</u>, 926 F.2d 1161, 1167

22   (Fed. Cir. 1991). "Rather, a jury's choice simply must be within the range encompassed by

23   the record as a whole." <u>Unisplay</u>, 69 F.3d at 519. Here, consistent with the Court's

24   instructions, Plaintiffs presented evidence establishing not only that a reasonable royalty was

25   greater than 5%, but Plaintiffs attempted to argue at trial that a royalty of 15% or higher was

26   supportable. As Plaintiffs note, the evidence presented at trial established that Defendant has

27   sold billions of dollars of ePTFE grafts embodying Dr. Goldfarb's invention, and have reaped

28   substantial profits as a result. Indeed, the Goldfarb patent was an important industry

- 16 -

achievement, which, some 30 years later, still remains the gold standard for vascular grafts, and both Bard and Gore have enjoyed substantial commercial success from Dr. Goldfarb's invention, each selling millions of ePTFE grafts. Under circumstances such as these, the jury's award cannot be fairly characterized as grossly excessive or monstrous.

The Court will now turn to the merits of whether damages amount was inconsistent or otherwise not supported by the clear weight of the evidence adduced at trial. The point of departure for an analysis of damages in the instant case is found in the language of the Patent Act, which states that damages for infringement shall be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. To achieve adequate compensation, an award of damages must provide "full compensation." General Motors Corp. V. Devex Corp., 461 U.S. 648, 654-55 (1983). The award must also not be less than a reasonable royalty, the purpose of which "is not to direct the form of the compensation, but to set a floor below which damage awards may not fall." Rite-Hite Corp. V. Kelley Co., 56 F.3d 1538, 1544 (Fed. Cir. 1995). The Patent Act's position on damages is "expansive rather than limiting. It affirmatively states that damages must be adequate, while providing only a lower limit and other limitation." Id.

In the instant case, Defendant argues that the jury determined that Gore's 5% option to sublicense the '135 patent lapsed on February 9, 2004 was available to it during the August 2002 hypothetical negotiation. As such, Defendant contends that the option constituted a binding contract. Thus, when the jury calculated a reasonable royalty award of 10%, without accounting for the 5% royalty rate of the option, it rendered the verdict internally inconsistent, meriting either a new trial or remittitur. Plaintiffs counter by arguing that there are several ways to reconcile the 10% royalty with the jury's finding that the option lapsed on February 9, 2004. First, Plaintiffs suggest that based on the evidence, the jury could determine that the 5% rate negotiated in 1984 was not a reasonable royalty and was incapable of adequately compensating Plaintiff for the infringement. Second, Plaintiff writes that the jury could have determined that the 1984 agreement was merely an "agreement to

1    agree," and thus not available to Defendant in the hypothetical negotiation. Third, Plaintiffs

2    claim that the jury was entitled to treat the option as lapsed in both the real world and in the

3    hypothetical negotiation.

4        Without addressing all of the arguments raised by the parties in their moving papers,

5    the Court notes that Defendant has not convincingly argued that the 5% option constitutes

6    a ceiling on the amount of damages that Plaintiffs could recover as a reasonable royalty rate

7    under 35 U.S.C. § 284.  For that reason, the jury's verdict cannot be classified as inconsistent

8    or irreconcilable.  For similar reasons the imposition of a 10% reasonable royalty rate was

9    not against the clear weight of the evidentiary record.

10        As Plaintiffs contend, the record is replete with evidence suggesting that a 5% royalty

11    rate—negotiated in 1984, 18 years before the hypothetical negotiation—could not reflect

12    what a reasonable royalty would be in 2002 in view of the vastly changed circumstances of

13    the parties. In addition, the 5% royalty was negotiated as part of the settlement of litigation

14    with Gore, and as such, is only of limited relevance to the hypothetical negotiation. See

15    Rite-Hite Corp. v. Kelley Co., 774 F. Supp. 1514, 1535 (E.D. Wis. 1991) ("settlement-

16    induced royalty agreements are determined largely by factors not considered in the

17    'hypothetical royalty negotiation' . . . .").  Importantly, the 5% royalty rate of the lapsed

18    option was negotiated at a time when the Goldfarb application was still being processed and

19    was in the midst of a contentious challenge by Defendant.  There were numerous

20    uncertainties at that time, including: (1) whether Dr. Goldfarb would prevail in the

21    interference; (2) if Dr. Goldfarb did prevail, whether a patent would issue; (3) if a patent

22    issued, whether its claims would cover Gore's products; and (4) if a patent issued, whether

23    its claims would be upheld as valid. Because none of the uncertainties that existed in 1984

24    are present during the hypothetical negotiation, the evidence presented tended to show that

25    the 5% rate negotiated in 1984 did not set the ceiling on the amount of damages that would

26    be adequate to compensate Plaintiffs for the infringement.  Furthermore, as Plaintiffs note,

27    the fact that the 5% royalty was confirmed by the real world evidence establishing that the

28    lapsed option might have been a below market deal because of the uncertainties that existed

- 18 -

at the time. As fact witness, Mr. McDermott, testified, based on his extensive industry experience, that the 5% royalty was "phenomenally low" and "below market rate."

> Q:    And based on that experience, and being president of the company, what was your view on a royalty rate of five percent in your industry?
>
> A:    Well, it was phenomenally low. To license a competitor at that level just— I was surprised. I wasn't involved when that got done originally. But when I learned about it, I was certainly surprised.
>
> Q:    What was your view when the option was not exercised?
>
> A:    Well, because I felt it was such below market rate and they didn't take it, I was just surprised. It didn't make sense to me.

(11/16/07 tr. at 1667:6-16.)  The jury was entitled to rely on such evidence and conclude that the 5% rate negotiated in 1984 was significantly less than a reasonable royalty resulting from a hypothetical negotiation in 2002 based on materially different circumstances.

The Court is further unmoved by Defendant's argument that the 10% royalty cannot stand because Gore "would never have agreed to pay more than five percent rate of the option during the hypothetical negotiation." (Dkt.#840, p. 1.)  Notwithstanding Defendant's contention, it should be noted that Gore did not try to exercise the option and did not take a license to the Goldfarb patent.  Instead, Defendant elected to take their chances with litigation; now that the jury has found Defendant's conduct to be objectively reckless, the fact that Gore would prefer to now pay the 5% royalty that it earlier rejected rather than the 10% royalty assessed by the jury is irrelevant.  "[W]hat an infringer would prefer to pay is not the test the damages." Rite-Hite, 56 F.3d at 1555 (citing TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 900 (Fed. Cir. 1986)).  In fact, as Plaintiffs point out, the Federal Circuit has specifically rejected the claim that Defendant has made, holding that the law does not preclude reasonable royalty from "be[ing] set so high that no rational self-interested wealth maximizing infringer acting *ex ante* would ever have agreed to it." Monsanto Co. v. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004).

A000067

Lastly, Defendants incorrectly assert that the jury determined that the lapsed option was in effect on August 20, 2002, and therefore was an available non-infringing alternative in the hypothetical negotiation. To the contrary, the jury was only asked to determine the reasonable period of time for exercise of the lapsed option, and was not asked to determine whether it was "in effect." Moreover, this Court previously determined that "the unexercised Option is nothing more than an agreement to agree at some point in the future, rather an enforceable contract" and held that "whether Gore is entitled to limit Bard's royalty damages claim . . . to five percent" was a question for the jury. (Dkt.# 559, p. 29.)

Defendant's claim that it can simply exercise the lapsed option in the hypothetical negotiation ignores the fact that the hypothetical negotiation does not mirror real business conditions. Rather, the "willing licensee/licensor approach must be flexibly applied as a 'devise in the aid of justice.'" TWM, 789 F.2d at 900 (internal citations omitted). Accordingly, the hypothetical negotiation differs from the real world at the time of the hypothetical negotiation in two significant respects. First, the court must "assume, for purposes of the hypothetical negotiation, that all parties would have known all relevant information." Mobil Oil Corp. v. Amoco Chems. Corp., 915 F. Supp. 1333, 1353 (D. Del. 1994). Second, and most importantly, the hypothetical negotiation requires the trial court to take into account facts that occur after the date of the first infringement. See Fromson v. Western Lito Plate and Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988). Here, among the subsequent information that the jury was permitted to take into account in the hypothetical negotiation was the fact that the parties could not agree on any of the material terms of a sublicense. It was undisputed that the lapsed option did not contain the negotiated terms of any sublicense agreement. It was also undisputed that following the issuance of the Goldfarb patent, Bard sent Gore a partial list of suggested license terms "to be discussed" including provisions on the royalty base on which royalties would be due; details as to the exclusivity of the sublicense; assignability or transfer provisions; provisions relating to payment and audit; provisions describing termination; covenants by Gore not to attack the validity or enforceability of the Goldfarb patent. As Plaintiffs note, not one of these terms was ever

- 20 -

agreed on by the Parties. (11/16/07 Tr. At 1657:4-1668:21, 1727:7-12; 11/29/07 Tr. At 2493:8-2498:18; 12/04/07 Tr. At 3043:1-3047:20.)  Instead the only evidence at trial was that in the event that Gore did decide to exercise the lapsed option, all of the material license terms needed to be negotiated.

In fact, Defendant's expert on the damages issue, Professor Teece, stated that he did not know what terms the Parties would agree to because he had not "done an analysis of what would be needed to finish off the actual world this—or to convert the option, to exercise the option and convert it into a license agreement." (11/29/07 Tr. At 2496:16-19.)  This lack of any agreement as to the material terms was also confirmed by Plaintiffs' licensing expert, Dr. Berneman, who testified that "many significant aspects" still required negotiation, and that reasonable parties frequently never reach agreement over such terms. (12/05/07 Tr. At 3237:1-22.)

The jury was therefore free to credit Plaintiffs' evidence and find that the lapsed option was merely an agreement to agree, though not an enforceable contract, and that Gore could not simply exercise it without first working out the terms.  Just as in the real world, the jury was free to conclude that the Parties could not work out the material terms of any agreement before the option lapsed and thus the lapsed option was not available to Gore to exercise in the hypothetical negotiations.  Thus, the jury's 10% reasonable royalty award is supported by record evidence and fully consistent with the jury's finding that Gore's 5% option lapsed on February 9, 2004.

In sum, Defendant has not met the requirements for a new trial or remittitur on the issue of damages.

## III.    REMAINING RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW

The Court will now address Defendant's remaining Motions. These Motions are all Renewed Motions for Judgment as a Matter of Law:  Motion for Judgment as a Matter of Law Regarding Invalidity Because Cooper and Goldfarb are Joint Inventors (Dkt.#841.), Renewed Motion for Judgment as a Matter of Law Regarding Willful Infringement

- 21 -

1   (Dkt.#842.), Renewed Motion for Judgment as a Matter of Law Regarding Invalidity of the

2   '135 Patent' for Failure to Disclose Best Mode (Dkt.#843.),  Renewed Motion for Judgment

3   as a Matter of Law that Claims 20-27 are Invalid for Failure to Satisfy the Written Description

4   Requirement of 35 U.S.C. § 112, ¶1 (Dkt.#844.),  Renewed Motion for Judgment as a Matter

5   of Law that Claims 20-27 are Invalid Under 35 U.S.C. § 102(B) for Lack of Novelty in View

6   of the 1973 Matsumoto *Surgery* Article (Dkt.#845.), Renewed Motion for Judgment as a

7   Matter of Law Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the

8   Typicality Element of Claims 20-27 (Dkt.#846.),  Renewed Motion for Judgment as a Matter

9   of Law Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent.' (Dkt.#847.)

10  A renewed motion for judgment as a matter of law is properly granted "if the

11  evidence, construed in the light most favorable to the nonmoving party, permits only one

12  reasonable conclusion, and that conclusion is contrary to the jury's verdict." Pavao v. Pagay,

13  307 F.3d 915, 918 (9th Cir. 2002).  The "jury's verdict must be upheld if its is supported by

14  substantial evidence, which is evidence adequate to support the jury's conclusion, even if it

15  is also possible to draw a contrary conclusion." Id.  Accordingly, a court "can overturn the

16  jury's verdict and grant such a motion only if there is no legally sufficient basis for a

17  reasonable jury to find for that party on that issue." Costa v. Desert Palace, Inc., 299 F.3d

18  858, 859 (9th Cir. 2002) (internal citations omitted).  If there is "sufficient evidence before

19  the jury on a particular issue, and if the jury instructions on the issue were correct, then the

20  jury's verdict must stand." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001,

21  1014 (9th Cir. 1985).

22  In ruling on a motion for judgment as a matter of law, the trial court must view all

23  evidence in the light most favorable to the nonmoving party, draw all reasonable inferences

24  in the favor of the nonmover, and disregard all evidence favorable to the moving party that

25  the jury is not required to believe. Costa, 299 F.3d at 859.  The court "may not substitute

26  [its] view of the evidence for that of the jury," nor can the court "make credibility

27  determinations nor weigh the evidence." Id.  The "high hurdle" of the 50(b) standard thus

28

- 22 -

1   "recognizes that credibility, inferences, and factfinding are the province of the jury, not [the]

2   court." Id.

