No. 14-1114

# United States Court of Appeals for the Federal Circuit

BARD PERIPHERAL VASCULAR, INC. and DAVID GOLDFARB, M.D.,
*Plaintiffs/Counterclaim*
*Defendants-Appellees,*

and

C.R. BARD, INC.
*Counterclaim Defendant-Appellee,*

v.

W.L. GORE & ASSOCIATES, INC.,
*Defendant/Counterclaimant-Appellant,*

and

JASON DANIELS,
*Defendant.*

Appeal from the United States District Court for the District of Arizona,
Case No. 03-CV-0597, Judge Mary H. Murguia

## APPELLEES' RESPONSE BRIEF

Steven C. Cherny
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, N.Y. 10022
(212) 446-4800

John L. Strand
WOLF, GREENFIELD
& SACKS, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000

Michael W. McConnell
John C. O'Quinn
William H. Burgess
Dennis J. Abdelnour
Liam P. Hardy
KIRKLAND & ELLIS LLP
655 Fifteenth St., NW
Washington, D.C. 20005
(202) 879-5000

*Counsel for Appellees Bard Peripheral Vascular, Inc.,*
*David Goldfarb, M.D., and C.R. Bard, Inc.*

January 24, 2014

# CERTIFICATE OF INTEREST

Counsel for Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc. certifies the following:

1. The full names of every party represented by me are: *Bard Peripheral Vascular, Inc.; David Goldfarb, M.D.; and C.R. Bard, Inc.*

2. The name of the real party in interest is: *N/A.*

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are as follows: *Bard Peripheral Vascular, Inc. is a wholly owned subsidiary of C.R. Bard, Inc., a publicly held company*.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:

<u>Kirkland & Ellis, LLP</u>:  Michael W. McConnell, Steven C. Cherny, John C. O'Quinn, Amanda Hollis, Nathan S. Mammen, William H. Burgess, Dennis J. Abdelnour, and Liam P. Hardy

<u>Wolf, Greenfield & Sacks, P.C.</u>: Lawrence M. Green and John L. Strand

<u>Fennemore Craig  P.C.</u>: Andrew M. Federhar

<u>Latham & Watkins LLP</u>:  Maximilian A. Grant, Gregory G. Garre, Stephen P. Swinton, Michael David, Katharine R. Saunders, Matthew B. Lehr, and Shawn McDonald

<u>Foley Hoag LLP</u>: Marc K. Temin, Peter B. Ellis, and Vickie L. Henry

<u>Gammage & Burnham PLC</u>: James F. Polese

<u>Fish & Neave (now part of Ropes & Gray LLP)</u>: Jesse J. Jenner, Pablo D. Hendler, Bhavana Joneja, Robert Wilson, Christine Willgoos, and Jane Massaro

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................... ix

STATEMENT OF JURISDICTION .......................................................... 1

PRELIMINARY STATEMENT ................................................................ 2

STATEMENT OF THE ISSUES ............................................................... 5

STATEMENT OF THE CASE .................................................................. 6

STATEMENT OF FACTS ......................................................................... 9

    A.    Goldfarb's Invention ................................................................. 9

    B.    PTO Proceedings (1974–2002) ............................................... 13

    C.    Ownership and Licensing of the '135 Patent ....................... 15

    D.    Initial District Court Proceedings (2003–2010) ................... 17

    E.    Prior Appeal (2010–2012) ...................................................... 19

    F.    Remand (2012–2013) .............................................................. 19

SUMMARY OF THE ARGUMENT ...................................................... 21

STANDARD OF REVIEW ...................................................................... 22

ARGUMENT ............................................................................................ 24

I.    Gore's Challenge to Plaintiffs' Standing is Legally Foreclosed
and, In Any Event, Without Merit ................................................. 24

    A.    Standing Has Already Been Decided and, Under the
Law of the Case and Mandate Rule, Cannot Be
Challenged Anew ................................................................... 24

        1.    The Law of the Case Doctrine Precludes
Relitigation of Standing Issues Previously
Decided ........................................................................ 26

        2.    Standing Was Established and Is Now Law of the
Case ............................................................................... 28

        3.    The Mandate Rule Also Jurisdictionally
Forecloses Gore's Challenge ..................................... 30

        4.    None of the Exceptions to Law of the Case or
Mandate Rule Applies Here ...................................... 33

B.  The Facts Relevant to Standing Are Conclusively Established and Clearly Demonstrate Standing .................. 35

C.  The District Court Did Not Clearly Err In Finding Facts Establishing That Plaintiffs Had Standing ............... 40

    1.  The District Court's Factual Findings Are Reviewed for Clear Error, Based on the Trial Court Record ................................................ 40

    2.  The District Court Correctly Found Standing ............ 42

II.  The Willfulness Ruling Should Be Affirmed ................................. 55

A.  The District Court Followed the Remand Instructions and Properly Found Gore's Defenses Objectively Unreasonable .......................................................... 57

    1.  The Jury's Fact Findings Underlying Gore's Inventorship are Supported By Substantial Evidence ................................................................ 57

    2.  No "Reasonable Litigant" Could "Realistically Expect" Gore's Joint Inventorship Defense To Succeed ................................................................ 59

    3.  Gore's Arguments Are Unavailing .............................. 66

B.  Gore's Conditional Request for a New Trial is Legally Foreclosed and Without Merit ............................................... 70

CONCLUSION ........................................................................................ 73

# TABLE OF AUTHORITIES

## Cases

*A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213 (Fed. Cir. 2010) .......... 45

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
    228 F.3d 1338 (Fed. Cir. 2000) ........................................... 39

*Alfred E. Mann Fund v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010) ........................................... 44

*Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008) ..................... 31

*Asyst Techs. v. Empak, Inc.*, No. C98-20451,
    2006 WL 3302476 (N.D. Cal. 2006) ..................................... 69

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    476 F.App'x 747 (Fed. Cir. June 14, 2012)........................... x, 8

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    670 F.3d 1171 (Fed. Cir. 2012) ("*Bard I*") ............ x, 3, 8, 11, 19, 28, 29,
                                       60, 61, 62, 63, 67, 68, 69

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    682 F.3d 1003 (Fed. Cir. 2012) ("*Bard II*") ................ x, 5, 8, 19, 23, 24,
                                            57, 58, 59, 71

*Barnes-Wallace v. City of San Diego*, 704 F.3d 1067 (9th Cir. 2012) ..... 25

*Barnum Timber Co. v. E.P.A.*, 633 F.3d 894 (9th Cir. 2011) .................. 40

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) ........................... 58

*Campbell v. United States*, 878 F.2d 385 (9th Cir. 1989) ................. 28, 30

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) ..................................... 33, 71

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988) ................................. 2, 24, 25, 26, 29, 34

*Cooper v. Goldfarb*, 154 F.3d 1321 (Fed. Cir. 1998)
("*Cooper I*") .................................................................xi, 14, 62

*Cooper v. Goldfarb*, 240 F.3d 1378 (Fed. Cir. 2001)
("*Cooper II*")................................xi, 14, 15, 56, 62, 64, 67

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962)....................................58

*Digitalis Educ. Solutions, Inc. v. United States*,
664 F.3d 1380 (Fed. Cir. 2012) ......................................................23, 40

*Durel Corp. v. Osram Sylvania Inc.*,
256 F.3d 1298 (Fed. Cir. 2001) ..........................................................27

*Duro-Last, Inc. v. Custom Seal, Inc.*,
321 F.3d 1098 (Fed. Cir. 2003) ..........................................................39

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352 (Fed. Cir. 2004).........60

*Engel Indus., Inc. v. Lockformer Co.*,
166 F.3d 1379 (Fed. Cir. 1999) ...........................1, 4, 30, 31, 32, 71, 72

*Enovsys LLC v. Nextel Commc'ns, Inc.*,
614 F.3d 1333 (Fed. Cir. 2010) ......................................................23, 40

*Enzo APA & Son, Inc. v. Geapag, A.G.*,
134 F.3d 1090 (Fed. Cir. 1998) ......................................................51, 52

*Evident Corp. v. Church & Dwight Co.*,
399 F.3d 1310 (Fed. Cir. 2005) ......................................................35, 55

*Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.*,
780 F.2d 549 (6th Cir. 1986)................................................................36

*Ferreira v. Borja*, 93 F.3d 671 (9th Cir. 1996)...................2, 24, 25, 27, 34

*Fieldturf, Inc. v. Sw. Recreational Indus. Inc.*,
357 F.3d 1266 (Fed. Cir. 2004) ...............................................27, 28, 43

*Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981) ....................................30

*Free v. Abbott Labs., Inc.*, 164 F.3d 270 (5th Cir. 1999) .........................25

iv

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) ........................................ 27

*Garrett Corp. v. United States*, 422 F.2d 874 (Ct. Cl. 1970) ............ 60, 68

*Gebhart v. SEC*, 595 F.3d 1034 (9th Cir. 2010) ...................................... 39

*Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761 (Fed. Cir. 2002) ............... 23

*Graphic Controls Corp. v. Utah Med. Prods., Inc.*,
    149 F.3d 1382 (Fed. Cir. 1998) ........................................................... 70

*Hess v. Advanced Cardiovascular Sys., Inc.*,
    106 F.3d 976 (Fed. Cir. 1997) ...................................................... 60, 68

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300
    (Fed. Cir. 2012), *cert. granted*, 134 S.Ct. 48 (Oct. 1, 2013) .......... 24, 56

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010),
    *aff'd* 131 S.Ct. 2238 (2011) ................................................................. 39

*In re Cellular 101, Inc.*, 539 F.3d 1150 (9th Cir. 2008) ........................... 30

*In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc) ...... 57

*Int'l Gamco, Inc. v. Multimedia Games, Inc.*,
    504 F.3d 1273 (Fed. Cir. 2007) ........................................................... 45

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
    248 F.3d 1333 (Fed. Cir. 2001) ..................................................... 43, 44

*Kamen v. AT&T*, 791 F.2d 1006 (2d Cir. 1986) ...................................... 42

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) ........................................................... 58

*King Instrument Corp. v. Otari Corp.*,
    814 F.2d 1560 (Fed. Cir. 1987) ........................................................... 20

*LaShawn v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) (en banc) ........................ 2, 24, 25, 28, 29

*Lowry v. Barnhart*, 329 F.3d 1019 (9th Cir. 2003) ................................. 41

*Macheca Transp. Co. v. Phila. Indem. Ins. Co.*,
   737 F.3d 1188 (8th Cir. 2013) .................................................. 29, 30, 35

*Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008) ........ 52

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
   240 F.3d 1016 (Fed. Cir. 2001) ..................................................... 27, 54

*Merritt v. Mackey*, 932 F.2d 1317 (9th Cir. 1991) ................................. 68

*Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261 (4th Cir. 2004) ............... 36

*Midwest Indus. Inc., v. Karavan Trailers, Inc.*,
   175 F.3d 1356 (Fed. Cir. 1999) .......................................................... 23

*Monsanto Co. v. Scruggs,*  459 F.3d 1328 (Fed. Cir. 2006) .................... 70

*Munoz v. Imperial Cnty.*, 667 F.2d 811 (9th Cir. 1982) ................... 30, 71

*Nat'l Org. for Women v. Scheidler*, 510 U.S. 249 (1994) ....................... 27

*Ormco Corp. v. Align Tech.*, 498 F.3d 1307 (Fed. Cir. 2007) ................. 33

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
   320 F.3d 1354 (Fed. Cir. 2003) ..................................................... 27, 41

*Pannu v. Iolab*, 155 F.3d 1344 (Fed. Cir. 1998) ..................................... 60

*Paper Converting Machine Co. v. Magna-Graphics Corp.*,
   785 F.2d 1013 (Fed. Cir. 1986) .......................................................... 69

*Pub. Interest Research Grp. of NJ, Inc. v. Magnesium Elektron,
   Inc.*, 123 F.3d 111 (3d Cir. 1997) ........................................................ 3

*R.R. Dynamics, Inc. v. A. Stucki Co.*,
   727 F.2d 1506 (Fed. Cir. 1984) .......................................................... 58

*Ricoh Co. v. Nashua Corp.*, 947 F. Supp. 21 (D.N.H. 1996) ................... 50