3       The Court is intimately familiar with the all of the invalidity defenses and other issues

4   that Defendant has raised in its renewed motions and finds little need to revisit each one

5   individually.  Suffice it to say that the Court is firmly convinced that the jury's decisions

6   were supported by substantial evidence. The Court therefore denies Gore's remaining

7   Renewed Motions for Judgment as a Matter of Law.

8   **Accordingly,**

9       **IT IS HEREBY ORDERED** denying Defendant's Motion Pursuant to Fed.R.Civ.P.

10  12(b)(1) and 12(h)(3) to Dismiss Plaintiffs' Complaint for Lack of Standing or in the

11  Alternative Renewed Motion for Judgment as a Matter of Law. (Dkt.#849.)

12      **IT IS FURTHER ORDERED** denying Defendant's Motion for New Trial or

13  Remittitur for Excessive Damages. (Dkt.#840.)

14      **IT IS FURTHER ORDERED** denying Defendant's Motion for Judgment as a Matter

15  of Law Regarding Invalidity Because Cooper and Goldfarb are Joint Inventors. (Dkt.#841.)

16      **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment

17  as a Matter of Law Regarding Willful Infringement. (Dkt.#842.)

18      **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment

19  as a Matter of Law Regarding Invalidity of the '135 Patent' for Failure to Disclose Best

20  Mode. (Dkt.#843.)

21      **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment

22  as a Matter of Law that Claims 20-27 are Invalid for Failure to Satisfy the Written Description

23  Requirement of 35 U.S.C. § 112, ¶1. (Dkt.#844.)

24      **IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment

25  as a Matter of Law that Claims 20-27 are Invalid Under 35 U.S.C. § 102(B) for Lack of

26  Novelty in View of the 1973 Matsumoto *Surgery* Article. (Dkt.#845.)

27  / / /

28

- 23 -

**IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20-27. (Dkt.#846.)

**IT IS FURTHER ORDERED** denying Defendant's Renewed Motion for Judgment as a Matter of Law Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent.' (Dkt.#847.)

DATED this 31st day of March, 2009.

_____
Mary H. Murguia
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., | No. CV-03-597-PHX-MHM |
| Plaintiffs, | **AMENDED CLERK'S JUDGMENT** |
| vs. | |
| W.L. Gore & Associates, Inc., | |
| Defendant. | |
| W.L. Gore & Associates, Inc., | |
| Counterclaimant, | |
| vs. | |
| Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., | |
| Counterdefendants. | |

Pursuant to the Court's Orders filed July 27, 2010 (Doc. Nos. 1040 and 1039); July 21, 2010 (Doc. No. 1036); July 9, 2010 (Doc. No. 1034); March 31, 2009 (Doc. Nos. 941 and 942); and July 29, 2008 (Doc. Nos. 833, 834, and 835); and the Jury's Verdict, entered on December 11, 2007 (Doc. No. 771), the following Amended Judgment is entered:

1.     This action was tried to a jury with Judge Murguia presiding, and the jury rendered

a verdict, (Doc. No. 771), reflected below:

    a.      Plaintiffs David Goldfarb, M.D. ("Goldfarb") and Bard Peripheral Vascular, Inc. ("BPV") (collectively, "Plaintiffs") proved that the subject W.L. Gore & Associates, Inc.'s ("Gore") surgical graft and stent graft products infringe the asserted claims of U.S. Patent No. 6,436,135 (the "'135 Patent");

    b.      Plaintiffs proved that Gore's infringement was willful; and,

    c.     Gore failed to prove by clear and convincing evidence that the '135 Patent is invalid.

2.    The Court denied post-trial motions to set-aside the verdict or for a new trial. (Doc. Nos. 833 and 834.)

3.    Gore's claims of inequitable conduct were tried to the Court, and the Court found that Gore did not prove by clear and convincing evidence that Dr. Goldfarb and/or his attorneys committed inequitable conduct during the prosecution of the '135 Patent.

4.    For the time period ending June 30, 2007, Plaintiffs are entitled to lost profits damages in the amount of $102,081,578.82 and reasonable royalty damages in the amount of $83,508,292.20, for a total of $185,589,871.02. For the reasons set forth in its Order dated March 31, 2009 (Doc. No. 941), these damages are doubled from $185,589,871.02 to the sum of $371,179,742.04 pursuant to 35 U.S.C. § 284.

5.    For the time period beginning July 1, 2007 and ending March 31, 2009, Plaintiffs are entitled to lost profits damages in the amount of $44,556,381.24 and reasonable royalty damages in the amount of $64,440,740, for a total of $108,897,121.24. For the reasons set forth in its Order dated July 9, 2010 (Doc. No. 1034), the Court declines to enhance these damages pursuant to 35 U.S.C. § 284.

6.    For the reasons set forth in its Order dated March 31, 2009 (Doc. No. 941), Plaintiffs are entitled to an award of their reasonable attorneys' fees and nontaxable costs in the sum of $19,000,000 pursuant to 35 U.S.C. § 285.

7.    For the reasons set forth in its Order dated March 31, 2009 (Doc. No. 942), Plaintiffs are entitled to an award of prejudgment interest on the damages specified in Paragraph

1  4 above (damages before enhancement) in the sum of $18,558,987.10. Plaintiffs are

2  entitled to an award of prejudgment interest on the attorneys' fees award specified in

3  Paragraph 6 above in the sum of $1,900,000. The Court declines to award

4  prejudgment interest on the damages specified in Paragraph 3 above.

5  8.  Plaintiffs are awarded post-judgment interest pursuant to 28 U.S.C. § 1961.

6  ### ORDER CONCERNING COMPULSORY LICENSE

7  **WHEREAS**, this Court has denied Plaintiff Bard Peripheral Vascular, Inc.'s motion

8  for a permanent injunction prohibiting prospective infringement by W.L. Gore & Associates,

9  Inc. ("Gore") of U.S. Patent No. 6,436,135;

10  **IT IS HEREBY ORDERED** granting a compulsory license to Bard Peripheral

11  Vascular, Inc. and David Goldfarb, M.D. in the form of 20% on surgical grafts, 15% on

12  stent-grafts, 15% on the PROPATEN® surgical grafts, and 12.5% on VIABAHN®

13  stent-grafts with heparin against W.L. Gore & Associates, Inc.

14  **IT IS FURTHER ORDERED** that Gore be permitted to practice, and Bard

15  Peripheral Vascular, Inc. ("Bard"), a subsidiary of C.R. Bard, Inc., be compelled to permit

16  Gore to practice, the '135 patent subject to the following terms:

17  **1.**  **TERM:** Gore's obligation to pay a royalty associated with this ORDER is

18  effective as of April 1, 2009, and expires upon the expiration of the '135

19  patent, on August 20, 2019, unless earlier terminated as provided herein.

20  **2.**  **TERMINATION:**

21  **(a)**  The provisions of this ORDER permitting Gore to practice the '135

22  patent shall terminate if Gore violates this ORDER, including without

23  limitation if Gore violates its obligation to timely pay royalties, and

24  fails to cure any such breach within thirty (30) days after receipt of

25  written notice thereof from Bard or the Court. Upon any such

26  termination, Gore shall no longer be permitted to practice the '135

27  patent.

28  **(b)**  Should all the asserted claims (20-27) of the '135 patent be held

- 3 -

A000075

invalid, not infringed, and/or unenforceable in a final and
nonappealable judgment in this case, then this ORDER shall be void
and all payments made by Gore hereunder and escrowed, plus interest
accrued thereon, shall be returned to Gore.

**(c)** If there is a final and non-appealable judgment in another case that all
the asserted claims (20-27) of the '135 patent are held invalid or
unenforceable, then the Parties' obligations under this ORDER will
immediately terminate.

**3.** **SCOPE OF ORDER:** This ORDER permitting Gore to practice the '135
patent under the terms specified herein is: (i) non-transferable and does not
inure to the benefit of any Gore joint venturers, affiliates, successors, or any
other legal person beyond Gore; (ii) non-exclusive to Gore in so much as the
ORDER does not limit in any way whatsoever Bard's ability to license,
sublicense or assign any or all of its rights in the '135 patent, including rights
granted under this ORDER; and (iii) limited to permitting Gore to make, use,
sell and/or import the following products in the United States:

**(a)** Standard Grafts (Standard Walled Ringed; Standard Walled Removable
Ringed; Thin Walled Ringed; Thin Walled Removable Ringed;
Standard Walled; Thin Walled);

**(b)** Stretch Grafts (Standard Walled Stretch; Standard Walled Large
Diameter Stretch; Standard Walled Removable Ringed Stretch;
Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch;
Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis;
Standard Walled Removable Ringed Stretch; Thin Walled Removable
Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch);

**(c)** PROPATEN® Grafts;

**(d)** INTERING® Grafts;

**(e)** INTERING® Stretch Grafts;

- 4 -

A000076

(f) ACUSEAL® Patch;

(g) Cardiovascular Patchs;

(h) VIABAHN® Stent-Grafts;

(i) EXCLUDER® Stent-Grafts;

(j) TAG® Stent-Grafts;

(k) VIATORR® Stent-Grafts;

(1) Gore products not more than colorably different from those on the market as of December 11, 2007, and falling within any of 3(a) through 3(k) hereof.

(m) Gore products falling within any of 3(a) through 3(l) that are approved by the FDA for new vascular indications.

This ORDER shall not confer any right to Gore to enforce the '135 patent nor any right to seek to have Bard enforce the' 135 patent. All rights to prosecute, maintain, enforce, license, sublicense or assign the '135 patent are reserved solely and exclusively to Bard.

**4.    ROYALTY PAYMENT**

(a) SURGICAL GRAFT PRODUCTS: "Surgical Graft Products" are those products identified in 3(a), (b), (d), (e), (f), (g) and (l), to the extent applicable. The royalty rate on such products is 20% of Gore's net selling price from Gore's sale of Surgical Graft Products.

(b) STENT GRAFT PRODUCTS: "Stent Graft Products" are those products identified in 3(i), (j), (k) and (1), to the extent applicable. The royalty rate on such products is 15% of Gore's net selling price from Gore's sale of Stent Graft Products.

(c) PROPATEN® Grafts: "PROPATEN® Grafts" are those products identified in 3(c), and (1), to the extent applicable. The royalty rate on such products is 15% of Gore's net selling price from Gore's sale of PROPATEN® Grafts.

(d) VIABAHN® Stent-Grafts: "VIABAHN® Stent-Grafts" are those

- 5 -

products identified in 3(h), and, (l), to the extent applicable. The royalty rate on such products that include heparin is 12.5% of Gore's net selling price from Gore's sale of VIABAHN® Stent-Grafts. The royalty rate on such products that do not include heparin is 15% of Gore's net selling price from Gore's sale of VIABAHN® Stent-Grafts.

**(e)** Gore shall have no obligation to pay any royalties for products identified in Section 3 covered by 35 U.S.C § 271(e)(1).

**(f)** As used herein, "net selling price" shall be the invoiced selling price (or imputed price, based on the average net selling price for the applicable products for the preceding two fiscal quarters, if non-monetary consideration is provided or services are bundled with such sales) of a product identified in Section 3 sold by or on behalf of Gore to a third party in an arms-length transaction less the following deductions to the extent recognized in accordance with applicable generally accepted accounting principles consistently applied to all Gore products and services: excise and sales taxes, quantity and cash discounts granted and taken by customers and not already reflected in the invoiced selling price, freight and handling charges to the extent included in the invoiced selling price, and allowances for returns due to warranty claims.

**6.** **PAYMENT TIMING:** Payments by Gore to Bard shall be wired in same day funds quarterly no later than the 30th day following the close of the calendar quarter. For clarity, payment for the first quarter shall be made within 30 days after March 31, payment for the second quarter shall be made within 30 days after June 30, payment for the third quarter shall be made within 30 days after September 30, and payment for the fourth quarter shall be made within 30 days after December 31. Payment for any quarters ending before the entry date of this Order shall be made within 30 days of the entry of this Order. Thereafter,

- 6 -

payments shall be made within 30 days of the end of the subsequent quarters. If the 30th day following the end of the quarter is a Saturday, Sunday or holiday, then the payment is due on the next business day, thereafter.

**7.** **ESCROW:** Payments made under this ORDER shall be escrowed with this Court until there is a final and non-appealable judgment in this case. During the time when escrowed payments are deposited with the Court, to the extent that the Clerk of the Court is unable to process a wire transfer, Gore shall deposit a cashier's check with the Clerk of the Court on or before the day payment is due.