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) (en banc) ............................................ 50

*Roberts v. Cooper*, 61 U.S. (20 How.) 467 (1857) .................................... 26

*Rothe Dev. Corp. v. Dep't of Defense*,
413 F.3d 1327 (Fed. Cir. 2005) .......................................................... 70

*Ry. Co. v. Ramsey*, 89 U.S. (22 Wall.) 322 (1875) .................................... 36

*Sibbald v. United States*, 37 U.S. (12 Pet.) 488 (1838) ........................... 33

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*,
427 F.3d 971 (Fed. Cir. 2005) ............................................................ 44

*State Contracting & Eng'g v. Condotte Am., Inc.*,
346 F.3d 1057 (Fed. Cir. 2003) .......................................................... 69

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ................... 27

*Steelcase Inc., v. Smart Techs. Inc.*,
336 F. Supp. 2d 714 (W.D. Mich. 2004) ............................................ 50

*Toro Co. v. White Consol. Indus. Inc.*,
383 F.3d 1326 (Fed. Cir. 2004) .......................................................... 26

*Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed. Cir. 2001) .................... 31, 71

*United States v. Bell*, 5 F.3d 64 (4th Cir. 1993) ..................................... 31

*United States v. Hays*, 515 U.S. 737 (1995) .......................................... 27

*United States v. Luong*, 627 F.3d 1306 (9th Cir. 2010) ............... 1, 32, 33

*United States v. Meyers*, 847 F.2d 1408 (9th Cir. 1988) ........................ 23

*United States v. Thrasher*, 483 F.3d 977 (9th Cir. 2007)............. 4, 31, 32

*Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290 (Fed. Cir. 2009) ............ 59

*Verzosa v. Merrill Lynch, Pierce, Fenner & Smith*,
589 F.2d 974 (9th Cir. 1978)............................................................... 36

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 133 S. Ct. 932 (2013) ........ xi

*Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358 (Fed. Cir. 2003) ..... 49

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000) ....................................... 24

*WiAV Solutions LLC v. Motorola, Inc.,*
  631 F.3d 1257 (Fed. Cir. 2010) .................................................... 48, 54

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .................................... 24, 25

**Statutes**

28 U.S.C. §1295(a)(1) ................................................................................ 1

35 U.S.C. § 152 ....................................................................................... 47

## STATEMENT OF RELATED CASES

Four appeals previously have been taken from the lower court proceeding: Nos. 2009-1345, 2009-1359, 2010-1510, and 2010-1542.

In No. 2009-1345, W.L. Gore & Associates, Inc. ("Gore") appealed from the District Court's March 31, 2009 orders. No. 2009-1359 was the corresponding cross-appeal of Bard Peripheral Vascular, Inc. ("BPV"), David Goldfarb, M.D., and C.R. Bard, Inc. ("C.R.Bard") (collectively "Appellees"). Before any briefing on the merits of either appeal, this Court granted Appellees' motion to dismiss Gore's appeal as premature. 346 F.App'x 580 (Fed. Cir. Aug. 17, 2009) (Mayer, Clevenger, and Rader, JJ.). Appellees voluntarily dismissed the interlocutory cross-appeal. 346 F.App'x 592 (Fed. Cir. Sept. 11, 2009).

In No. 2010-1510, Gore appealed the District Court's August 24, 2010 final judgment, raising anticipation, obviousness, inventorship, written description, willfulness, enhanced damages, attorneys' fees, and the ongoing royalty. Gore did not appeal the District Court's determination that Plaintiffs had standing. The panel initially affirmed in all respects. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171 (Fed. Cir. 2012) (per Gajarsa, J., joined by Linn, J.)

["*Bard I*"]. Judge Newman dissented as to joint inventorship. *See id.* at 1193. Gore petitioned for rehearing on joint inventorship and willfulness. This full Court "denie[d] en banc review, but grant[ed] rehearing en banc for the *limited purpose* of authorizing the panel to revise the portion of its opinion addressing willfulness," and "return[ed the] appeal to the merits panel." 476 F.App'x 747, 748 (Fed. Cir. June 14, 2012).[1] The panel expressly reaffirmed its initial opinion in all respects, except for willfulness (and with it the award of enhanced damages and attorneys' fees). *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012) (per Gajarsa, J., joined by Linn, J.) ["*Bard II*"]. *Bard II* "clarified the legal standard for *Seagate*'s objective willfulness prong," *id.* at 1008, "hold[ing] that the threshold objective prong … is a question of law based on underlying mixed questions of law and fact," *id.* at 1005, and remanded for the District Court to determine the objective prong of willfulness. Judge Newman concurred in part, but dissented from the decision to remand. *Id.* at 1009. Gore petitioned for a writ of certiorari, which the Supreme

---

[1] All emphasis added unless otherwise indicated.

Court denied on January 14, 2013. *W.L Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 133 S.Ct. 932 (2013).

Appeal No. 2010-1542 was the cross-appeal corresponding to No. 2010-1510, which Appellees voluntarily dismissed. 405 F. App'x 501 (Fed. Cir. Dec. 28, 2010).

Also related to this case are two appeals to this Court arising out of the interference concerning the patent-in-suit: *Peter B. Cooper v. David Goldfarb*, No. 97-1302, 154 F.3d 1321 (Fed. Cir. Sept. 1, 1998) (Clevenger, Skelton, and Schall, JJ.) ("*Cooper I*"), and *Peter B. Cooper v. David Goldfarb*, No. 00-1046, 240 F.3d 1378 (Fed. Cir. Mar. 2, 2001) (Clevenger, Rader, and Schall, JJ.) ("*Cooper II*").

## STATEMENT OF JURISDICTION

The parties dispute jurisdiction. Gore seeks to reopen the entire judgment by resurrecting a jurisdictional argument that was briefed, addressed, and finally resolved at an earlier stage of this litigation. Appellees contend that this Court has jurisdiction under 28 U.S.C. §1295(a)(1) solely to review issues within the scope of this Court's limited remand from the previous appeal in this case. *See United States v. Luong*, 627 F.3d 1306, 1309-1311 (9th Cir. 2010); *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999).

## PRELIMINARY STATEMENT

Without even alluding to the law of the case doctrine or the mandate rule, which definitively resolve most of this appeal, Gore attempts to resurrect an argument about standing that was raised and resolved at an earlier stage in this litigation—an argument twice rejected by the District Court, and abandoned by Gore in its prior appeal to this Court.  Gore does so on the theory that "jurisdictional" issues may be raised, and re-raised, at any stage.  That theory is simply wrong as a matter of law.   There is no "'jurisdictional question' exception to the law-of-the-case doctrine." *LaShawn v. Barry*, 87 F.3d 1389, 1394 (D.C. Cir. 1996) (en banc) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816-17 n.5 (1988)); *see Ferreira v. Borja*, 93 F.3d 671, 674 (9th Cir. 1996).  Although it is true that "federal courts have an independent obligation to examine standing at all stages of the litigation, even when it is raised *for the first time* on appeal," Gore Br. 21, it is not true that jurisdictional issues, once raised and resolved, may be reopened again and again, in defiance of the law of the case and the mandate rule.  Gore is foreclosed from raising standing now.

Unlike the cases cited by Gore, *this is not a case where a jurisdictional issue was never previously identified or raised.* Before the previous appeal, Gore twice moved to dismiss this case for lack of standing based on the same arguments it makes here. The District Court denied those motions in thorough and meticulous opinions in 2008 (A40-48) and 2009 (A49-63; A71), determining that Plaintiffs had standing based on factual findings clearly supported by the record. Gore's distinguished counsel appealed other issues in those very orders, but rather than challenging standing on appeal, explicitly conceded jurisdiction. This Court, in turn, held that the "district court had jurisdiction under 28 U.S.C. §1338(a)." *Bard I*, 670 F.3d at 1178.

Absent "extraordinary circumstances," the standing determination is law of the case and may not be relitigated. *Pub. Interest Research Grp. of NJ, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). Gore has not even attempted to establish any such circumstance here. Nothing has changed since the prior appeal in the law or the facts, and there is no injustice in requiring Gore to live with the consequences of its past litigating positions. Indeed, Gore's attempt to raise standing now is particularly egregious: Gore not only failed to

3

alert this Court to what it now professes to believe was a meritorious jurisdictional argument, but affirmatively represented to the Court that it had jurisdiction, which it now denies.

Moreover, because *Bard II* remanded solely for reconsideration of willfulness, the District Court lacked jurisdiction to reconsider other issues resolved by *Bard I* and *II*. The mandate rule, thus, also forecloses Gore's attempt to relitigate standing, which was outside the scope of the remand. *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2007); *Engel*, 166 F.3d at 1383.

In any event, Gore's standing argument is frivolous in light of the District Court's factual findings—findings that Gore did not previously appeal and some of which Gore expressly conceded. Gore asserts that Goldfarb, the patentee-inventor, lacked standing because the exclusive license he granted C.R.Bard in 1980 should be retroactively reclassified as an assignment of the patent itself. And Gore claims that BPV, C.R.Bard's wholly-owned subsidiary, was never properly transferred C.R.Bard's interest in the patent. The District Court, however, made factual findings rejecting those arguments. Those findings are no

longer subject to challenge and, even if the Court accepts Gore's invitation to review them, are not clearly erroneous.

As to willfulness—the only issue properly before this Court—Gore's arguments depend on factual assertions rejected first by the jury and again by the District Court on remand. This Court remanded willfulness because of "the trial judge's first-hand knowledge of witnesses, testimony, and issues." *Bard II*, 682 F.3d at 1008. After considering the entire trial record and applying its knowledge of the facts and evidence, the District Court independently found Gore's reliance on its defenses (including joint-inventorship) not objectively reasonable. Gore ignores the record facts and treats this Court's remand as an empty exercise. The District Court's rulings are firmly rooted in the record and the applicable law, and should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether Gore's standing challenge is foreclosed by the law-of-the-case doctrine and this Court's mandate.

2. Whether Gore is foreclosed from challenging the facts on which the District Court's determination of standing is based.

5

3.      Whether the District Court's factual findings were not clearly erroneous, in any event, and it properly found that Plaintiffs have standing.

4.      Whether the District Court correctly held that Gore's infringement was willful.

## STATEMENT OF THE CASE

As noted in the Statement of Related Cases, pp. v-vi, *supra*, this is the second appeal to this Court.  In 2003, patentee-inventor Goldfarb and exclusive licensee BPV sued Gore for willful infringement of U.S. Patent No. 6,436,135.  Gore counterclaimed against those parties, *plus C.R.Bard*, for declarations of invalidity, noninfringement, and unenforceability.  A229.  After a 17-day jury trial and separate bench trial on unenforceability, A3952, Appellees prevailed and Gore's infringement was found willful.  A85-102; A4033-34.  The District Court denied Gore's pre- and post-verdict JMOL motions, A28-48; A3942-51; A49-72; A4656-65, awarded enhanced damages and attorneys' fees based on Gore's willfulness, A4666-88, imposed an ongoing royalty instead of an injunction, A6275-96, and entered judgment.  A73-81.

In the initial District Court action, Gore first challenged Plaintiffs' standing in 2007 at the close of BPV's case, and in 2008—after the verdict. Gore contended then, as it does now, that Goldfarb retained no substantial interest in the patent, that any interest granted to BPV was void for lack of a writing, that C.R.Bard owned the patent, and that only C.R.Bard had standing. A4082-83; A3624-25, A3627.

In two separate, comprehensive orders, A40-48; A49-63, the District Court rejected Gore's arguments, concluding as a factual matter that Goldfarb's 1980 agreement with C.R.Bard was a license, not an assignment, A43; A50, and that Goldfarb retained substantial interests in the patent, A43-44; A56-59. The court found that "[t]he record evidence indisputably established that BPV was an exclusive licensee," A62, which did not require a writing, and that, in any event, "by at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV," A51 (quoting A44); A61 (same). The District Court further held that "[i]f it appeared to the Court that standing was an issue here and that to have standing C.R. Bard is a necessary plaintiff, the Court would grant Plaintiffs leave to amend the Complaint under Fed.R.Civ.P. 15 and 21." A63 n.6.