**8.** **AUDIT RIGHTS**

**(a)** Gore is ORDERED to keep complete, true and accurate books of account and records, including but not limited to, unit sales, dollar sales and average selling price for infringing products, for the purpose of determining the royalty amounts payable. Gore shall certify its compliance with the ORDER annually 60 days after the close of its financial year and ensure that the quarterly payments for the preceding financial year are in accordance with the ORDER. Such certification shall be accompanied with any underpayments for the preceding four quarters. If Gore's certification process reveals an underpayment in excess of five percent (5%) of the amount owed, Gore is ORDERED to pay interest on the unpaid royalties at the prime interest rate calculated quarterly, at the same time. An underpayment discovered pursuant to this section will not terminate this ORDER pursuant to Section 2 unless Gore fails to pay the underpayment within 60 days of the end of its financial year.

**(b)** Bard shall have the right, upon reasonable notice and at its expense, to direct an independent certified accounting firm to inspect and audit the relevant accounting and sales books and records, including but not

A000079

limited to, the unit sales, dollar revenue and average selling price for each infringing product. The audit may be made once per year and may cover any period within the previous four completed fiscal years prior to the audit, provided that such period has not been previously audited. The determination of the independent certified accounting firm shall be final. In the event an audit reveals an underpayment, Gore shall remit payment of such amount to Bard within thirty (30) days of receiving written notice of such underpayment from the independent certified accounting firm. In addition, if any such audit reveals an underpayment in excess of five percent (5%) of the amount owed for the period audited, Gore is ORDERED to pay the reasonable fees and expenses actually incurred relating to the audit as well as interest on the unpaid royalties at the prime interest rate calculated quarterly, which Gore is ORDERED to pay to Bard within thirty (30) days of notice from Bard to Gore. An underpayment discovered pursuant to this Section 8(b) will not terminate this ORDER pursuant to Section 2 unless Gore fails to pay the underpayment within thirty (30) days of notice.

If the audit discloses an overpayment, Bard is ORDERED to credit Gore the overpayment amount for future payments. If the overpayment exceeds the royalty amount owed by Gore at the expiration of this ORDER, Bard is ORDERED to refund Gore the amount of overpayment in excess of Gore's owed royalties within thirty (30) days.

**9.** **MARKING**: Gore shall mark all products covered by this ORDER in accordance with 35 U.S.C. § 287.

**10.** **NOTICE OF NEW PRODUCTS:** Gore shall provide Bard notice no less than 180 days before the first anticipated commercial sale of any new vascular product utilizing ePTFE that it contends constitutes to be a Gore product covered by Section 3(1) or Section 3(m) of this ORDER.

**11.** **DISPUTE RESOLUTION:** Bard and Gore shall meet and confer in good

A000080

faith in an attempt to resolve all disputes that may arise under the ORDER. The Court specifically retains jurisdiction to enforce, modify, or terminate this ORDER as the equities may require, and to adopt procedures for resolution of any dispute under the ORDER.

12.    **FORM OF NOTICES:** All notices of any asserted breach or any other asserted dispute under this compulsory license shall be in writing and shall be deemed given when sent by (a) prepaid, registered or certified mail, addressed to the party at the below address, or (b) by private courier service signature for delivery required, addressed to the party at the address below. Each party may change such address from time to time by notice so given.

**To Bard:** C.R. Bard, Inc.

730 Central Avenue

Murray Hill, NJ USA

Attn: General Counsel

(800) 367-2273

**To Gore:** W. L. Gore & Associates, Inc.

551 Paper Mill Road

Newark, Delaware 19711

Attn: General Counsel

August 24, 2010                    RICHARD H. WEARE
                                   District Court Executive/Clerk

                                   s/L. Dixon
                                   By: Deputy Clerk

- 9 -

☒ FILED     ___ LODGED
___ RECEIVED     ___ COPY

DEC 1 1 2007

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ Z DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Bard Peripheral Vascular, Inc. and David
Goldfarb, M.D.,

                    Plaintiffs,

          v.

W. L. Gore & Associates, Inc.

                    Defendant

---

W. L. Gore & Associates, Inc.

                    Counterclaimant,

          v.

Bard Peripheral Vascular, Inc., David Goldfarb,
M.D., and C. R. Bard, Inc.

                    Counterdefendants.

**No. CV 03-0597 PHX MHM**

**VERDICT**

(Redacted)

# VERDICT FORM

You, the jury, are to answer the following questions based on the evidence admitted at trial and according to the instructions the court has given you.  Start with Question No. 1 and proceed through the questions following the directions included in this Verdict Form.

When answering the questions and filling out this Verdict Form, please follow the directions provided throughout the form.  Your answer to each question must be unanimous.  Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions.  Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

## I.   INFRINGEMENT

*Question No. 1 (Direct Infringement):*

Considering each claim and product separately, have Plaintiffs proved that it is more likely than not that the following Gore products directly infringe any of the following claims of the '135 patent?  Answer "yes" (for Plaintiffs) or "no" (for Gore). On each line within each chart below, if you answer "yes" for Literal Infringement, you should not answer for doctrine of equivalents for that line. (See Instruction Nos. 13-18).

A000084

| Patent Claim 20 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Grafts and INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |
| ACUSEAL Patch | Yes☒ No☐ | Yes☐ No☐ |
| Cardiovascular Patch | Yes☒ No☐ | Yes☐ No☐ |
| VIABAHN Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| EXCLUDER Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| TAG Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| VIATORR Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |

-3-

| Patent Claim 21 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Grafts and INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |
| ACUSEAL Patch | Yes☒ No☐ | Yes☐ No☐ |
| Cardiovascular Patch | Yes☒ No☐ | Yes☐ No☐ |
| VIABAHN Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| EXCLUDER Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| TAG Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| VIATORR Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |

A000086

| Patent Claim 22 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| **Standard Grafts**<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| **Stretch Grafts**<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| **PROPATEN Grafts** | Yes☒ No☐ | Yes☐ No☐ |
| **INTERING Grafts and INTERING Stretch Grafts** | Yes☒ No☐ | Yes☐ No☐ |
| **ACUSEAL Patch** | Yes☒ No☐ | Yes☐ No☐ |
| **Cardiovascular Patch** | Yes☒ No☐ | Yes☐ No☐ |
| **VIABAHN Stent-Grafts** | Yes☒ No☐ | Yes☐ No☐ |
| **EXCLUDER Stent-Grafts** | Yes☒ No☐ | Yes☐ No☐ |
| **TAG Stent-Grafts** | Yes☒ No☐ | Yes☐ No☐ |
| **VIATORR Stent-Grafts** | Yes☒ No☐ | Yes☐ No☐ |

A000087

| Patent Claim 23 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Grafts and INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |
| ACUSEAL Patch | Yes☒ No☐ | Yes☐ No☐ |
| Cardiovascular Patch | Yes☒ No☐ | Yes☐ No☐ |
| VIABAHN Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| EXCLUDER Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| TAG Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| VIATORR Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |

A000088

| Patent Claim 24 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Grafts and INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |
| ACUSEAL Patch | Yes☒ No☐ | Yes☐ No☐ |
| Cardiovascular Patch | Yes☒ No☐ | Yes☐ No☐ |
| VIABAHN Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| EXCLUDER Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| TAG Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| VIATORR Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |

A000089

| Patent Claim 25 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Removable Ringed Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Grafts and INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |
| ACUSEAL Patch | Yes☒ No☐ | Yes☐ No☐ |
| Cardiovascular Patch | Yes☒ No☐ | Yes☐ No☐ |

A000090

| Patent Claim 26 | | |
| --- | --- | --- |
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Removable Ringed Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |

-9-

A000091

| Patent Claim 27 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Standard Grafts<br><br>(Standard Walled Ringed; Standard Walled Removable Ringed; Thin Walled Ringed; Thin Walled Removable Ringed; Standard Walled; Thin Walled) | Yes☒ No☐ | Yes☐ No☐ |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Grafts and INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |
| ACUSEAL Patch | Yes☒ No☐ | Yes☐ No☐ |
| Cardiovascular Patch | Yes☒ No☐ | Yes☐ No☐ |
| VIABAHN Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| EXCLUDER Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| TAG Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |
| VIATORR Stent-Grafts | Yes☒ No☐ | Yes☐ No☐ |

A000092

*Question No. 2 (Indirect Infringement -- Stretch Products):*

Considering each claim and product separately, have Plaintiffs proved that it is more likely than not that the following Gore stretch products indirectly infringe any of the following claims of the '135 patent? Answer "yes" (for Plaintiffs) or "no" (for Gore). On each line within each chart below, if you answer "yes" for Literal Infringement, you should not answer for doctrine of equivalents for that line. (See Instruction Nos. 13-20).

| Patent Claim 20 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| **Stretch Grafts**<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

| Patent Claim 21 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Stretch Grafts <br><br> (Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

| Patent Claim 22 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Stretch Grafts <br><br> (Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

-12-

| Patent Claim 23 | | |
|---|---|---|
| Gore Product | Literal Infringement | Infringement under the doctrine of equivalents |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

| Patent Claim 24 | | |
|---|---|---|
| Gore Product | Literal Infringement | Infringement under the doctrine of equivalents |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

-13-

A000095

| Patent Claim 25 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Removable Ringed Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

| Patent Claim 26 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Removable Ringed Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |

A000096

| Patent Claim 27 | | |
|---|---|---|
| **Gore Product** | **Literal Infringement** | **Infringement under the doctrine of equivalents** |
| Stretch Grafts<br><br>(Standard Walled Stretch; Standard Walled Large Diameter Stretch; Standard Walled Removable Ringed Stretch; Standard Walled Bifurcated Stretch; Thin Walled Bifurcated Stretch; Standard Walled Ringed Stretch; Standard Walled Ringed Dialysis; Standard Walled Removable Ringed Stretch; Thin Walled Removable Ringed Stretch; Thin Walled Ringed Stretch; Thin Walled Stretch) | Yes☒ No☐ | Yes☐ No☐ |
| PROPATEN Grafts | Yes☒ No☐ | Yes☐ No☐ |
| INTERING Stretch Grafts | Yes☒ No☐ | Yes☐ No☐ |

**Regardless of whether or not you found infringement of claims 20-27 of the**

**'135 patent, please proceed to Section II below.**

-15-

## II.   INVALIDITY

Gore asserts that claims 20-27 of the '135 patent are invalid for various reasons.

*Question No. 3 (Anticipation):*

Considering each claim separately, has Gore proved that it is highly probable that any of the asserted claims (claims 20 to 27) of the '135 patent is invalid by "anticipation"?  Answer "yes" (for Gore) or "no" (for Plaintiffs).  (See Instruction Nos. 21-22, 26-31).

|          | Dr. Norton's use in "Mrs. B" |
|----------|------------------------------|
| Claim 20 | Yes☐ No☒ |
| Claim 21 | Yes☐ No☒ |
| Claim 22 | Yes☐ No☒ |
| Claim 23 | Yes☐ No☒ |
| Claim 24 | Yes☐ No☒ |
| Claim 25 | Yes☐ No☒ |
| Claim 26 | ■■■■■■■■■ |
| Claim 27 | Yes☐ No☒ |

|          | Matsumoto Publication |
|----------|------------------------|
| Claim 20 | Yes☐ No☒ |
| Claim 21 | Yes☐ No☒ |
| Claim 22 | Yes☐ No☒ |
| Claim 23 | Yes☐ No☒ |
| Claim 24 | Yes☐ No☒ |
| Claim 25 | Yes☐ No☒ |
| Claim 26 | Yes☐ No☒ |
| Claim 27 | Yes☐ No☒ |

A000098

*Question No. 4 (Obviousness):*

Considering each claim separately, has Gore proved that it is highly probable that any of the asserted claims of the '135 patent is invalid for "obviousness"? Answer "yes" (for Gore) or "no" (for Plaintiffs). (See Instruction Nos. 21-22, 27, 28 & 33).

|  | Volder Publication |
| --- | --- |
| Claim 20 | Yes☐ No☒ |
| Claim 21 | Yes☐ No☒ |
| Claim 22 | Yes☐ No☒ |
| Claim 23 | Yes☐ No☒ |
| Claim 24 | Yes☐ No☒ |
| Claim 25 | ■■■■■ |
| Claim 26 | ■■■■■ |
| Claim 27 | Yes☐ No☒ |

|  | Matsumoto and Volder Publications |
| --- | --- |
| Claim 20 | Yes☐ No☒ |
| Claim 21 | Yes☐ No☒ |
| Claim 22 | Yes☐ No☒ |
| Claim 23 | Yes☐ No☒ |
| Claim 24 | Yes☐ No☒ |
| Claim 25 | Yes☐ No☒ |
| Claim 26 | Yes☐ No☒ |
| Claim 27 | Yes☐ No☒ |

### Question No. 5 (Improper Inventorship):

Has Gore proved that it is highly probable that the claims of the '135 patent are invalid for "improper inventorship," because Dr. Volder was a sole inventor or because Dr. Volder or Mr. Cooper was a co-inventor of the subject matter claimed in any of the claims of the '135 patent? Answer "yes" (for Gore) or "no" (for Plaintiffs). (See Instruction Nos. 25).