7

In the prior appeal, Gore affirmatively represented that this Court and the District Court had jurisdiction, A27589, abandoning its standing argument. It did not challenge the District Court's factual findings supporting standing, and conceded that the patent "is now assigned to Bard Peripheral Vascular." A27612 n.10. Gore challenged six rulings on the merits in other sections of the same orders resolving standing. A27590-91. This Court determined that "the district court had jurisdiction under 28 U.S.C. §1338(a)," *Bard I*, 670 F.3d at 1178, and proceeded to resolve the merits.

This Court affirmed in full. *Id.* at 1193. Following Gore's rehearing petition, the en banc Court returned the matter to the panel "for the limited purpose of authorizing the panel to revise the portion of its opinion addressing willfulness." 476 F.App'x at 748. The panel then clarified the test for willful infringement and remanded "so that the trial court may reconsider its denial of JMOL of no willful infringement" and if necessary the concomitant enhanced damages and attorneys' fees that depended on its finding of willfulness. *Bard II*, 682 at 1005. The Court otherwise "reaffirm[ed] its opinion issued February 10, 2012" in all respects. *Id.* at 1005 & n.1. The Supreme Court denied Gore's

certiorari petition, 133 S. Ct. 932 (2013), wherein Gore represented that both this Court and the Supreme Court had jurisdiction. 2012 WL 4862577, at *1.

On remand, the District Court reaffirmed that Gore's infringement was willful and denied Gore's contingent motion for a new trial. A22; A6458. The court granted leave to execute on the portions of the judgment not affected by willfulness, A23, and specified the terms of execution on October 30, 2013. A24-27. Appellees executed on November 1. A7448-49. Gore never mentioned standing in any way on remand—not as a defense to objective willfulness and not in opposition to Appellees' motion to execute.

On November 18, 2013, Gore again appealed.

## STATEMENT OF FACTS

### A.    Goldfarb's Invention

In 1973 Dr. David Goldfarb, a researcher in Arizona, discovered the microstructure necessary to make expanded polytetrafluoroethylene ("ePTFE") vascular grafts work consistently. His invention is described and claimed in the '135 patent, A108-20, and Gore and the medical community use it widely to this day. A24761-62; A25598.

Before Goldfarb's invention, Gore had tried for years to find medical applications for ePTFE, a low-cost industrial material. A24988-89. Researchers found that ePTFE vascular grafts occasionally worked in animal experiments, but usually failed, and could not ascertain why. A45455-60. Consistent success is critical, as failure can result in death.

In 1973, Goldfarb was independently researching vascular prosthetics. A23593-608. Gore's Richard Mendenhall asked Goldfarb "to include GORE-TEX [ePTFE] in *his* study." A45609-10; A23610. In February and April 1973, Peter Cooper shipped Goldfarb boxes of undifferentiated ePTFE tubes, accompanied by reports from unsuccessful researchers. A41135-36; *Bard I*, 670 F.3d at 1183. Cooper was a Gore plant manager who corresponded with researchers and sent them ePTFE tubes, A28610-12; A45455; A45466; but contributed little of substance. A23656-57; A27925; A29084; A29082; A28609-11; A37554-55. A Gore employee testified that Cooper was a "hindrance." A25190. Some tubes shipped to Goldfarb had been punctured deliberately with a sewing needle in a so-called "latest attempt" toward a successful ePTFE graft. A41136; A45611; A42585.

10

Goldfarb cut away the punctured portions of the tubes. A23624; A37996. He examined the remaining portions microscopically and observed that ePTFE material is made of wispy "fibril" strands connecting solid "nodes." A23621; A23614; *Bard I*, 670 F.3d at 1175.



Unaided by Cooper or anyone else, Goldfarb had the insight to realize the *micro*structure—"internodal distance" or "fibril length"—determined an ePTFE graft's success or failure. Further, Goldfarb realized that previous researchers had focused erroneously on *macro*scopic properties, such as "porosity," "coarseness," "pore size," "stiffness," or "density." A45466; A45469; A45474-78; A45483; A23624. With those insights, Goldfarb succeeded where others failed, and discovered and reduced to practice the microstructure necessary to

make a consistently successful ePTFE vascular graft—*i.e.*, the claimed invention. A31639-40.

Goldfarb informed Gore of his discovery, which Gore later referred to as the "Goldfarb Structure," or "AHI Structure," after the Arizona Heart Institute where Goldfarb conducted his research.    A3958; A48098-100; A28528; A42880.  Cooper wrote that "*[a]ny success* at this point in time is the *direct result of the AHI efforts*," A41408, and credited AHI with "the *specific structure* necessary for a viable vascular graft."    A35502.    Nonetheless, Gore filed a patent application in Cooper's name, which "plagiarized its working examples from a memorandum which described the work of Dr. David Goldfarb." A51575; A47251; A47269-87; A53530-34; A53537; A23678.

As shown at trial, Goldfarb had virtually no other interaction with Cooper, A23656-57, and Gore employees testified there was "no discussion of substance" between Cooper and Goldfarb.    A28562-63. Gore presented Cooper's videotaped deposition testimony, A24999-5008, permitting the jury and District Court to assess Cooper's credibility as he described his alleged contribution, which Cooper stated as "due to my work, these tubes were created and put into David Goldfarb's

hands." A25008; Supp.Video.Appx.(4:48-5:15).[2] Gore's witness Detton testified that Cooper regretted Gore's effort to name Cooper as an inventor, "didn't feel his name should have been on it," and "apologized." A25197-98.

Even after Gore's filing, doctors working with Gore continued to fail. A40899 ("we are doing something wrong"); A40959-66. In November 1974, *Cooper stole Goldfarb's microscopic pathology slides* from Goldfarb's laboratory in hopes of understanding the invention. A42908-09; A23672-73. Cooper testified shortly thereafter that "we were trying to get the good research results that Dr. Goldfarb had obtained… We wondered if there was something to be learned through the microscope that could help us decide if production of variables in the grafts were important." A42909.

### B.    PTO Proceedings (1974–2002)

Goldfarb filed his patent application in October 1974. A108; A47059-88. His and Cooper's applications were assigned to the same examiner and prosecuted side-by-side for 9 years. A47225-28; A51490.

---

[2] "Supp.Video.Appx." refers to Appellees' Rule 30(j) Supplemental Video Recording Media Appendix, filed with this Court on CD-ROM on January 24, 2014.

The examiner considered whether the proper inventor on Goldfarb's application was Goldfarb, Cooper, others, or some combination, A47630-31, and determined that Goldfarb was the sole inventor. A47640.

The PTO declared an interference in 1983, A30198-200, and subsequently awarded priority to Goldfarb, A35077-114. This Court affirmed the decision that Goldfarb was the first to reduce to practice, but remanded for consideration of whether Goldfarb's reduction-to-practice inured to Cooper's benefit. *Cooper I*, 154 F.3d at 1331. The PTO found that it did not, A36152-68, and this Court affirmed. *Cooper II*, 240 F.3d at 1386.

This Court observed that, when Cooper shipped tubes to Goldfarb, Cooper "did not know that the ePTFE material he sent to Goldfarb met the fibril length limitation of the count," did not "recognize[] the importance of the fibril length," and never subsequently "communicate[d] his conception to Goldfarb, and…did not ask Goldfarb to use material having fibril lengths within the range specified by the interference count, or to measure the fibril lengths of the material he had provided." *Id.* at 1381-82, 1384. Cooper had no expectation that

the material he sent to Goldfarb would have an internodal distance that would render it successful. *Id*. at 1385.

The PTO issued the patent to Goldfarb in 2002. A47046.

## C. Ownership and Licensing of the '135 Patent

In 1980, while the application was pending, Goldfarb entered into a license agreement with C.R.Bard's USCI division, granting a "worldwide, exclusive license" to his application and certain other patents and applications, A7909, in exchange for royalties and other consideration. A7910-13; A40; A53. The agreement was titled a "license," A7909, included the defined term "LICENSED PRODUCT," A7910, and referred to the "license" throughout. A7910-26. The District Court later found as a fact that the agreement was intended to be a license. A40-42; A56-59. Goldfarb retained significant rights if various contingencies arose, A40-41, and the license excluded a category of products—heart valves—from its field of use. A40; A57-58.

As the District Court found, the license "does not grant C.R. Bard the exclusive right to sue for all infringement." A58. The license gave C.R.Bard the right to control a particular subset of litigation involving an issued patent—actions "brought against Dr. Goldfarb or USCI

seeking to declare a patent invalid." A7920. The license also contemplated Goldfarb's participation in future litigation asserting the patent. A58-59; A7920. Finally, the agreement restricted C.R.Bard's ability to assign its interests except to successors to its business. A59; A7924.

In 1996, C.R.Bard acquired IMPRA, which later became Bard Peripheral Vascular, Inc. ("BPV"). BPV, a wholly-owned subsidiary of C.R.Bard, conducted C.R.Bard's vascular business. A24883-88. With Goldfarb's consent, A60; A23737-38; A24892-95; A23427, C.R.Bard assigned its interest in the license to BPV, and BPV assumed C.R.Bard's rights and obligations thereunder. A24890-94.

In 1997—long before the patent issued or this litigation began— Goldfarb, C.R.Bard, and BPV entered into an updated agreement. A8041-46; A24893-95. The District Court found that BPV's president, McDermott, was authorized to execute the agreement on behalf of both BPV and its parent, C.R.Bard. A45; A51; A54-55. If there was any doubt whether C.R.Bard assigned its interests to BPV in 1996, the 1997 agreement (which was "by and among David Goldfarb…, C.R. Bard…, and IMPRA"), eliminated it. A8042. Moreover, the 1997 agreement

removed the heart-valve exclusion, altered the restrictions on assignability, and altered the parties' financial arrangements.   A54. The District Court found that "[t]he record evidence indisputably established that BPV was an exclusive licensee."   A62.   In 2007, Goldfarb assigned his patent to BPV.   A23427-30.

## D.   Initial District Court Proceedings (2003–2010)

In 2003, Goldfarb and BPV sued Gore for infringement.   A135. Despite its 28-year campaign to secure the '135 patent, Gore denied that it infringed, asserted that the patent was invalid and unenforceable, and generally "adopted a 'shotgun' approach of litigating every conceivable issue."   A4678.

During a 17-day trial, the jury and the court heard testimony from 31 witnesses and received over 1200 exhibits, including the interference record.   The jury saw Goldfarb testify live and Cooper by video, and could assess their credibility.   Despite voluminous contrary evidence and several prior rulings by the PTO and this Court regarding the facts surrounding inventorship, Gore asserted three alternative, inconsistent theories of invalidity for nonjoinder of an inventor, *two of which did not include Cooper at all*:   (1) Jay Volder (a researcher who worked with

Gore) purportedly was the sole inventor, (2) Volder and Goldfarb were joint inventors, or (3) Cooper and Goldfarb were joint inventors. A100.

The jury rejected Gore's defenses, and found Gore's infringement willful. A102. The District Court denied Gore's JMOL motions, issuing fact-intensive opinions addressing standing, and awarded double damages and attorneys' fees. A28-48; A3942-51; A49-72; A4656-65; A4666-88. The court observed that, given the interference and Gore's knowledge of the facts, Gore's "continuing reliance on its positions, without change or reevaluation of those positions, becomes reprehensible," A4676, and "the good-faith nature of [Gore's] 'zealous advocacy' is called into question by the fact that [Gore] spent decades fighting before the PTO and the Federal Circuit to patent the Goldfarb invention as its own and to block the issuance of the '135 patent in Dr. Goldfarb's name, only to then attack the validity of that patent with every tool in the toolbox once it was issued in Dr. Goldfarb's name, while all along manufacturing products that contain the same or similar ePTFE microstructure claimed in the '135 patent." *Id.*

### E.   Prior Appeal (2010–2012)

Gore appealed and raised anticipation, obviousness, inventorship, written description, willfulness (and the ensuing enhanced damages and attorneys' fees), and the ongoing royalty, *but not standing*. *Bard I*, 670 F.3d at 1179.