| | |
|---|---|
| Dr. Volder Sole Inventor | Yes☐ No☒ |

| | |
|---|---|
| Mr. Cooper and Dr. Goldfarb Joint Inventors | Yes☐ No☒ |

| | |
|---|---|
| Dr. Volder and Dr. Goldfarb Joint Inventors | Yes☐ No☒ |

### Question No. 6 (Failure to Disclose Best Mode):

Has Gore proved that it is highly probable that any of claims 20-27 of the '135 patent are invalid for failure to disclose the "best mode," because by October 24, 1974 (when Dr. Goldfarb filed his patent application) he had in mind a "best mode" for practicing the claimed invention that was not disclosed in his patent application? Answer "yes" (for Gore) or "no" (for Plaintiffs). (See Instruction Nos. 24).

| | |
|---|---|
| Claim 20 | Yes☐ No☒ |
| Claim 21 | Yes☐ No☒ |
| Claim 22 | Yes☐ No☒ |
| Claim 23 | Yes☐ No☒ |

-18-

| Claim 24 | Yes☐ No☒ |
| Claim 25 | Yes☐ No☒ |
| Claim 26 | Yes☐ No☒ |
| Claim 27 | Yes☐ No☒ |

***Question No. 7 (Lack of Adequate Written Description):***

Has Gore proved that it is highly probable that any claims of the '135 patent are invalid for lack of adequate "written description"? Answer "yes" (for Gore) or "no" (for Plaintiffs). (See Instruction Nos. 23).

| Claim 20 | Yes☐ No☒ |
| Claim 21 | Yes☐ No☒ |
| Claim 22 | Yes☐ No☒ |
| Claim 23 | Yes☐ No☒ |
| Claim 24 | Yes☐ No☒ |
| Claim 25 | Yes☐ No☒ |
| Claim 26 | Yes☐ No☒ |
| Claim 27 | Yes☐ No☒ |

**If you found any claim infringed and not invalid, please proceed to Section III.**

**Otherwise, please proceed to Section IV.**

-19-

## III.    <u>WILLFULNESS</u>

*Question No. 8 (Willful Infringement):*

Have Plaintiffs proved that it is highly probable that Gore's infringement of any valid claim of claims 20 through 27 of the '135 patent was willful? (See Instruction Nos. 34).

Answer:      Yes (for Plaintiffs) ☒                    No (for Gore) ☐

**Please Proceed to Section IV.**

A000102

IV.    **OPTION**

*Question No. 9 (Option):*

What is the reasonable period of time that Gore had to exercise its option to obtain

a license to the '135 patent at a 5% royalty? (See Instruction Nos. 41).

[Write in Reasonable Period of Time]: ___Feb 9, 2004_____

**If you have found that Gore has not infringed a valid claim, please proceed to**

**Section VI.  If you have found that any of the accused Gore products infringe any**

**valid claim of the '135 patent, please proceed to Section V.**

-21-

## V.    DAMAGES

### *Question No. 10 (Lost Profits):*

Have Plaintiffs proved that it is more likely than not that Bard Peripheral Vascular is entitled to damages for lost profits due to Gore's sales of surgical vascular grafts and patches inside the United States? (See Instruction Nos. 36-41).

Yes (for Plaintiffs) ☒        No (for Gore) ☐

### *Question No. 11 (Amount of Lost Profits):*

If your answer to Question No. 10 is "yes", answer this question.  Otherwise, do not answer this question.

What is the amount of lost profits? (See Instruction Nos. 36-41).

$ ___102,081,578.82_____

A000104

*Question No. 12 (Royalty Rate):*

If you find that Bard Peripheral Vascular ("Bard PV") has proved that it is more likely than not that it is entitled to reasonable royalty damages for the sales of certain surgical vascular grafts, cardiovascular patches and/or stent-grafts for which Bard Peripheral Vascular is not seeking or entitled to lost profits, what is the reasonable royalty rate to which Bard Peripheral Vascular is entitled? (If you find that Bard Peripheral Vascular is not entitled to reasonable royalty damages, leave the line below blank or insert "zero.") (See Instruction Nos. 41-43).

_____10_____ %

*Question No. 13 (Royalties):*

If you answered Question No. 12 by entering a percentage, answer this question. Otherwise, do not answer this question.

What is the total amount of royalties to which Bard Peripheral Vascular is entitled? (See Instruction Nos. 41-43).

$ 83,508,292.20

**Please proceed to Section VI.**

## VI.    <u>UNANIMOUS VERDICT</u>

You have now reached the end of the verdict form and should review it to ensure that it accurately reflects your unanimous determinations.  The jury foreperson should then sign and date the verdict form in the spaces below.

Dec 11, 2007
<u>                    </u>
Date

CASE NO.        <u>CV-03-0597-PHX-MHM</u>

<u>Bard Peripheral Vascular, Inc., and David</u>

<u>Goldfarb, M.D.</u>

VS.       <u>W. L. Gore & Associates, Inc.</u>

PLAINTIFF'S EXHIBIT     <u>1</u>

DATE: _____     IDEN.

DATE: _____     EVID.

    BY:

                 Deputy Clerk

US006436135B1

(12) **United States Patent**
Goldfarb

(10) Patent No.: **US 6,436,135 B1**
(45) Date of Patent: **Aug. 20, 2002**

(54) **PROSTHETIC VASCULAR GRAFT**

(76) Inventor: **David Goldfarb**, 5706 E. Horseshoe Rd., Paradise Valley, AZ (US) 85253

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **05/517,415**

(22) Filed: **Oct. 24, 1974**

(51) Int. Cl.[7] ................................................. A61F 2/00
(52) U.S. Cl. ..................... 623/1.39; 623/1.1; 623/1.49; 623/23.71
(58) Field of Search ...................... 3/1, 1.4; 128/92 C, 128/334 R, 334 C, DIG. 14; 260/2.5 R, 2.5 M; 264/288, 289; 623/1.1, 1.39, 1.4, 1.49, 23.64, 23.71, 23.76

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,642,625 A | 6/1953 | Peck |
| 2,782,180 A | 2/1957 | Weidman |
| 3,008,187 A | 11/1961 | Slade |
| 3,027,601 A | 4/1962 | Barry |
| 3,054,761 A | 9/1962 | Moore |
| 3,060,517 A | 10/1962 | Fields |
| 3,094,762 A | 6/1963 | Juckel |
| 3,105,492 A | 10/1963 | Jeckel |
| 3,158,181 A | 11/1964 | Gore |
| 3,196,194 A | 7/1965 | Ely, Jr. et al. |
| 3,208,100 A | 9/1965 | Nash |
| 3,214,503 A | 10/1965 | Markwood |
| 3,217,083 A | 11/1965 | Gore |
| 3,281,511 A | 10/1966 | Goldsmith |
| 3,304,557 A | 2/1967 | Polansky |
| 3,372,082 A | 3/1968 | Yutaka |
| 3,389,201 A | 6/1968 | Alsup et al. |
| 3,390,067 A | 6/1968 | Miller |
| 3,390,221 A | 6/1968 | Kampmann et al. |
| 3,400,719 A | 9/1968 | Buddecke |
| 3,425,418 A | 2/1969 | Chvapil |
| 3,473,087 A | 10/1969 | Slade |
| 3,479,670 A | 11/1969 | Medell |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| BE | 750553-Q | 5/1969 |
| BE | 767423 | 1/1970 |
| BE | 744984 | 7/1970 |
| BE | 757004 | 10/1971 |
| DE | 1 494 939 | 6/1963 |
| DE | 1494 939 | 6/1963 |
| DE | 1504291 | 10/1969 |
| DE | 1959147 | 6/1970 |
| DE | 1925582 | 12/1970 |
| DE | 1936411 | 1/1971 |
| DE | 2021305 | 1/1971 |
| DE | 2028393 | 4/1971 |
| DE | 2057802 | 6/1971 |
| DE | 2057164 | 9/1971 |
| DE | 2205116 | 10/1972 |

(List continued on next page.)

OTHER PUBLICATIONS

"A New Venous Prosthesis" by T. Soyer et al, *Surgery*, vol. 72, No. 6, pp. 864–872, Dec. 1972, 3–1.4.*
"A–VShunts Created In NewWay" by J.G.R. Volder et al, *Transactions Amer. Society For Artificial Internal Organs*, vol. XIX, pp. 38–42, Published Nov. 13, 1973, Disclosed in Boston, Mass. Apr. 8–9, 1973.*
"A New Vascular Prosthesis for A Small Caliber Artery" by H. Matsumoto et al, *Surgery*, vol. 74, No. 4, pp. 519–532. 3–41.*

(List continued on next page.)

*Primary Examiner*—Michael J. Milano
(74) *Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

(57) **ABSTRACT**

A prosthetic vascular graft with walls less than O.8B millimeters in thickness and formed of highly expanded polytetrafluoroethylene with a microscopic superstructure of nodes and interconnecting fibrils, which nodes are substantially uniformly separated by an average distance greater than a typical red cell. The superstructure of the graft controls transmural cellular ingrowth and assures the establishment and maintenance of a thin,viable neointima.

27 Claims, 2 Drawing Sheets



**US 6,436,135 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,512,183 | A | 5/1970 | Sharp |
| 3,526,906 | A | 9/1970 | Laszlo |
| 3,585,647 | A | 6/1971 | Gajewski |
| 3,588,920 | A | 6/1971 | Wesolowski |
| 3,609,768 | A | 10/1971 | Ayres |
| 3,626,947 | A | 12/1971 | Sparks |
| 3,637,906 | A | 1/1972 | Parathoen |
| 3,652,759 | A | 3/1972 | Schlemmer |
| 3,658,976 | A | 4/1972 | Slade |
| 3,664,915 | A | 5/1972 | Gore |
| 3,679,614 | A | 7/1972 | Shah |
| 3,688,317 | A | 9/1972 | Kurtz |
| 3,700,380 | A | 10/1972 | Kitrilakis |
| 3,767,500 | A | 10/1973 | Tally et al. |
| 3,813,461 | A | 5/1974 | Murayama |
| 3,833,455 | A | 9/1974 | Rosenblatt, Jr. et al. |
| 3,846,353 | A | 11/1974 | Grotta |
| 3,890,417 | A | 6/1975 | Vallance |
| 3,908,201 | A | 9/1975 | Jones |
| 3,914,802 | A | 10/1975 | Reick |
| 3,953,566 | A | 4/1976 | Gore |
| 3,957,936 | A | 5/1976 | Lauchenauer |
| 3,962,153 | A | 6/1976 | Gore |
| 3,992,725 | A | 11/1976 | Homsy |
| 4,118,532 | A | 10/1978 | Homsy |
| 4,127,706 | A | 11/1978 | Martin |
| 4,129,470 | A | 12/1978 | Homsy |
| 4,194,040 | A | 3/1980 | Breton |
| 4,203,938 | A | 5/1980 | Burnett |
| 4,209,480 | A | 6/1980 | Homsy |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2130039 | 12/1972 |
| DE | 2 255 743 | 5/1973 |
| DE | 2417901 | 6/1973 |
| DE | 2413221 | 10/1974 |
| FR | 1243053 | 10/1960 |
| FR | 1317801 | 12/1963 |
| FR | 1580077 | 1/1969 |
| FR | 2134331 | 4/1971 |
| FR | 2118623 | 7/1972 |
| GB | 686438 | 1/1953 |
| GB | 887346 | 1/1962 |
| GB | 981849 | 1/1965 |
| GB | 1076438 | 1/1967 |
| GB | 1057077 | 2/1967 |
| GB | 1071506 | 6/1967 |
| GB | 1120871 | 7/1968 |
| GB | 1174313 | 5/1969 |
| GB | 1161858 | 8/1969 |
| GB | 1169601 | 11/1969 |
| GB | 1240883 | 6/1971 |
| GB | 1284321 | 8/1972 |
| GB | 1 355373 | 6/1974 |
| GB | 1357829 | 6/1974 |
| GB | 1390445 | 4/1975 |
| GB | 1415686 | 11/1975 |
| GB | 1440651 | 6/1976 |
| GB | 1475316 | 6/1977 |
| GB | 1594493 | 7/1981 |
| JP | 7008 165 R | 10/1965 |
| JP | 41-8585 | 5/1966 |
| JP | 67003369 | 2/1967 |
| JP | 67003691 | 2/1967 |
| JP | 13560/67 | 8/1967 |
| JP | 67013560 | 8/1967 |
| JP | 67023980 | 11/1967 |
| JP | 68005554 | 2/1968 |
| JP | 68015644 | 7/1968 |

| | | |
|---|---|---|
| JP | 68026359 | 11/1968 |
| JP | 68030016 | 12/1968 |
| JP | 69 00455 | 1/1969 |
| JP | 69007396 | 4/1969 |
| JP | 69007754 | 4/1969 |
| JP | 69022219 | 9/1969 |
| JP | 69022771 | 9/1969 |
| JP | 44-30807 | 12/1969 |
| JP | 69030807 | 12/1969 |
| JP | 70003300 | 2/1970 |
| JP | 70 08 165 | 3/1970 |
| JP | 70008727 | 3/1970 |
| JP | 70008728 | 3/1970 |
| JP | 70019470 | 7/1970 |
| JP | 70030049 | 9/1970 |
| JP | 70036015 | 11/1970 |
| JP | 71011458 | 3/1971 |
| JP | 49042773 | 8/1972 |
| JP | 72040091 | 10/1972 |
| JP | 72040572 | 10/1972 |
| JP | 72050662 | 12/1972 |
| JP | 7300532 | 1/1973 |
| JP | 48-34388 | 5/1973 |
| JP | 48052863 | 7/1973 |
| JP | 42-3691 | 10/1973 |
| JP | 42-23980 | 10/1973 |
| JP | 7334388 | 10/1973 |
| JP | 7334389 | 10/1973 |
| JP | 49005151 | 1/1974 |
| JP | 22792/74 | 2/1974 |
| JP | 49060360 | 6/1974 |
| JP | 49117568 | 11/1974 |
| JP | 49118772 | 11/1974 |
| JP | 49119874 | 11/1974 |
| JP | 50021075 | 3/1975 |
| JP | 41-8585 | 4/1992 |
| NL | 6606343 | 11/1966 |
| NL | 6917 801-Q | 11/1968 |
| NL | 6814336 | 4/1969 |
| NL | 7208704 | 12/1972 |
| RU | 158988 | 1/1963 |
| SU | 240997 | 4/1969 |
| SU | 240996 | 6/1969 |
| SU | 308113 | 9/1971 |

## OTHER PUBLICATIONS

"The Use of Plastic Fabrics As Arterial Prostheses" by E.J. Potchtal, *Annals of Surgery*, Oct. 1955, vol. 142, No. 4, pp. 624–632 3–1.*

English Translation of Japanese Patent No. 42–13560, issued August 1, 1967, entitled "A Process for Fabricating Porous Polytetrafluoroethylene".