This Court addressed each argument at length, and initially affirmed the judgment in full. *Id.* at 1193. In a subsequent amended opinion, the panel "reaffirm[ed] its opinion issued on February 10, 2012, except for" the portions addressing willfulness, enhanced damages and attorneys' fees, clarified the legal test for willful infringement and "remand[ed] the issue of willfulness so that the trial court may reconsider its denial of JMOL of no willful infringement in view of this holding." *Bard II*, 683 F.3d at 1005. If the District Court granted JMOL of non-willfulness, the Court instructed, "it should then reconsider its decisions on enhanced damages and attorneys' fees." *Id.*

### F.   Remand (2012–2013)

Judge Murguia presided over all seven years of prior district court proceedings, but now sits on the Ninth Circuit. Despite this Court's recognition that "the trial judge's first-hand knowledge of witnesses, testimony, and issues" was critical on remand, Gore opposed having

Judge Murguia preside, arguing that "cognitive dissonance" would prevent her from "impartially apply[ing] a newly-articulated objective standard." A6306-07.

Gore filed a renewed JMOL motion on willfulness, arguing that its joint-inventorship and anticipation defenses were objectively reasonable. A6420. Despite the limited remand, Gore also filed a motion for a new trial on liability and damages, arguing that if JMOL of non-willfulness was granted, that would call into question the judgment of liability; *Gore did not challenge Plaintiffs' standing.* A6458.[3]

Relying on *King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560 (Fed. Cir. 1987), Appellees requested leave to execute on the portions of the judgment that were not affected by willfulness, and thus not subject to further dispute following this Court's affirmance in *Bard I* and *II*. A6394-95; A6406-09.

Judge Murguia denied Gore's motions. In addressing willfulness, the court reviewed the full trial record, including Gore's inconsistent

---

[3] While the case was on remand, Gore also pursued a short-lived *ex parte* reexamination of the '135 patent, relying on the same Matsumoto reference that was before the PTO in the interference, and before this Court and the District Court as the basis of Gore's failed anticipation defense. The PTO confirmed the patentability of the challenged claims after receiving Appellees' response. A7301-03

positions on inventorship, A5-19, and explained at length why—based on the record—"[i]t was not reasonable for Defendant to expect that it could succeed on its defense that Cooper was a joint inventor with Dr. Goldfarb." A11. It concluded "there was essentially no evidence that Cooper collaborated in any meaningful way with Dr. Goldfarb, and [Gore's] own employees denied that Cooper contributed to the invention." *Id.* The court similarly found Gore's other defenses objectively unreasonable, finding it "clear … just as it was to the jury, that [Gore], as a 'reasonable litigant,' could not have 'realistically expected' its defenses to succeed." A19. The Court granted Appellees' motion for execution, finding "no compelling reason to further stay execution of the Amended Clerk's Judgment regarding the portions that are final and non-appealable based on *Bard I* and *Bard II*." A23. Appellees executed on November 1, 2013. Gore appealed.

## SUMMARY OF THE ARGUMENT

Gore cannot resurrect the same standing argument that the District Court twice rejected, that Gore abandoned on appeal, and that Gore did not raise on remand. *First*, Plaintiffs' standing has been established as the law of the case. Gore's challenge to standing also is

barred by the mandate rule as beyond the scope of this Court's limited remand. *Second*, even if Gore still could assert the lack of standing, Gore waived any challenge to the District Court's underlying factual findings when Gore failed to dispute those facts in the previous appeal. *Third*, since Gore does not argue even now that the District Court's factual findings were clearly erroneous, Gore cannot show reversible error. *Finally*, in any event, the record evidence clearly establishes Plaintiffs' standing.

The District Court's willfulness ruling on remand is grounded in the record developed in seven years of litigation before the same judge. Gore's joint-inventorship defense depended on factual assertions that the PTO had rejected, was inconsistent with Gore's two *other* joint-inventorship defenses, and was utterly unsupported by evidence at trial. No reasonable litigant could have expected to prove invalidity by clear and convincing evidence.

The Court should affirm.

## STANDARD OF REVIEW

To the extent standing is properly at issue, the Court reviews the ultimate issue of standing *de novo*, but "underlying fact findings are

reviewed for clear error." *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012); *Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1341 (Fed. Cir. 2010). Regional circuit law—here, that of the Ninth Circuit—applies to review of procedural and non-patent issues, such as the law-of-the-case doctrine. *See Midwest Indus. Inc., v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc in relevant part). Evidentiary rulings are reviewed for abuse of discretion. *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 768 (Fed. Cir. 2002) (citing *United States v. Meyers*, 847 F.2d 1408, 1411 (9th Cir. 1988)).

For willful infringement, "the objective determination of recklessness, even though predicated on mixed questions of law and fact, is best decided by the judge as a question of law subject to *de novo* review." *Bard II*, 682 F.3d at 1006-07. Willfulness is "based on the record ultimately made in the infringement proceedings," *id.* at 1008, and on review, "courts of appeals should be constantly alert to the trial judge's first-hand knowledge of witnesses, testimony, and issues, and should give due consideration to the first-instance decisionmaker's 'feel'

for the overall case." *Id.* (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 443 (2000)).[4]

# ARGUMENT

## I. Gore's Challenge to Plaintiffs' Standing is Legally Foreclosed and, In Any Event, Without Merit

### A. Standing Has Already Been Decided and, Under the Law of the Case and Mandate Rule, Cannot Be Challenged Anew

Gore seeks to challenge Plaintiffs' standing, even though standing was adjudicated and resolved in orders that this Court reviewed and affirmed in the prior appeal. Gore does so on the theory that, because of its "jurisdictional" character, a party's standing can be re-raised and reargued at will. That is not the law. The Supreme Court, the Ninth Circuit (whose law applies for these purposes), and other courts of appeals have rejected such arguments. *See Wyoming v. Oklahoma*, 502 U.S. 437, 446 (1992); *Christianson*, 486 U.S. at 816 n.5; *Ferreira*, 93 F.3d at 674; *LaShawn*, 87 F.3d at 1394. There is no "'jurisdictional question' exception to the law-of-the-case doctrine." *LaShawn*, 87 F.3d

---

[4] Bard respectfully maintains that the District Court's finding of objective willfulness should be reviewed with deference, *see Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300 (Fed. Cir. 2012), *cert. granted*, 134 S.Ct. 48 (Oct. 1, 2013), and that objective willfulness should be an issue for the jury.

at 1394. Instead, "at some point, even jurisdictional rulings achieve a reasonable level of finality." *Ferreira*, 93 F.3d at 674.

In *Wyoming*, the Supreme Court invoked law-of-the-case principles in declining to entertain Wyoming's second challenge to Oklahoma's standing. 502 U.S. at 446. In *Christianson*, the Supreme Court held that there is "no reason to apply law-of-the-case principles less rigorously to transfer decisions that implicate the transferee's jurisdiction," reasoning that "[p]erpetual litigation of any issue—jurisdictional or nonjurisdictional—delays, and therefore threatens to deny, justice." 486 U.S. at 816 n.5. Before *Christianson*, there was some confusion among the circuits about whether the law of the case applied to jurisdictional questions. Since *Christianson*, all circuits to address the issue have applied law-of-the-case to standing. The D.C. Circuit has flatly stated that "this court and other courts of appeals routinely apply law-of-the-case preclusion to questions of jurisdiction." *LaShawn*, 87 F.3d at 1394; *see Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1076–77 (9th Cir. 2012); *Free v. Abbott Labs., Inc.*, 164 F.3d 270, 272–73 (5th Cir. 1999). Gore's brief does not address this line of

authority or the related mandate rule, which are dispositive of the standing issue on this appeal.

### 1. The Law of the Case Doctrine Precludes Relitigation of Standing Issues Previously Decided

"[T]he doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson*, 486 U.S. at 815-16.  The doctrine "serve[s] the interest of judicial economy, finality, and avoidance of 'panel shopping.'" *Toro Co. v. White Consol. Indus.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004); *see also Roberts v. Cooper*, 61 U.S. (20 How.) 467, 481 (1857).

Without so much as mentioning law-of-the-case, Gore invokes the general proposition that "federal courts have an independent obligation to examine standing at all stages of the litigation, even when it is raised *for the first time* on appeal."  Gore Br. 21.  But this appeal is not "the first time" standing has been raised, and Gore's brief ignores the fact that this Court and the District Court already have discharged their obligations to examine standing.  Where, as here, standing has been fully raised and adjudicated, Gore is not entitled to raise it again.  As

the Ninth Circuit put it in *Ferreira*, "a court that has decided that it has jurisdiction is not duty-bound to entertain thereafter a series of repetitive motions to dismiss for lack of jurisdiction." 93 F.3d at 674.

None of the cases on which Gore relies is to the contrary. None reopens a standing ruling that would otherwise be law of the case; instead all address a standing question that had never been previously raised or decided. *See United States v. Hays*, 515 U.S. 737, 742-43 (1995) (addressing standing to challenge "Act 1," which was not at issue in earlier proceedings involving "Act 42"); *FW/PBS v. Dallas*, 493 U.S. 215, 230 (1990) (addressing standing sua sponte, where "[n]either the District Court nor the Court of Appeals" previously had addressed standing); *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994).[5] Indeed, in *Fieldturf v. Southwest Recreational Industries*, 357 F.3d 1266 (Fed. Cir. 2004), which Gore cites, the Court addressed standing only

---

[5] *See also Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1300 n.1 (Fed. Cir. 2001) (addressing standing *sua sponte* and finding standing)*; Mentor H/S v. Med. Device Alliance*, 240 F.3d 1016, 1018 (Fed. Cir. 2001) (same, subject to joinder of another party)*; Pandrol USA, LP v. Airboss Ry. Prods.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003) (finding standing: "any party, and even the court *sua sponte,* can raise … standing *for the first time* at any stage of the litigation, including on appeal"); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) (redressability).

after determining that a motions judge's ruling was *not law of the case*, recognizing that if it were, it would not be free to revisit the issue. *Id.* at 1268 ("A motion to dismiss denied by the order of a single judge, however, does not become law of the case. We are *therefore* free, indeed obligated, to determine whether Fieldturf has standing…").

### 2. Standing Was Established and Is Now Law of the Case

The law of the case unquestionably applies here. The District Court twice painstakingly addressed the same arguments Gore now makes. A40-48; A49-63; A71. The District Court's orders holding Plaintiffs had standing were before this Court in the previous appeal— indeed, physically appended to Gore's brief. This Court concluded it had jurisdiction, 670 F.3d at 1178, and proceeded to the merits. Nothing has changed to alter the analysis.

The law-of-the-case doctrine applies to the first appeal, "even when the first decision regarding jurisdiction is less than explicit." *LaShawn*, 87 F.3d at 1394. In other words, it applies "to questions decided 'explicitly or by necessary implication.'" *Id.*; *see Campbell v. United States*, 878 F.2d 385 (9th Cir. 1989) (unpublished) (applying law-of-the-case to a jurisdictional the government had not appealed in a

prior appeal). In the prior appeal, this Court affirmed the two comprehensive District Court opinions, stating: "The district court had jurisdiction under 28 U.S.C. §1338(a), and we have appellate jurisdiction under 28 U.S.C. §1295(a)(1)." *Bard I*, 670 F.3d at 1178. To be sure, it did not detail its reasoning—which was unnecessary in light of Gore's concessions—but the law-of-the-case doctrine turns "on whether a court previously 'decide[d] upon a rule of law' … not on whether, or how well, it explained the decision." *Christianson*, 486 U.S. at 817; *see LaShawn*, 87 F.3d at 1394.

Even if this Court had not explicitly considered jurisdiction, it is sufficient that Gore raised standing in the District Court, the District Court resolved it, Gore failed to appeal it, and this Court affirmed. The law-of-the-case doctrine applies on a second appeal where, as here, the lower court's determination was not previously appealed. That is a "well-entrenched part of the law-of-the-case doctrine," "[f]or over one hundred years." *Macheca Transp. Co. v. Phila. Indem. Ins.*, 737 F.3d 1188, 1194, 1195 & n.6 (8th Cir. 2013) (citing cases from nine other circuits). That is because "'[i]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as

29

regards the law of the case than one who had argued and lost."'
*Campbell*, 878 F.2d 385 (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 109
(2d Cir. 1981) (Friendly, J.)); *see also Macheca*, 737 F.3d at 1195-96
("We should not permit such parties to hold in reserve an argument
regarding a particular issue…in the event they do not like the outcome
of the second trial.  To conclude otherwise would be unfair to opposing
parties, encourage piecemeal appeals, and undermine our procedural
efficiency."); *Munoz v. Imperial Cnty.*, 667 F.2d 811, 817 (9th Cir. 1982)
("We need not and do not consider a new contention that could have
been but was not raised on the prior appeal.  It is already the law of the
case."); *In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008).
Standing is thus law of the case and cannot be challenged in this second
appeal.