Dale et al., "Modified Bovine Heterographs for Arterial Replacement," *Annals of Surgery*, vol. 169, No. 6, pp. 927–946 (Jun. 1969).

Campbell et al., Expanded Polytetrafluoro–Ethylene As a Small Artery Substitute, vol. XX *Transactions American Society of Artificial Organs*, pp. 86–90 (1974).

Goldfarb et. al., "Expanded Polytetrafluoroethylene (PTFE): A Superior Biocompatible Material for Vascular Prostheses," vol. XX, *Transactions American Society of Artificial Internal Organs*, (1974).

Matsumoto et al., "A New Vascular Prosthesis for Small Caliber Artery," *Surgery*, vol. 74, No. 4, pp. 519–523 (Oct. 1973).

Poth et al., "The Use of Plastic Fabrics as Arterial Prosthesis," *Annals of Surgery*, vol. 122, No. 4, pp. 624–632 (Oct. 1955) (Originally presented on Apr. 28, 1955).

PX 1.2

Sauvage et al., "An External Velour Surface for Porous Arterial Prostheses," *Surgery,* vol. 70, No. 6, pp. 940–953 (Dec. 1971).

Sauvage, "The Future of Porous–Fabric Arterial Prostheses," *The Annals of Thoracic Surgery,* vol. 19, No. 3, pp. 333–335 (Mar. 1975).

Sharp et al., "Rubber Latex Tubing as a Vascular Prosthesis," *American Journal of Surgery,* vol. 105, pp. 802–811 (Jun. 1963).

Sharp et al., "Promotion of a Viable Intima," *Vascular Surgery,* vol. 3, No. 4, pp. 243–249 (Dec. 1969).

Soyer et al., "A New Venous Prosthesis," *Surgery,* vol. 72, No. 6, pp. 864–872 (Dec. 1972).

Volder et al., "A–V Shunts Created in New Ways," vol. XIX *Transactions American Society of Artificial Organs,* pp. 38–42 (1973).

Wesolowski et al., "Porosity: Primary Determinant of Ultimate Fate of Synthetic Vascular Grafts," *Surgery,* vol. 56, No. 1, pp. 91–96 (Jul. 1961).

Wesolowski et al., "Evaluation of a New Vascular Prosthesis with Optimal Specifications," *Surgery,* vol. 59, No. 1, pp. 40–56 (Jan. 1966).

Andrews et al., "Cold Drawing of High Density Polyethylene," *Journal of Materials Science,* 5 pp. 411–417 (1970).

Berkowitz et al., "Pseudointimal Development of Microporous Polyurethane Lattices," vol. XVIII *Transactions American Society of Artificial Organs,* pp. 25–29 (1972).

Berkowitz et al., "Pseudointimal Development on Microporous Polyurethane Lattices," *Surgery,* vol. 72, No. 6, pp. 888–896 (Dec. 1972).

Braunwald et al., "Relation of Pore Size to Tissue Ingrowth in Prosthetic Heart Valves: An Experimental Study," *Surgery,* vol. 57, No. 5, pp. 741–748 (1965).

Bruck et al., "Macromolecular Aspects of Biocompatible Materials—A Review," *Journal of Biomedical Materials Research,* vol. 6, pp. 173–183 (1972).

Campbell et al., Expanded PTFE (Teflon) as a Small Artery Substitute, *Abstacts of ASAIO,* vol. 3, pp. 12 (1974).

Campbell et al., "A Small Arterial Substitute: Expanded Microporous Polytetrafluoroethylene: Pateny Versus Porosity," *Annals of Surgery,* vol. 182, No. 2, pp. 138–143 (1975).

Clark et al., "New Principles Governing the Tissue Reactivity of Prosthetic Materials," *Journals of Scientific Research,* vol. 16, pp. 510–522 (1974).

Calnan, "The Use of Inert Plastic Material in Reconstructive Surgery," *British Journal of Plastic Surgery,* vol. XVI, pp. 1–22, (1963).

Davila et al., "Reprocessed Biological Materials and Mechanical Behavior," Materials in Biomedical Engineering, *Annals of the New York Academy of Sciences,* vol. 146, Art. 1, pp. 138–147 (1968).

Fujiwara et al., "Use of Gortex grafts for replacement of the superior and inferior venae cavae," *The Journal of Thoracic and Cardiovascular Surgery,* vol. 67, No. 5, pp. 774–779 (May, 1974).

Goldfarb et al., "Expanded Polytetrafluoroethylene (PTFE)—A Superior Biocompatible Material for Vascular Prostheses," *Proceedings of the San Diego Biomedical Symposium,* (Feb. 1975).

Gott et al., "Techniques of Applying a Graphite–Benzalkonium–Heparin Coating to Various Plastics and Metals," Vol. X, *Transactions American Society of Artificial Internal Organs,* pp. 213–217 (1964).

Gott et al., "The Coating of Intravascular Plastic Prostheses with Colloidal Graphite," *Surgery,* vol. 50, No. 2, pp. 382–389 (Aug. 1961).

Hamner et al., "Implantable Ceramic Teeth," *Journal of Biomedical Materials Research Symposium,* No. 4, pp. 217–234 (1973).

Hamner et al., "Ceramic Root Implantation in Baboons," *Journal of Biomedical Materials Research Symposium,* No. 3, pp. 1–13 (1972).

Hirschhorn, et al., "Porous Titanium Surgical Implant Materials," *Journal of Biomedical Materials Research Symposium,* No. 2 (Part 1), pp. 49–67 (1971).

Hulbert et al., "Attachment of Prostheses to the Musculo–Skeletal System by Tissue Ingrowth and Mechanical Interlocking," *Journal of Biomedical Materials Research Symposium* No. 4, pp. 1–23 (1973).

Hulbert et al., "Tissue Reaction to Three Ceramics of Porous and Non–Porous Structures," *Journal of Biomedical Material Research,* vol. 6, pp. 347–374 (1972).

Kelly et al., "Development of New Vascular Prosthetic," *Archives of Surgery,* vol. 117, pp. 1367–1370 (Oct. 1982).

Klawitter et al., "Application of Porous Ceramics for the Attachment of Load Bearing Internal Orthopedic Applications," *Journal of Biomedical Material Research Symposium,* No. 4 (Part 1), pp. 161–229 (1971).

Levine, "Survey of Materials for Hard–Tissue Prosthesis," *Journal of Biomedical Material Research Symposium,* No. 2 (Part 1), pp. 5–16 (1971).

Lontz et al., "Extrusion Properties of Lubricated Resin from Coagulated Dispersion," *Industrial and Engineering Chemistry,* vol. 44, No. 8, pp. 1805–1810 (1952).

Matsumoto, "The Need and Current Situation of Anti–thrombotic Substances in the Modern Medical Treatment," *II Symposium on the Medical Applications of High Molecular Compounds: Summaries of Speeches on High Molecular Materials as Anti–Clotting Substances,* pp. 1–15, Feb. 17, 1973.

Matsumoto et al., "Application of Expanded Polytetrafluoroethylene to Vascular Prosthesis, The Fourth Report: Comparison between Expanded Polytetrafluoroethylene and Polytetrafluoroethylene–methylmetacrylate Graftcopolymer Implanted in the Portal Vein," *Artificial Organs,* vol. 3, Supplement, pp. 202–203 (Sep. 30, 1974).

Matsumoto et al., "The Artifical Blood Vessel: the Second Report on the Application of Expanded Polytetrafluoroethylene (former Porous Polytetrafluoroethylene) as the Artificial Blood Vessel, Its Nature and Application to the Vein," *Unknown Source,* pp. 16–17.

Matsumoto et al., "The Application of Expanded Polytetrafluoroethylene to the Trachea" *Unknown Source,* p. 156.

Matsumoto et al., "Studies of Porous Polytetrafluoroethylene as a Vascular Prosthesis: Application to Peripheral Arteries," *Artificial Organs,* vol. 1, No. 1, pp. 44–47 (1972).

Matsumoto et al., "Experimental Studies on Expanded Polytetrafluoroethylene (formerly Called Porous Polytetrafluoroethylene) as Vascular Prosthesis—the Second Report: Its Physiocochemical Properties and Applicability to Veins", *Proceedings of the 10th Japan Congress of Artificial Organs, Artificial Organs,* vol. 1 Supplement, pp. 16–17 (1972).

Matsumoto et al., "Studies on Expanded Polytetrafluoroethylene as the Vascular Prosthesis (the Third Report) Its Antithrombogenicity, Surface Properties and Porosity," *Artificial Organs,* vol. 3, No. 5, pp. 337–341 (1974).

PX 1.3

Matsumoto et al., "Studies on the Porous Polytetrafluoroethylene as a Vascular Prosthesis," *Artificial Organs*, vol. 1, No. 1, pp. 44–47 (1972).

Matsumoto et al., *Translation of* "Application of Expanded Polytetrafluoroethylene as a Vascular Prosthesis—Report No. 3: Anti–Thrombocity in Venous System, Porosity, and Surface Properties," *Artificial Organs*, vol. 3, No. 5 (1974).

Matsumoto et al., "Experimental Studies of Expanded Polytetrafluoroethylene as Vascular Prosthesis—the Second Report: its Applicability to Veins," *Artificial Organs*, vol. 2, No. 5, pp. 262–269 (1973).

Matsumoto et al., *Translation of* "Application of Expanded Polytetrafluoroethylene to Biological Texture," (Source and Date Unknown).

Matsumoto et al., *Translation of* "Studies of Expanded Polytetrafluoroethylene as Vascular Prosthesis (Third Report): Antithrombogenecity, Surface Properties and Porosity," *Artificial Organs*, vol. 2, Supplement (Proceedings of the 11th General Meeting) (1973).

Motels et al., "Orientation Stretching as a Factor in the Tenacity of Polifen Fibre," *Translation from khimicheskie Volokan*, No. 1, pp. 53–56, (Jan.–Feb. 1971) (As Submitted Herein—pp. 73–77 from 1972 Consultants Bureau).

Motels et al., "The Effect of Stretching on the Faults in Polifen Fibre," *Translation from Khimiches–kie Volokna*, No. 2, pp. 74–75 (Mar.–Apr. 1971) (As Submitted Herin— pp. 220–221 from 1972 Consultants Bureau).

Moynihan, "The Molecular Structure of Perfluorocarbon Polymers. Infrared Studies on Pelytetrafluoroethylene," Unknown Source, (Jan. 13, 1958).

Najjar et al., "The use of small–diameter Dacron grafts with wall–bonded heparin for venous and arterial replacement: Canine studies and preliminary clinical experience," *Surgery*, vol. 68, No. 6, pp. 1053–1063 (1970).

Norton et al., Replacement of Portal Vein During Pancreatectomy for Carcinoma, *Surgery*, vol. 77, No. 2, pp. 280–284 (1975).

Nuwayser et al., "Research Materials Compatible with Blood," *Proceedings of Artificial Heart Program Conference*, pp. 153–168 (1969).

Parsonnet et al., "Autogenous polypropylene–supported collagen tubes for long–term arterial replacement," *Surgery*, vol. 70, No. 6, pp. 935–939 (1971).

Perepelkin, "Theoretical and Maximum Attainable Strength of Various Uniaxially Oriented Polymers (Film. Fibers)," *Mekhanika Polimerov*, vol. 2, No. 6, pp. 845–856 (1966).