### 3. The Mandate Rule Also Jurisdictionally Forecloses Gore's Challenge

The mandate rule provides an additional ground for rejecting
Gore's argument.  Under the mandate rule, "[u]nless remanded by this
court, all issues within the scope of the appealed judgment are deemed
incorporated within the mandate and thus are *precluded from further
litigation*."  *Engel*, 166 F.3d at 1383; *see Tronzo v. Biomet, Inc.*, 236 F.3d

1342, 1348 & n.1 (Fed. Cir. 2001). The mandate rule—like law-of-the-case—forecloses not only issues explicitly decided in the previous appeal, but also issues *not* raised by the appellant and therefore subsumed within the mandate. *Engel*, 166 F.3d at 1382 ("The scope of the issues presented to this court on appeal must be measured by the scope of the judgment appealed from, … not by the arguments advanced by the appellant."); *see Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 (Fed. Cir. 2008); *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (mandate rule "forecloses relitigation of … issues decided by the district court but foregone on appeal").

Like law-of-the-case, the mandate rule serves interests in "finality, judicial economy, the consistency of judicial decisions, the discouragement of piecemeal adjudication, and the prevention of the perverse result of allowing a litigant to be in a better position by failing to raise an issue in an initial appeal," *Tronzo*, 236 F.3d at 1349 n.3, as well as the *additional* "interest in preserving the hierarchical structure of the court system." *Thrasher*, 483 F.3d at 982. The mandate rule is a *jurisdictional* limitation on the scope of further proceedings on remand and in further appeals. As the Ninth Circuit has explained, "[w]e have

described our mandate as limiting the district court's 'authority' on remand, which is jurisdiction language." *Thrasher*, 483 F.3d at 982; *see Luong*, 627 F.3d at 1311. This Court has similarly held that issues within the original district court judgment but not remanded are "*removed from the district court's jurisdiction*" on remand. *Engel*, 166 F.3d at 1382.

Thus, the District Court would not have had jurisdiction to reconsider standing on remand if Gore had raised it (which it did not). Likewise, this Court has no jurisdiction to reconsider the now-affirmed orders of the District Court finding standing. *Luong*, 627 F.3d at 1309 (where "the district court had no jurisdiction to rule on" issues outside the scope of the earlier remand, the court of appeals had "no power to review them").

The mandate rule unquestionably applies here. Standing was "within the scope of the appealed judgment" and not "reserved or remanded by this court." *Engel*, 166 F.3d at 1383.[6] Thus, the issues

---

[6] *TecSec, Inc. v. IBM*, 731 F.3d 1336 (Fed. Cir. 2013) is thus inapposite. There, the party had previously appealed two issues, this Court affirmed by Rule 36. The panel determined that each issue was independently sufficient to support the judgment, and it was thus "impossible to glean which issues this court decided when we issued the

open on remand—and in this appeal—are limited to the willfulness issue this Court remanded in *Bard II*. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1356 (Fed. Cir. 2009) ("The mandate rule requires that the district court follow an appellate decree as the law of the case. Therefore, according to our explicit instructions, any new trial on remand was limited to an assessment of infringement and a calculation of any damages.") (citing *Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 492, (1838)); *Luong*, 627 F.3d at 1309.

### 4. None of the Exceptions to Law of the Case or Mandate Rule Applies Here

The law-of-the-case doctrine and mandate rule have three exceptions: where "(1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of the law inapplicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice." *Ormco Corp. v. Align Tech.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007);

---

Rule 36 judgment." *Id.* at 1341. Here, this Court necessarily assured itself of jurisdiction. Regardless, Gore did not even appeal standing in the first appeal, making this a straightforward application of *Engel*. *See* 166 F.3d at 1382-83.

*Ferreira*, 93 F.3d at 674. Gore does not attempt to show that any applies.

*First*, there has been no change in evidence or circumstances since the previous appeal. Indeed, Gore's arguments and evidence are exactly the same now as they were before the District Court more than five years ago.

*Second*, Gore identifies no change in controlling legal authority, and Plaintiffs are aware of none.

*Third*, Gore makes no showing that the prior standing decisions were clearly wrong, much less that they work a manifest injustice. If any injustice is afoot, it is Gore's attempt to relitigate standing at this late date, after the District Court granted Appellees' motion for execution on the "final and non-appealable" aspects of the judgment. *See Christianson*, 486 U.S. at 816 n.5. The District Court held that even if Gore's standing argument were correct, it would allow Appellees to amend the complaint to add C.R.Bard as a plaintiff, which would cure any defect. A63 n.6. It would be manifestly unjust to allow Gore to hold its standing argument in reserve until all its other arguments were exhausted, and then spring it on this Court *after the executed judgment*

*has been collected* without permitting Appellees to effect the technical cure the District Court was willing to permit. *See, e.g., Macheca*, 737 F.3d at 1195-96. This is not a case where the judgment threatens Gore's existence; to the contrary, the royalty was crafted by the District Court to allow Gore to continue to make a profit, and Gore has already paid the portion of the judgment this Court previously affirmed.

Moreover, C.R.Bard fully participated in this litigation as a counterclaim defendant. Thus, the purported failure of Appellees to add C.R.Bard as a plaintiff had no practical or substantive consequence. *Evident Corp. v. Church & Dwight Co.*, 399 F.3d 1310, 1314 (Fed. Cir. 2005) (the "policy concerns motivating the need for a patent owner to be joined in an infringement suit with its licensee" are "surely met" where the patentee was "joined as a third-party defendant").

### B. The Facts Relevant to Standing Are Conclusively Established and Clearly Demonstrate Standing

Even setting aside law-of-the-case and the mandate rule, Gore misstates the law by arguing that the *facts* determined below are now subject to *de novo* review. Even if standing could be challenged at this stage, the District Court's factual findings, which are far from clearly erroneous, are binding. In addition, after foregoing its right to

challenge those findings in the first appeal, Gore has waived any objections to those findings and cannot escape the consequences of that waiver merely because the *facts* have jurisdictional significance.

Although parties cannot consent to jurisdiction where there is no legal basis for jurisdiction, "the parties *may admit the existence of facts* which show jurisdiction, and the courts may act judicially upon such an admission." *Ry. Co. v. Ramsey*, 89 U.S. (22 Wall.) 322, 327 (1875). That distinction is well established. *See, e.g.*, *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 (4th Cir. 2004); *Ferguson v. Neighborhood Hous. Servs. of Cleveland*, 780 F.2d 549, 550-51 (6th Cir. 1986) (citing *Ramsey*; noting "distinction between an admission that federal subject matter jurisdiction exists, and an admission of *facts* serving in part to establish federal subject matter jurisdiction"); *Verzosa v. Merrill Lynch, Pierce, Fenner & Smith*, 589 F.2d 974, 977 (9th Cir. 1978). The jurisdictional nature of standing does not entitle a defendant to seek *de novo* consideration of the *facts* underlying a prior determination of standing. *See Ferguson*, 780 F.2d at 551 ("The early elimination of litigation over *facts* forming the basis of the court's jurisdiction should be encouraged."). Having chosen not to appeal the District Court's factual

findings on standing in the previous appeal, Gore has conceded them and may not now relitigate them.

Gore's standing challenge depends on *factual* assertions rejected by the District Court. The District Court resolved the fact-intensive issue after considering the record, including interpreting ambiguous agreements and making factual findings about transactions in the 1980s and 1990s. These findings demonstrate conclusively that Goldfarb retained substantial rights in the patent, and was therefore the patentee, until years after the lawsuit was filed; that C.R. Bard transferred all its interests in the patent to BPV no later than 1997; and that BPV was at least an exclusive licensee by the late 1990s. That is sufficient to show that the co-plaintiffs, Goldfarb and BPV, had standing to sue in 2002, and that C.R. Bard did not need to be joined as a co-plaintiff.

- Dr. Goldfarb did not transfer all substantial rights to C.R.Bard under the 1980 License. *See* A50 ("Dr. Goldfarb retains substantial rights in the 1980 agreement. ...") (quoting A43); A44 ("Dr. Goldfarb retained substantial rights to his patent application.").

- "Dr. Goldfarb and C.R. Bard *intended* the 1980 agreement to be a license not an assignment." A58.

37

- The right to sue under the 1980 License "is limited to third party challenges to validity and does not grant C.R. Bard the exclusive right to sue for all infringement." A58 (construing ambiguous contract language).

- The "1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact license" demonstrated by the parties' subsequent conduct. A50.

- The 1997 agreement was by and among IMPRA, C.R.Bard, and Dr. Goldfarb. A54-55.

- Mr. McDermott executed the 1997 agreement on behalf of both IMPRA and C.R.Bard. A54-55.

- "[B]y at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV." A44; A51.

Gore not only failed to challenge these findings in the previous appeal; it accepted them. In its opening brief (and in its certiorari petition), Gore affirmatively represented that there was jurisdiction and made factual representations consistent with the District Court's findings. For example, Gore told this Court in its opening brief:

- "The patent was issued to Dr. David Goldfarb ('Goldfarb') *and is now assigned to Bard Peripheral Vascular* ('BardPV')." A27589.

- The patent was assigned to BPV (previously known as IMPRA) by Goldfarb "in 2007, some years after Bard acquired IMPRA." A27612 n.10.

- BardPV is *Goldfarb's* "assignee." A27597.

These are Gore's *factual* admissions, and they necessarily contradict Gore's present argument that Goldfarb lacked substantial rights when suit was filed in 2003. *See* Gore Br. 13 n.4. After all, Goldfarb could not have assigned the patent to BPV in 2007 (as Gore previously conceded he did) if he had assigned it to C.R.Bard in 1980 (as Gore now argues).

Because Gore failed in the prior appeal to challenge—indeed, conceded—the facts underlying the District Court's standing ruling, Gore cannot challenge those facts on this appeal. *See Gebhart v. SEC*, 595 F.3d 1034, 1045 (9th Cir. 2010) (petitioners "waived their challenges to the SEC's factual findings ... by failing to raise them in their prior appeal"); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1343 (Fed. Cir. 2000) (defendant estopped from objecting to factual findings due to its failure to timely appeal). As this Court has recognized in analogous contexts, even where a legal issue remains subject to review, the *factual* findings underpinning that determination cannot be reconsidered on appeal if a party fails to preserve a challenge to those *factual* determinations. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010), *aff'd* 131 S.Ct. 2238 (2011); *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1108 (Fed. Cir. 2003).

## C.    The District Court Did Not Clearly Err In Finding Facts Establishing That Plaintiffs Had Standing

Finally, even if this Court were to review the District Court's factual findings underlying its determination of standing, those findings are not clearly erroneous.  The District Court twice correctly found that Goldfarb remained the patentee at the time the lawsuit was filed because he had not transferred "all substantial rights" in the patent, and BPV was the exclusive licensee at that time.  It is well established that the exclusive licensee and the patentee together have standing to sue for infringement.

### 1.    The District Court's Factual Findings Are Reviewed for Clear Error, Based on the Trial Court Record

Gore misstates the standard and scope of this Court's review.  As to the standard, a trial court's ultimate determination of standing is reviewed de novo, but the "underlying fact findings are reviewed for clear error."  *See Digitalis*, 664 F.3d at 1384; *Barnum Timber Co. v. E.P.A.*, 633 F.3d 894, 905 (9th Cir. 2011) ("The Court reviews the district court's factual findings relevant to standing for clear error."); *Enovsys*, 614 F.3d at 1341.