Ribbans, "Unsintered Tape Manufacture of Calendering Round Rods," *Report of E.I. Dupont De Nemours & Co, Technical Services Laboratory, Plastics Department*, (Mar. 15, 1966).

Salvatore et al., "An Experimental Study of the Influence of Pore Size of Implanted Polyurethane Sponges Upon Subsequent Tissue Formation," *Surgery*, vol. 112, pp. 463–468 (Jan. to Jun. 1961).

Sauer et al., "The Role of Porous Polymeric Materials in Prosthesis Attachment," *J. Biomed. Mater. Res. Symposium*, No. 5 (Part 1), pp. 145–153 (1974).

Taylor et al., Porous Methyl Methacrylate as an Implant Material, *J. Biomed. Mater. Res. Symposium*, No. 2 (Part 2), pp. 467–479 (1972).

Thompson, Jr. et al., "Paste Extrusion," *Modern Plastics*, pp. 115–122 (Feb. 1956).

Tynnyi et al., "Effect of Strain Rate on the Strength of Polymer Materials in Liquid Media," *Soviet Materials Science*, pp. 566–568 (1969).

Volder et al., "Induced Growth of Connective tissue in Cardiovascular Prosthesis," Vol. XX, *Transactions of American Society of Artificial Internal Organs*, pp. 521–529 (1974).

Wesolowski et al., "Artificial Arteries," *AORN Journal*, pp. 35–50 (Jan. 1968).

Wesolowski et al., "Considerations in the Development of Small Artery Prostheses," vol. XIV, *Transactions of American Society of Artificial Internal Organs*, vol. XIV, pp. 43–47 (circa 1970).

Wesolowski et al., "The compound Prosthetic Vascular Graft: A Pathologic Survey," *Surgery*, vol. 53, No. 1, pp. 19–44 (1963).

Wesolowski, "Some Problems Concerning the Assessment of Arterial Prosthetic Materials," *J. Biomed. Mater. Res.*, vol. 1, pp. 171–174 (1967).

Whiffen et al., "Heparin Application to Graphite–coated Intravascular Prostheses," *Surgery*, vol. 36, No. 2, pp. 404–412 (Aug. 1964).

White et al., "Preliminary Report: Evaluation of Tissue Ingrowth into Experimental Replaminaform Vascular Prostheses," *Surgery*, vol. 79, No. 2, pp. 229–232 (1976).

Winter, "Transcutaneous Implants: Reactions of the Skin–Implant Interface," *J. Biomed. Mater. Res. Symposium*, No. 5 (Part II), pp. 99–113 (1974).

Yamaguchi et al., "Effect of Stretching upon the structure of the Properties of Polytetrafluoroethylene Plate," *Research Reports of the Kogakuin University*, No. 24, pp. 60–70 (1968).

Yamaguchi et al., *Translation of,* "Effect of Stretching upon the Structure of the Properties of Ethylene Tetra–fluoride Resin," *Research Reports fo the Kogakuin University*, No. 24, pp. 1–19 (May 1968).

Dupont Article re: 62TFE–fluorocarbon resin, (pre 1974?).

Dupont Article re: 6A TFE–fluorocarbon resin, (pre 1974?).

Dupont Article re: 64TFE–fluorocarbon resin, (pre 1974?).

Dupont Article re: 6C TFE–fluorocarbon resin, (pre 1974?).

Dupont Information Bulletin re: Teflon 6 and 6C (pre 1974?).

Tetrafluoroethylene Polymers, *Encyclopedia of Polymer Science and Technology*, vol. 13, pp. 642–644 (pre 1974?).

"Fluorocarbon Polymers," *Properties of Commercial Polymers*, pp. 419–429 (pre 1974?).

Matsumoto et al., *Translation of,* "Experimental Studies on Synthetic Prosthesis for the Portal Vein," presented at the 75th meeting of the Society of Surgery, Apr. 3, 1975.

Matsumoto et al., *Translation of,* "The Prerequisites for Venous Implanting," presented at the 75th Japanese Society of Surgery, Apr. 4, 1975.

Matsumoto et al., *Translation of,* "Application of Expanded Polytetrafluoroethylene as Vascular Prosthesis—Report#3 : Anti–Thrombogenecity in Venous System, Porosity, and Surface Properties," *Artificial Organs*, vol. 3, No. 5 (1974).

Matsumoto et al., *Translation of,* "Application of Expanded Polytetrafluoroethylene to Biological Structure," (Date and Publication unknown).

Matsumoto et al., *Translation of,* "Application of Expanded Polytetrafluoroethylene to Artificial Blood Vessels (4th Report on the Comparison with Polytetrafluoroethylene–M-ethyl–methacrylate Graft Copolymer in the Portal Vein System," (Date and Publication unknown).

PX 1.4

A000111

US 6,436,135 B1
Page 5

Matsumoto et al., "A New Vascular Prosthesis for a Small Caliber Artery," (pre 1974?).

Bassett et al, "On Crystalization Phenomena in Polytetrafluoroethylene," *Polymer,* vol. 15, (1974).

English translation of Japanese publication JP 41–8585 (1966).

English translation of German publication DE 1,494,939 (1963).

Information Bulletin, "TFE–Fluorocarbon Resins Molding Techniques," (Pre 1973?).

Lewis et al., "Rheology of Lubricated Polytetrafluoroethylene Compositions," Reprinted from *Industrial and Engineering Chemistry,* vol. 45, pp. 1123–1127 (1953).

Price List for USCI, 1972.

Ribans, "High Quality Hose Constructions From Teflon TFE Fluorocarbon Resins," (1965).

Speerschneider et al., "Some Observations on the Structure of Polytetrafluoroethylene," *Journal of Applied Physics,* vol. 33 No. 5, pp. 1871–1874 (1962).

Suwa et al., "Melting and Crystallization Behavior of Poly(tetrafluoroethylene). New Method for Molecular Weight Measurement of Poly(tetrafluoroethylene) Using a Differential Scanning Calorimeter," *Journal of Applied Polymer Science,* vol. 17, pp. 3253–3257 (1973).

* cited by examiner

PX 1.5

A000112

Case: 14-1114 CASE PARTICIPANTS ONLY Document: 15 Page: 188 Filed: 12/11/2013



fig. 1

fig. 2

PX 1.6

A000113

Case: 14-1114 Case: 14-1114 CASE PARTICIPANTS ONLY Document: 1895 Page: 189 Filed: 12/11/2013 Filed: 12/11/2013



*fig. 3*

US 6,436,135 B1

1

## PROSTHETIC VASCULAR GRAFT

The present invention relates to prosthetic vascular structures and, more particularly, to vascular prostheses fabricated from highly expanded polytetrafluoroethylene.

Frequently in cardiovascular surgery, it is necessary to bypass or replace blood vessels, whether veins or arteries, to assure an adequate and balanced blood flow to particular organs, extremities or areas of the body.

Unsuccessful attempts were made during the early years of this century to implant prosthetic or artificial vessels fabricated from glass and metal. With the availability of inert synthetic materials such as nylon, Orlon, Dacron and Teflon (polytetrafluoroethylene or PTFE) during the late 1940's and early 1950's, large arterial replacements were achieved with increasing degrees of success.

Cardiovascular surgeons presently have available knitted and woven vessels of Dacron and Teflon which may be used as replacements for arteries having relatively large inside diameters (approximately 7 millimeters). However, no clinically acceptable small arterial prosthesis has been available; and surgeons have found it necessary to scavenge marginally important or superficial vessels, such as the saphenous vein, to serve as replacements for defective small bore arteries.

It is a principal objective of the present invention to provide a prosthetic vascular structure capable of replacing or bypassing natural blood vessels having relatively small inside diameters as well as those vessels of intermediate and large bore.

The transplantation of saphenous veins from the patient's legs to more critical portions of the cardiovascular system entails numerous disadvantages: The entire surgical procedure is unduly protracted by having to first excise the venous replacement from one part of the patient's body, then prepare the replacement for implantation, and finally implant the substitute vessel at another point in the patient's cardiovascular system. Prolonged exposure to anesthesia and multiple incisions combine to increase the probability of both infection and post-operative discomfort.

Cardiovascular surgery frequently requires grafts of various lengths and diameters in achieving, for example: the femoral artery to popliteal artery bypass, the coronary artery bypass, the renal artery bypass, etc.. Occasionally, however, especially in older patients, the saphenous veins themselves are inadequate for use as replacements; and in some instances only unacceptably short segments of the saphenous veins are available for transplantation.

It is another object of the present invention to provide an artificial vascular structure which may be prefabricated in various lengths and diameters, thereby eliminating unnecessary incisions, minimizing exposure to anesthesia, conserving already limited surgical resources, and assuring an ample supply of blood vascular replacements.

Operations such as the femoral/popliteal bypass require especially long grafts which ideally taper in cross-sectional area from their proximal to their distal ends. Heretofore, transplanted saphenous veins have been used to accomplish this bypass procedure. Because blood flow through the saphenous vein is unidirectional in character, it is necessary to reverse the vein when it is being used as an arterial substitute. The inside diameter of a saphenous vein naturally tapers between its proximal and distal ends. Reversing the vein for implantation between the femoral and popliteal arteries results in a corresponding reversal of this taper so that the smaller diameter end must be grafted to the relatively large femoral artery while the larger diameter end is grafted to the relatively small popliteal artery. The reversed

2

taper of an implanted saphenous vein causes deceleration of the blood flow while the turbulence inducing discontinuities at the bypass junctures contribute to stasis and associated thrombosis.

It is a further object of the present invention to provide a small bore prosthetic vascular structure which may be fabricated in relatively long segments, which segments decrease in inside diameter between proximal and distal ends so as to facilitate their implantation as peripheral artery replacements and assure a close hemodynamic simulation of the corresponding natural vessel.

The inner surface of natural blood vessels is characterized by a thin, delicate layer of endothelial cells known as the intima. The primary function of this layer is to provide a smooth interface between the blood stream and the vessel wall. For example, a ruptured artery may, after healing, include rough or irregular protrusions from the wall into the blood stream. As the natural intima reestablishes itself over the wound area, it serves to lessen the severity Ln irregular wall transitions and thereby assure laminar blood flow.

While the outer surface of a vessel prosthesis is encapsulated by fibrous growth as a result of normal rejection processes, the inner surface typically becomes isolated from the blood stream by a layer which has been referred to, with varying degrees of accuracy, as the neointima or pseudointima. To be classified as a true neointima, it would be necessary for the inner surface of the artificial vessel to be covered with an extremely thin lining of viable endothelial cells. Although such a lining would vary in thickness from point to point, it would be typically less than ten cells thick. There has heretofore existed no known vessel prosthesis of any size or configuration which, when implanted, would support the growth and maintenance of a true neointima layer. Accordingly, the vessel/blood interface associated with state of the art prostheses is characterized by a pseudointima consisting at best of a few irregularly distributed islands of endothelial growth but made up largely of compacted fibrin which has been flow sculptured by the blood stream. Occasionally, portions of this pseudointima will fracture or particulate and introduce emboli into the patient's blood stream.

The formation and maintenance of a true neointima requires a continuous extravascular source of nourishment to supplement whatever nourishment might be supplied by diffusion from the adjacent blood stream. In extremely short grafts (less than 2 to 3 centimeters), cellular ingrowth has been observed along the inside surfaces from the suture lines at the ends of the graft. In such cases, the tissue growth, augmented by capillary ingrowth, can provide a continuous nutrition route capable of supporting a viable neointima. However, the thickness of this inner layer of tissue is so great as to virtually occlude all but large bore grafts. Not only is ingrowth of this type unpredictable but it can be expected or tolerated at all only in very short grafts of relatively large inside diameter.

Extensive efforts have been made toward the fabrication of a porous vascular structure which would permit uniform transmural tissue ingrowth sufficient to assure the formation and continuous nutrition of a true neointima layer. The culmination of this prior art effort is represented by grafts which are machine woven from threads consisting of tightly twisted Dacron or Teflon fibers. The threads used in the manufacture of these woven grafts, while extremely small by garment industry standards, are enormous when viewed in the context of a hemodynamic system under pressure. As is true of any knitted or women fabric, the minimum size of the interstices between threads is determined by the diameter

PX 1.8

A000115

US 6,436,135 B1

3

of the threads themselves. Because these interstices or voids are quite large in woven grafts, it is necessary to preclot the graft by dipping it in blood in order to prevent excessive transmural leakage after implantation.

The large size of the threads used in prior art woven grafts and the tightness with which the constituent fibers are twisted renders each individual thread virtually impenetrable to cellular ingrowth and virtually beyond cellular circummigration. From the viewpoint of a single fibroblast, a knitted vessel prosthesis looks like two or three mammoth structures separated by equally mammoth voids which have been filled by the clotting process with masses of coagulated fibrin and proteinaceous matter. Viewed on a similar microscopic basis, the inner wall of the knitted graft appears as a series of large, rough cylinders of inert material separated by cavities which are equal or larger in breadth and depth to the diameter of the cylinders. As the blood flows through a prosthetic vessel of this type, the cavities are filled with slow moving blood while the irregularity and protrusion of the threads promotes turbulent blood flow. Thrombosis throughout the wall of the graft and at its inner surface, combined with the large size and separation of the knitted threads, serves to initiate buildup of an irregular pseudointima layer while at the same time blocking and inhibiting transmural cellular ingrowth of the type necessary for the support of a uniform, viable neointima.