40

Gore blurs that distinction by arguing that that "the district court was incorrect as a matter of law on each point." Gore Br. 26. The District Court, however, understood the distinction between legal conclusions and factual findings, and many years ago corrected that same misstatement by Gore. A50 (Gore "ignores the factual findings the Court has previously made based on the record evidence.").

As to the scope of review, Gore also improperly relies on materials not in the record, including hearsay from a New Jersey proceeding. Gore Br. 15-16. Again, the District Court rejected Gore's same attempt in 2009—noting that Gore could not rely "on documents and deposition testimony that ... are not in evidence and were not presented during the trial." A51. Gore never appealed that evidentiary ruling.

After a trial court rules on standing "based upon a fully developed record," *Pandrol*, 320 F.3d at 1367, the court of appeals determines standing based on that record. *Id.* While some circumstances (*e.g.*, mootness) permit appellate courts to look beyond the trial record, *see Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003), not so here. Regardless, "even if supplementation of the record were permissible … Gore's reliance on inadmissible testimony is not because 'any evidence

submitted outside the pleadings [must] be competent.'"   A52 (quoting *Kamen v. AT&T*, 791 F.2d 1006, 1011 (2d Cir. 1986)).   Extra-record hearsay cannot impugn the District Court's findings.[7]

## 2.    The District Court Correctly Found Standing

Even if the Court were to permit Gore to relitigate standing, Gore cannot prevail unless it shows that Goldfarb and BPV lacked standing. The District Court correctly found that Goldfarb had standing as patentee because he had not assigned (and had only licensed) his patent to C.R.Bard.   It also correctly found that BPV had constitutional standing as exclusive licensee, having at least an implied-in-fact license by 1996 and a confirmed written license by 1997.

### a.    Goldfarb Had Standing Because He Did Not Transfer "All Substantial Rights" In The '135 Patent

Gore argues that Goldfarb transferred all substantial rights in the patent to C.R.Bard in the 1980 license agreement.   Gore Br. 23–37.   The District Court found to the contrary.

---

[7] That hearsay does not support Gore in any event.   Mr. Flink did not testify there was no transfer from C.R.Bard to BPV, but only that he had *no personal knowledge one way or the other*.   A4220 ("And if my assumption or my knowledge is incorrect and in fact it did occur, then I'm incorrect.").)

As Gore recognizes, the question whether a transaction transferred all substantial rights is intensely fact-bound and requires examination of "the record… as a whole." Gore Br. 23. The court "must ascertain the *intention* of the parties and examine the *substance* of what was granted by the agreement," *Fieldturf*, 357 F.3d at 1269, and should also "consider rights retained by the grantor in addition to rights transferred to the grantee." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1342 (Fed. Cir. 2001).

The District Court performed that fact-intensive analysis, *see* A56-59, and properly found that the parties did not intend the 1980 License agreement to assign ownership of the patent, and that Goldfarb retained specific substantial rights, including: "the right to share in any damages recovered from enforcement or licensing of the '135 patent"; "significant reversionary rights"; and rights to "a category of products ('heart valves')" excluded from the license's "subject matter." A53; A40.

Those findings are amply supported.

*First*, Gore is wrong to argue that the 1980 license gave C.R.Bard the exclusive right to sue for infringement of the '135 patent. The District Court rejected Gore's reading, which Gore admits is at best an

43

"awkward" reading of ambiguous language. Gore Br. 32. C.R.Bard's right is limited to "all actions and claims against third parties for infringement of any PATENTS *brought against Dr. GOLDFARB or USCI seeking to declare a PATENT invalid.*" A58 (quoting A7920). "By its terms, therefore, this right ... does not grant C.R. Bard the exclusive right to sue for all infringement as Gore contends." A58; *see also Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 979 (Fed. Cir. 2005) (right to sue for "commercial" infringement only is not an assignment). Moreover, the District Court found that the agreement contemplated Goldfarb's active participation in litigation because recovery was tied to the sharing of litigation costs. A58 (citing A7920-22). In any event, although a licensor's *retention* of "a right to sue accused infringers … often precludes a finding that all substantial rights were transferred to the licensee," *Alfred E. Mann Fund v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010), *granting* a limited right to sue does not suffice to create an assignment.

Indeed, this Court has "recognize[d] that limits on the assignment of rights are a factor weighing in favor of finding a transfer of fewer than all substantial rights." *Intellectual Prop. Dev.*, 248 F.3d at 1345.

The District Court also relied on limitations on C.R.Bard's ability to assign without Goldfarb's consent. Without consent, C.R.Bard could transfer its right only to "any successor to or purchaser of all or substantially all of its VASCULAR PROSTHESIS business." A59 (quoting A7924). Gore contends that restriction was illusory because C.R.Bard had "virtually unlimited right to sublicense the '135 patent to third parties" since there was "no lower limit on the potential sublicense royalty rate." Gore Br. 36. However, the license required C.R.Bard, except under limited circumstances, to "pay to DR. GOLDFARB a royalty of 5% of the NET SELLING PRICE of such products as are sold by the third party." A7920. The District Court did not clearly err in finding that the parties intended the 1980 agreement to be what it said it was—an exclusive license, not an assignment of the patent.

*Second*, the 1980 license excludes a category of products—heart valves—from its scope. It is, at most, a "field of use" license that cannot confer "all substantial rights." *See, e.g.*, *A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1217-19 (Fed. Cir. 2010); *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278 (Fed. Cir. 2007). That restriction demonstrates a lack of intent for the license to be an

assignment. The District Court rejected as "baseless" Gore's argument that the heart-valve exclusion was illusory. A58 n.4. Gore similarly argues that the exclusion did not apply to the '135 patent because the corresponding application was listed in Exhibit A of the license. Gore Br. 29. Again, the District Court properly concluded otherwise. A57-58 & n.4. Exhibit A does not limit the applicability of the field-of-use restriction. A7927-28. Nor could it. By its terms the "HEART VALVE" restriction applies across-the-board to *all* inventions within the "subject matter" of the license. Although the agreement relates to prostheses for "blood vessels" generally, A7909, the field-of-use restriction carves out a specific type of blood vessel for which use is not licensed. *Id.* ("blood vessels of the human body except HEART VALVES"); *see* A57-58 & n.4.

*Third*, the District Court found that Goldfarb retained an ownership interest in any patent C.R.Bard abandoned, with "any patent so obtained … not … subject this LICENSE," and was entitled to royalties irrespective of the prosecution or maintenance of any patents, *see* A58; A7910; A7915. Unlike the cases Gore cites, Gore Br. 30-31, that was not a mere reversionary interest. As the District Court found,

Goldfarb's interest was a substantive right to the applications themselves that did not require a breach.

*Fourth*, the 1997 agreement confirms the parties' intent in 1980 to enter an exclusive *license* agreement, not an assignment. To conclude otherwise would render the three-way 1997 Agreement void of any legitimate purpose. Gore has identified no reason for Goldfarb, C.R.Bard, or BPV to have engaged in gamesmanship in 1997, years before the patent issued and this litigation began; no such reason exists. Nor is there any basis to second-guess the District Court's credibility determinations, where the District Court observed McDermott and Goldfarb (the signatories to the 1997 Agreement) testify in person.

*Fifth*, the patent confirms that Goldfarb remained the patentee even after his agreements with C.R.Bard. When the '135 patent issued in 2002—years after Goldfarb entered the original license agreement with C.R.Bard—the PTO issued it in Goldfarb's name, not in C.R.Bard's name as an assignee. A47046; *see* 35 U.S.C. §152 ("Patents may be granted to the assignee of the inventor of record in the [PTO]"). If C.R.Bard had acquired an assignment of this extraordinarily valuable

patent application in 1980, it would surely have insisted that it be recognized as the assignee when the patent issued.

*Finally*, the 2007 assignment from Goldfarb to BPV further confirms that the 1980 agreement was a license and that "Dr. Goldfarb [was] the sole owner of all right and interest in and to" the patent. A23427. Under Gore's theory, that assignment was illusory, because in that event Goldfarb had nothing to assign, *see* Gore Br. 13 n.4. Gore, however, repeatedly represented to this Court without qualification that Goldfarb assigned the patent to BPV in 2007. *See* A27589; A27612 n.10; A27593, quoted p. 38, *supra*. In sum, the record clearly established that the 1980 agreement was an exclusive license, not an assignment, and that Goldfarb had standing as the patentee.

### b. BPV Has Standing Because It Is The Exclusive Licensee

Exclusive licensees have constitutional standing to sue for infringement. *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264-65 (Fed. Cir. 2010) (collecting cases). Gore contends that BPV lacked standing because (1) Goldfarb purportedly assigned the patent to C.R.Bard in 1980, and (2) any transfer of interests from C.R.Bard to BPV was ineffective because it was not in writing. That argument fails

for three reasons. *First*, as just discussed, §I.C.2.a, *supra*, Goldfarb gave C.R.Bard an exclusive license, not an assignment of the patent. *Second*, it is well settled that an exclusive license can be granted or transferred orally—even implicitly—and the District Court found based on the record that BPV had "at least" an implied-in-fact exclusive license. *Third*, the District Court found that the 1997 written agreement, executed before this litigation began, transferred all of C.R.Bard's interests to BPV. C.R.Bard's absence as a plaintiff is, thus, irrelevant to standing.

Gore argues that "[t]he absence of a written instrument is dispositive of the standing issue with respect to IMPRA/BPV." Gore Br. 40. The District Court properly rejected that argument: "Gore's argument that all assignments of exclusive licenses are required to be in writing is both wrong as a matter of law and irrelevant in light of the Court's express factual findings." A51. Although 35 U.S.C. §261 requires that *patent assignments* be in writing, it is well-settled that the grant or transfer of "[a]n exclusive license need not be in writing"; rather, it "may be written, oral, or implied-in-fact." A42; *see Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed. Cir. 2003) ("Only

assignments need be in writing … Licenses may be oral."); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (en banc) ("To be an exclusive licensee for standing purposes, a party must have received … the patentee's express *or implied* promise" of exclusivity). Thus, even if Gore were correct that Goldfarb transferred the patent to C.R.Bard in 1980, no written agreement was required for C.R.Bard to make BPV its exclusive licensee, which is sufficient for constitutional standing. *See id.*; *see also Ricoh Co. v. Nashua Corp.*, 947 F. Supp. 21, 24 (D.N.H. 1996) (finding implied exclusive license to wholly-owned subsidiary); *Steelcase Inc., v. Smart Techs. Inc.*, 336 F. Supp. 2d 714, 718 (W.D. Mich. 2004) (finding implied exclusive license to parent corporation).

As a factual matter, the District Court found that as of 1996, there was "at least an implied-in-fact transfer of the license to Impra/BPV" from C.R.Bard, which was sufficient for BPV to be the exclusive licensee. A59 (quoting A43); A50. That finding was based on the District Court's review of the record:

- "Impra/BPV assumed all rights and responsibilities for the license including the right to sue to enforce the patent, provided it joined Dr. Goldfarb, the patent title holder at the time." A43.

50

- "In further support of an implied-in-fact transfer of the exclusive agreement is the testimony of then-president of Impra[BPV], John McDermott, that pursuant to the transfer, Impra[BPV] assumed the obligation to pay Dr. Goldfarb royalties as his licensee." A43 (citing A24892-93).

- The 1997 Amendment "confirmed" that BPV at least had an "implied-in-fact" exclusive license. A60.

- Goldfarb's subsequent "2007 assignment of the '135 patent to BPV" further confirmed that BPV has the exclusive licensee. A60.

As the District Court found, whether Goldfarb or C.R.Bard was the patentee, "all relevant parties—Dr. Goldfarb, Impra/BPV, and C.R. Bard—treated BPV as the exclusive licensee." A60. That factual finding that BPV was at least the implied-in-fact exclusive licensee is amply supported.[8]

Accordingly, Gore's reliance on *Enzo APA & Son, Inc. v. Geapag, A.G.*, 134 F.3d 1090 (Fed. Cir. 1998) is unavailing. In *Enzo*, the plaintiff asserted standing based on a "virtual" (but unwritten) assignment. *Id.* at 1093. By contrast, no written agreement was required for BPV to be exclusive licensee (and have constitutional standing). *Enzo* itself

---

[8] BPV also at least acted as the exclusive licensee in entering sublicenses with third parties, wherein BPV represented that it "holds certain license rights under" the Goldfarb patent, "including the right to grant sublicenses,"A14896, and filing complaints in other litigation, *see, e.g.*, *Bard Peripheral Vascular, Inc. v. Atrium Med. Corp.*, No. 10-cv-1694 (D. Ariz.).

acknowledges that "a license may be written, verbal, or implied," *id.*, and that a writing is required only if a license is advanced "as a virtual assignment to assert standing." *Id.; see also* A44.