Accordingly, it is a major objective of the present invention to provide a homogeneously porous vascular prosthesis characterized by small nodes interconnected by extremely fine fibrils to form an open superstructure which will allow uniform, controlled transmural cellular ingrowth and thereby assure the establishment and maintenance of a thin, viable neointima as well as firm structural integration of the graft into the body.

It is another objective of the present invention to provide a porous vascular prosthesis characterized by a superstructure which is substantially impermeable to the flow of relatively high viscosity liquids such as blood at normal pressures.

Briefly stated, the invention constitutes a prosthetic vascular device formed from a small bore tube of polytetrafluoroethylene which has been heated, expanded and sintered so as to have a microscopic superstructure of uniformly distributed nodes interconnected by fibrils and characterized by: (a) an average internodular distance which is (i) large enough to allow transmural migration of typical red cells and fibroblast, and (ii) small enough to inhibit both transmural blood flow at normal pressures and excessive tissue ingrowth; and (b) an average wall thickness which is (i) small enough to provide proper mechanical conformity to adjacent cardiovascular structures, and (ii) large enough, when taken in conjunction with the associated internodular distance, to prevent leakage and excess tissue ingrowth, to allow free and uniform transmiral nutrient flow, and to assure mechanical strength and ease of implantation.

The invention is pointed out with particularity in the appended claims; however, other objectives and advantages, together with methods for making and using the invention, will be better understood by referring to the following detailed description taken in conjunction with the following illustrations wherein:

FIG. 1 is a photomicrograph, taken at 250X, of a section through the wall of a vascular graft embodying the present invention after having been implanted as a femoral artery segment for a period of eight months.

FIG. 2 is a photomicrograph, taken by means of a scanning electron microscope at 1000X, showing the node

4

and fibril superstructure characterizing highly expanded polytetrafluoroethylene vessel prostheses embodying the present invention.

FIG. 3 is a macroscopic stylization of a graft segment showing the sectional plane viewed in FIG. 1.

Referring to FIG. 1, it is seen that the graft of the present invention consists of a wall 1 having an outer surface 2 and an inner surface 3. Corresponding numerical denominations have been applied to the macroscopic view of the graft shown in FIG. 3 where the cutaway section shows the plane of wall 1 depicted in the photomicrograph of FIG. 1.

The graft as shown generally in FIG. 3 is further characterized by a proximal end 4 and a distal end 5. By convention, blood flow through the graft is in the direction indicated by arrow 6, i.e., from the proximal end 4 to the distal end 5.

As can be seen in FIG. 1, the inner surface 3 of graft wall 1 is covered by a uniform layer of endothelial cells forming the neointima 7. The outer surface 2 is covered by a uniform, firmly attached, encapsulation 8 of collagenous matter which includes substantial capillary ingrowth (not shown).

The graft wall 1 is a superstructure made up of polytetrafluoroethylene nodes 9 which appear in FIG. 1 as irregularly shaped islands of inert white material. The polytetrafluoroethylene nodes 9 are interconnected by fine fibrils which, because of their extremely small diameters and their disaffinity for photographic stain, are not visible in FIG. 1.

FIG. 2 depicts the node/fibril superstructure of FIG. 1 prior to implantation. The polytetrafluoroethylene nodes 9 and the many interconnecting fibrils 10 may be clearly observed in the absence of cellular ingrowth and at a magnification of approximately 4 times greater than FIG. 1. On the other hand, the implanted graft of FIG. 1 has been thoroughly and uniformly permeated by fibroblasts having cellular nuclei which appear in the photomicrograph as black dots 11. The nuclei of the endothelial cells forming the neointima 5 appear as black dots 11a in FIG. 1. As may be observed, the neointima is approximately eight cells in thickness.

Methods and techniques for expanding polytetrafluoroethylene have been known for many years. One of the earliest disclosures containing a discussion of such methods and resultant products is found in Japanese Patent No. 13,560/67 which was filed Nov. 1, 1963 and officially published on Aug. 1, 1967. Partially expanded polytetrafluoroethylene has been used to provide electrical insulation on cables and to form low friction structural members such as bearings and piston rings, to provide sealing in liquid systems, and, without clinically meaningful or reproducible success, for artificial vessel replacements. See for example, Japanese Patent No. 13,560/67; Soyer, et al, "A New Venous-Prosthesis", Surgery, Vol. 72, page 864 (December 1972); and Matsumoto, et al, "A New Vascular Prosthesis for Small Caliber Artery", Surgery, Vol. 74, page 519 (October 1973).

The basic process for expanding polytetrafluoroethylene is quite simple: The constituent resin is first subjected to shear by, for example, extrusion into the desired geometrical configuration. The extrudate is then heated at a temperature below the sintering temperature of 327° C. and physically stretched or expanded along at least one axis. The expanded member is then physically restrained against contraction and is sintered by brief exposure to temperatures in excess of 327° C. , thereby crystallizing the expanded structure and providing moderate tensile strength of up to approximately 6500 psi. As the raw extrudate is stretched, the non-porous polytetrafluoroethylene separates into solid nodes 9 of poly-

PX 1.9

US 6,436,135 B1

5

tetrafluoroethylene which remain structurally interconnected by polytetrafluoroethylene fibrils 10 which are drawn from the nodes during expansion. See FIG. 2. Node size and distribution in the final product is adversely affected by: very rapid expansion, uneven expansion, insufficient heating, non-uniform heating, and irregularly distributed expansion forces. The distance between nodes 9 is directly proportional to the extent to which the extrudate has been expanded. When polytetrafluoroethylene is properly expanded along one axis, virtually no dimensional changes are observed in the orthogonal direction. The directional vector 12 in FIGS. 1, 2 and 3, indicates the axis along which grafts embodying the present invention are typically expanded.

As can be seen in FIGS. 1 and 2, the nodes 9 are crudely ellipsoidal in configuration with their major axis disposed at approximately right angles to the axis of expansion 12. The nodes 9 are of random but generally uniform size and are distributed in a homogeneous pattern throughout the wall 1. Furthermore, the nodes are extremely small, typically less than a few times the size of a normal fibroblast or red cell.

Because the minor axes of the ellipsoidal nodes 9 are transverse to the generally radial direction typifying cellular ingrowth, the invading fibroblasts never encounter any massive polytetrafluoroethylene barrier. It is believed that the size and orientation of the nodes 9, together with their tapered configuration, facilitates cellular migration and ingrowth. To avoid substantial impediment to ingrowth, the average minor axis dimension of the nodes 9 is less than three times the major dimension of a typical red cell, i.e., less than about 18 microns.

It has been found that the average internodular distance, as measured along the axis of expansion 12, must fall within a relatively narrow range of values, viz., between approximately 6 and 80 microns. As will be appreciated by those skilled in the art, the term "average" when used in conjunction with internodular distance and node size cannot be used or interpreted with statistical precision; rather, the term is intended to connote a nominal or typical dimension derived from a broad sample. By way of example, where the average internodular distance is said to be 30 microns, it would be expected that some of the nodes would be separated by only a few microns while others might be separated by 90 or 100 microns. In the ideal graft, each node 9 would have a perfect elongated football shape and would be separated from its neighbors by uniformly distributed fibrils 10 of equal lengths. Unfortunately, such perfection is rarely, if ever, achieved in a microscopic environment.

Where the average internodular distance is less than the major dimension of a typical red cell, or approximately 6 microns, inadequate cellular ingrowth has been observed. In such cases, the node/fibril superstructure is so tightly packed as to preclude either the establishment or continued nutrition of a viable neointima.

Associated with (very large internodular distances is a loss of tensile strength and overall structural integrity. The graft becomes progressively more pliable and progressively more difficult to handle during surgery. Excessively expanded grafts will be subject to deformation and leakage at the suture line. Furthermore, excessive cellular ingrowth has been observed in grafts having an average internodular in excess of approximately 80 microns. Where the inside diameter of the graft is critically small, excessive cellular penetration of this type can lead to the formation of a pseudointima or an unacceptable thickening of the neointima with an accompanying occlusion of the lumen.

As the average internodular distance is extended beyond, for example, 150 to 200 microns, the graft superstructure

6

becomes progressively more permeable to blood flow and is characterized by substantial interstial clotting and progressively decreasing and non-uniform cellular ingrowth. Ultimately, were it possible to reproduce internodular distances comparable in size to the interstial voids of the size characterizing woven grafts, then virtually all transmural growth would be inhibited, and the support of a true neointima would be impossible.

Just as the nodes 9 must be of such size, configuration and orientation to avoid substantial impediment to cellular ingrowth, so too, they must be substantially uniformly distributed throughout the length and cross-section of the graft. It has been found that clumps or groupings of closely packed nodes can serve as barriers to ingrowth. It has also been found particularly critical to the creation and support of a viable neointima, that the nodes immediately adjacent to and defining the inner surface 3 of the graft be uniformly distributed, i.e., neither clumped so as to block the flow of nutrition to the neointima nor so widely spaced as to define deep thrombosis inducing irregularities in the inner wall 3.

A phenomenon referred to as "skin effect" is attributed to non-uniform force distribution occurring either during the extrusion or the expansion of tubular structures of the type embodying the present invention. Skin effect involves a relatively high concentration of nodes in a given circumferential plane, usually either the inner surface 3 or the outer surface 2. A slight skin effect is observed on the outer surface 2 of the graftssegment shown in FIG. 1, while the inner surface 3 is characterized by an open regular node pattern. The limited skin effect observed at outer surface 2 is obviously acceptable in degree since, as FIG. 1 clearly shows, it has not adversely affected cellular ingrowth.

In some instances, skin effect is a highly localized phenomenon, yet in other instances it may be observed over the entire inner or outer surface of the graft. A skin effect which might be acceptable at the outer surface of the graft might well be unacceptable at the inner surface because of the greater criticality for establishing a regular superstructure which will allow ample and uniform nutrient flow to, and mechanical support for, the neointima 7.

Wall thickness is another factor affecting the establishment and maintenance of a viable neointima in grafts embodying the present invention. For any particular internodular distance within the acceptable range, the thickness of the graft wall can be made so great as to preclude complete transmural cellular migration and ingrowth.

Nutrition of the fibroblasts in wall 1 as well as the endothelial cells forming the neointima 7 depends primarily upon capillary ingrowth, which normally becomes well developed within the third and fourth weeks after implantation of the graft. Diffusion of nutrients from the blood stream itself, especially during the period immediately following implantation, and transmural diffusion of nutrition also contribute to tissue growth.

There is a limit to which cellular ingrowth will penetrate from the outer surface 2 into a graft wall. The depth or extent of nutritional diffusion is also limited. Where the wall of a particular graft is too thick (considering the internodular distance), an unnourished calcifying layer will form within the wall of the graft in any area which is so far removed from the outer surface 2 as to be beyond the range of normal cellular ingrowth and which is too far from the inner surface 3 to receive nutrients by diffusion from the blood stream. This calcifying layer, itself a result of inadequate nutritional flow, acts as a barrier, further inhibiting the growth of new cells. Within the acceptable range of average internodular distances, it has been found that wall thicknesses greater than approximately 0.8 millimeters are excessive.

US 6,436,135 B1

7

While excessive wall thickness may result in an unacceptably stiff graft or one which inhibits transmural ingrowth, insufficient wall thickness results in a limp, unmanageable graft or one which allows excessive cellular ingrowth. Thus, wall thickness and internodular distance are the two prime determinants of graft pliability and strength and are also the two major factors which combine to control the extent and uniformity of transmural ingrowth.

Grafts embodying the present invention, having wall thicknesses in the range between 0.2 and 0.8 millimeters and characterized by internodular distances in the range between 6 and 80 microns have exhibited excellent mechanical properties and have resulted in controlled ingrowth sufficient to assure the support of a thin, viable neointima which does not unduly restrict the lumen of the graft. Grafts falling outside these ranges have been found to be marginal or clinically unacceptable. Grafts falling into these preferred ranges are characterized by moderately high tensile strength in the range between 2500 and 6500 pounds per square inch and average density between 0.2 and 0.5 grams per milliliter.