To the extent a written agreement was required—and none was—the court also correctly found that "by at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV." A61 (quoting A44); A51 (same). And, even if confirmatory (as Gore contends), that writing pre-dates this litigation by years. By contrast, *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008), on which Gore relies, involved a mid-litigation defective written transfer of *title* that was termed a "Confirmation Agreement," not a pre-litigation written "Agreement Amending License Agreement" at issue here. A45-47. As the District Court explained:

> [T]he 1997 written Agreement Amending License Agreement was not merely "confirmatory" as Gore contends. Rather, the 1997 Agreement created a new license agreement between Dr. Goldfarb and Impra/BPV. … Thus, unlike *Mars* where the Confirmation Agreement merely "acknowledged" that Mars owned the patents, here, the 1997 Agreement expressly transferred in writing the rights from C.R. Bard to Impra/BPV and actually enhanced those rights by granting additional rights to Impra/BPV that Dr. Goldfarb had previously retained. Moreover, also distinguishable from *Mars*, here, the owner of the patent title—Dr. Goldfarb—was

a plaintiff at the commencement of the lawsuit and has remained a plaintiff throughout the entire litigation.

A46-47.

Gore insinuates that C.R.Bard and BPV obtained some advantage by joining BPV in this suit, despite representing in other contexts that C.R.Bard was the exclusive licensee. There is no inconsistency, nor any advantage. C.R.Bard brought the New Jersey litigation because *it* was the counterparty to a 1984 agreement with Gore. Even after the transfer of its exclusive license to BPV, C.R.Bard (as BPV's parent) remained the ultimate beneficiary.

Likewise, Gore's references to certificates of interest in *Cooper I* and *Cooper II* are makeweight. Those certificates were to help this Court determine recusal issues, and Goldfarb's counsel properly identified C.R.Bard as a real party in interest, because it is the publicly-traded entity that wholly owned BPV, the exclusive licensee.

Gore also baldly asserts that naming BPV enabled Plaintiffs to "seek maximum infringement damages against Gore," Gore Br. 43, but Gore never made any argument to the District Court to that effect, and never gave the District Court (or the jury) the opportunity to make *factual* determinations about any such differences. Gore, not Appellees,

is engaging in "revisionist history" in hopes of undoing the now-executed judgment of liability that this Court previously affirmed.

### c. BPV's Constitutional Standing Is Sufficient

Finally, even *if* Gore were somehow correct that Goldfarb assigned (rather than licensed) the patent to C.R.Bard in the 1980 Agreement, standing would merely require joining C.R.Bard as a plaintiff, in addition to being a counterclaim defendant. It would not require dismissal as Gore urges. BPV is the exclusive licensee—whether licensed by Goldfarb or C.R.Bard—and has constitutional standing as such. *WiAV*, 631 F.3d at 1264-65. Any failure to join C.R.Bard would thus be a matter of prudential standing that can be cured at any time. *See Mentor H/S*, 240 F.3d at 1019. In *Mentor*, this Court invited the exclusive licensee to file a motion to add the patent owner to correct any lack of standing. In this case, the District Court specifically held that it would grant such a motion, if necessary. A63 n.6 ("If it appeared to the Court that standing was an issue here and that to have standing C.R.Bard is a necessary plaintiff, the Court would grant Plaintiffs leave to amend the Complaint under Fed.R.Civ.P. 15 and 21. … However, the

Court finds standing exists with the current Plaintiffs and does not find amendment necessary.").

Even that simple remedial step would be unnecessary because C.R.Bard has been a party to this lawsuit from the time Gore filed its answer and named C.R.Bard as a defendant to its counterclaims of non-infringement and invalidity.[9]  In *Evident*, this Court held that the "policy concerns motivating the need for a patent owner to be joined in an infringement suit with its licensee" are "surely met" where the patentee was "joined as third-party defendant."   399 F.3d at 1314. Joining C.R.Bard cured any technical defect that might have existed in the initial complaint (and none did).

## II.   The Willfulness Ruling Should Be Affirmed

Turning to the only issue properly presented in this appeal, the District Court's determination that Gore's infringement was objectively willful should be affirmed.  On remand, Judge Murguia—who presided over all seven years of the prior proceedings—performed the

---

[9] Because C.R.Bard is a counterclaim-defendant, even if the Court reached and accepted all of Gore's standing arguments, and also rejected BPV as the exclusive licensee, that would not result in dismissal, because C.R.Bard is a party to the judgment that Gore infringes and that the patent is not invalid.  A73-81.

"*retrospective* assessment of the merits of the entire litigation … '*based on the record* ultimately made in the infringement proceedings,'" as required by *Highmark*, 687 F.3d at 1310, and properly found that Gore's defenses were objectively unreasonable.

Unlike most willfulness cases, notice of the patent-in-suit was not at issue, nor were Gore's defenses untested in litigation. Indeed, the PTO found as early as 1981 that Goldfarb was the sole inventor of his application and specifically rejected the notion that Cooper or any others were co-inventors. A47640; A47630-31. The bulk of Gore's invalidity defenses at trial were fully aired and rejected by the PTO during prosecution of the Goldfarb and Cooper applications, and the interference. Importantly, the PTO strongly rejected the narrative behind Gore's joint-inventorship defense, and this Court affirmed: "This is *not* a case where a party conceives the invention, and then sends out the apparatus or compound in question to another for testing to confirm that the apparatus or compound will function to achieve the result intended by the conceiver." A36166, *aff'd, Cooper II*.

As the District Court put it in 2009, "Defendant spent decades fighting before the PTO and the Federal Circuit to patent the Goldfarb

invention as its own and block issuance of the '135 patent in Dr. Goldfarb's name, only then to attack the validity of that patent with every tool in the toolbox once it was issued." A4676. Any good-faith basis Gore may have had for asserting that Cooper was a joint inventor was gone well before this litigation commenced. The evidence at trial clearly bore that out. A6-A11.

### A. The District Court Followed the Remand Instructions and Properly Found Gore's Defenses Objectively Unreasonable

#### 1. The Jury's Fact Findings Underlying Gore's Inventorship are Supported By Substantial Evidence

Willful infringement requires "a showing of objective recklessness," which must be "determined by the record developed in the infringement proceeding." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). "[T]he threshold objective prong … is a question of law based on underlying mixed questions of law and fact." *Bard II*, 682 F.3d at 1005, 1008. Thus, although "the judge remains the final arbiter of whether the defense was reasonable," "the judge may when the defense is a question of fact or a mixed question of law and fact allow the jury to determine the underlying facts relevant to the defense in the first instance." *Id.* at 1007-8.

Here, the jury resolved the facts underlying Gore's joint-inventorship defense, and those underlying factual findings are binding. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959). Thus, this Court—like in the review of obviousness following a jury's verdict—must decide the ultimate question as a matter of law, but is "required to accept all implicit factual findings supporting the jury's conclusion with respect to the ultimate conclusion … that [are] supported by substantial evidence." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). Gore does not claim that the findings underlying the jury's rejection of Gore's joint-inventorship defense are unsupported by substantial evidence. *See Bard I*, 670 F.3d at 1182. That leaves only a review of whether those fact findings support the legal conclusion of objective willfulness or, in other words, given the findings, whether the joint-inventorship defense was reasonable as a matter of law. *See Kinetic Concepts*, 688 F.3d at 1360; *R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1513 (Fed. Cir. 1984).

Although the District Court correctly interpreted *Bard II* as requiring it to accept the jury's findings of fact, in an abundance of

caution, the District Court also conducted its own independent assessment of the record. It concluded that "*[u]nder either standard*, it is clear to this Court, just as it was to the jury, that Defendant, as a 'reasonable litigant,' could not have 'realistically expected' its defenses to succeed." A19.

### 2. No "Reasonable Litigant" Could "Realistically Expect" Gore's Joint Inventorship Defense To Succeed

This Court directed the District Court on remand to consider four defenses that Gore "says were 'reasonable': inventorship, inadequate written description, obviousness, and anticipation." *Bard II*, 682 F.3d at 1008. Gore abandoned two of those on remand, and it argues here only that its defense of joint inventorship between Cooper and Goldfarb was reasonable. The District Court's assessment of that defense is well-founded in the record, A6-11, A19, including the interference record this Court reviewed in *Cooper I* and *II*. Gore has not demonstrated error.

Joint inventorship is a question of law "based on underlying facts." *Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009). To succeed, Gore had to prove, by clear and convincing evidence, that Cooper "(1) contribute[d] in some significant manner to the conception

or reduction to practice of the invention, (2) ma[de] a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) d[id] more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Bard I*, 670 F.3d at 1180 (quoting *Pannu v. Iolab*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)). Joint inventorship also requires "collaboration or concerted effort." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004).

As Gore has conceded, A6431, the law is clear that one who suggests to an inventor a result without the means of accomplishing it or merely explains the state of the art is not a joint inventor. *Hess v. Advanced Cardiovascular Sys.*, 106 F.3d 976, 981 (Fed. Cir. 1997); *Garrett Corp. v. United States*, 422 F.2d 874, 881 (Ct. Cl. 1970). Cooper never collaborated with Goldfarb on the claimed invention, and the only communications from Cooper were grossly insufficient to establish joint-inventorship.

The suggestion that ePTFE was potentially useful for a vascular graft was not new. Cooper's written communications to Goldfarb consisted of two short cover notes, A41135; A41136, sent with

undifferentiated—and in one instance, punctured—tubes. *Bard I*, 670 F.3d at 1183. The evidence showed that the notes in fact were misdirection, and that Goldfarb succeeded by disregarding it.

Cooper's first note, on February 14, 1973, accompanied a box of undifferentiated ePTFE tubes in "a variety of sizes," for "your [Goldfarb's] animal artery prosthetic experiments … to help you [Goldfarb] with your project." A41135; *Bard I*, 670 F.3d at 1182. The second note, sent April 19, 1973, accompanied tubes that had been punctured with a sewing needle in Gore's "latest attempt to achieve satisfactory patency rates," and so-called "[u]p-to-date research reports." A41136. As the evidence showed, those "research reports" merely reflected the state-of-the-art failures by others and mistakenly focused on macroscopic properties such as porosity, pore size, stiffness, and density. A26314; A43867; A43979; A40904. And the sewing-needle punctures in fact destroyed the critical microstructure of the ePTFE tubes. A23624; A37996. Goldfarb achieved his invention by disregarding both the research reports' focus on *macroscopic* properties and Gore's suggestion of sewing-needle punctures, focusing instead on

the *microscopic* structure in the undamaged portions of the ePTFE tubes. A23624; A37996.

Beyond those two notes, the evidence showed that Cooper had almost no other interaction with Dr. Goldfarb, *Bard I*, 670 F.3d at 1182 (quoting A23656-57); *id.* at 1183, and that when Cooper sent the tubes, he had no clue about the relevance of the microstructure. *Cooper II*, 240 F.3d at 1381. In the 1970s, ePTFE was manufactured by hand, without controlling for internodal distance, and that property "var[ied] along each tube … not only from graft to graft, but within the same graft." *Cooper I*, 154 F.3d at 1329.

Gore's assertion that Cooper provided the "embodiment" of the invention, Gore Br. 52, misses the point. Cooper provided numerous doctors with ePTFE tubes, *see* A7453-60, but none was able to make a consistently successful graft; the record is replete with their failures. *See, e.g.*, A43024 (grafts "bled like stink"); A45456 (grafts "clotted in two attempts"); A45507 (grafts "completely thrombosed"); A40886 ("we are doing something wrong."). Until Goldfarb discovered internodal distance as the key parameter and discovered the proper internodal

distance, no one (certainly not Cooper) understood how to make a consistently successful graft.