In the introductory portion hereof it was pointed out that reversed saphenous vein grafts have been frequently used to bypass diseased segments of peripheral arteries. This requires anastomosis of the graft to arteries having substantially different diameters. The proximal artery always has a larger diameter than the distal artery, as is true, for example, in the case of the common femoral artery-to-popliteal artery bypasses performed for the purpose of routing blood flow around obstruction in the superficial femoral artery. The femoral artery normally has a diameter of 6 to 8 millimeters whereas the popliteal artery is typically between 3 and 4 millimeters in diameter. If a constant diameter prosthesis or a reversed saphenous vein is used in accomplishing the bypass, a sudden cross-sectional area change is present at either or both ends of the graft. From a hemodynamic point of view, these sudden area changes are highly disadvantageous in that they tend to produce turbulence with pockets of stasis, causing deposition of platelets, fibrin and cellular materials and thus the formation of thrombi which can ultimately propagate to occlusion of the vessel. These problems are eliminated in accord with one embodiment of the present invention wherein the inside diameter of the prosthesis tapers gradually over its entire length from the diameter of the larger proximal vessel down to the diameter of the smaller distal vessel. Tapering of the graft promotes streamlining of the blood and assures laminar rather than turbulent flow. Tapering also results in accelerated blood flow with an associated increase in the velocity of the blood elements; as opposed to deceleration, which characterizes flow through the reversed saphenous vein. Thus, tapered grafts of the present invention not only provide for the growth and maintenance of a viable neointima but also promote accelerated laminar blood flow with the resultant elimination of clotting due to stasis and turbulence.

In addition to the significant biomedical, hemodynamic and mechanical advantages which accompany the use of vessel prostheses of the type described herein, numerous surgical, procedural and post-operative benefits are also realized. Cardiovascular surgery calling for a small bore vessel substitute has heretofore required initial harvesting of the saphenous vein for use as a graft. This involves the following surgical steps which are rendered unnecessary by the present invention:

1. groin incision and proximal dissection of the patient's saphenous vein;
2. lower thigh incision and distal dissection of the patient's saphenous vein;

8

3. multiple medial thigh incisions for completion of the saphenous vein dissection;
4. removal of the saphenous vein and careful ligation of all branches;
5. reversal of the saphenous vein prior to implantation so that venous valves do not obstruct arterial flow, thereby necessitating the awkward anastomosis of the small (approximately 3 millimeters) distal end of the vein to a substantially larger proximal artery and, in the case of a peripheral artery replacement, anastomosis of the relatively large proximal end of the vein to a very small bore distal artery;
6. careful inspection for possible leaks from the various branches in the graft or from those remaining in the patient's thigh; and,
7. closing of the multiple incisions necessitated by removal of the saphenous vein.

Use of expanded polytetrafluoroethylene grafts of the type described and claimed herein not only eliminates these unnecessary surgical procedures, but also shortens operative and anesthetic time by between one and two hours, does away with the post-operative discomfort and possible infection resulting from numerous leg wounds and greatly conserves already limited hospital and surgical resources.

The manufacture of prosthetic vascular structures embodying the present invention is extremely simple and can be readily performed with the most rudimental laboratory equipment, realizing of course that more sophisticated equipment is required for volume production and quality control. The basic physical, chemical and procedural parameters for expanding polytetrafluoroethylene are presented and discussed in the previously cited Japanese Patent No. 13,560/67; however, an example will be given illustrating the fundamental technique involved in making small bore polytetrafluoroethylene grafts having the claimed structure.

Polytetrafluoroethylene is extruded to form tubing having an average inside diameter of approximately 4 millimeters and an average wall thickness of approximately 0.5 millimeters. Unsintered tubing of this type, identified by the manufacturer's No. S16882-7, may be obtained from W. S. Shamban Company (71 Mitchell Road, Newberry Park, Calif. 91320). The unsintered extrudate, which is quite fragile, is carefully cut with a razor blade into lengths of, for example, 7.3 centimeters. Small aluminum plugs of virtually any configuration are inserted into the end of the tubing and secured thereto by tightly wrapped stainless steel wire. A relatively short end segment is thus confined between the inserted plug and the stainless steel wire. These plugs provide points for handling and attachment during the subsequent heating, elongation and sintering steps.

The tubing and plug assembly is placed in a uniformly heated oven for approximately one hour at 275° C. Thereafter, the assembly is removed from the oven, the plugs are grasped and stretched apart manually to obtain a tubular length of 23 centimeters. The time required for removal and elongation should be made as short as possible to reduce the effects of cooling. Elongation should be carried out at a moderate, uniform rate and the plugs should be moved apart along a common axis of expansion to assure uniform force distribution. Typically, this manual operation has required less than ten seconds and has yielded good results.

The elongated assembly is then secured against contraction by restraining the plugs at the desired separation. This may be achieved in any number of obvious ways, as for example, by using plugs with enlarged ends which are placed in a fixture having U-shaped slots separated by the desired distance of 23 centimeters.

PX 1.11

9

10

While still restrained, the elongated assembly is returned to the oven for approximately forty-five seconds at 400° C., during which time the node/fibril superstructure is sintered and becomes fixed. The elongated grafts are then cut to the desired lengths and after sterilization are ready for implantation.

In large commercial applications, expansion is achieved mechanically in the oven itself at closely controlled rates and is immediately followed by sintering. However, excellent grafts, such as the one shown in FIG. 1, have been obtained by the simple laboratory techniques outlined above.

Fabrication of tapered grafts such as those used for peripheral artery replacement involves the additional step of reshaping a sintered tube of desired length and diameter over a tapered stainless steel mandrel which has been heated to approximately 300° C. After the entire assembly is allowed to cool, the slightly re-expanded graft retains the shape of the mandrel and may be removed for use without further heat treatment.

It will be apparent to those skilled in the art that the disclosed prosthetic vascular structure may be modified in numerous ways and may assume many embodiments and configurations other than those specifically set forth and described above. For example, the basic prosthetic structure may be made various lengths and in diameters up to approximately 40 millimeters without affecting the structural integrity or operativeness of the graft. Various secondary configurations such as bifurcated grafts may also be produced. Because grafts embodying the present invention are substantially impermeable to transmural blood flow, it will be obvious to those of ordinary skill in the art that the patients need not be heparinized to avoid leakage through the graft. Accordingly, it is intended by the appended claims to cover all such modifications of the invention which fall within the true spirit and scope of the invention.

What is claimed is:

1. A prosthetic vascular structure of expanded polytetrafluorethylene having:

(i) a macroscopically tubular configuration with proximal and distal ends, and

(ii) a microscopic superstructure of irregularly spaced nodes of various sizes and shapes interconnected by fibrils;

said vascular structure further comprising:

   a. an average wall thickness in the range between 0.2 and 0.8 millimeters;

   b. a substantially uniform distribution of nodes throughout said tubular configuration;

   c. an average density in the range between 0.2 and 0.5 grams per milliliter; and

   d. an average distance between said nodes small enough to prevent transmural blood flow and thrombosis but no less than the maximum dimension of an average red cell;

whereby said structure may provide for the smooth flow of blood between at least two points in a living organism while controlling cellular ingrowth through the wall of the tubular configuration to promote and nourish a thin, viable neointima over the inner surface thereof and to firmly attach said prosthetic vascular structure to adjacent tissue of said living organism.

2. The prosthetic vascular structure of claim 1 wherein said nodes are generally ellipsoidal in shape and have an average dimension along their minor axes less than three times the maximum dimension of an average red cell.

3. The prosthetic vascular structure of claim 2 wherein the major axes of said nodes are in a generally radial orientation with respect to the tubular configuration.

4. The prosthetic vascular structure of claim 1 wherein the tubular configuration thereof has an average inside diameter of less than 8 millimeters.

5. The prosthetic vascular structure of claim 4 wherein the tubular configuration thereof has an average inside diameter of between 2 and 6 millimeters.

6. The prosthetic vascular structure of claim 1 wherein the tubular configuration thereof has an average inside diameter of less than 40 millimeters.

7. The prosthetic vascular structure of claim 1 further having a tensile strength in the range between 2500 and 6500 psi.

8. The prosthetic vascular structure of claim 1 wherein the tubular configuration thereof tapers from a first inside diameter at the proximal end to a second inside diameter at the distal end.

9. The prosthetic vascular structure of claim 8 wherein said first inside diameter is in the range between 5 and 8 millimeters and the second inside diameter is in the range of between 2 and 6 millimeters.

10. A prosthetic vascular structure as set forth in claim 1 wherein said average distance between said nodes is no greater than about 80 microns.

11. The prosthetic vascular structure of claim 2 wherein the minor axes of the nodes are substantially transverse to generally radial direction of the tubular configuration.

12. A prosthetic vascular structure of expanded polytetrafluorethylene having:

(i) a macroscopically tubular configuration with proximal and distal ends, and

(ii) a microscopic superstructure of irregularly spaced nodes of various sizes and shapes interconnected by fibrils;

said vascular structure including:

   a. an average inside diameter in the range between 2 and 6 millimeters;

   b. an average wall thickness in the range between 0.2 and 0.8 millimeters;

   c. a substantially uniform distribution of generally ellipsoidal nodes having major axes disposed in a generally radial orientation with respect to the tubular configuration and an average minor axis dimension less than 18 microns;

   d. an average density in the range between 0.2 and 0.8 grams per milliliter; and

   e. a tensile strength in the range of between 2500 and 6500 pounds per square inch; whereby said structure may provide for the smooth flow of blood between at least two points in a living organism while controlling cellular ingrowth through the wall of the tubular configuration to promote and nourish a thin, viable neointima over the inner surface thereof and to firmly attach said prosthetic vascular structure to adjacent tissue of said living organism.

13. A prosthetic vascular structure as defined in claim 12 wherein the distribution of nodes is such that the average internodal distance is no greater than about 80 microns.

14. A prosthetic vascular graft of expanded polytetrafluoroethylene having a microscopic structure of nodes interconnected by fibrils comprising:

   a wall thickness within the range between 0.2 and 0.8 millimeters;

   a substantially uniform distribution of nodes;

   an average density in the range between 0.2 and 0.5 grams per milliliter; and

   an average distance between nodes in the range of between about 6 to 80 microns.

PX 1.12

US 6,436,135 B1

| 11 | 12 |

15. A prosthetic vascular structure as defined in claim 14 which is in tubular form.

16. A prosthetic vascular structure as defined in claim 15 wherein the inner diameter of the graft is between 2 to 10 millimeters.

17. A prosthetic vascular structure of expanded polytetrafluoroethylene having:

(i) a macroscopically tubular configuration with proximal and distal ends, and

(ii) a microscopic superstructure of irregularly spaced nodes of various sizes and shapes interconnected by fibrils;

said vascular structure including:

a. an average inside diameter in the range between 2 and 6 millimeters;

b. an average wall thickness in the range between 0.2 and 0.8 millimeters;

c. a substantially uniform distribution of generally ellipsoidal nodes having minor axes disposed in a generally transverse orientation with respect to the radial direction of the tubular configuration and an average minor axis dimension less than 18 microns;

d. an average density in the range between 0.2 and 0.5 grams per milliliter; and

e. an average distance between said nodes small enough to prevent transmural blood flow and thrombosis but no less than the maximum dimension of an average red cell;

whereby said structure may provide for the smooth flow of blood between at least two points in a living organism while controlling cellular ingrowth through the wall of the tubular configuration to promote and nourish a thin, viable neointima over the inner surface thereof and to firmly attach said prosthetic vascular structure to adjacent tissue of said living organism.

18. A prosthetic structure as set forth in claim 17 wherein said average distance between said nodes is no greater than about 80 microns.

19. A prosthetic vascular structure as set forth in claim 17 wherein the average distance between said nodes is in the range of between 6 and 80 microns.

20. An artificial vascular prosthesis comprising expanded, porous, polytetrafluoroethylene having a microstructure consisting of nodes interconnected by fibrils which permits tissue ingrowth, wherein an average distance between nodes is not less than about 6 microns and is small enough to prevent transmural blood flow.

21. The artificial vascular prosthesis as defined in claim 20 wherein said average distance between nodes is not greater than about 200 microns.

22. The artificial vascular prosthesis as defined in claim 20 wherein said average distance between nodes is not greater than about 150 microns.

23. The artificial vascular prosthesis as defined in claim 20 wherein said average distance between nodes does not extend beyond 150 to 200 microns.

24. The artificial vascular prosthesis as defined in claim 20 wherein said average distance between nodes is not greater than about 80 microns.

25. A prosthetic vascular graft of expanded polytetrafluoroethylene having a microscopic structure of nodes interconnected by fibrils, said graft comprising:

a wall thickness greater than about 0.2 millimeters and less than about 0.8 millimeters; and

an average distance between nodes in the range of between about 6 to 80 microns.

26. A prosthetic vascular graft of expanded polytetrafluoroethylene having a microscopic structure of nodes interconnected by fibrils, said graft comprising:

a wall thickness greater than about 0.2 millimeters and less than about 0.8 millimeters;

an average density in the range of between about 0.2 and 0.5 grams per milliliter; and

an average distance between nodes in the range of between about 6 to 80 microns.

27. An artificial vascular prosthesis comprising expanded, porous, polytetrafluoroetylene having a microstructure consisting of nodes interconnected by fibrils which permits tissue ingrowth, wherein an average distance between nodes is not less than about 6 microns and is not greater than about 80 microns.

* * * * *

PX 1.13