Goldfarb conceived and reduced his invention to practice using his own laboratory, through his own experiments, without input from Cooper who merely supplied the raw materials and, rather than aiding Goldfarb, misdirected him. No one instructed Goldfarb on his experiments or what grafts to use. *See, e.g.*, A37553-55; *Bard I*, 670 F.3d at 1181-82.

The PTO record, which was in evidence at trial, confirmed that Cooper was not a co-inventor. *First*, in 1979 the patent examiner investigated whether, as to Goldfarb's application, the proper inventor was Goldfarb, Cooper, others, or some combination, A47630-31, and concluded that Goldfarb was the sole inventor. A47640. *Then,* after a decades-long interference, the PTO held—and this Court affirmed—that Goldfarb had rightful priority to the invention, that his reduction to practice did not inure to Cooper's benefit, and that "[t]his is not a case where a party conceives the invention, and then sends out the apparatus or compound in question to another for testing to confirm that the apparatus or compound will function to achieve the result

intended by the conceiver." A36166; *aff'd*, *Cooper II*, 240 F.3d at 1385-86.

The District Court—like the jury—saw Cooper struggle and fail to identify any meaningful contribution he made. A10-11. Cooper could not recall when he had purportedly developed a range of fibril lengths that would be suitable for a graft. A10-11; A25005-06; Supp.Video.Appx.(1:45-3:26). He claimed he was aware of the five micron limit, but could not recall how, nor could he recall telling anyone about that limit. A10-11; Supp.Video.Appx.(1:45-3:26). He conceded his only contribution was that "due to my work, these tubes were created and put into David Goldfarb's hands." A10-11; A25007-08; Supp.Video.Appx.(3:27-5:15). And even *after* applying for the patent, Cooper had to take Goldfarb's research slides "to help him understand an invention that he apparently did not comprehend." A11.

Testimony from Gore employees with firsthand knowledge further belied any suggestion that Cooper made a significant contribution to the invention. Witnesses described Cooper as a "hindrance," A25190:12-17, noted "no discussion of substance" from Cooper to Goldfarb, A28563:1-2, and that it was Goldfarb who explained "the characteristics that were

ideal for the synthetic artery" to Cooper. A28557:12-15. Gore employees strongly disagreed with Gore's claim that Cooper was an inventor. Dan Detton, *Gore's* witness, testified that Cooper "didn't feel his name should have been on" Gore's patent application and "apologize[d] about it." A25197-98; *see also* A29844-45. Mendenhall testified that naming Cooper as an inventor "was a mind blower, no one could believe it was done. That in my business career is probably the most unethical thing I have ever seen done in my life. It is just not true." A29888.

At the end of the day, as the District Court found, it was not reasonable for Gore to expect to succeed on its joint inventorship defense. The court summed up:

> The PTO and the Federal Circuit found that Dr. Goldfarb's work did not inure to Cooper or to Defendant's credit. Cooper's action of providing the ePTFE tubes to Dr. Goldfarb was insignificant as the evidence shows that he punctured the tubes, he erroneously focused on porosity, and that, after applying for the patent, he took Dr. Goldfarb's research slides to help him understand an invention that he apparently did not comprehend. Cooper did not control or direct Dr. Goldfarb's experiments and Cooper admitted that he did not convey the importance of fibril length to Dr. Goldfarb. Indeed, Defendant's steps in pursuing the joint inventorship defense can be deemed reckless. The PTO considered and rejected Defendant's contention that Cooper was the prior inventor, there was essentially no evidence

that Cooper collaborated in any meaningful way with Dr. Goldfarb, and Defendant's own employees denied that Cooper contributed to the invention. Defendant could not have realistically expected to succeed on its joint inventorship defense. A11.

In light of these facts, no objective, reasonable litigant could have believed it could prove the patent invalid by clear and convincing evidence.

### 3. Gore's Arguments Are Unavailing

On appeal, Gore spins its own tale, as though the remand was a meaningless exercise and factual issues can be litigated anew. Gore's self-serving assertion that "a robust record establish[ed] the substantial work done by Peter Cooper," Gore Br. 47, denies reality and bears no resemblance to the facts found by the jury and the District Court.

Gore, contends that "[a]t a high level … plaintiffs' lawsuit on its face appears anomalous" because Gore allegedly developed ePTFE and suggested its use as an artificial graft, making much of the fact that Goldfarb had not previously worked with ePTFE. Gore Br. 50. But Goldfarb's invention is not ePTFE, or even the general notion of using ePTFE as a vascular graft. The claimed invention is a vascular graft made of ePTFE with a very specific microstructure, the microstructure

Goldfarb discovered and reduced to practice. *Bard I*, 670 F.3d at 1183.[10] Cooper did not suggest any means of accomplishing the result (a working ePTFE vascular graft) other than the erroneous suggestion to puncture the tubes with sewing needles and focus on macroscopic properties. Gore points to Cooper's purported conception of the requisite internodal distance, but *that was never shared with Goldfarb* and cannot be said to have contributed to *Goldfarb's* discovery. *Cooper II*, 240 F.3d at 1385 ("Cooper admit[ted] … he did not convey [the importance of fibril length] to Goldfarb. He also admits that he did not ask Goldfarb to use grafts with fibril lengths required by the interference count, or to determine the fibril lengths of successful grafts."). Although inurement and joint inventorship are not identical inquiries, there is much overlap, and many of the factual underpinnings of Gore's joint inventorship defense were advanced and rejected during the interference. *Bard I*, 670 F.3d at 1182; *Cooper II*, 240 F.3d at 1385.

Gore's reasonableness defense also ignores the relevant legal standards. *First*, Gore claims that §116 "sets no explicit lower limit on the quantum or quality of inventive contribution required for a person

---

[10] In any event, Cooper did not invent ePTFE or manufacture the ePTFE tubes provided to Goldfarb.

to qualify as a joint inventor." Gore Br. 48. It does not follow, however, that any claim of joint inventorship is objectively reasonable. To the contrary, the law is clear that suggesting a result without a means of accomplishing it, or merely explaining the state of the art will not suffice. *Hess*, 106 F.3d at 981; *Garrett*, 422 F.2d at 881.

*Second*, Gore asks the Court to go beyond the trial record and essentially defer to the dissent in *Bard I*—arguing that mere existence of a dissent in the prior appeal "should end the inquiry," because whenever "a federal judge has agreed with a party's claim or defense … the claim or defense cannot be baseless." Gore Br. 55. That argument is fundamentally mistaken.

If Gore were correct, remand would not have been justified; rather, this Court would have been required to reverse on willfulness based solely on Judge Newman's dissent. Judge Newman argued for that result, *Bard I*, 682 F.3d at 1009 ("remand is unnecessary"), but the majority disagreed. *Id.* at 1008. In similar circumstances, the Ninth Circuit rejected analogous arguments, explaining that those arguments would give the dissenting judge a veto over the majority. *Merritt v. Mackey*, 932 F.2d 1317, 1322 (9th Cir. 1991) ("We cannot accord a

dissent that much probative power. [To do so] would be to hold the majority hostage to the dissent…. One judge would have a veto that would prevent any majority of two from denying a claim of qualified immunity.")

Gore's cases do not hold otherwise. To the contrary, in *Paper Converting Machine Co. v. Magna-Graphics Corp.*, this Court *reaffirmed* the judgment of willfulness and treble damages *despite* the existence of a dissent in the previous appeal. 785 F.2d 1013, 1016 (Fed. Cir. 1986). *State Contracting* and *Asyst* are also inapposite. In *Asyst Technologies v. Empak, Inc.*, the Federal Circuit *majority* stated in a previous appeal that infringement was "close." No. C98-20451, 2006 WL 3302476, at *3 (N.D.Cal. 2006). In *State Contracting & Engineering v. Condotte America, Inc.*, the Court found that a contract could be read to support a licensing defense. 346 F.3d 1057, 1064 (Fed. Cir. 2003). No similar findings exist here. The majority in *Bard I* rejected any contention that joint inventorship was "close," and explained that the dissent misapprehended the patented invention, overlooked the interference and the *Cooper v. Goldfarb* decisions, and characterized the record in a way the jury rejected. 670 F.3d at 1175 n.1, 1182-83 & n.7.

## B. Gore's Conditional Request for a New Trial is Legally Foreclosed and Without Merit

Gore's request for a new trial depends on the Court accepting its willfulness arguments. Those arguments are meritless, and the Court therefore need not reach this issue. Regardless, Gore's new trial arguments are not properly part of this appeal and are frivolous on their face.

*First*, Gore's new trial argument is procedurally defective. Gore's brief does not cite any law or facts in support of its new trial argument, but instead attempts to incorporate its district court briefing by reference. Gore Br. 59. That is a clear violation of this Court's rules, as improperly circumventing word limitations and multiplying the briefing. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1335 (Fed. Cir. 2006) ("[A]rgument by incorporation … is a violation of Fed.R.App.P. 28(a)(6)."); *Rothe Dev. Corp. v. Dep't of Defense*, 413 F.3d 1327, 1339 (Fed. Cir. 2005); *Graphic Controls Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1385 (Fed. Cir. 1998). Accordingly, the new trial argument is forfeited. *Monsanto*, 459 F.3d at 1335. Gore similarly purports to challenge the District Court's order permitting execution, Gore Br. 45, but says nothing about that order other than to call it "premature."

70

*Second*, for reasons discussed above, the mandate rule and the plain terms of this Court's remand foreclose Gore's new trial argument. The remand was clear about which parts of the judgment were open for reconsideration if the District Court granted JMOL on willfulness, and which were not. Only willfulness, and the enhanced damages and attorneys' fees that depended on it, were part of the remand:

> The court remands the issue of willfulness so that the trial court may reconsider its denial of JMOL of no willful infringement in view of this holding. If the court grants the JMOL, it should then reconsider its decisions on enhanced damages and attorneys' fees.

*Bard II*, 682 F.3d at 1005. All other issues—including validity issues addressed in *Bard I*—were foreclosed by the mandate. *See id.* at 1005 & n.1; *Cardiac Pacemakers*, 576 F.3d at 1356.

If the plain terms of the remand were not clear enough, the mandate rule forecloses any reconsideration of liability. *See Engel*, 166 F.3d at 1383; *Tronzo*, 236 F.3d at 1347-50. Gore asks for a new trial based on the supposed prejudice of trying willfulness with the rest of the case. Gore could have raised that argument in the previous appeal, but did not, and, thus, cannot raise it now. *Munoz*, 667 F.2d at 817

("We need not and do not consider a new contention that could have been but was not raised on the prior appeal."); *Engel*, 166 F.3d at 1383.

*Finally*, Gore's new trial argument has no substantive merit. Infringement, validity and willfulness were tried together. Gore did not request bifurcation or contend during trial or the previous appeal that the evidence Gore now cites was inadmissibly prejudicial or that the jury was improperly instructed. Validity and infringement were resolved in the previous appeal, and Gore's attempt to leverage a narrow remand into a do-over of ten years of litigation is unsupportable and of a piece with its myriad other vexatious tactics to delay or undo the judgment in this case. It is time to bring this to an end.

# CONCLUSION

The District Court should be affirmed.

January 24, 2014                         Respectfully submitted,

                                         /s/ John C. O'Quinn

Steven C. Cherny                         Michael W. McConnell
KIRKLAND & ELLIS LLP                     John C. O'Quinn
601 Lexington Ave.                       William H. Burgess
New York, N.Y.  10022                    Dennis J. Abdelnour
(212) 446-4800                           Liam P. Hardy
                                         KIRKLAND & ELLIS LLP
John L. Strand                           655 Fifteenth St., NW
WOLF, GREENFIELD & SACKS, P.C.           Washington, D.C.  20005
600 Atlantic Ave.                        (202) 879-5000
Boston, MA  02210
(617) 646-8000

*Counsel for Appellees Bard Peripheral Vascular, Inc.,*
*David Goldfarb, M.D., and C.R. Bard, Inc.*

## CERTIFICATE OF SERVICE

On January 24, 2014, I caused the foregoing brief to be filed with the Court through the CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

/s/ John C. O'Quinn

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7). According to the word processing system used to prepare it, the brief contains 13,986 words.

/s/ John C. O'Quinn